UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Dr. Tara Gustilo, M.D., <br><br> Plaintiff, <br><br> v. <br><br> Hennepin Healthcare System, Inc. <br><br> Defendant. | **JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff Dr. Tara Gustilo, as and for her Complaint against Hennepin Health System, Inc. states and alleges as follows:

### PARTIES

1. Plaintiff Dr. Tara Gustilo is a natural person who resides at 1919 Timberline Spur, Minnetonka, MN 55305.

2. Defendant Hennepin Healthcare System, Inc. is a subsidiary of Hennepin County and has a principal place of business at 730 South 8th Street, Minneapolis, MN 55415.

### JURISDICTION AND VENUE

3. This Court has jurisdiction over Plaintiff's 42 U.S.C. § 1983 and Title VI and VII of the Civil Rights Act of 1964 claims pursuant to 28 U.S.C. § 1331 because they arise under the Constitution and laws of the United States.

1

4. This Court has supplemental jurisdiction over Plaintiff's Minnesota Human Rights Act claims pursuant to 28 U.S.C. § 1367.

5. Venue is proper in this District under 28 U.S.C. § 1391 because Defendant resides in this District and a substantial part of the events giving rise to Plaintiff' claims occurred in this District.

## FACTUAL ALLEGATIONS

6. Dr. Tara Gustilo ("Dr. Gustilo" or "Plaintiff") is of Filipino descent, with three Black children of Filipino descent.

7. Dr. Gustilo is currently employed as a physician at Hennepin Healthcare System, Inc. where she works in the obstetrics and gynecology department ("OBGYN Department" or the "Department").

8. Dr. Gustilo attended Harvard-Radcliffe College where she received a Bachelor's degree in Arts. She then received her medical doctorate degree at Mayo Medical School and completed her residency at Duke University Medical Center.

9. Thereafter her residency, Dr. Gustilo served the population on the Navajo reservation in Chinle, Arizona and then worked at the Cleveland Clinic in Ohio. By the time she moved to Minneapolis, she had a broad range of experience in the medical field, serving a diverse range of patients.

10. Hennepin Healthcare System, Inc. ("HHS" or "Defendant") is a governmental public system of clinics ranging in a variety of medical care. HHS is a subsidiary of Hennepin County. Its governing board is made up of Hennepin County Commissioners.

As demonstrated in its Health Executive Summary, a portion of revenue for HHS comes from federal funds, beyond what is allocated for Medicare and Medicaid.

11. Dr. Gustilo began working at HHS in January 2008 as a clinician in the OBGYN Department. She quickly became involved in the HHS community by obtaining several leadership roles such as serving on the Board of Directors, as well as serving as an Elected Member of the Hennepin Healthcare System Physician Leadership Development Committee, as a Member of the Hennepin Healthcare System Medical Executive Committee, and as a Member of the Hennepin Healthcare System Medical Staff Quality Committee.

### Dr. Gustilo's Leadership at HHS.

12. After just two years with HHS, Dr. Gustilo was named Clinic Medical Director of her practice group. Through this role, she made several improvements to the clinic, including changing templates so the clinic could service more patients, setting higher expectations for continuity of care, and working on several initiatives to connect HHS's diverse patient population to better medical care.

13. During this time, she also served as an elected member of the Hennepin County Medical Center ("HCMC") Physician Leadership Development Committee as well as a member of the HCMC Medical Executive Committee. In addition, Dr. Gustilo served as a member on the Hennepin Healthcare System Board of Directors for six years.

14. Dr. Gustilo was appointed Interim Chair of the Department of Obstetrics and Gynecology Department ("OBGYN Department") at HHS in May of 2015.

15.     In this role as Interim chair, she maintained her gynecology practice but, with HHS's approval, no longer saw obstetrics patients in order to focus on improving several different facets within clinical care. After four years serving as Interim Chair (2015-2019), HHS officially appointed her permanent Chair of the OBGYN Department.

16.     Under her leadership as Chair, Dr. Gustilo had one of the highest patient satisfaction rates throughout the hospital, and one of the lowest decreases in visits during the Covid-19 pandemic of all departments within HHS.

**Dr. Gustilo's Personal Opinions Regarding Critical Race Theory and Advocacy for Equality and Title VII Compliance.**

17.     After the murder of George Floyd, Dr. Gustilo began researching statistics relating to allegations of police brutality and the black population. As a person of color, and a mother to children of color, she sought to better understand the dynamics of race in America.

18.     Through this research, Dr. Gustilo learned that Critical Race Theory ("CRT") is a race essentialist ideology that presupposes zero sum racial conflict and seeks to remedy that by discriminating against individuals, so as to make group outcomes more equal.

19.     Based on her research, Dr. Gustilo discovered the following:

   a. CRT rejects core concepts of Western Liberalism, including meritocracy and colorblindness and instead proposes that invisible systems of power – "systemic racism" – bear the primary responsibility for racial inequality. Peggy McIntosh, *White People Facing Race: Uncovering Myths that Keep Racism in Place* (2009).

4

b. CRT deems any person in a minoritized racial group as a victim of a rigged system and that those born into "privileged races" are automatically and inherently exploiters of minorities. Robin DiAngelo, *White Fragility* (2018).

c. Critical Race theorists explicitly reject the principle of equality under the law, arguing that legal equality, nondiscrimination, and "colorblindness" are mere camouflages used to uphold white supremacist structures. Delgado & Stefanic, *Critical Race Theory: An Introduction* (1995).

d. Importantly, encompassed in this notion, is the idea that the First Amendment serves to advance the interests of white supremacy, thus the government should restrict freedom of speech that is deemed "racist" or "hateful." Ibram X. Kendi, *Inequality: Pass an Anti-Racist Constitutional Amendment*, Politico (accessed January 6, 2022) https://www.politico.com/interactives/2019/how-to-fix-politics-in-america/inequality/pass-an-anti-racist-constitutional-amendment/.

e. Finally, CRT also warns people of color against "internalized whiteness," the theory that people of a nondominant group believe the "myths" and "misinformation" about people of color because "whiteness" is deemed superior. National Museum of African American History & Culture, *Talking about Race: Whiteness* (accessed June 18, 2021) https://nmaahc.si.edu/learn/talking-about-race/topics/whiteness.

20. Through the summer of 2020, Dr. Gustilo began posting her research and findings to her personal Facebook page. These posts also included her personal opinions on the Black Lives Matter movement and CRT.

21. Dr. Gustilo rejected CRT publicly on her Facebook page because she believed that CRT is not a continuation of the civil rights movement but rather a repudiation of it.

22. Dr. Gustilo wrote a letter to HHS's CEO and the HHS Board of Directors in July of 2020 warning that, given the data available, the defunding of the police and the continued riots would cause loss of life and property. She also provided data procured from the Federal Bureau of Investigations contradicting the narrative that police officers were warrantlessly shooting black people. She urged HHS to hold open discussions regarding the data and acknowledge the disproportionate harm on vulnerable populations that could be anticipated by these actions.

23. HHS largely ignored Dr. Gustilo's letter and instead continued to foster an environment of discrimination and retaliation by supporting and perpetuating such a narrative and by imposing its own views on race, consistent with those espoused in CRT.

**Hennepin Healthcare System Fosters a Discriminatory Environment.**

24. First, and most notably, Dr. Gustilo vocalized her disagreement with the discriminatory and retaliatory environment HHS was fostering when a program she created began to morph into racially segregated care. Initially, Dr. Gustilo sought to create a program within HHS's OBGYN Department to better understand the varying traditions and cultures of the diverse population HHS serves in order to personalize and improve each patient's experience during birth. She referred to this as "culturally congruent care," which

emphasized and celebrated the varying cultural traditions during the birthing process, rather than letting such traditions divide or hinder how patients were cared for. However, she noticed that members of the Department instead began to transform the program from one that simply sought to respect and appreciate the various cultures to one of segregated care based on race.

25. Dr. Gustilo expressed her concerns and voiced her disagreement with this transformation, on behalf of her diverse patients and providers and in compliance with Title VII. Her concerns were dismissed.

26. After the murder of George Floyd, members of the OBGYN Department sought to send a public letter stating their support for the community. However, in the letter, members of the Department wished to state they supported members of their community in their "unrest."

27. Dr. Gustilo felt uncomfortable with how this term was used in the letter, believing it encouraged violence and rioting. As a healer, she felt compelled to stand up against what she believed could incite violence among diverse populations.

28. She encouraged members of the Department to sign the letter individually if they so wished but would not sign it from the Department as a whole, since not all members agreed on the language.

29. Ultimately, the term was taken out and Dr. Gustilo signed the letter on behalf of the Department.

30.     In another instance, Dr. Gustilo vocalized her disagreement with the Department's public support of a Black Lives Matter event because this support ran contrary to HHS's policy against affiliating with political groups.

31.     Moreover, Dr. Gustilo believed that the Black Lives Matter movement promotes and is guided by CRT and did not believe HHS should be advocating for the inequality and discriminatory environment created by CRT.

32.     After Dr. Gustilo began posting her personal beliefs relating to CRT on her personal Facebook page, Dr. Gustilo's superiors, including Chief Medical Officer Daniel Hoody ("CMO Hoody") and Vice President of Medical Affairs David Hilden ("VPMA Hilden"), approached her. CMO Hoody and VPMA David Hilden asked Dr. Gustilo to put a disclaimer that her views were her own and not those of HHS but confirmed that she was still allowed to express her thoughts on her personal Facebook page.

33.     Her personal Facebook posts included posts criticizing CRT and aspects of the Black Lives Matter movement as movements and teachings that contradicted the principle of equality under the U.S. Constitution and Title VII and the Minnesota Human Rights Act.

34.     Throughout each of the above occurrences, Dr. Gustilo advocated for equality under the U.S. Constitution, Title VII, and the Minnesota Human Rights Act.

35.     After this string of events, CMO Hoody and HHS Human Resources conducted their first meeting with Dr. Gustilo, in October 2020.

36.     In this meeting, Dr. Gustilo was told that members of the Department were afraid of her and believed her posts and stated beliefs were racist.

37. In this meeting (and beyond), Dr. Gustilo continuously asked for tangible instances of racist behavior, or perceived instances of retaliation against those whom she did not agree with. HHS superiors were unable to identify any examples.

38. CMO Hoody and HHS Human Resources alleged that staff grew "afraid" to talk to her and felt that her personal Facebook posts were "racist." Dr. Gustilo was also told that her personal Facebook posts affected her "ability to lead."

39. After this meeting, HHS retained a human resources firm to conduct an internal investigation into Dr. Gustilo.

40. The human resources firm interviewed and sought feedback from members of the OBGYN Department. On January 7, 2021, the firm shared its Investigation Summary.

41. The human resources firm's Investigation Summary stated that Dr. Gustilo was not involved enough in the Department, was late for or missed meetings, and cut people off in discussions. The human resources firm's Investigation Summary also indicated a distrust among members of the Department.

42. However, Dr. Gustilo was not previously penalized for such alleged behavior.

43. Moreover, both email receipts and client satisfaction feedback surveys strongly contrasted the human resource's firm's Investigation Summary.

44. Importantly, Dr. Gustilo's performance had never been questioned or brought to her attention before she began voicing her beliefs on her personal Facebook page and standing up for compliance under the United States Constitution, Title VII, and the Minnesota Human Rights Act.

45.   In fact, Defendant thought of Dr. Gustilo as such an exemplary doctor that she had been featured on an HHS billboard in downtown Minneapolis, near Hennepin County Medical Center.

46.   She was also frequently lauded amongst colleagues and her superiors for her passion and service to the diverse population HHS served.

47.   It was not until she, as a person of color who had previously been celebrated, spoke out against CRT that she was instead deemed unqualified, unable to lead her team, and even questioned as having a mental breakdown.

48.   Along with the immaterial and false allegations of issues with Dr. Gustilo's performance, Superiors of HHS also stated Dr. Gustilo did not have insight into her own "racism" and how her beliefs affected members of the Department.

49.   This lack of basis was also supported by a letter sent by members of her Department primarily voicing their concerns with her social media postings and the "lack of confidence in leadership." This letter claimed these issues caused distrust and division within the Department.

### HHS Retaliates against Dr. Gustilo.

50.   On January 8, 2021, Dr. Gustilo was asked to voluntarily step down.

51.   She refused, stating that HHS had failed to identify any tangible or material reason warranting stepping down or a potential demotion.

52.   On January 22, 2021, Dr. Gustilo was placed on paid administrative leave from her duties as Chair; she was only permitted to perform her responsibilities for direct patient care or work unrelated to Chair duties.

53. The vote for removal of Dr. Gustilo as chair went before the Medical Executive Committee, who voted in favor of recommending demotion. This recommendation was then brought to the Board of Directors.

54. On April 29, 2021, Dr. Gustilo was formally demoted by the Board of Directors in her role as Chief of the OBGYN Department.

55. Dr. Gustilo's successor as Chief of the OBGYN Department is white.

56. Dr. Gustilo once again asked for the basis of her demotion, given that she received above standard marks for quality performance, clear communication, listening, showing respect, and spending enough time with patients. She also was running one of the highest performing departments among HHS.

57. She was told that members of her Department questioned her ability to lead based on her statements made on her personal Facebook page, and specifically, her views on race which conform with Title VII and the Minnesota Human Rights Act.

58. During one specific HHS HR meeting on March 10, 2021, she was told that her beliefs, including her advocacy for equality under the law and compliance with the U.S. Constitution, Title VII, and the Minnesota Human Rights Act were the "trigger" for her demotion.

59. HHS Human Resources went on to explain that such beliefs and advocacy impacted the workplace.

60. On October 24, 2021, as a result of her demotion, Dr. Gustilo's annual salary decreased from $493,293.00 to $340,000.00.

61. It became clear to Dr. Gustilo that HHS was discriminating against her, as a person of color, for her refusal to subscribe to CRT and her supposed "internalized whiteness" for rejecting CRT.

62. HHS stated that Dr. Gustilo could not adequately lead her Department, and that this inability to lead was due to her refusal to subscribe to the beliefs encompassed in CRT.

63. Dr. Gustilo was also removed from her role as Chair by the Board of Directors, the same body that had endorsed her as qualified, committed, and passionate only months prior on July 10, 2020.

64. On June 26, 2021, Dr. Gustilo brought an Equal Employment Opportunity Commission ("EEOC") Charge against HHS, wherein she alleged that she had been discriminated and retaliated against on the basis of her race and for her advocacy for compliance with Title VII.

65. HHS's Position Statement, in response to Dr. Gustilo's EEOC Charge, failed to identify any legitimate basis for her demotion. A true and correct copy of HHS's Position Statement is attached hereto as **Exhibit A**.

66. In its Position Statement, HHS included a report from March 2017 where two female African American physicians spoke to HR about how they felt they were treated in the OBGYN Department. (Ex. A.) Yet, nowhere in the HR report presented by HHS do any of the concerns specifically point to or place blame on Dr. Gustilo. (*Id*.) The two African American physicians listed examples of micro-aggressions, namely an incident where a patient refused to see an African-American provider, as well as an inappropriate statement made by an Registered Nurse. (*Id*.)

67. The report itself concludes there was "nothing specific mentioned other than the specific examples listed." (Ex. A.)

68. Instead, Dr. Gustilo's assertion in her Charge remained true: her record had been pristine, and her ability to lead and run her Department had gone unquestioned, until she began to vocalize her opinions regarding race that are consistent with the views of Martin Luther King, Jr., the Civil Rights Movement of the 1960s, Title VII, and the Minnesota Human Rights Act. She only rejected the now fashionable but avowedly anti-liberal race essentialist views that have come to dominate the moral pronouncements of the managerial-professional class and the medical profession since 2020.

69. Moreover, HHS emphasized that Dr. Gustilo's views on race created "trauma" and "discomfort" among the OBGYN Department.

70. HHS itself admits that because members of the Department, and other leaders in the HHS community, resented her nonconformance to such views as a person of color, and they were unable to work with her or respect her leadership as Chair because of such nonconformance.

71. On December 29, 2021, after 180 days from when Dr. Gustilo filed her Charge with the EEOC, the EEOC gave Dr. Gustilo Notice of Right to Sue. A true and correct copy of the EEOC's Notice of Right to Sue is attached hereto as **Exhibit B**.

72. Despite HHS's claim that Dr. Gustilo's demotion was warranted because she was unable to lead her Department, the interim acting chair of the Department, Dr. Gustilo's successor, requested Dr. Gustilo present to the Department on ways to effectively manage the responsibilities of working in clinic.

13

73. The interim acting chair of the Department made this request based on Dr. Gustilo's continued high performance and patient satisfaction.

## CAUSES OF ACTION

### COUNT I – TITLE VII RACIAL DISCRIMINATION

74. Plaintiff restates and realleges the foregoing as if fully stated herein.

75. Plaintiff, as a female doctor of Filipino descent, is a member of a protected class.

76. Plaintiff was qualified for her role as Chair of the HHS OBGYN Department. This is demonstrated through the metrics demonstrating the OBGYN Department's high performance and satisfaction rates under her tenure, the numerous initiatives she spearheaded as Chair, and her personal patient satisfaction records.

77. Plaintiff was demoted from her role as Chair of the OBGYN Department, which resulted in a decrease in pay of over $150,000.00

78. Plaintiff's demotion occurred under circumstances giving rise to an inference of discrimination:

    a. Before Plaintiff began expressing her beliefs and advocating for compliance under Title VII and the U.S. Constitution, her leadership, qualifications, or ability to run the OBGYN Department had never been questioned.

    b. In the meetings leading up to her demotion, and when she was demoted, Defendant was unable to identify any material issues warranting a demotion.

    c. Moreover, Plaintiff was even told by human resources personnel that her beliefs served as the "trigger" for her demotion and affected her ability to lead her Department.

    d. Plaintiff was demoted when she refused to subscribe to the ideology expected of her as a person of color and was instead punished for her "internalized whiteness."

    e. Finally, months after her demotion, the interim Chair who replaced Plaintiff, requested her help in teaching members of the Department how to effectively manage the responsibilities of clinic. The interim Chair requested this of Plaintiff despite the fact that one of the stated bases for Plaintiff's demotion was her "inability to lead."

79. Because Plaintiff is a member of a protected class, who was qualified for her position, and suffered an adverse employment action that occurred under circumstances giving rise to an inference of discrimination, she has been discriminated against on the basis of race, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2

80. Plaintiff has suffered damages in the form of humiliation, embarrassment, degradation of character, demotion and suffered a pay decrease for such violation.

## COUNT II – RETALIATION UNDER TITLE VII

81. Plaintiff restates and realleges the foregoing as if fully stated herein.

82. On numerous occasions, Plaintiff voiced her dissent to the discriminatory actions of Defendant. These discriminatory actions included the advocacy for segregated care and the implementation of CRT, which fostered inequality and noncompliance with Title VII.

83. Plaintiff also voiced her dissent to the discrimination she experienced, as a woman of color, for her personal beliefs and advocacy of equality and compliance with Title VII.

84. Defendant retaliated against Plaintiff for opposing such discrimination by demoting her from her role as Chief of the OBGYN Department without due cause. This demotion included a decrease in pay of over $150,000.

85. Defendant failed to identify any material justification warranting such demotion. Before Plaintiff began expressing her beliefs and advocating for compliance under Title VII, her leadership, qualifications, or ability to run the OBGYN Department had never been questioned. In the meetings leading up to her demotion, and when she was demoted, Defendant was unable to identify any material issues warranting a demotion. Moreover, Plaintiff was even told by human resources personnel that her beliefs served as the "trigger" for her demotion and affected her ability to lead her Department.

86. Finally, months after her demotion, the interim Chair who replaced Plaintiff, requested her help in teaching members of the Department how to effectively manage the responsibilities of clinic. The interim Chair requested this of Plaintiff despite the fact that one of the stated bases for Plaintiff's demotion was her "inability to lead."

87. Because Plaintiff voiced her dissent against Defendant's discriminatory actions, and Defendant retaliated against Plaintiff for such dissent by demoting her and decreasing her pay, Defendant has retaliated against Plaintiff under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3.

88. Plaintiff has suffered damages in the form of humiliation, embarrassment, degradation of character, demotion, and a pay decrease for such violation.

## COUNT III – 42 U.S.C. § 1983 Deprivation of Rights
## (First Amendment Retaliation)

89.     Plaintiff restates and realleges the foregoing as if fully stated herein.

90.     Plaintiff engaged in a constitutionally protected activity when she expressed her opinions on her personal Facebook page.

91.     Defendant, as a subsidiary of Hennepin County, is a state actor.

92.     Defendant acted under color of the law when it demoted Plaintiff for her advocacy for equality and non-discrimination, and willfully deprived Plaintiff of her constitutional right to freedom of speech.

93.     Plaintiff's protected activity was a substantial and motivating factor in Defendant's actions as evidenced by Defendant's failure to identify any material or valid reason for Plaintiff's demotion. Moreover, Defendant never issued any sort of warning for any of the alleged behavior. Plaintiff was also told by human resources personnel that her beliefs served as the "trigger" for her demotion and affected her ability to lead her Department.

94.     Plaintiff's demotion was an official act of HHS because it was done upon recommendation from the HHS medical executive committee and was formally adopted and approved by the HHS Board of Directors. Because Plaintiff's demotion was an official action of the final policy making authority of HHS, this demotion was act of official HHS policy.

95.     This demotion made by the Board of Directors as an official act and policy of HHS, violated Plaintiff's constitutional rights because her protected speech was a basis for her demotion.

96. Because Plaintiff engaged in a constitutionally protected activity, and Defendant acted under color of the law in demoting Plaintiff for such protected activity, Defendant retaliated against Plaintiff, in violation of the First Amendment and 42 U.S.C. § 1983.

97. Plaintiff has suffered damages in the form of humiliation, embarrassment, degradation of character, demotion, and a pay decrease for such violation.

### COUNT V – RACIAL DISCRIMINATION UNDER THE MINNESOTA HUMAN RIGHTS ACT

98. Plaintiff restates and realleges the foregoing as if fully stated herein.

99. Plaintiff, as a Black female doctor of Filipino descent, is a member of a protected class under the Minnesota Human Rights Act.

100. Plaintiff was qualified for her role as Chair of the HHS OBGYN Department. This is demonstrated through the numerous initiatives she spearheaded and the metrics demonstrating the OBGYN Department's high performance and satisfaction rates.

101. Plaintiff was demoted from her role as Chief of the OBGYN Department, which included a decrease in pay.

102. Plaintiff's successor is white.

103. Plaintiff's demotion occurred under circumstances giving rise to an inference of discrimination as Defendant was unable to identify any material issues warranting a demotion, nor did she ever receive a warning for any of the alleged behavior. Plaintiff was also told by human resources personnel that her beliefs served as the "trigger" for her demotion and affected her ability to lead her Department.

104. Finally, months after her demotion, the interim Chair who replaced Plaintiff, requested her help in teaching members of the Department how to effectively manage the responsibilities of clinic. The interim Chair requested this of Plaintiff despite the fact that one of the stated bases for Plaintiff's demotion was her "inability to lead."

105. Moreover, Defendant discriminated against Plaintiff when she refused to subscribe to the ideology expected of her as a person of color, and was instead punished for her "internalized whiteness."

106. Because Plaintiff is a member of a protected class, who was qualified for her position, suffered an adverse employment action that occurred under circumstances giving rise to an inference of discrimination, Defendant discriminated against Plaintiff on the basis of race, in violation of the Minnesota Human Rights Act under Minn. Stat. § 363A.15(1).

107. Plaintiff has suffered damages in the form of humiliation, embarrassment, degradation of character, demotion, and a pay decrease for such violation.

## COUNT - VI
## REPRISAL UNDER THE MINNESOTA HUMAN RIGHTS ACT

108. Plaintiff restates and realleges the foregoing as if fully stated herein.

109. Plaintiff was discriminated against under the Minnesota Human Rights Act as a member of a protected class, who suffered an adverse employment action that occurred under circumstances giving rise to an inference of discrimination.

110. Defendant, as the perpetrator of discrimination, intentionally engaged in reprisal against Plaintiff by demoting her for opposing discrimination in violation of the Minnesota Human Rights Act, Minn. Stat. § 363A.15(1).

111. Plaintiff has suffered damages in the form of humiliation, embarrassment, degradation of character, demotion, and a pay decrease for such violation.

**WHEREFORE**, Plaintiff Dr. Tara Gustilo prays for Judgment as follows:

A. For an Award of damages in an amount in excess of $75,000.00, exclusive of interest and costs, the exact amount to be proven at trial;

B. For costs and disbursements and expenses;

C. For reasonable attorney's fees, pursuant to 42 U.S.C. § 1988, 42 U.S.C § 2000e–5(k), and Minn. Stat. § 363A.33, or other applicable law; and

D. For such other relief as the Court deems just and equitable.

ECKLAND & BLANDO LLP

Dated: February 6, 2022

/s/ DANIEL J. CRAGG
Daniel J. Cragg (#389888)
Anne St. Amant (#401923)
800 Lumber Exchange Building
10 South Fifth Street
Minneapolis, Minnesota 55402
dcragg@ecklandblando.com
astamant@ecklandblando.com
(612) 236-0160

UPPER MIDWEST LAW CENTER

Douglas P. Seaton (#127759)
James V. F. Dickey (#393613)
8421 Wayzata Boulevard, Suite 300
Golden Valley, Minnesota 55426
(612) 428-7000
Doug.Seaton@umlc.org
James.Dickey@umlc.org

*Counsel for Plaintiff*