| | |
|---|---|
| Dr. Tara Gustilo, M.D., | 22-CV-00352 (SRN-DJF) |
| Plaintiff, | |
| v. | **DEFENDANT'S SUMMARY JUDGMENT MEMORANDUM OF LAW** |
| Hennepin Healthcare System, Inc. | |
| Defendant. | |

## INTRODUCTION

The Court should dismiss with prejudice the Title VII of the Civil Rights Act of 1964 ("Title VII"), Minnesota Human Rights Act ("MHRA"), and 42 U.S.C. § 1983 First Amendment retaliation claims Plaintiff Dr. Tara Gustilo ("Gustilo") has asserted against Defendant Hennepin Healthcare System, Inc. ("HHS") because HHS did not discriminate or retaliate against Gustilo and because HHS did not infringe her right to free speech when she was demoted as chair of the Ob/Gyn department in April 2021. Instead, HHS demoted Gustilo because of her documented lack of leadership that brought the department to the brink of implosion, including the potential loss of up to one-third of the department's physicians. HHS spent months trying to right the ship with Gustilo as chair, but because of her inability or refusal to acknowledge the damage she caused to the department and move forward in a productive manner HHS was left with no choice but to remove her as chair. For the reasons set forth below, Gustilo has failed to establish the elements necessary to prevail on any of her claims and they should be dismissed accordingly.

## STATEMENT OF UNDISPUTED FACTS

### *HHS Committed to Health Equity*

HHS is an urban safety-net healthcare system that operates the Hennepin County Medical Center ("HCMC"), and its mission includes providing medical care "for the indigent." (Minn. Stat. §§ 383B.901-902, 928). HHS also operates clinics in historically underserved communities, including the East Lake Street neighborhood. (*See* www.hennepinhealthcare.org).

After the May 25, 2020, murder of George Floyd, the HHS Board of Directors approved an August 5, 2020, resolution declaring racism a "public health crisis." (Ex 1; *see also* Ex 2 at 52 ("[T]he general consensus is that racism in society leads to poor health outcomes for certain groups[.]")).[1] In its resolution, HHS stated it "strongly agrees that racism is an ongoing public health crisis that urgently demands more focused attention[.]" (Ex 1). HHS "believe[s] equity is essential for optimal health outcomes" and is "committed to partnering with [its] entire community, both internal and external, in achieving their fullest health potential by actively eliminating barriers due to racism[.]" (www.hennepinhealthcare.org). Health equity is a "strategic priority" for HHS, and it is committed to "advocating for relevant policies that improve health in…communities of color." (Ex 1; *see also* Ex 3 at 15 (HHS's "long-term corporate strategy" "is to achieve health equity or to achieve health outcomes that do not differ by different groups"). HHS

---

[1] All referenced exhibits are attached to the Declaration of Matthew S. Frantzen.

also has a "corporate interest in attracting and retaining a diverse staff[.]" (Ex 3 at 17).

### *Gustilo's Pre-2020 Tenure at HHS*

Gustilo is a gynecologist who was employed at HHS from January 2008 until voluntarily resigning in March 2022 and moving to Tennessee. (*See generally* Ex 4; Ex 5, ¶11; Exs 6-8). Gustilo served as chair of the HHS Ob/Gyn department from 2015 until being demoted from that position in 2021. (*See generally* Ex 4; Ex 8 at 22-24, 47-48, 216, 285). Chairs are appointed for an initial five-year term and "may be reappointed for one (1) additional five-year term." (Ex 8 at 31-33, 56-57; Ex 9 at HHS 74, 76).

As chair, Gustilo was the "clinical and academic leader of" the department and was "responsible for" the recruitment, retention, and development of medical staff. (Ex 9 at 76). She was also subject to "employment requirements" and "leadership expectations," including (1) "[e]mbrac[ing] [HHS's] mission;" (2) "[p]romot[ing] department member engagement;" (3) "[m]odel[ing] and promot[ing] behavior consistent with the organization's values;" (4) being "[s]killed in fostering a positive workplace culture and building inclusive workplace teams;" and (5) exercising "skill[] in creating an environment that is open to feedback." (*Id*. at 78). Prior to 2020, Gustilo generally received positive performance evaluations, but her leadership was neither "pristine" nor had it "gone unquestioned." (Ex 5, ¶68; Exs 10-11).

In 2017, three department physicians (two of whom are women of color) contacted HHS human resources ("HR") "regarding a 'pattern of microaggressions towards Black physicians' and 'subtle racism.'" (Ex 12 at 1). A March 7, 2017, memorandum addressed to Gustilo contained examples of the physicians' concerns, including an appointment that

was "cancelled and rescheduled with another provider" because a patient did not want an "African provider." (*Id*.) The physician told HR that "this behavior is discriminatory and did not feel supported in this matter." (*Id*.) Jennifer Hauff, an HR manager who investigated these concerns, said the physician "didn't feel like the response" provided by Gustilo "satisfied her concerns." (Ex 13 at 9-10, 15-16).

The physicians also advised HR that whenever Gustilo

br[ought] concerns to their attention...it [was] done in a way that no matter how the incident had played out...they are being asked to take the blame and ensure the relationship is repaired. Regardless of the intent in how concerns are brought to their attention, the impact is the physicians feel like they are not supported.

(Ex 12 at 2; *see also* Ex 13 at 20 ("when...Gustilo brought concerns to their attention, it was done in a manner where they were asked to kind of take the ownership of it...And...the physicians that we spoke to in this matter felt that was not a supportive way of talking to them about concerns").

Gustilo was given several "[r]ecommendations," including to "engage with" an HR professional "to explore feedback methods" because the way she was providing feedback "makes these physicians feel uncomfortable." (Ex 12 at 2). Gustilo was also advised to "[i]dentify a mentor for...the three physicians" and "[r]econnect and [r]establish relationships with" two of them because there would "need to be some damage repair done with those relationships." (Ex 12 at 2-3). Gustilo "can't remember" and "can't recall" whether she acted on these recommendations. (Ex 8 at 64-71).

In 2019, department members participated in a "provider engagement" survey in which they provided feedback to Gustilo. (Ex 14). In response to the question, "What one

thing about the way your department functions would you like to change?," staff said they wanted "[m]ore involvement from the c[hair]" and they "wish[ed] they had a business strategy that was put together by people who know about our work, rather than a 'director' who has only peripheral understanding of the scope of care we provide." (*Id*. at 6). Staff also wanted "communication!" and "better communication." (*Id*.)

### *Midwife Salary Cuts*

Because of COVID-related budget concerns in early 2020, Gustilo asked department physicians to vote on whether to personally "absorb the burden" of midwife salary cuts and donate portions of their own salaries to midwives. (Ex 9 at 4). The physicians initially voted against this and Gustilo was "a bit disappointed." (*Id*.). Gustilo browbeat the physicians, "encourage[d]" them to "reconsider this decision," and held a second vote. (*Id*.). Gustilo acknowledged she was "pushing." (*Id*. at 5). This time, Gustilo achieved the outcome she wanted and the physicians agreed to personally absorb the salary cuts. (Ex 3 at 88 (Gustilo "manipulated people in[to] voting not anonymously to give up their income")).

Dr. Laura Nezworski (a department physician) testified that "when the group didn't give [Gustilo] the answer that she wanted, she pushed back and asked them again." (Ex 15 at 21). Nezworski said "when it comes to a question of finances or money, it's important to get the opinion of the group and, then, also to follow what they request[.]" (*Id*.). This is especially so when Gustilo's own salary was "not at risk," only the staff physicians were asked to donate portions of their income to the midwives. (*Id*. at 22).

Department physicians told HHS leadership that forcing a second vote "put them in

an awkward position" because of their personal financial situations. (Ex 9 at 4). For the second vote, Gustilo asked the physicians "to send her a personal email…with their new vote. So she was intimidating people to give up their earned income based on her beliefs of…how we ought to manage our finances." (Ex 3 at 82). The forced re-vote was an example of Gustilo "ha[ving] difficulty hearing concerns and responding in a way that gives confidence they are being understood and valued." (Ex 9 at 4).

### George Floyd Letter

After Mr. Floyd's murder, Dr. Sally Zanotto (a department physician) proposed sending a letter to patients "that pledges our support for our patients" and "recognize[s] our privilege that we have to care for mothers of color." (Ex 16 at HHS 3213). Department physicians, including Gustilo, agreed that sending a letter was a good idea. (*See generally* Ex 16). Gustilo thought "writing a letter to send to our patients/community is a great idea. I thank you for thinking of it and taking leadership on it. I would, of course, be happy to help in crafting this letter." (*Id*. at HHS 3211). She also "apologize[d] for her lack of 'leadership[.]'" (*Id*.).

Gustilo circulated her proposed edits to the initial draft and thanked the department for "their leadership in writing this letter." (Ex 17 at HHS 3180). Gustilo "included the effects of the riots in this letter" because she felt "strongly that we need to recognize the effects of these riots and the adversity that they have and will cause." (*Id*.). Her proposed edits (in red) added a sentence: "We mourn the destruction, fear and anxiety riots have caused in our neighborhoods." (Ex 18). The basis for Gustilo's proposed edits was her concern that patients might believe the department "supported that destruction and unrest"

6

that occurred after Mr. Floyd's murder.  (Ex 8 at 86-88).

Zanotto disagreed with the edits and said she "really hesitate[d] to use the word riot" because "it takes away from the peaceful protesting that is largely occurring in our community."  (Ex 17 at HHS 3180).  Another department physician, Dr. Rebecca Petersen, also opposed the edits, stating she "respectfully disagree[d] with emphasizing the riots." (*Id*.)

In response, Gustilo said she wanted the letter to "make a distinction between the peaceful protests and the riots" and that "the fear and terror many in the communities being looted and burnt felt as the riots occurred" was "[e]qually important."  (*Id*. at HHS 3179). She said that "by NOT addressing the riots and their effects, we are not truly standing for social justice."  (*Id*. at HHS 3179-3180).

Dr. Elizabeth Alabi (a department physician who is African American) told Gustilo that she "support[ed] the original letter" because the letter "already alludes to riots and looting and in no way shape or form lends any support to it."  (*Id*. at HHS 3177; Ex 2 at 122).  Alabi said, "Tara you think your intentions are good, but you are actually shifting focus away from the original issues (inequality and injustice) by being so steadfast in your need to focus on this."  (Ex 17 at HHS 3177).  In response, Gustilo said, "I have thought about this quite a lot given that I am clearly at odds with you, my partners (who I respect and admire), on this…I am sorry I pushed so hard[.]"  (*Id*.).  But Gustilo refused to accept use of the word "unrest" and told the department the letter would have to be sent without her involvement if the word was not omitted: "If you as a group feel like the removal of this word diminishes the message in some way that you cannot abide, it can be sent but not

with my signature or inclusion.  (*Id*.; *see also* Ex 19 (stating she "cannot in good conscience sign this letter as is")).  The department agreed to Gustilo's request, and the letter was sent to patients.  (Ex 17 at HHS 3173-3177; Ex 9 at 12).

Gustilo told the department she was "deeply saddened that this letter, which should have brought us together, seems to have created acrimony and hard feelings.  I am even sadder that I have been the nidus of this conflict."  (Ex 17 at HHS 3173).  She tried to explain her perspective, but also "recognize[d]" she "was too forceful in [her] assertions." (*Id*.).  Gustilo said, "In the past, I have been told that I am 'too passionate' and can be a bit of a bull in a China shop; I clearly need to keep working on these aspects of my personality!"  (*Id*.).  Gustilo's behavior was "highly disruptive to her department."  (Ex 3 at 98).  It was not "the content of what she said.  It was the way she managed her speech in the workplace."  (*Id*. at 98-99).

### *"White Coats for Black Lives" Rally*

The department discussed attending a rally at the Capitol called "White Coats for Black Lives."  (Ex. 20; *see generally* Ex 21).  The rally was, in part, a protest of Mr. Floyd's murder.  (Ex 20; Ex 21 at HHS 3634).  Dr. Samantha Pace (a department physician of Asian descent) brought the idea of attending to the department, and it was noted the department could not display "HHS signs" or HHS-related apparel at the rally.  (Ex. 21; Ex 2 at 110).  Gustilo said the department could "certainly represent ourselves as clinicians" and that "HHS supports our right to use our voices as private citizens and clinicians."  (Ex 21 at HHS 3633; *see also* Ex 8 at 84-85, 103-106 (agreeing that HHS employees participating in demonstrations would do so in their personal capacities, that it

8

was her "understanding" that HHS employees would not be doing so as HHS representatives, and that it was the department's understanding and "expectation" that attending the rally was done in their personal capacities)).

Gustilo expressed no objection to the department attending the rally. She instead sent an email the day before to ensure that everyone knew it "was the brain child and creation of our very own Dr. Zanotto, Dr. Alabi, Dr. Pace, Dr. Feist and Dr. Petersen." (Ex 22). Gustilo continued: "What an incredible idea! I know this must have taken quite a bit of hard work and effort. Many, many thanks!" (*Id*.). Gustilo was "proud of" the department "for wanting…to show support for our community." (Ex 8 at 105, 107).

The rally "was not an HHS event" and HHS "was not a sponsor[.]" (Ex 3 at 80). It was, instead, "an external event" and included "hundreds of people wearing white lab coats from…pretty much every health system." (*Id*.). The rally "was not in any way an event that anyone construed to be from leadership an HHS event." (*Id*.). Gustilo, along with "hundreds" of others, attended the rally and she became upset when members of the White Coats for Black Lives organization discussed "defunding the police" because she "do[esn't] support defunding the police." (Ex 8 at 107-109).

Gustilo later sent an email to the department "to congratulate again the organizers of the protest last Saturday. Clearly, it was a success." (Ex 23). She also felt a

> need to express…that I was taken aback when one of the tenets stated of "White [C]oats for Black [L]ives" was the defunding of police. This is not something that I support and I felt incredibly uncomfortable when it was stated, to the point that I almost felt compelled to leave…I accept that I should have researched "[W]hite [C]oats for [B]lack [L]ives" stances more thoroughly.

(*Id*.) Gustilo said she was "happy to discuss why I feel the way I do regarding the police."

(*Id*.).  She also said, "We need to respect all who work here and to make sure that we are not silencing minority points of view, nor assume we all agree."  (*Id*.).  Even so, nobody told her they felt their point of view had been silenced.  (Ex 8 at 115-116).

Gustilo sent another email later that day, stating she took issue with the White Coats for Black Lives organization's alleged preference to "'reallocate funds from our police to our communities'" and "advocat[ing] for the abolition of police and prisons."  (Ex 24 at HHS 3485).  Because of these alleged positions, Gustilo said "there was an implication that [the department] supported [White Coats for Black Lives] and what they stood for or that it could easily be interpreted as such."  (*Id*. at HHS 3486).  She later admitted that discussing her personal views of police funding was not "important for the delivery of healthcare[.]"  (Ex 8 at 113).

In response to Gustilo's emails, Pace took "full responsibility for making it seem like the…department formally endorsed the…rally[.]"  (Ex 24 at HHS 3483).  Pace noted that neither HHS nor the department "endorsed" or sponsored the rally because

> [w]hen those of us who organized the rally first came up with the idea, we absolutely did not want the…department to "own" it…hence, our name / dept never showed up on any of the published or printed fliers and we never publicly spoke.
>
> But because we had worked so hard on everything and because HCMC predominantly serves a community of color and because the rally seemed to provide a much-needed voice & platform for the entire Twin Cities medical community, I personally and unilaterally asked the student organizers if they would be willing to publicly thank us for our efforts.  I NEVER intended for that to come across as a departmental endorsement[.]
>
> [I]t was my bad, I take full responsibility, and I consider it a unique and isolated event.

(*Id*. at HHS 3483-3484).

The thanks given to HHS at the rally "was an unofficial and unplanned comment by someone from an outside organization" and HHS was not "aware" that such a public thanks would be given because HHS was not "a sponsor of the event." (Ex 3 at 81). From the perspective of HHS, "Somebody simply spontaneously said: I'd like to thank the members of this organization" and it was "never an endorsement. It was a person from another organization that chose to say: Thank you for being here." (*Id.*). HHS had "no concern that" there may have been an "appearance of HHS endorsing the rally" because it simply did not "endors[e] or sponsor[] that rally." (*Id.*). Gustilo acknowledged that the White Coats for Black Lives organization thanked the department "for supporting them and the…rally," not for supporting the cause of "defunding the police." (Ex 8 at 112).

Gustilo said that as chair, "I rightly shoulder the majority of the blame for not being more diligent and raising this issue sooner[.]" (Ex 24 at HHS 3483). Gustilo said she could have "vetted the White Coats for Black Lives organization a little bit better and understood it better kind of at the upfront and been a little bit more introspective[.]" (Ex 8 at 144-145).

### *Gustilo Used Public Facebook Account for HHS Fundraising*

On March 20, 2020, Gustilo posted a fundraising link to her public Facebook account entitled, "OB/GYN Improvement Fund - Hennepin Healthcare Foundation." (Ex 25 at HHS 2200-2201; *see also* Ex 8 at 158-161 (acknowledging she made the posts included in Exhibit 25 to her public Facebook account, and that she understood that even if someone was not her "friend" on Facebook they could still see her posts because they were public)). In her post, Gustilo identified herself as "the Department Chair of Obstetrics and Gynecology at" HHS and said, "HHS is a non-profit medical system which acts as a

safety net charged with ensuring excellent care for all, regardless of financial status. We care for those most vulnerable in our community." (Ex 25 at HHS 2201). Her post sought "funds…for 1,350 pregnant women enrolled in our prenatal care system" that would be used to "purchas[e] blood pressure cuffs and thermometers[.]" (*Id*.). In two public posts made an hour later, Gustilo said this "was the fastest way to get this moving" and that "all funds will be used for the [COVID] response." (*Id*. at HHS 2200; *see also* Ex 8 at 162-163 ("I understood that this post was going to be public").

Gustilo's post caught the attention of Mpls. St. Paul Magazine and an April 2, 2020, article noted she was "the chairwoman of obstetrics and gynecology at Hennepin Healthcare" and that she had "decided to take matters into her own hands and initiated a fundraising request, spreading the message across…her very own Facebook page." (Ex 26 at 2-3). The article quoted directly from Gustilo's Facebook page and noted that "[f]undraising amounts were met within days." (*Id*. at 3-5).

### *Concerns with Gustilo's Public Facebook Account*

On October 1, 2020, Dr. Helen Kim (an HHS physician) emailed several of Gustilo's public Facebook and Twitter posts to Dr. David Hilden, then-Vice President of Medical Affairs, under the heading, "concer[n]ing social media posts including one identifying leader role and affiliation with HHS." (Ex 27; *see also* Ex 2 at 11).[2]

Although Gustilo testified she "rarely used" Facebook, at least eight separate posts were made by Gustilo between August 16, 2020, and September 19, 2020. (Ex 8 at 161,

---

[2] The Facebook and Twitter posts contained within Kim's email are found in Ex 25.

165-166 (confirming these posts were made to her public Facebook account); Ex 25). Her posts concerned several topics, including presidential candidates, fascism, racism, police killings, Black Lives Matter, and COVID. (Ex 25).

During discovery, Gustilo disclosed an additional 56 pages of posts she made to her public Facebook account between June 28, 2020, and August 31, 2020. (Ex 28). These posts include her opinions regarding race, Black Lives Matter, civil unrest, crime, socialism, "defunding" the police, and police shootings. (*Id*.). Kim also provided Hilden with posts Gustilo made on her public Twitter account, which has since been deleted. (Ex 25 at HHS 2188; Ex 8 at 164-167).

The "concern" was that

> Gustilo had a public Facebook account that could be accessed by patients or potentially financial donors, and she was using her Facebook account for department things, such as soliciting funds from donors for the department. And identifying herself as chair of the…department…made it feel like it wasn't just a personal account but that she was using it for work purposes as well.

(Ex 15 at 44). The concern about donors accessing Gustilo's public Facebook account was well-founded. Dr. Julia Di Caprio, the "head of UCare," reached out to Gustilo after seeing her fundraising post on Facebook and "offer[ed] the money that [she] needed for the blood pressure cuffs." (Ex 8 at 37, 203-204). Di Caprio, who Gustilo "perceive[s]…as black," was not one of Gustilo's "friends" on Facebook but she was able to see the post because it was public. (*Id*. at 204).

### *Gustilo Injected Politics into the Workplace*

Gustilo not only shared her personal political opinions on her public social media accounts. She also debated politics with her subordinates in the workplace.

13

Nezworski testified that once the pandemic began, Gustilo "was sharing conspiracy theories" in the "hallway at work" about "the pandemic and China's involvement in the pandemic and how they were buying all the PPE and had unleashed the virus on the rest of the world." (Ex 15 at 13-14). Gustilo's "Facebook posts that she made about the virus and calling it the China virus caused multiple layers of people to lose trust in her" because use of the phrase "China virus" was "potentially offensive to people of Asian descent."[3] (*Id.* at 14-15; *see also* Ex 2 at 57-59 (stating that "to continue to insist to refer to [COVID] in geographic terms would be inconsistent with modern medical care" and that "World health leaders around the planet would not have referred to this as the China virus. That would not be considered acceptable practice today. And her continuing to state why that's not a problem to her staff…would raise an eyebrow"); Ex 29 at 30-31 (stating Gustilo's use of the phrase "China virus" was "culturally and racially insensitive" and that use of that phrase is "unbecoming of a leader of a department")). Nezworski recalled a conversation in which Gustilo "was trying to convince me that more white people are being mistreated by police than black people[.]" (Ex 15 at 15). For Nezworski, it was "a really uncomfortable conversation to have at work at that time, especially because…she wasn't really taking my

---

[3] Gustilo made a Facebook post regarding an apple orchard and its use of the phrase "China virus." (Ex 8 at 176-180). Gustilo did not disclose this post in discovery. (Ex 28). During a discussion, department physician Dr. Tracy Prosen advised Gustilo that the phrase "was racist" and that other department physicians took issue with Gustilo's use of that phrase. (Ex 8 at 177-178). Gustilo said her post asked people to "think[] about why people are using the term China virus" because "in this time I think it was a reasonable thing to think about, the possibility that there was perhaps a country who if they did not on purpose release a virus…we had pretty good evidence they had withheld information[.]" (*Id.* at 177, 179-180).

viewpoints into account, she was trying to convince me of hers." (*Id*.). Gustilo's insistence on debating political issues at work caused Nezworski to "t[ake] a break from having regular meetings with" Gustilo because Nezworski "felt concerned that they would evolve into ideological conversations and" she wanted to, instead, "focus on work at work." (*Id*. at 17). Nezworski said Gustilo "was creating a work environment that was uncomfortable if we didn't completely agree with each other." (*Id*. at 18).

Sylvia Lotz was Gustilo's administrative assistant, they had worked closely for years, and Gustilo considered her a friend. (Ex 8 at 102-103, 212). In an email to Gustilo, Lotz said their relationship was "strained" because their

> political differences and your passionate need to voice your opinions on a regular basis when we are together cause me a great deal of discomfort and uneasiness. I am not one to debate such issues, and even when I ask you to "stop," while you might for a minute or two, it always seems to come back around, so yes; for these reasons our relationship is strained.

(Ex 30; Ex 8 at 214 (acknowledging she "talked politics" with Lotz)).

### HHS Leadership Becomes Involved

In September 2020, five department physicians (more than one-third of department physicians), including one physician of color, brought their concerns to Hilden and HR. (Ex 2 at 29-33; Ex 9 at 13; Ex 31). The physicians expressed concerns with Gustilo's use of her public social media accounts, acknowledging that she "has the right to her own views and to state them." (Ex 9 at 13). But they believed Gustilo had "crossed a line in that she is public in advertising that she is chair of [the department] and her personal views may be seen as representing the dept and them." (*Id*.). There was a concern that Gustilo's public social media posts could cause people of color to "not feel comfortable getting care here."

(*Id.*).  The physicians said the "tone of" Gustilo's "leadership has changed," she was "not supportive of staff," was "less accessible, not her old self," and that she "'sits in the corner' of the clinic, not engaged."  (*Id.*).  The physicians said "staff of color" "do not feel comfortable with her leadership" and they were concerned that Gustilo's behavior would cause two or three physicians to leave the department if "her leadership concerns don't change."  (*Id.*; *see also id.* at 15-16 (Hilden's notes regarding similar concerns expressed during calls with three physicians); Ex 2 at 110 (stating he was told that "at least three of our physicians might leave and will refuse to work for her any longer.  And three represents a quarter of the department") and 122 (testifying that an African American physician in the department stated, "I need to protect myself from her.  I don't feel safe working here")).  The physicians were ultimately concerned the "department was imploding."  (Ex 2 at 30).

Hilden and Dr. Daniel Hoody, HHS's Chief Medical Officer, asked to meet with Gustilo to discuss "issues" that "have come to our attention about communications and the work atmosphere in the [d]epartment."  (Ex 32; Ex 33 at 15-16).  Hilden made clear that the purpose of the meeting was "not only to get a more complete picture but also to see how we can help…you and the department (if any help is needed at all)."  (Ex 32).

Gustilo, Hilden, and Hoody met on October 5, 2020.  (Ex 34 at HHS 4028-4029).  Hilden noted that "[s]everal members" of the department relayed their "concerns around issues of racial justice and the way that is manifested in the daily work of your department" and that "[s]everal members" of the department "have indicated that they don't feel comfortable providing this feedback directly to you given their perception that you have not been receptive to this feedback in the past."  (*Id.* at HHS 4028).

As for social media, Hilden advised Gustilo that her posts "are perceived, by some, as representing not just your personal views" but potentially those of the department "given your leadership role." (*Id.*). She was referred to the HHS social media policy, which "caution[s] leaders…to 'use exceptional judgment' when posting on social media sites." (*Id.*; *see also* Ex 35 ("Managers and Executives of HHS have a heightened responsibility when participating in social media environments" and "should use exceptional judgment on social media")). To "minimize risk" that her personal views could be construed as those of HHS, Hilden and Hoody "talked about" having her "clearly label your posts as not representing HHS and are exclusively your own." (Ex 34 at HHS 4028; *see also* Ex 35 (asking HHS employees to "consider assuring your readers that the views you express are yours alone and that you are not representing HHS")).[4]

During the meeting, Gustilo was "defiant" and, unprompted, "brought up a number of political issues," including "police funding mechanisms," which she "kept bringing…up;" critical race theory; the presidential election; and "[t]hings like that." (Ex 2 at 34-35). Neither Hilden nor Hoody even "kn[e]w what [critical race theory] was" and they had to "Google[] it." (*Id.* at 70; Ex 33 at 51). They reassured Gustilo this was not about her political views and she was "entitled to your own opinions on all matters and have the right to express those opinions. Your personal opinions on issues of the day are not our concern." (Ex 34 at HHS 4028). Hilden said the "larger discussion" had nothing

---

[4] After the meeting, Gustilo added a statement to her Facebook profile: "My posts do not necessarily represent those with whom I am affiliated. Obvious, right?" (Ex 28 at GUSTILO 53; Ex 8 at 159)).

to do with social media or Gustilo's personal opinions, "but rather about the atmosphere in the [d]epartment" and the "potential for tensions…going forward." (*Id.*; Ex 33 at 49-50 (the discussion regarding social media was "very amiable," Gustilo "had a better understanding of social media policy," and they had "significant discussion around this has nothing to do with your personal opinions"). Hilden underscored that "[d]iversity of opinion is important and I hope we conveyed that to you" and said the aim of their discussion was to "support the members" of the department and "importantly, to support you as the Chair." (Ex 34 at HHS 4028). Hilden said, "The goal is a long, productive, and rewarding tenure of you as Chair." (*Id.*). Hilden hoped his email "summarizes our mutual understanding of Monday's meeting," and Gustilo replied, "Thanks for the summary." (*Id.* at HHS 4027-4028). Gustilo also said she "took down the [Facebook] post that identifies me with HHS." (*Id.* at 4027; Ex 36 at HHS 4019).

During this time, Gustilo had a discussion with Prosen which Prosen characterized as "very disheartening." (Ex 37; Ex 38). Even though Hilden and Hoody had advised Gustilo that her subordinates did not feel comfortable discussing their concerns directly with her, Gustilo approached Prosen to discuss issues in the department and, during this meeting, Prosen told Gustilo the department "had noticed a dramatic change in her in the past several months and" there was concern "she may be going through some difficulties in her personal life." (Ex 38 at HHS 1324). Gustilo admitted she had "changed in the past several months" after "watch[ing] the impeachment trial and felt that things she saw there did not add up so she took it upon herself to do her own research." (Ex 37 at HHS 4149). Prosen told Gustilo she "had no issue with her personal politics," but said "several people

18

had seen her Facebook posts" and that some of the posts "were felt to be offensive and hurtful." (*Id*.).

During this discussion, Gustilo "started into a 10 minute mantra" about China's alleged involvement with COVID. (*Id*. at 4150). Prosen referenced a post that Gustilo had made about the "China virus," which Gustilo claimed to have deleted. (*Id*.). Prosen told Gustilo

> that [Gustilo] had previously used Facebook as a platform to raise funds for our department so she directly linked herself to HCMC and to our department – so particularly as a leader, anything else that she posted could be seen as directly linking to us as an institution, a department, and as individuals in the organization. We were concerned that if people saw her posts and her relationship to HCMC and our department that they would be left with concern about how they might be treated by us.

(*Id*.). Gustilo expressed hurt feelings because "no one had come directly to her," but Prosen "pointed out that there is a power differential at play so that makes it more complicated." (*Id*.). Prosen told Gustilo there had been "several occasions" when department members had not felt they had "been heard" and that "conversations seemed to be progressively one-sided," and that "while it may have been easy to approach the Tara we knew a year ago," the department was "no longer…sure who we were dealing with so when you couple that with the power differential we weren't sure how to deal with this new Tara." (*Id*.).

Prosen's discussion with Gustilo was "unpleasant" and Gustilo was "clearly not happy." (*Id*.). Ultimately, Prosen concluded that Gustilo had "absolutely no insight [in]to these issues" and Prosen felt "even more strongly after this discussion…that [Gustilo] cannot lead our department." (*Id*.). Because of Gustilo's "lack of insight," Prosen did not "hold out much hope" for a meeting with a mediator. (*Id*. at HHS 4151; Ex 38 at HHS

1324 (she was "not sure how much good a meeting with a moderator is going to do. [Gustilo] does not seem to want to admit that we've been hurt")).

In two unsolicited emails sent to the department on November 2, 2020, Gustilo attached a letter acknowledging the concern that her social media posts may have "reflect[ed]" on the department, but she then proceeded to explain and defend her personal views, and stated, "Although I do believe that every private citizen has a right to express themselves freely, I have taken down my public posts." (Exs 39-40; Ex 3 at 84-85 (stating Gustilo interfered with the operation of the department when she "pulls people aside, her direct reports and others…to convince them of the rightness of her views, blames them when they don't agree and then persists repeatedly to try to persuade them of her personal views in the workplace on company time. She's not being paid to persuade her employees about her personal views" and that Gustilo's "intimidating style about her personal viewpoints" was "yet another example where the clinical operations, the very functioning of the department, suffered because of what she was saying and [how she was] conducting herself")).

### Environmental Study

After conferring with HR, Hilden and Hoody opted to retain an outside company to conduct an "environmental scan" of the department to "help navigate through what was clearly a complicated situation." (Ex 33 at 61-62). HHS hired Human Systems Dynamics Institute ("HSDI"), "a neutral party skilled at assessing environments in workplaces," to conduct a "survey of the environment in the department" and Gustilo was "in favor of moving forward" in this manner. (*Id*. at 67-68; Ex 2 at 72, 76; Ex 8 at 208-209; Ex 41; Ex

42 (stating Gustilo was "aware of the plan [to hire HSDI] and agreeable to moving forward"); Ex 43 (stating she was "looking forward to meeting [HSDI] and to what we discover as we go through this process"); Ex 44 (observing that Gustilo "seems really engaged" with the HSDI process); Ex 45 (stating, "Gustilo is in full support of this work")).

Over the next few weeks, HSDI conducted interviews with Gustilo and thirteen other department members. (*See* Exs 46-59).[5] After completing interviews, HSDI advised Hilden that "[s]everal" members of the department

> expressed a personal concern and affection for [Gustilo], but all described concerns for her leadership. The same issues of racism, absence, distance, lack of understanding day-to-day business, insensitivity, communication style, and misalignment with the mission and values…Many expressed doubt about a productive future for the department with current leadership.

(Ex 60).

In the meantime, Dr. William Madland (a department physician) advised Hilden that he had a "lack of confidence in" Gustilo completing annual performance reviews. (Ex 61 at HHS 3934). Dr. Eric Heegaard (a department physician) "fear[ed]…the department risks 'imploding' under current department leadership" and that "one or more physicians will leave[.]" (Ex 62 at HHS 3946). Dr. Heegaard also told Hilden he was concerned about an "'implosion'" of the department, which would be "potentially catastrophic and from which it could be hard to recover." (Ex 61 at HHS 3934). Because of these concerns, Hoody told Gustilo they were "going to postpone indefinitely the performance evaluations of your direct reports." (Ex 63 at HHS 3911).

---

[5] HHS did not have access to the interview recordings or transcripts prepared by HSDI until after this lawsuit commenced. (Ex 3 at 96-97).

HSDI's January 5, 2021, report was damning.  (Ex 64).  HSDI found Gustilo "[d]oes not represent values of the organization" and does not "share…the mission of" HHS.  (*Id*. at HHS 42).  HSDI also found that Gustilo: "Doesn't know what [the department] [is] doing;" is "[c]hronically tardy" and "schedules meetings and does not attend;" "Shares her perspective and pressures others to join her side;" "Does not engage with others in a collaborative" manner; "Demands her own and shuts down others' perspectives;" "Disparages other practices, positions, and/or expertise;" "Lashes out, rather than looking for solutions;" "Crosses personal/professional lines in social media;" is "[n]ot aware of impact of her speech on others;" is "[n]ot willing to apologize, but quite willing to explain;" "Shuts down BIPOC voices;" used the phrase "welfare queens;" "Lack[s]…a long-term strategy or direction for the department;" "[S]ow[s] division;" and is "[n]ot sensitive to the power differential between herself and providers."  (*Id*. at HHS 42-44).

HSDI found that department members believed Gustilo's "political views are her political views, and they should make no difference in her leadership."  (*Id*. at HHS 44).  Significantly, HSDI found that department members saw "no sustainable way forward for the department under her leadership."  (*Id*.; Ex 3 at 82-83 (Gustilo's "speech was interfering with the operations of the department in that we had…a quarter to a third of…physicians in the department considering leaving the organization," which "would have disrupted our operations to the point where we could no longer adequately provide child birth care to our communities") and 90-91 (it "was becoming quite apparent that our ability to practice medicine in this area…was at risk" because Gustilo lacked the support of "anybody in her department," that department physicians were telling leadership they

were "looking to leave" HHS, that "her behaviors of intimidation and bullying and failing to listen to the view[points] of her people, in fact blaming them leads to disruption of team work," and that her "lack of insight in[to] her role of that was going to lead potentially to the loss of access to care for our patients and that is highly disruptive")).

### 360 Review

Because Gustilo was halfway through her five-year term as chair, a midterm 360 review was initiated in December 2020. (Ex 65; Ex 2 at 154-155). As part of the review, which was a "regularly-scheduled evaluation mechanism," people who worked with Gustilo were given the opportunity to provide anonymous feedback regarding her performance. (Ex 2 at 154; Ex 3 at 59, 63-64). Gustilo's review was "one of the worst ones on record," her scores were "considerably lower than any other chair," and "[w]hereas" the reviews of other chairs "are largely complimentary, hers were devastatingly bad." (Ex 2 at 156-158; Ex 3 at 62 (agreeing Gustilo's scores were "not a score you want your department chairs to be in or to be at")). Given these results, "it was unlikely that she would be renewed" for a second term as chair. (Ex 2 at 158).

### Department Meeting

On January 15, 2021, Hilden, Hoody, and HR held a department meeting to discuss HSDI's report. (*Id*. at 107-108; Ex 33 at 102; Ex 66).

"Several members…expressed quite emotionally their discomfort with [Gustilo's] leadership" and one physician "broke down in sobs about how emotionally uncomfortable she was with…Gustilo." (Ex 2 at 109-110). A physician "who had not been previously as vocal…spoke up in forceful terms that the department was likely not going to survive with

[Gustilo's] leadership" and he "felt a number of junior physicians would leave" the department.  (Ex 2 at 110; Ex 66 at HHS 1677-1679 (expressing concerns that the department would "lose a team of all-stars because of the issues with [Gustilo's] leadership," that things were not "reparable with the leadership we have" and "beyond repair," that there was a "vote of no confidence that this can be repaired," that a "lack of leadership is the biggest issue," and that it "seems like a really big ask to ask that people keep working in this environment")).

### *Gustilo Demoted*

After receiving HSDI's report, Gustilo attended six meetings between January 8, 2021, and March 10, 2021, with Hoody and Hauff.  (*See* Exs 67-72).[6]

During these meetings, Gustilo said she wanted to "face" her "accusers" but was instructed not to "reach[] out to any of your team about anything you've heard in this…until further notice" because "that'll be viewed as retaliation."  (Ex 67 at 7).  Hoody advised Gustilo that he did not "see a path forward for [her] in the leadership role at the department level right now" and asked her to "think about voluntarily stepping down from" chair.  (*Id*. at 8).  Gustilo gave Hoody a letter in which she refused to step down, said this was an effort to "'cancel'" her, and claimed it was because of her "political beliefs" and "opposition to the Marxist and racist Critical Race Theory ideology, in violation of my First Amendment Constitutional Rights."  (Ex 73).  Gustilo made no claim that her race played a role.  (*Id*.).

---

[6] Gustilo surreptitiously recorded all six of these meetings.  Exhibits 67-72 are transcripts of the recordings she provided in discovery.  (Ex 8 at 219-222, 225-226, 236-240, 242-243).

Hoody asked Gustilo to voluntarily take paid administrative leave from the chair position, but she refused and was involuntarily placed on leave. (Ex 69 at 5-6; Ex 74). While on paid leave, Gustilo continued providing patient care and, even though she was no longer performing chair duties, she continued to be paid as if she was still chair. (Ex 74). When told Nezworski would become acting chair, Gustilo said, "It's a good choice." (Ex 69 at 6; Ex 3 at 101-103 (stating Gustilo had no objections to the appointment of Nezworski); Ex 15 at 60-61 and Ex 33 at 120-121 (setting forth the bases for Nezworski's selection as acting chair)).

During the March 10, 2021, meeting, Hoody advised Gustilo that the "tone and tenor" of her statements during the previous five meetings was "concerning" because they did not "convey a willingness to openly discuss…the concerns that have been raised with an open mind." (Ex 72 at 3). Hauff told Gustilo that

> we've all agreed…everyone here is allowed to have their own personal beliefs… that's part of what makes Hennepin great…But…it's some of these other things that have taken place in the workplace that have been really concerning. And from our perspective, it feels like there's not been recognition from you about those things.

(*Id*. at 7). At this meeting, Nezworski provided a letter to Gustilo signed by thirteen of the department's fourteen physicians that listed several concerns they had with Gustilo's leadership. (*Id*. at 4-5; Ex 75).

Because Gustilo refused to voluntarily resign as chair, the HHS Medical Executive Committee ("MEC") convened on April 13, 2021, to determine whether she ought to be voted out as chair. (*See generally* Ex 9). Pursuant to the Medical Staff Bylaws, chairs can be removed by a two-thirds vote of MEC that must be subsequently approved by the HHS

Board (the "Governing Body"). (*Id*. at 74). Gustilo, a longtime member of MEC, was "well aware of…and…entirely in agreement with" the process and procedure that would take place at the MEC meeting and she never objected to the process. (Ex 3 at 69, 100-101; Ex 8 at 51-53, 255). Prior to the meeting, Hilden provided MEC members with two information packets, one that he prepared and one Gustilo had prepared. (Exs 9, 76-77; Ex 3 at 69; Ex 8 at 256). During the meeting, Hilden and Gustilo made presentations to MEC and, after a discussion period, MEC voted 25-1 (with one abstention) to recommend Gustilo's removal as chair. (Ex 3 at 70-71; Ex 8 at 257-262; Exs 9, 76, 78-79). Gustilo cast the only vote against removal. (Ex 8 at 262). Gustilo believes MEC was being "practical" when it voted to remove her because it "felt that things had gotten to the point and escalated to the point that it would be very difficult for me to be chair again[.]" (*Id*. at 262-263).

Hilden provided an April 21, 2021, memorandum to the Board setting forth the bases of MEC's recommendation to remove Gustilo (she (1) "lost the support of her colleagues;" (2) "raised issues at work" unrelated to the job duties that "negatively impacted the staff and created a poor work environment;" (3) failed to "accept[] responsibility" and instead "blamed staff without apology;" (4) "failed to change and adapt…in ways needed to support the team;" and (5) "was not meeting critical elements of the Chair's job responsibilities") and, on April 28, 2021, the Board unanimously approved Gustilo's removal. (Ex 3 at 75-77; Ex 80 at HHS 28-29; Ex 81). After the demotion, Gustilo remained employed as an HHS physician until voluntarily resigning on March 3, 2022. (Ex 6). Gustilo filed a discrimination charge with the EEOC but, after receiving a

right to sue notice, initiated this lawsuit.  (Ex 5, ¶71; Ex 82).

### Gustilo's Claims

As a Black woman of Filipino descent, Gustilo alleges she was demoted because of her race in violation of Title VII and the MHRA.  (Ex 5, ¶¶6, 75-79, 99-107).  In support of these claims, Gustilo alleges she was demoted because she "refused to subscribe to the ideology expected of her as a person of color and was instead punished for her 'internalized whiteness.'"  (*Id.*, ¶¶75, 78-79, 99, 105-106).  However, HHS has made clear that race played no part in the demotion.  (Ex 2 at 158-159; Ex 3 at 99; Ex 33 at 122).  Indeed, Gustilo admitted that no one told her the demotion was in any way based on race.  (Ex 8 at 277).

Gustilo alleges her demotion was retaliation/reprisal for "voic[ing] her dissent to" HHS's supposed "advocacy for segregated care and the implementation of [critical race theory]" in violation of Title VII and that HHS demoted her "for opposing discrimination" in violation of the MHRA.  (Ex 5, ¶¶82-88, 108-111).  These claims arise from a voluntary "culturally congruent care" program she supported and developed that sought to pair expectant African American mothers with African American medical providers if the patient so desired.  (Ex 3 at 26-29, 35; Ex 5, ¶24; Ex 8 at 35-44).  However, Gustilo never vocalized her alleged dissent to, or disagreement with, the program in writing and, instead, told an HHS midwife (whose name she cannot remember and who was not in a position of leadership at HHS) about her alleged concerns "in meetings."  (Ex 8 at 272-273, 289-294; Ex 83 at Supplemental Response 18 (providing no substantive details regarding her alleged dissent to this program)).  The "culturally congruent care" program never launched because

of COVID and HHS was never made aware of any alleged dissent, complaint, or concern Gustilo supposedly had about the program. (Ex 3 at 99-100; Ex 4 at GUSTILO 72 (touting her work "to develop" a program that "paired" "black women…with" providers "of color" and "to develop culturally congruent group prenatal care pilots for Black American and Indigenous women" that were "placed on hold" because of COVID); Ex 8 at 271-272). Further, nobody told her that her refusal to subscribe to critical race theory was a basis for her demotion, she admitted that HHS did not adopt critical race theory "as its standard of care for treating patients," and she admitted there was "never a formal adoption" of critical race theory as a means for patient care at HHS. (Ex 8 at 270-271, 274-275; Ex 2 at 70 (stating that "not one of us brings up critical race theory as a basis of our policy. I didn't even know what it was. None of us did. That's all coming from [Gustilo]")).

Gustilo alleges her demotion was an "official act and policy of HHS" and that HHS retaliated against her in violation of Section 1983 and the First Amendment for "engag[ing] in a constitutionally protected activity when she expressed her opinions on her personal Facebook page."[7] (Ex 5, ¶¶90, 95). But neither Gustilo's Facebook posts nor her personal political opinions were a basis for the demotion. Indeed, MEC members based their votes on Gustilo's leadership failures, not her Facebook posts or politics. (Ex 29 at 24-25, 30, 32-33, 37-38; Ex 84 at 15-19; Ex 85 at 13-15, 20-21, 25, 28-29; Ex 86 at 29-30, 33, 36-40;

---

[7] The sole "constitutionally protected activity" that Gustilo bases her Section 1983 claim on are the opinions she expressed "on her personal Facebook page," which contained her supposed "advocacy for equality and non-discrimination[.]" (Ex 5, ¶¶90, 92).

Ex 87 at 21-23, 27; Ex 88 at 17-24, 28-30; Ex 89 at 14-17, 19, 21; Ex 90 at 15-21, 24-27; Ex 91 at 26-30, 43-44; Ex 92 at 14-16, 18-21, 26-27).

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the pleadings, the discovery…and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). "While employment discrimination cases are often fact intensive and dependent on nuance in the workplace, they are not immune from summary judgment and there is no separate summary judgment standard for employment discrimination cases." *Fercello v. Ramsey Cty.*, 612 F.3d 1069, 1077 (8th Cir. 2010).

## LEGAL ARGUMENT

**I.    The Court should Dismiss the Title VII and MHRA Racial Discrimination Claims with Prejudice Because Gustilo Cannot Establish Direct or Circumstantial Evidence of Discrimination.**

Title VII and the MHRA make it unlawful for an employer to discriminate against an employee because of race. 42 U.S.C. § 2000e-2(a)(1)-(2) (2022); Minn. Stat. § 363A.08, subd. 2 (2022). However, Title VII "does not demand that an employer give preferential treatment to minorities" and the law was "not intended to 'diminish traditional management prerogatives.'" *Torgerson v. City of Rochester*, 643 F.3d 1031, 1045 (8th Cir. 2011). "The same [legal] analysis" is applied to Title VII and MHRA discrimination claims. *Id.* at 1043.

Gustilo's discrimination claims can survive summary judgment "in one of two ways:" (1) proving by "direct evidence" that the demotion was discriminatory, or (2) "by

29

creating the requisite inference of unlawful discrimination through the *McDonnell Douglas* analysis, including sufficient evidence of pretext." *Griffith v. Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004).

### A. Gustilo Cannot Establish Direct Evidence of Discrimination

Evidence of discrimination is "direct" if it "establishes 'a specific link between the [alleged] discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated' the employer's decision." *Putman v. Unity Health Sys.*, 348 F.3d 732, 735 (8th Cir. 2003); *see also McCullough v. Univ. of Arkansas for Med. Sciences*, 559 F.3d 855, 861 (8th Cir. 2009) (observing that direct evidence "provides a strong causal link between the alleged discriminatory bias and the adverse employment decision").

Gustilo has not provided any evidence (much less direct evidence) that her race had any bearing whatsoever on her demotion. HHS disclosed several thousand documents in discovery and Gustilo had the opportunity to depose every single person involved in the demotion, but absolutely nothing (not a single document, not a single piece of testimony) indicates that her race played any part in the demotion. Nobody (not Hilden, not Hoody, not Nezworski, not HR, not anyone in the department) ever referenced Gustilo's race as a justification or basis to demote her. Nobody used racial slurs when referring to or communicating with Gustilo. Nobody resorted to racial stereotypes when referring to or communicating with Gustilo. Nobody made racial jokes at Gustilo's expense. All communication with and regarding Gustilo was "facially and contextually neutral as to" her race. *Torgerson*, 643 F.3d at 1045 (observing that "[d]irect evidence does not include

30

statements by decisionmakers that are facially and contextually neutral"); *Twymon v. Wells Fargo & Co.*, 462 F.3d 925, 934 (8th Cir. 2006) (stating, "[f]acially race-neutral statements, without more, do not demonstrate racial animus on the part of the speaker").

Tellingly, Gustilo herself never claimed (not during her meetings with HHS leadership, not during her HSDI interview, not during the MEC meeting) her race was a factor in the demotion. Aside from the allegations in the Complaint, the only time Gustilo's race was ever mentioned in this litigation was when HHS's counsel asked their own clients during depositions whether race played any part in the demotion. The answer was "no." (Ex 2 at 158-159; Ex 3 at 99; Ex 33 at 122). And, for unknown reasons, the bases Gustilo uses to support her racial discrimination claims focus on her political beliefs and ideology – not her race. (Ex 5, ¶¶78, 103, 105 (alleging she was demoted for "expressing her beliefs" and that her "beliefs served as the 'trigger' for her demotion").

Gustilo has failed to provide direct evidence of discrimination, so she must proceed under the *McDonnell Douglas* burden-shifting framework. *See Torgerson*, 643 F.3d at 1044 (stating, "if the plaintiff lacks evidence that clearly points to the presence of an illegal motive, [they] must avoid summary judgment by creating the requisite inference of unlawful discrimination through the *McDonnell Douglas* analysis").

### B.    Gustilo Cannot Establish Circumstantial Evidence of Discrimination.

Under *McDonnell Douglas*, Gustilo has "the initial burden…of establishing a prima facie case of racial discrimination," which is done by showing she (1) belongs to a protected class; (2) "was qualified for" the job; (3) was demoted "despite h[er] qualifications;" and (4) "was replaced by a person with similar qualifications." *McDonnell Douglas Corp. v.*

*Green*, 411 U.S. 792, 802 (1973); *Putman*, 348 F.3d at 736; *see also Lucke v. Solsvig*, 912 F.3d 1084, 1087 (8th Cir. 2019) (stating a plaintiff "must first establish a prima facie case by providing sufficient circumstantial evidence to 'giv[e] rise to an inference that [they] ha[ve] been intentionally discriminated against because of [their] race'"). Although HHS adamantly denies the demotion had anything to do with Gustilo's race and even though Gustilo's documented lack of leadership ability disqualified her for the chair position, HHS assumes for purposes of this motion that Gustilo could likely surpass this initial hurdle of the analysis. *See Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981) (stating "the burden of establishing a prima facie case of" discrimination "is not onerous").

The burden now shifts to HHS to "show a 'legitimate, non-discriminatory reason' for the challenged conduct." *Lucke*, 912 F.3d at 1087. "The burden to articulate a nondiscriminatory justification is not onerous, and the explanation need not be demonstrated by a preponderance of the evidence." *Floyd v. Missouri Dept. of Social Services*, 188 F.3d 932, 936 (8th Cir. 1999).

Hilden set forth the bases for the demotion in his memorandum to the Board (Ex 80 at HHS 28-29), none of which had anything to do with Gustilo's race and were instead legitimate and non-discriminatory. *See Fiero v. CSG Systems, Inc.*, 759 F.3d 874, 878 (8th Cir. 2014) (observing that "performance-related concerns constitute legitimate, non-discriminatory justifications for discharging" an employee); *Chambers v. Travelers Cos., Inc.*, 668 F.3d 559, 567 (8th Cir. 2012) (concluding employee's "performance deficiencies" constituted a "non-discriminatory" basis for termination); *Lidge-Myrtil v. Deere & Co.*, 49 F.3d 1308, 1310 (8th Cir. 1995) (concluding employer met its burden under *McDonnell*

*Douglas* by providing legitimate, non-discriminatory bases for its decision not to promote an employee who had "experienced some disciplinary problems at work," had "poor relationships with co-workers," and "received below average job performance appraisals for her interpersonal relations").

The burden now "shifts back to" Gustilo to establish that the reasons given by HHS for the demotion are "pretextual." *Lucke*, 912 F.3d at 1088; *see also Torgerson*, 643 F.3d at 1046 (observing that "[t]he ultimate burden" then "falls on [the plaintiff] to produce evidence sufficient to create a genuine issue of material fact regarding whether [the defendant's] proffered nondiscriminatory justifications are mere pretext for intentional discrimination"). To meet her burden and establish pretext, Gustilo must do more "than merely disput[e] the reason; [she] must present evidence 'that the reason was false, and that discrimination was the real reason.'" *Lucke*, 912 F.3d at 1088. Gustilo must show that HHS's explanation for the demotion is "'unworthy of credence…because it has no basis in fact'" or that a "[prohibited] reason more likely motivated" HHS. *Torgerson*, 643 F.3d at 1047. Ultimately, Gustilo must establish that "a prohibited reason, rather than" the "stated reason" given by HHS "actually motivated" the demotion. *Id*.; *see also Barnhardt v. Open Harvest Co-Op*, 742 F.3d 365, 371 (8th Cir. 2014) (stating that to establish pretext a plaintiff "must point to 'enough admissible evidence to raise genuine doubt as to the legitimacy of the defendant's motive'").

Gustilo cannot establish pretext because there is none. Gustilo was not demoted because of her race and there is zero evidence (direct or circumstantial) showing that HHS's decision was in any way based on race. The evidence instead establishes Gustilo was

demoted because of her manifold leadership failures, her inability or refusal to acknowledge and remedy those failures, and the concern that the department would "implode" if she was not removed from the chair position. Although Gustilo seems to allege that her well-experienced and well-qualified successor's race (Nezworski is white) was somehow a consideration of the demotion, there is, again, zero evidence to support such an allegation. (*See* Ex 5, ¶102 (noting that her "successor is white")). Indeed, Gustilo praised Nezworski's promotion to chair, calling her "a good choice."

Because Gustilo cannot establish pretext, her Title VII and MHRA racial discrimination claims must be dismissed with prejudice. *See Torgerson*, 643 F.3d at 1052 (affirming dismissal of Title VII and MHRA claims because plaintiffs "fail[ed] at step three of the *McDonnell Douglas* analysis").

## II. The Court should Dismiss the Title VII Retaliation and MHRA Reprisal Claims because Gustilo did not Engage in Protected Activity.

To establish her retaliation/reprisal claims, Gustilo has the burden to prove that (1) she "'engaged in'" an activity protected by Title VII; (2) she "'suffered an adverse employment action;'" and (3) "'a causal connection [existed] between the adverse employment action and the protected activity.'" *Artis v. Francis Howell North Band Booster Assn., Inc.*, 161 F.3d 1178, 1182 (8th Cir. 1998).[8] With regard to the first element, Title VII protects against an "unlawful employment practice," defined as (1) "fail[ing] or refus[ing] to hire or…discharg[ing] any individual, or otherwise discriminat[ing] against

---

[8] Title VII retaliation and MHRA reprisal claims "are governed by the same standards." *Fercello*, 612 F.3d at 1084, n. 2.

any individual with respect to [their] compensation, terms, conditions, or privileges of employment" because of "race;" or (2) "limit[ing], segregat[ing], or classify[ing]…employees…in any way which would deprive or tend to deprive any individual of employment opportunities" because of "race." 42 U.S.C. § 2000e-2(a)(1)-(2); *see also* Minn. Stat. § 363A.15 (2022) (stating it is an "unfair discriminatory practice" to "engage in reprisal against any person because that person…opposed a practice forbidden under" the MHRA); *Hunt v. Nebraska Pub. Power Dist.*, 282 F.3d 1021, 1028 (8th Cir. 2002) (observing that Title VII "prohibits employers from retaliating against an employee who is engaged in a protected activity, which can be…opposing an act of discrimination made unlawful by Title VII"). Gustilo's claims fail and must be dismissed because she did not oppose an employment practice made unlawful by Title VII or the MHRA.

Gustilo claims HHS retaliated against her for "voic[ing] her dissent to" HHS's supposed "advocacy for segregated care and the implementation of [critical race theory]" and for "opposing discrimination[.]" (Ex 5, ¶¶82-88, 110).[9] But, significantly, Gustilo did not oppose a discriminatory employment practice. She instead claims her supposed dissent was limited to (1) a voluntary "culturally congruent care" program (a program she

_____

[9] Gustilo's MHRA reprisal claim is based on her opposition to discrimination in violation of Minn. Stat. § 363A.15(1). (Ex 5, ¶110). HHS assumes for purposes of this motion that Gustilo bases her MHRA reprisal claim on the same allegations set forth in her Title VII retaliation claim. But Gustilo has pled her MHRA reprisal claim in such a way that it is unclear whether that is the case. To the extent Gustilo bases her MHRA reprisal claim on alleged discrimination against her because of her race, her claim fails for the same reasons the Title VII and MHRA race discrimination claims fail (there is no direct or circumstantial evidence of discrimination).

supported and touts in her resume but that never launched because of COVID) wherein HHS sought to improve patient care for expectant African American mothers, and (2) critical race theory, which she admits was never implemented by HHS. Even taking these allegations as true, they do not establish opposition to an employment practice, let alone a discriminatory one. As such, Gustilo was not "engaged in a protected activity for the purposes of Title VII" (or the MHRA) and she cannot, therefore, "establish a prima facie case of retaliation." *Hunt*, 282 F.3d at 1028-1029 (affirming dismissal of Title VII retaliation claim because plaintiff was not engaged in a protected activity and consequently could not "establish a prima facie case of retaliation"); *Artis*, 161 F.3d at 1183 (observing that "opposing an employer's actions outside the ambit of an employment practice is unprotected by Title VII").

Gustilo's retaliation claims also fail because although she supposedly expressed "dissent" to a non-leader HHS employee regarding the "culturally congruent care" program, HHS was never made aware of any alleged dissent, complaint, or concern Gustilo supposedly had about the program. (Ex 3 at 99-100). Because HHS was never made aware of Gustilo's alleged dissent, it could not have possibly retaliated against her for it. *See Hervey v. Koochiching Cty.*, 527 F.3d 711, 722 (8th Cir. 2008) (stating a plaintiff "must show that the employer had actual or constructive knowledge of the protected activity in order to establish unlawful retaliation").

**III.** **The Court should Dismiss the Section 1983 First Amendment Retaliation Claim with Prejudice because HHS did not Maintain an Unconstitutional Policy.**

Section 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State…subjects, or causes to be subjected, any citizen of the United States…to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law…for redress[.]"

42 U.S.C. § 1983 (2022).  Section 1983 "creates no substantive rights; it merely provides remedies for deprivations of rights established elsewhere."  *Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985).  The "initial inquiry" must

focus on whether the two essential elements to a § 1983 action are present: (1) whether the conduct complained of was committed by a person acting under color of state law; and (2) whether this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States.

*DuBose v. Kelly*, 187 F.3d 999, 1002 (8th Cir. 1999); *see also Baker v. McCollan*, 443 U.S. 137, 140 (1979) (observing that the "first inquiry in any § 1983 suit…is whether the plaintiff has been deprived of a right 'secured by the Constitution and laws'").

"[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents," instead it is when "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."  *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 694 (1978); *see also Benner v. St. Paul Pub. Schs.*, 380 F.Supp.3d 869, 907 (D.Minn. 2019) (observing that "a municipality…is only liable for violating a plaintiff's constitutional rights if the violation

arose pursuant to an 'unconstitutional official custom or policy'"). Respondeat superior "is not applicable to § 1983 claims." *Ouzts v. Cummins*, 825 F.2d 1276, 1277 (8th Cir. 1987). The Supreme Court "has set a high bar for establishing municipal liability under § 1983, and demands careful analysis from district courts, to avoid any risk that liability could be imposed under a theory of respondeat superior" because a "municipality bears responsibility for its own torts, not the torts of its employees." *Soltesz v. Rushmore Plaza Civic Ctr.*, 847 F.3d 941, 947 (8th Cir. 2017).

"Policy" in the context of *Monell* involves a "'deliberate choice to follow a course of action…made from among various alternatives' by an official who has the final authority to establish governmental policy." *Jane Doe v. Special Sch. Dist. of St. Louis Cty.*, 901 F.2d 642, 645 (8th Cir. 1990). To establish a "custom" within this context, a plaintiff must prove three things: (1) the "existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by [government] employees;" (2) "[d]eliberate indifference to or tacit authorization of such conduct by [a government's] policymaking officials after notice to the officials of that misconduct;" and (3) the plaintiff was injured "by acts pursuant to [government] custom, i.e., [proof] that the custom was the moving force behind the constitutional violation." *Ware v. Jackson Cty.*, 150 F.3d 873, 880 (8th Cir. 1998).

Gustilo focuses her Section 1983 claim on the first type of municipal liability, claiming her demotion was an "official act and policy of HHS" because "it was done upon recommendation from" MEC and "formally adopted and approved by" the Board. (Ex 5, ¶¶94-95). In First Amendment employment cases, a "policy sufficient to support municipal liability can arise from a single" employment action, but only if "the decisionmaker

possesses final authority to establish municipal policy with respect to the action ordered." *Hess v. Ables*, 714 F.3d 1048, 1054 (8th Cir. 2013). "[W]hether an official had final policymaking authority is a question of state law." *Davison v. Minneapolis*, 490 F.3d 648, 661 (8th Cir. 2007). "[T]he identification of those officials whose decisions represent the official policy of the local government unit is itself a legal question to be resolved by the [Court.]" *Soltesz*, 847 F.3d at 946.

The authority to "approve personnel policies and practices" at HHS rests with its governing body, the Board, and the Bylaws expressly preserve the Board's final policymaking authority over department chair removal. Minn. Stat. § 383B.907, subd. 1(3) (2022); (Ex 9 at 74). While the Bylaws give MEC the authority to recommend removal of a chair by a two-thirds vote, the Board retains (and does not delegate) final policymaking authority. *See Soltesz*, 847 F.3d at 946-947 ("If the board retains the authority to review, even though it may not exercise such review or investigate the basis of the decision, delegation of final authority does not occur."). "Simply going along with discretionary decisions made by one's subordinates…is not a delegation to them of the authority to make policy." *St. Louis v. Praprotnik*, 485 U.S. 112, 130 (1988); *see also Pembaur v. Cincinnati*, 475 U.S. 469, 483, n.12 (1986) (noting that if a County Board "left the Sheriff discretion to hire and fire employees and the Sheriff exercised that discretion in an unconstitutional manner" the "decision to act unlawfully would not be a decision of the Board").

Because the Board had final policymaking authority over Gustilo's demotion, Gustilo must prove the Board's decision was unconstitutional. The bases for the Board's decision are set forth in Hilden's memorandum to the Board and no reasonable juror could

conclude they were based on Gustilo's protected speech. Indeed, Gustilo alleges the demotion was based on her "protected activity" of posting opinions on Facebook. (Ex 5, ¶¶90, 93). But Gustilo's Facebook posts are not referenced in Hilden's memorandum and there is no evidence that the Board discussed, considered, or even knew about Gustilo's Facebook posts during its April 28 meeting when it approved the demotion.

Documents referencing Gustilo's Facebook posts involved earlier steps taken by the Board's subordinates (Hilden and Hoody) who did not have final policymaking authority to remove a department chair. And concerns about Gustilo's Facebook posts were addressed and resolved shortly after her October 5, 2020, meeting with Hilden and Hoody (six months before the Board's decision) when she added a disclaimer to her Facebook page consistent with HHS's social media policy. (Ex 8 at 159; Ex 28 at GUSTILO 53; Ex 34 at HHS 4028). There is no evidence that the Board was in any way involved with this earlier lower-level action or that the Board was even aware of Gustilo's Facebook posts.

Even if Gustilo could prove that one of the Board's subordinates retaliated against her based on her Facebook posts (she cannot), Section 1983 does not impose liability on HHS for the torts of its employees. *Soltesz*, 847 F.3d at 947. The Supreme Court recognizes a "presumption that…subordinates are faithfully attempting to comply with the policies that are supposed to guide them." *Praprotnik*, 485 U.S. at 130; *see also Bolderson v. City of Wentzville*, 840 F.3d 982, 986 (8th Cir. 2016) (affirming summary judgment dismissal because "[w]ithout a showing that the mayor played a more active role in [the plaintiff's] termination, [the plaintiff] cannot demonstrate that the city is liable."); *Davison*, 490 F.3d at 660-662 (affirming summary judgment dismissal in favor of the employer).

Further, ratification of a subordinate's conduct "requires both knowledge of the alleged constitutional violation, and proof that the [final] policymaker specifically approved of the subordinate's act." *Benner*, 380 F.Supp.3d at 907, 909 (dismissing plaintiff's First Amendment retaliation claim with prejudice). No reasonable juror could conclude that the Board knew about or officially endorsed an alleged constitutional violation and, despite over a year of fact discovery, the evidence "falls short of demonstrating a reasonable dispute" that the Board's decision was based on protected speech. *Bolderson*, 840 F.3d at 986-987. Gustilo's Section 1983 claim should be dismissed with prejudice accordingly.

**IV.     Alternatively, the Court should Dismiss the Section 1983 Claim with Prejudice because Gustilo's Facebook Posts had an Adverse Impact on the Department and the Posts were Not a Basis for the Demotion.**

"[I]t has been settled that a state cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." *Connick v. Myers*, 461 U.S. 138, 142 (1983). But "[i]n the context of public employment…this First Amendment right is not absolute." *Grantham v. Trickey*, 21 F.3d 289, 292 (8th Cir. 1994). When a "citizen enters government service, the citizen by necessity must accept certain limitations on [their] freedom" because "[g]overnment employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). A government employer's control over an employee's words and actions is necessary because "public employees…often occupy trusted positions in society" and, "[w]hen they speak

out, they can express views that contravene governmental policies or impair the proper performance of governmental functions." *Id.* at 419.

To establish a First Amendment retaliation claim, Gustilo must prove that (1) she "engaged in activity protected by the First Amendment;" (2) HHS "took an adverse employment action against" her; and (3) "the protected conduct was a substantial or motivating factor in" HHS's decision to demote her. *Lyons v. Vaught*, 875 F.3d 1168, 1172 (8th Cir. 2017).

### A.     Gustilo's Facebook Posts Had an Adverse Impact on the Department.

As to the first element, a public employee's speech is "protected from retaliation, in certain circumstances, if the speech addresses a matter of public concern." *Bailey v. Dept. of Elementary & Secondary Educ.*, 451 F.3d 514, 518 (8th Cir. 2006). Whether Gustilo's Facebook posts addressed a matter of public concern "must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147-148; *Shands v. City of Kennett*, 993 F.2d 1337, 1343 (8th Cir. 1993) (stating a "matter of public concern" relates to "a matter of political, social, or other concern to the community"). Whether Gustilo spoke as a citizen on a matter of public concern when she made the posts "is a question of law for the Court." *McGee v. Public Water Supply*, 471 F.3d 918, 920 (8th Cir. 2006). Although Gustilo used her public Facebook account to fundraise in her capacity as chair of the department, was featured in a magazine about her Facebook fundraising efforts, and thereby blurred the lines between her public employee and private citizen roles, HHS assumes for purposes of this motion only that Gustilo's posts "address[ed]…matters of public concern." *Palmer v. Anoka Cty.*, 200 F.Supp.3d 842, 845-

847 (D.Minn. 2016) (concluding employee's Facebook posts regarding police shootings were a matter of public concern).

But even when "a public employee speaks as a citizen on a matter of public concern, 'the First Amendment requires a delicate balancing of the competing interests surrounding the speech and its consequences.'" *Bailey*, 451 F.3d at 520. Assuming Gustilo's posts addressed matters of public concern, HHS must "'produce[] evidence to indicate the speech had an adverse impact on the efficiency of [HHS's] operations.'" *Hemminghaus v. Missouri*, 756 F.3d 1100, 1111 (8th Cir. 2014); *see also Garcetti*, 547 U.S. at 418 (stating this "consideration reflects the importance of the relationship between the speaker's expressions and employment" and that a "government entity has broader discretion to restrict speech when it acts in its role as employer, but the restrictions it imposes must be directed at speech that has some potential to affect the entity's operations"). Gustilo's speech "affects the efficiency of the operation…when it affects the morale of the work force and damages the program's reputation." *Grantham*, 21 F.3d at 295. But "'[e]vidence of actual disruption…is not required in all cases,'" *Bailey*, 451 F.3d at 521, because Courts "do not see the necessity for an employer to allow events to unfold to the extent that disruption of the office and the destruction of working relationships is manifest before taking action." *Connick*, 461 U.S. at 152; *see also Hemminghaus*, 756 F.3d at 1112 (observing that Courts "'have given substantial weight to government employers' reasonable predictions of disruption, even when the speech involved is a matter of public concern'"). Whether Gustilo's Facebook posts adversely impacted HHS's operations is a question of law. *Shands*, 993 F.3d at 1342.

The evidence establishes that Gustilo's public Facebook posts had an adverse impact on, and disrupted, the department. There was significant concern that Gustilo's posts, containing her personal opinions about contentious political matters and use of the phrase "China virus," could be interpreted as the opinions of HHS because Gustilo used her public Facebook account in her professional capacity to fundraise for HHS. There was, consequently, a concern that these posts could be offensive to people of Asian descent, patients, and donors. These were significant concerns for HHS, a public safety-net hospital that has taken public stands against racism and healthcare inequities and has an interest in hiring and retaining a diverse staff. Gustilo's use of the phrase "China virus" in a post caused "multiple layers of people to lose trust in her," the phrase was "culturally and racially insensitive" and "unbecoming of a leader of a department," and the department's letter underscored the concern that the views expressed by Gustilo in her posts were "not representative of our institutional mission, or of our department or of us as individuals." (Ex 15 at 14; Ex 29 at 30-31; Ex 75). Compounding this concern was the fact that Gustilo had used her public Facebook account to fundraise on behalf of HHS, which was profiled in a prominent local magazine. Further, Gustilo injected the opinions showcased in her Facebook posts (including debating the use of the phrase "China virus") into the day-to-day work of the department and her insistence on having these discussions in the workplace with subordinates (which she does not claim was protected speech) contributed to the disruption. *See Connick*, 461 U.S. at 151-152 (stating that "[w]hen close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate" and "the fact that [the plaintiff]…exercised her

rights to speech at the office supports [the defendant's] fears that the functioning of [the] office was endangered"); *Hemminghaus*, 756 F.3d at 1112 (observing that "whether the employee's speech has a detrimental impact on working relationships where personal loyalty or confidence is necessary" is a "[p]ertinent" consideration when determining whether speech had an adverse impact on operational efficiency); *Palmer*, 200 F.Supp.3d at 847-848 (concluding an employee's political Facebook posts created "a major disruption" in the county attorney's office and that the employee "showed terrible judgment"); *Bennett v. Nashville*, 977 F.3d 530, 541-542 (6th Cir. 2020) (concluding employee's public Facebook posts that included "use of a racial slur when discussing politics" created a "disruption" in the office that was "substantial"); *Durstein v. Alexander*, 629 F.Supp.3d 408, 416-417, 423 (S.D.W.V 2022) (concluding employee's anti-Muslim Facebook posts disrupted the "efficient operation of the workplace" and observing that "'[a] social media platform amplifies the distribution of the speaker's message – which favors the employee's free speech interests – but also increases the potential, in some cases exponentially, for departmental disruption, thereby favoring the employer's interest in efficiency'").

Because Gustilo's public Facebook posts addressed a matter of public concern and disrupted the department, the Court must apply the *Pickering* test and balance the "'interests of the [employee], as a citizen, in commenting upon matters of public concern and the interests of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Shands*, 993 F.2d at 1344 (quoting *Pickering*

*v. Board of Educ.*, 391 U.S. 563, 568 (1968)).  Under *Pickering*, the Court must balance

six "interrelated factors:"

> (1) the need for harmony in the [workplace]; (2) whether the government's responsibilities require a close working relationship; (3) the time, manner, and place of the speech; (4) the context in which the dispute arose; (5) the degree of public interest in the speech; and (6) whether the speech impeded the employee's ability to perform [their] duties.

*Anzaldua v. N.E. Ambulance & Fire Protection Dist.*, 793 F.3d 822, 835 (8th Cir. 2015);

*see also Shands*, 993 F.2d at 1344 (observing, "[t]he *Pickering* balance is flexible, and the

weight to be given to any one factor depends upon the specific circumstances of each

case").

The same reasons set forth above establishing that Gustilo's posts had an adverse

impact on, and disrupted, the department establish that the *Pickering* factors weigh

decisively in HHS's favor.  Gustilo's posts created significant disharmony in the

department, which is charged with, among other things, providing medical treatment and

care to expectant mothers (many of whom are women of color).  In addition, "the degree

of public interest in her speech was minimal" because Gustilo "does not have any particular

expertise on the issues on which she was commenting, nor was she acting as a

whistleblower or contributing previously unknown facts or insights to the public debate."

*Palmer*, 200 F.Supp.3d at 848.  In her posts about the presidential candidates, socialism,

fascism, racism, police killings, Black Lives Matter, "defunding" the police, and COVID

Gustilo was, instead, "simply adding her views to the views of countless others."  *Id*.

(concluding the *Pickering* factors "come[] out decidedly in defendants' favor" and

dismissing plaintiff's First Amendment claim with prejudice).

Gustilo's First Amendment retaliation claim fails as a matter of law for these reasons and should be dismissed with prejudice accordingly.  *See Bailey*, 451 F.3d at 522 (affirming dismissal because plaintiff's speech "lacked sufficient counterbalancing public interest…even if [it] did touch upon a matter of public concern"); *Shands*, 993 F.2d at 1346 (affirming dismissal because the *Pickering* factors "favor[ed]" defendant and plaintiff's speech was thereby "not protected by the First Amendment").

### B.    Gustilo's Facebook Posts were Not a Basis for the Demotion.

Although the lack of First Amendment protection under *Pickering* is dispositive, Gustilo also fails to establish that her Facebook posts satisfy the second and third elements of a retaliation claim: that HHS "took an adverse employment action against" her because of her posts and that "the protected conduct was a substantial or motivating factor in" the demotion.  In the context of a First Amendment claim, an "adverse employment action" is a "'tangible change in working conditions that produces a material employment disadvantage'" that can include "'termination, cuts in pay or benefits, and changes that affect an employee's future prospects[.]'"  *Benner*, 380 F.Supp.3d at 896.

HHS took no adverse action against Gustilo because of her posts.  Instead, on October 5, 2020 (more than six months before the demotion), Hilden and Hoody had a discussion with Gustilo regarding the HHS social media policy and about "clearly label[ing] [her] posts as not representing HHS[.]"  (Ex 34 at HHS 4028; Ex 35).  Gustilo agreed to add a disclaimer to her Facebook profile and the matter was resolved.  (Ex 28 at GUSTILO 53; Ex 8 at 159).  Indeed, Hilden and Hoody made clear on October 5 that she

is "entitled to your own opinions on all matters and have the right to express those opinions. Your personal opinions on issues of the day are not our concern." (Ex 34 at HHS 4028).

The "larger discussion" regarding Gustilo's behavior in the workplace had nothing to do with social media, "but rather about the atmosphere in the [d]epartment" and the "potential for tensions…going forward." (*Id.*). The "atmosphere" in the department had eroded to such an extent that there was a concern it would "implode" because of the manifold ways in which Gustilo failed as department leader. Gustilo's demotion six months after concerns first came to light had nothing to do with her Facebook posts and dismissal with prejudice is, therefore, appropriate. *See Tyler v. Univ. of Ark. Bd. of Trustees*, 628 F.3d 980, 986 (8th Cir. 2011) (affirming dismissal of First Amendment retaliation claim because "[a]s more time passes between the protected conduct and the retaliatory act, the inference of retaliation becomes weaker and requires stronger alternate evidence of causation" and observing that "[t]he inference vanishes altogether when the time gap between the protected activity and the adverse employment action is measured in months"); *Lewis v. St. Cloud State Univ.*, 467 F.3d 1133, 1138 (8th Cir. 2006) (observing that "an interval as brief as two months did not show causation for purposes of establishing a retaliation claim" and that "a two-week interval was 'sufficient, but barely so'"); *Howard v. Columbia Pub. Sch. Dist.*, 363 F.3d 797, 801 (8th Cir. 2004) (affirming dismissal of First Amendment claim because plaintiff "failed to present any evidence that her speech motivated defendants to terminate her employment" and observing that the "mere fact that [plaintiff] engaged in protected conduct…is 'not sufficient to give rise to an inference of causation'").

## CONCLUSION

For these reasons, Gustilo's claims should be dismissed with prejudice.

Respectfully submitted,

Dated: August 16, 2023

MARY F. MORIARTY
Hennepin County Attorney

*Matthew S. Frantzen*

Matthew S. Frantzen (#332793)
Katlyn J. Lynch (#398242)
Assistant Hennepin County Attorneys
A-2000 Government Center
300 South Sixth Street
Minneapolis, MN 55487
Telephone: (612) 596-0075
Matthew.Frantzen@hennepin.us
Katie.Lynch@hennepin.us

*Attorneys for Defendant Hennepin Healthcare System, Inc.*