| | |
|---|---|
| Dr. Tara Gustilo, M.D., <br><br> Plaintiff, <br><br> v. <br><br> Hennepin Healthcare System, Inc. <br><br> Defendant. | Case No. 22-cv-352 (SRN/DJF) |

## PLAINTIFF'S OPPOSITION TO
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

Before May of 2020, Dr. Tara Gustilo ("Dr. Gustilo") was a pillar of the Hennepin Healthcare System, Inc. ("HHS") community; as an accomplished person of color, she was put on billboards and featured on podcasts, held numerous leadership roles, and was highly regarded as a great physician and a great leader by her colleagues. However, after May of 2020, Dr. Gustilo began to question how discourse occurs in this Country, especially in relation to Critical Race Theory and COVID-19. While Dr. Gustilo's personal views evolved, her willingness to respectfully discuss, debate, and learn remained the same. But when Dr. Gustilo's views began to diverge from those expected of her as a person of color by HHS and its employees, she began to experience discrimination and face retaliation; her

leadership, alignment with HHS and its mission, and even her sanity, were all suddenly placed in questioned, and ultimately served as the basis for her demotion.

The facts and circumstances surrounding Dr. Gustilo's demotion amount to a clear violation under the United States Constitution, Title VII, and the Minnesota Human Rights Act; at minimum, they create a genuine dispute of material fact. Accordingly, Plaintiff Dr. Gustilo respectfully requests this Court deny Defendant HHS's Motion for Summary Judgment.

## SUMMARY OF DISPUTED FACTS

### Gustilo's Background and Role at HHS
### Prior to May of 2020

Dr. Tara Gustilo is an Asian-American woman of Filipino descent whose children are black. (Gustilo Dep. at 33:10-11, 12:12-21.) She graduated from Harvard-Radcliffe College in 1989 and then attended Mayo Medical School where she graduated in 1994. (*Id*. at 14: 10-16; 12:24-13:9.) After medical school, Dr. Gustilo completed her residency at Duke University in obstetrics and gynecology. (*Id*. 14:10-18.) Dr. Gustilo is additionally a certified acupuncturist and has her master's degree in public health through the University of North Carolina. (*Id*. at 16:7-19.) Dr. Gustilo's public health degree is in epidemiology, which focuses on the evaluation and development of research. (*Id*. at 17:1-7.)

Dr. Gustilo has devoted her entire career to underserved populations, which has included working on the Navajo Reservation where she served as the OB/GYN and outpatient medical director. (*Id*. at. 46:18-22.) She then started at HHS in 2008 and became interim chair in 2015 through the recommendation of the outgoing Chair. (*Id*. at 47:13-16;

2

48:4-14.) Executive leadership at HHS supported the idea and thus Dr. Gustilo accepted the role as interim chair. (*Id*. at 48:4-14.) Before entering the role of interim chair, Dr. Gustilo had served as clinic medical director. (*Id*. at 49:1-4.) Leadership runs in Dr. Gustilo's blood, as she took cues from her father who served as Chair of Orthopedic Surgery at HHS for approximately 25 years. (*Id*. at 31:16-32:11.)

After becoming interim chair, Dr. Gustilo ceased practicing obstetrics to develop other clinical interests with support from her department to do so. (*See id.* at 23:24-24:9.)

In her time with HHS, Dr. Gustilo was also heavily involved in several committees and other leadership roles. From 2014-2020, Dr. Gustilo served on the Board of Directors, rotating off the Board in 2020 due to the end of a six-year term limit. (*Id*. at 25:25-27:2.) Her term concluded with a card from the Board with the some of the following characteristics ascribed to her:



(Declaration of Anne St. Amant, (hereinafter referred to as "St. Amant Decl.") Ex. A.) Dr. Gustilo also served on the Claims Management & Disposition Committee, (Gustilo Dep.

at 28:6-9) the physician leadership development committee, (*Id*. at 29:17-29) the ambulatory quality of care committee, the surgery committee, (*Id*. at 48:19-25) and the medical staff quality committee. (*Id*. at 50:7-16.) Dr. Gustilo served on the Medical Executive Committee ("MEC") (the committee which would ultimately vote to demote her) from 2012 to 2021. (*Id*. at 52:2-19.)

Continuing her dedication to meeting the needs of all the populations she serves, Dr. Gustilo piloted the Doula program. (*Id*. at 35:19-36:11.) This program sought to address the needs of African American and Native American women—a population that has disparities in health outcomes in obstetrics—by engaging doulas to work with black women, and perhaps, the pairing of an African American doula with an African American patient. (*Id*.) This was borne from a discussion regarding the barriers that women of these populations faced, including that some black and indigenous women expressed their preference of having clinicians that looked like them. (*Id*. at 39:1-40:17.) Dr. Gustilo's goal for the doula program was to be more expansive in the implementation of culturally congruent care, where such care would be addressed not only through the lens of ethnicity but more broadly through socioeconomics, religious beliefs, and countries of origin. (*Id*. at 41:25-423:25.)

In her tenure as Chair, Dr. Gustilo improved daily life for physicians of the OB/GYN department, including obtaining the post-call day off for the members, since, at the time they were working a 36-hour shift which was a "high dissatisfier" for the team. (*Id*. at 22:8-23:9.) She also worked to fully staff the OB/GYN Department. (*Id*.) These improvements—and overall satisfaction—were highlighted in a 2017 review of Dr.

Gustilo. In this review, a rating of 2 meant, "Fully Meets Expectations: Employee consistently completes the work that is required, and at times go beyond expectations." (St. Amant Decl. Ex. B.) A rating of 3 (the highest score possible) meant, "Consistently Exceeds Expectations: Performance consistently and signification surpasses all established expectations." (*Id*.) Dr. Gustilo received 2's and 3's across the board. (*Id*.) In the category of "listens to feedback from colleagues, respects their opinions, and manages conflict in a manner that allows for open and honest dialogue," Dr. Gustilo received a 2. In the category of "[f]osters a culture that values diversity and compassion," Dr. Gustilo received a 3. In the category, "Creates relationships with all other staff that fosters open dialogue, creating an environment of patient safety," Dr. Gustilo received a 3 (despite giving herself a 2.5). (*Id*.)

Even in a 2019 provider engagement survey, the focus of the feedback was on providing sufficient support in the way of equipment and staff to the Department. (St. Amant Decl. Ex. C) ("Hire more support staff"); ("Hire more L&D nurses"); ("please give providers the support we need (equipment and staff) to ensure we can work to the top of our scope at all times"). No comment in that Survey directly references Dr. Gustilo by name. (*Id*.)

Dr. Gustilo served as interim chair from 2015-2018. (Gustilo Dep. at 54:23-55:5.) After a substantial run of proven success, Dr. Gustilo underwent the arduous process of becoming chair. (*Id*. at 54:23-55:5.) The process for appointing a Chair includes multiple levels of review, which can involve a search committee, consultation with the appropriate department head at the University of Minnesota, and review by Members of the Medical

Staff of the involved department, who then submit candidates to the CMO, VMPA, CCO, and CEO for consideration. (St. Amant Decl. Ex. D at 12.) The CMO then submits the final candidate to the MEC for two-thirds majority vote of the MEC to become effective. (*Id*.) Dr. Gustilo was made permanent Chair in 2018. (St. Amant Decl. Ex. E.)

Dr. Hilden ("Hilden") was the Vice President of Medical Affairs at HHS during the time period surrounding the circumstances of Dr. Gustilo's demotion. (Hilden Dep. at 18:8-10.) His role included "ensuring the professional competency of its physician staff and nonphysicians." (*Id*. at 18:8-10.) Yet, before May of 2020, not one doctor brought any concerns to Dr. Hilden regarding Dr. Gustilo's performance as chair before May of 2020. (*Id*. at. 25:10-13.) Dr. Hilden himself never had any issues with Dr. Gustilo's performance as Chair of the OB/GYN Department before May of 2020. (*Id*. at 25:6-9.) In fact, several members of the Department "had quite positive thing to say about [Dr. Gustilo]" before May of 2020, specifically, "[t]hey felt she was approachable and had been—they didn't have concerns." (*Id*. at 40:2-9.)

Indeed, Dr. Gustilo was highlighted prominently as a representative for HHS, appearing on podcasts and billboards. (*See* Gustilo Dep. at 169:20–170:12.)



(Declaration of Dr. Tara Gustilo, (hereinafter referred to as "Gustilo Decl."), Ex. A.)



(Gustilo Decl. Ex. B.)

### *The Rise of Critical Race Theory in the Workplace Environment*

Critical Race theorists explicitly reject the principle of equality under the law, arguing that legal equality, nondiscrimination, and "colorblindness" are mere camouflages

7

used to uphold white supremacist structures. (Gustilo Decl. ¶ 6.) Critical race theory ("CRT") does so by rejecting the core of Western Liberalism, including meritocracy and colorblindness and instead proposes that invisible systems of power – "systemic racism" – bear the primary responsibility for racial inequality. (*Id*.) Importantly, encompassed in this notion, is the idea that the First Amendment serves to advance the interests of white supremacy, thus, freedom of speech that is deemed "racist" or "hateful." (*Id*. ¶ 7.) CRT also warns people of color against "internalized whiteness," the theory that people of a nondominant group believe the "myths" and "misinformation" about people of color because "whiteness" is deemed superior." (*Id*. ¶ 8.)

CRT's key assertion is that racism is not the result of individual, conscious racist actions or thoughts. Racism is "systemic" and "structural." (*Id*. ¶ 9.) It is embedded in America's legal system, institutions, and free enterprise system, and imposes "whiteness" as the societal norm. (*Id*.) Importantly, under CRT, equity replaces equality. "Equity" sounds like "equality," but under CRT, it has become its functional opposite. (*Id*.) "Equality" means equal treatment of all Americans under the law. (*Id*.) CRT's "equity" demands race-based discrimination. (*Id*.) Because systemic racism has produced disparities between the races and because the system will only deepen these disparities by rewarding the "wrong" criteria, CRT espouses that the government must treat individual Americans unequally according to skin color to forcibly produce equal outcomes. (*Id*.) Advocating equity over equality is part of CRT. (*Id*.)

On May 25, 2020, 46-year-old black American man, George Floyd, was murdered by white police officer, Derek Chauvin outside of a convenience store.[1] A public reckoning occurred in the form of mass protests across the Country.[2] After Mr. Floyd's murder, there was a wide-spread desire for large-scale change in the form of CRT—which began to seep into American workplaces.[3] Companies like American Express began firing employees who voiced dissent to the subjection of this re-education.[4] In June 2020, JPMorgan Chase CEO Jamie Dimon kneeled in solidarity with employees and proclaimed: "It's long past time that society addresses racial inequities in a more tangible, meaningful way."[5] Employers across the country took the same cues and would spend the following years honing in on diversity, equity, and inclusion (DEI) with an energy, at least according to some experts, not seen since the Civil Rights Movement.[6] This time, however, the playbook changed. The new order paved the way for CRT in the workplace: "Leaders will have to be vocal. They have to be visibly present in charting this course to mitigate the negative effects of CRT backlash. Workers, regardless of how they personally feel about

---

[1]     MPR News, https://www.mprnews.org/crime-law-and-justice/killing-of-george-floyd, (accessed September 5, 2023).

[2]     Nicole Chavez, Ray Sanchez, Madeline Holcombe, Tens of thousands march in largest Geroge Floyd protests so far in the US, June 6, 2020, https://www.cnn.com/2020/06/06/us/us-george-floyd-protests-saturday/index.html (accessed September 5, 2023).

[3]     S. Mitra Kalita, The work of critical race theory falls on employers now, November 9, 2021, https://www.charterworks.com/business-critical-race-theory/ (accessed September 5, 2023).

[4]     Mike Gonzalez, American Express CRT Training and Marxism in the Workplace, September 9, 2021, https://www.heritage.org/progressivism/commentary/american-express-crt-training-and-marxism-the-workplace (accessed September 5, 2023).

[5]     *Id*.

[6]     Kalita, *supra* note 3.

it, will follow suit–or they will leave. This will require organizational courage and strong, committed leadership."[7]

HHS quickly fell in line, resolving on August 5, 2020, to declare "racism a public health crisis that affects the entire Country[.]" (St. Amant Decl. Ex. F.) HHS resolved to support "local, state, regional, and federal initiatives that advance efforts to dismantle individual to institutional to systemic racism and will promote community efforts to amplify issues of racism and its impact on health[.]" (*Id.*) This resolution is bolstered by materials like, "Nobody Gets A Pass," a video made by HHS, espousing tenets of CRT, such as the principle that "there is a dual system," at HHS, one system for white people and one for people of color.[8] Other paper materials distributed by HHS include these principles. (St. Amant Decl. Ex. G.) ("Health equity is the ability for all people (regardless of race) to receive necessary resources to be as healthy as possible"); *see also* (St. Amant Decl. Ex. H at 29); (health equity is defined as "the ability for historically marginalized and socioeconomically disadvantaged persons to receive the necessary resources" needed for their health.) (*Id.*)

### *Dr. Gustilo Speaks Out Against CRT Indoctrination at HHS*

The instantiation of the CRT ideology was an especially poignant concern for Dr. Gustilo because of how it affects care, as it supports an idea that a whole group can be judged on the basis of their skin color and assigns certain attributes to each, instead of

---

[7]    *Id.*

[8]    https://www.youtube.com/watch?v=8MVuz9Fy1us.

looking at each personal individually. (Gustilo Dep. at 266:20–269:5.) It affects care because it espouses that a white doctor cannot take care of a black patient due to the inherent power dynamic that lies within their respective races. (*Id*.) Thus, the implementation of CRT at HHS created problems for both patients and clinicians because it advances the idea that individuals are unable to give good care on the basis of their different races. (*Id*.) And while Dr. Gustilo supported learning and studying different ethnicities and culturally through a culturally congruent care model, she rejected the idea of CRT because it supports and results in segregated care and the differentiation of treatment based on race and ethnicity. (*Id*.) Dr. Gustilo recognized that CRT ideology was becoming part of the decision-making process at HHS. (*Id*. at 270:25–271:8.) As a result, she voiced concerns to HHS leadership multiple times.

This included Dr. Gustilo's speaking out prior to a retreat regarding equity. (*Id*. at 149:6–19; *see also* St. Amant Decl. Ex. I.) When reviewing the reading material ahead of the retreat, Dr. Gustilo believed there was a "clear political bent" to them, with all materials approaching such topics "from a similar vantage point." (Gustilo Dep. at 150:10–21.) Dr. Gustilo reiterated in her email that HHS should collectively "be considering or at least thinking about and discussing" other perspectives. (*Id*. at 153:13–14.) In her email, Dr. Gustilo sought to provide that other "vantage point" in that the policies supported by HHS were actually hurting the patients HHS cared for. (*Id*. at 155:1–9.) She stated, "I ask that you consider. . .how HHS and you as the Board approach equity issues going forward." (St. Amant Decl. Ex. I.) Attached to this email was a document further outlining her concerns regarding the harm and violence in the communities HHS served:

> I do think we need to encourage honest and frank conversations to understand the culture of police forces and why people of color are so very disproportionately afflicted by crime and violence. We need to understand the underlying causes before we can seek to correct the effects.

(*Id*.) Dr. Gustilo explained, "The patients that we cared for -- the patients that I was caring for at Hennepin, many of them were living in areas where the defunding of the police from what we knew would probably increase levels of crime. At least historically when police have been defunded, that we would be seeing increased levels of crime, of murder and of other -- and violence in general." (*Id*.) Dr. Gustilo continued:

> This letter was meant to be: There's the narrative out there right now. I'm not saying that narrative is completely wrong. What I'm saying, again, is that there may be other things that we're not considering and as these -- as we are. . .the safety net hospital, I think it was important for us to be mindful of that[.]

> And also I was encouraging them to have. . .the hospital be a leader in these discussions because these are our patients. . .[who] have been adversely affected with such moves in the past.

(*Id*. at 155:18–156:12.) Dr. Hoody, Chief Medical Officer at HHS, found Dr. Gustilo's related comments at this retreat questioning why HHS was still discussing systemic racism when it ended in the 1960's, to be invalidating the presence of systemic racism. (St. Amant Decl. Ex. J [Hoody Dep.] at 34:18–21.) When asked whether Dr. Gustilo was a racist, Dr. Hoody indirectly responded that her comment was "racist." (*Id*. at 98:5–11.) Beyond this impression, HHS leadership largely ignored Dr. Gustilo's vocalized concern. (Gustilo Dep. at 157:23–158:3.)

Dr. Gustilo also vocalized her dissent when the goals of the Doula program and culturally congruent care model (discussed above) began to morph into those consistent with CRT when it was suggested that only black patients could be seen by black providers.

(*Id.* at 271:9–22, 272:22–273:11.) Dr. Gustilo vocalized her dissent of a segregated care model on a group call with UCare doula and to at least one midwife at HHS. (*Id.* at 289:24–292:15.)

Continuing on in her dissent, in the Fall of 2020, Dr. Gustilo wrote to HHS leadership, "although I have been thinking and working on racial/social justice issues for decades, our current political environment has inspired me to read and seek information more broadly than ever before." (St. Amant Decl. Ex. K.) (Hilden Dep. at 69.) "In considering the tenets of critical race theory, I have concluded that it fosters a mindset that promote racism and will, in fact, be detrimental to POC." (*Id.*)

Dr. Gustilo maintained, and continues to maintain to this day, that the implementation of CRT at HHS negatively affects the delivery of healthcare specifically in the OB/GYN Department and more broadly, hospital-wide:

> [C]ritical race theory has tenets of things like the ideas of microaggressions. It has ideas that promote the idea that the medical system is racist and, you know, that things have been put in place kind of to maintain a white supremacy. And I think that those kind of ideas if you are starting to adopt them in to a medical system necessarily starts to cause problems in the system. . .
>
> There were multiple [predictors] for the risk of having a cesarean section. . . Studies had been done and they had factored things out and race was one of those things that actually had fallen out as seemed to be a marker for someone who might be at higher risk for a C-section. So in critical race -- you know, as you start looking at that and if you decide that that inclusion of race is actually racist and you're trying to cause more C-section by having this and you take that out, that may be a problem, right, because now we may not be giving as good as data as we could . . . when you're talking about in a department, if you're thinking about critical race theory and microaggressions, if someone misspeaks or someone says something that

> actually they didn't even mean, you take offense -- it fosters this idea that you
> are looking for things to be offended for. And I think that can be problematic.

(Gustilo Dep. at 192:17–25, 193:18–194:14.) This vocalized opposition to CRT would prove to be fatal to Dr. Gustilo's previously-held respect, reputation, and position at HHS. As a woman of color, Dr. Gustilo expressed views that were not acceptable. (*Id*. at. 219:18–220:1; Gustilo Decl. ¶¶ 12-14.) Rather than supporting Dr. Gustilo in the idea that an individual can have any personally held beliefs as long as they are performing their work satisfactorily, HHS allowed biases to take hold of the OB/GYN department and dictate the future of Dr. Gustilo's career and ability to lead. (*Id*. at 228:5–14.)

### *June of 2020: Members of the OB-GYN Department disagree with Dr. Gustilo's views on a letter addressing the murder of Geroge Floyd and the apparent endorsement of a "White Coats for Black Lives" Rally*

In June of 2020, members of the OB/GYN (including the doctors, midwives, and nurse practitioners), sought to write an open letter for their community in the wake of the murder of George Floyd. (St. Amant Decl. Ex. D at 28.) HHS does not have any formal policy, guidelines, or standard regarding department-wide letters, nor could Jennifer Hauff ("Hauff"), former human resources manager at HHS, ever recall handling a similar situation. (St. Amant Decl. Ex. L [Hauff Dep.] at 9:20-10:22, 41:10–22.) Accordingly, Dr. Gustilo proceeded with caution when moving forward with the Letter, being thoughtfully supportive while balancing the voices of all those who sought to contribute; this resulted in a great deal of conversation surrounding the Letter. (*See* St. Amant Decl. Ex. M.) After the first draft was sent to the Department for review, Dr. Gustilo expressed her willingness to engage in the conversation, thanking her employees for the idea and offered to help in

logistics, but suggested changes based on her concerns regarding the riots in the

community:

> I again want to thank Sally, Becky and Kristen for their leadership in writing this letter. I have attached my thoughts and revisions using red to highlight my changes.
>
> You will note that I have included the effect of the riots in this letter. I feel strongly that we need to recognize the effects of these events and the adversity that they have and will cause.
>
> Thank you again for your work on this. Once the final draft is done, if you want, I can help with the logistics of mailing this out.

(*Id.*) In response, Sally Zanotto (one of the initial drafters), validated Dr. Gustilo's desire

to reference the strain on the community resulting from the destruction:

> Thank you for your edits. I think that we alluded to destruction in our community in the second paragraph when we referred to the strain that the events have caused. I also really hesitate to use the word riot, I think it takes away from the peaceful protesting that is largely occurring our community. Thoughts?

(*Id.*) Dr. Gustilo clarified her concerns and acknowledged the desire to address the peaceful

protests:

> I think we should make a distinction between the peaceful protests and the riots but the riots were/are real and have led to devastation in many parts of our community. . .These riots, de facto, are likely to have a disproportionate negative long lasting economic impact on the communities that are most at risk. . .There is also the injury and killing of people protecting their property and livelihood that has occurred because of these riots.
>
> I fully support racial justice. I fully support the right to demonstrate and make voices heard. What happened in these riots, however, wreaked havoc and devastation on many of the communities that we seek to stand with on these issues. I believe that by NOT addressing the riots and their effects, we are not truly standing for social justice.

(*Id*.) One member of the department, Senior Medical Office Specialist, Pambala Hall, agreed that the issue of rioting could still be referenced in a respectful way:

> I definitely feel that it can be stated that we don't support rioting. However, we do support righteous protest against racial inequity and the best way to reconcile is through serving.

(*Id*.) While the discussion had remained respectful of viewpoints until this point, Dr. Elizabeth Alabi's contribution shifted the conversation with an accusatory tone:

> Tara, you think your intentions are good, but you are actually shifting focus away from the original issues (inequality and injustice) by being so steadfast in your need to focus on this. . . our patients . . . don't need a history lesson.

(*Id*.) Dr. Gustilo responded respectfully acknowledging Dr. Alabi's points:

> Point taken that you all want to focus on racial justice along as what happened to Mr. Floyd getting lost in the reporting of the riots. I have thought about this quite a lot given that I am clearly at odds with you, my partners (who I respect and admire), on this. I think staying focused on the racial injustice highlighted by Mr. Floyd's murder alone is something that all can agree with and so I think you are right in keeping this as the focus alone. I am sorry I pushed hard, I am very upset by the riots and what I believe their consequences will be.

(*Id*.) Dr. Gustilo conveyed her willingness and support of the letter even without the reference to riots, but communicated her concern with just one term but supported the letter moving forward without her signature:

> I can support the letter as written save the statement regarding 'unrest'. If we are not going to address the riots, I am fine with that but I believe this word can evoke them (as it is used in media to describe what is occurring). I again ask that it be removed. If you as a group feel like the removal of this work diminished the message in some way that you cannot abide, it can be sent but not with my signature or inclusion.

(*Id*.) Zanotto's response emphasized her bottom line priority of simply sending a letter:

> I feel very strongly about avoiding the sentence about rioting. I feel LESS strongly about removing the word unrest, and if that's what it takes to get the letter out I would agree to it! I feel MOST strongly about getting a letter of support out for our patients in a timely fashion!

(*Id*.) In Dr. Gustilo's email confirming approval for the letter, in self-awareness, she apologized that the Letter had caused tension; Dr. Gustilo's email correspondence also included a note of gratitude and encouragement:

> I am heartened that you all were willing and able to push back and state you wanted to keep the focus on Mr. Floyd and racial justice. This is something that we all whole heartedly support and with which we agree. Thank you for your wisdom.

(*Id*.) But in the same way that others had expressed their priorities and preferences regarding language of the Letter, Dr. Gustilo reiterated her boundaries:

> I debated heavily with myself whether to leave it at that and leave the letter as was. I did not want to create a rift in our department or with any of you, my colleagues. In the end, however, I found that I could not in good conscience sign onto a letter with the word 'unrest' included. I decided that I needed to respect myself as much as I would seek to respect any of you.

(*Id*.) This correspondence came after Dr. Gustilo reflected on the issue and decided to apologize for her role in the back-and-forth discussions of the Letter, although ensuring to convey they came from a place of sincere disagreement. (Gustilo Dep. at 83:9-84:8.)

Around the same time, members of the OB/GYN Department wished to attend a local sit-in called "White Coats for Black Lives." (*Id*. at 100:20–101:4.) Encompassed within the mission and vision of White Coats for Black lives is the dismantling of systems of oppression by centering the needs and well-being of those most marginalized in our

communities and cultivating the means for collective liberation.[9] This specifically requires the redistribution of power and resources.[10]

Dr. Gustilo encouraged her team members to represent themselves and use their voices as private citizens and clinicians but reminded them that they were not to be representing themselves on behalf of HHS. (*Id*. at 103:19–104:6, 104:8–24.) Paired with this instruction, Dr. Gustilo emphasized her encouragement and gratitude for those who planned to attend:

> Hello, I just want to make sure all are aware that this rally, which has been picked up by White Coats for Black Lives, was the brain child and creation of our very own Dr. Zanotto, Dr. Alabi, Dr. Pace, Dr. Fiest and Dr. Petersen. What an incredible idea! I know this must have taken quite a bit of work and effort. Many, many thanks!

(*Id*. at 106:14–22; email chain.) To further show her support of her colleagues, Dr. Gustilo attended the rally. (*Id*. at 107:5–6.) However, she became concerned by the content of the rally, specifically, regarding its emphasis on defunding the police, paired with the HHS OB/GYN Department being publicly thanked for its "help" in putting on the rally. (*Id*. at 107:7–108:20.) Dr. Gustilo noted her concern after the event—first congratulating her colleagues on its success—but then vocalizing discomfort in its message paired with the appearance of sponsorship by the OG/GYN Department. (*Id*. at 110:5–111:24.) Dr. Gustilo clarified that while she knew her colleagues attended in their personal capacity, she felt

---

[9]     WC4BL National Working Group, "Our Vision and Values," White Coats for Black Lives at *2, Published June 25, 2021, https://whitecoats4blacklives.org/wp-content/uploads/2021/07/WC4BL_Vision_Document_1_.pdf.
[10]     *Id*.

uncomfortable that the OB/GYN Department was publicly thanked in that forum, given the content of the rally. (*Id*. at 111:25–112:16.)

Consistent with the positions she took when sending out her letter, Dr. Gustilo explained her email and stance: "we should be very circumspect and thoughtful when we are going to take a stance as a department because we are a department of diverse individuals. And so we want to make sure that everyone in the department when we make kind of a statement as a department, that everyone in the department can be comfortable with that because they are part of the department[]" especially when that statement comes "from the entire department." (*Id*. at 116:11–19; 125:3–9.)

Dr. Gustilo stood by her actions noting, "I stand by the ideas and the placing a primacy on allowing people in the department to hold beliefs, personal beliefs, and for the department not to infringe on those beliefs unless absolutely necessary." (*Id*. at 146:7–11.) She further noted that at least one member vocalized her own discomfort in the tone of the White Coats for Black Lives rally. (*Id*. at 146:12–147:1.)

### Fall of 2020: Members of the OB/GYN Department disagree with Dr. Gustilo's posts on her personal Facebook page

In the Fall of 2020, some members of the department raised issue with Dr. Gustilo's personal Facebook page. Dr. Hilden testified "[t]here were concerns raised about Dr. Gustilo putting on public . . . forums like Facebook positions that could be reasonably interpreted as those of the organization." (Hilden Dep. at 37:7-13.) This concern supposedly stemmed from Dr. Gustilo using her personal Facebook page to fundraise for at-home blood pressure cuffs for pregnant mothers during the height of COVID-19.

(Gustilo Dep. at 162:1–163:9.) Dr. Hilden stated, "the concern was that she was blurring the lines between her personal views and those of the chair." (Hilden Dep. at 37:18-38:3.) Despite a particular interest in Dr. Gustilo's Facebook, HR did not typically review leaders' posts or social media posts. (*Id.*, Ex. L [Hauff Dep.] at 28:7–11.)

Included in the packet that would ultimately be provided to the MEC ahead of the consideration of Dr. Gustilo's demotion were emails of employees raising concerns that Dr. Gustilo's posts were offensive and political in nature. (St. Amant Decl. Ex. D at 34.) In a particular October 2020 email correspondence, where Dr. Gustilo was accused of having a mental breakdown, Dr. Prosen (anonymous in the email) pointed to an article Dr. Gustilo shared about an apple orchard near Hinkley referencing the "China virus." (*Id.*) Dr. Gustilo explained her reasoning for why she reposted the article to her personal Facebook page, including the origination of the virus and China's role in covering up the danger of the virus for its own benefit. (*Id.*) Dr. Gustilo also provided her own perspective as a person of color, as part Asian, she did not find the term "China virus" to be personally offensive. (*Id.*) Dr. Gustilo clarified, in respect to this Post, that she "was not using the term China virus[]" but rather that she sought to explain "why people are using the term China virus[]" in the first place. (Gustilo Dep. at 179:18–180:1.) She further clarified that she never thought the term "China virus" was necessarily appropriate, but rather only encouraged discussions surrounding the term's use. (*Id.* at 180:10–18.)

HHS, in this case, took the position that "in. . .modern healthcare, we are getting far away from describing pathological processed in geographic terms." (*Id.* at 57:25-58:17.) For this reason, Dr. Hilden asserted that Dr. Gustilo's reference to COVID-19 in terms of

its geographic location "would not be consistent with modern medical care." When Dr. Hilden was provided with examples of geographically labeled diseases, he claimed that such that practice was still "obsolete." (*Id*. at 59:25-60:3.) Dr. Hilden apparently disregards terms like the Zika Virus (referred to by the World Health Organization as recent as December of 2022).[11]

Hauff testified that Dr. Gustilo's personal Facebook posts were "not in keeping with Hennepin Healthcare values[.]" (St. Amant Decl. Ex. L [Hauff Dep.] at 24:7–16.) When asked for specific examples of what this "alignment" meant, Hauff testified "generally speaking, alignment with Hennepin's values on respect, compassion, teamwork . . . people feeling valued." (*Id*. at 25:24–26:8.) But Dr. Gustilo's Facebook posts reflect her thoughts and impressions on current issues and conversations on race, equality, and misinformation in the U.S.; they primarily include shared links with commentary and often invitations to engage her personal Facebook friends in a respectful discussion. (*See* St. Amant Decl. Ex. N at Gustilo0016) ("We all agree with the premise of innate equality of humans, black and otherwise. We all agree that this is an ideal that we as a country should seek to embody. The question is how best to achieve it . . . I am not seeking to tell you how to think about, just to think about it); (*See also* St. Amant Decl. Ex. N at Gustilo0019) ("Powerful speech, in my opinion. Makes me think. Would love to hear the thoughts of others. What do you agree with, what don't you? Why?").

---

[11]    World Health Organization, Zika Virus, December 8, 2022 https://www.who.int/news-room/fact-sheets/detail/zika-virus, (accessed September 5, 2023).

After fielding complaints about Dr. Gustilo's personal Facebook, Dr. Gustilo was asked to make a disclaimer on her Facebook page that her views were her own, which she complied with. (Hilden Dep. at 38:4-12.) She was also asked to make her Facebook private, which she did. (*Id*. at 185:14–21.) This issue was addressed and resolved in October 2020. (*Id*. at 36:20-38:12; St. Amant Decl. Ex. O.)

Although Hauff confirmed that an employee who puts a disclaimer on their social media brings them into compliance regarding HHS's policy on social media (*Id*., Ex. L [Hauff Dep.] at 27:9–28:6), Dr. Gustilo's Facebook page remained an issue consistently brought up in the OB/GYN Department—and would be prominently featured in the packet introduced to MEC before the vote to demote Dr. Gustilo, especially through a department-wide letter sent to Dr. Gustilo regarding her leadership. (*See, e.g.* St. Amant Decl. Ex. D at 4, 19, 33, 34, 35, 36, 41.) This Letter specifically highlighted the content of Dr. Gustilo's social media posts and how such content conflicted with the personal views of other members of the department.

> It has come to our attention, directly and indirectly, that you have expressed views on Facebook that are not representative of our institutional mission, or of our department or of us as individuals.

(*Id*. at 19.) Despite Dr. Gustilo following orders from HHS leadership on making her Facebook private and posting a disclaimer, this was not enough, as months after the issue was supposedly resolved, the members state: "as a visible leader in our institution, your posted beliefs may be construed to incorrectly represent Hennepin Healthcare, our department, and us as individuals." (*Id*.) Despite claiming that the members' grievances were not motivated by Dr. Gustilo's politics, they outlined the content they found to be

concerning, including posts that "imply" or state that racism does not exist, and "[p]osts that support others statements of blatantly racist comments." (*Id*.)

These communications indicate that it wasn't the "blurred line" that was truly the concern from some members of the Department, rather, that the content and nature of her posts were considered "offensive." (Hilden Dep. at 41:18-42:1.)

### *The OB-GYN Department's View of*
### *Dr. Gustilo as a Leader after May of 2020*

In the Fall of 2020, four physicians approached Dr. Hilden with alleged concerns regarding Dr. Gustilo, including Will Madland, Tracy Prosen, Elizabeth Alabi, and Laura Nezworski (Dr. Gustilo's eventual successor). (*Id*. at 29:14-24.) They told Dr. Hilden that the department was "imploding," and it was no longer a "safe space" to practice or receive care. (*Id*. at 29:5-30:6.) When they raised these concerns to Dr. Hilden, they specifically referenced "[t]he murder of George Floyd" and "[t]he events surrounding COVID-19." (*Id*. at 31:11-18.) Dr. Hilden commented, "[t]hey were in a clinical setting and she was trying to convince them of her personal views about things not related to work." (*Id*. at 31:5-7; see also Ex. MEC Packet at 29.)

Despite the Department's requests to write the Letter, attend the rally, and finding issue with Dr. Gustilo's personal Facebook page, Dr. Hilden recollected that it was Dr. Gustilo who "pushed those issues [] (*Id*. at 32:2-9) yet could not recall whether Dr. Gustilo simply brought "these things up out of the blue with her team[.]" (*Id*. at 32: 10-14.)

At the same time, however, Dr. Hilden testified that racial and social justice is a prominent concern for HHS. (*Id*. at 51:3-7.) A stated goal of the HHS organization is to

combat racism. (*Id*. at 51:16-52:8.) Dr. Hilden noted as such in email correspondence to Dr. Prosen, stating, "I am firm in that commitment to work alongside all of our Medical Staff, including all of you and Dr. Gustilo, toward ending racism in our organization to the very best of our ability." (*Id*.) Dr. Hilden also agreed that it was necessary, in 2020, to have sensitive discussions about race, stating, "[f]or decades we've talked about racial disparities in medicine. I think it's important that we try to reduce racial disparity . . . so . . .it's important that we discuss these issues in healthcare settings." (*Id*. at 54:19-55:23; St. Amant Decl. Ex. D at 32.) Despite that "[t]he whole organization was talking about racial justice issues[]" (*Id*. at 124:16–19.), Dr. Hilden noted to the MEC regarding Dr. Gustilo's demotion, that the "key point [was a] [l]ack of safety for people of color." (*Id*. at 120:22–121:9.) The explanation for this key point was that he had been told that people of color would not feel comfortable working here nor receiving care due to not feeling safe and Dr. Gustilo's supposed "insistence on attempting to impose her views about those types of issues on people, especially people of color, who never brought them up." (*Id*. at 121:6–122:11.)

When asked how Dr. Gustilo was supposed to approach these conversations happening around her, Dr. Hilden offered "[s]he may participate in the discussions about how our communities are best served in the healthcare setting[.]" (*Id*. at 127:6–16.) But that's exactly *what* Dr. Gustilo was doing, yet her views on how to end racism at HHS were not considered to be germane. (*Id*. at 52:9-14.) Despite Dr. Hilden's affirmation that racism in society leads to poor health outcomes for certain groups, Dr. Hilden claimed to be

unaware of Dr. Gustilo's shared concern and desire to eliminate disparate racial outcomes. (*Id*. at 54:15-53:7.)

Regarding the "COVID-19 issues," Covid was actually discussed "a lot" at HHS. (*Id*. at 46:3–6.) Yet, *Dr. Gustilo's* discussions regarding the origins of Covid left members of the department feeling "unsafe to practice medicine and to be an employee under a leader who was trying to lecture them repeatedly about global events." (*Id*. at 45:10–46:10.)

Despite numerous references to her viewpoints, Dr. Gustilo rarely discussed her politics at work. (Gustilo Dep. at 175:21–176:4.) And despite the stated concern regarding Dr. Gustilo's viewpoints resulting in the loss of patients (*Id*. at 85: 8-18.), HHS does not attribute the OB/GYN's financial performance to Dr. Gustilo's leadership. (*Id*. at 66:19–67:23.) Dr. Gustilo's beliefs, encompassed in her Facebook posts and rooted in both conversations in how COVID-19 was handled as well as debunking misinformation related to CRT, were cited as the "trigger" for her demotion. (*Id*. at 274:25–275:12; St. Amant Decl. Ex. P at 15:18-17:23.)

### *November 2020 to January 2021: HHS Retains HSDI for an "environmental study" where the lead investigator immediately concludes Dr. Gustilo must step down*

In November of 2020, HHS retained Human Systems Dynamics Institute ("HSDI") to conduct an "environmental study." (St. Amant Decl. Ex. Q.) HHS went directly to an "environmental study," without an attempt to mediate. (Hilden Dep. at 62:2-63:3.) This "environmental study" was led by HSDI employee Glenda Eyoang ("Eyoang"). (St. Amant Decl. Ex. Q.) Despite Dr. Gustilo's strong encouragement of mediation, it never happened. (*Id*., Gustilo Dep. at 196:14–197:16.) The explained reasoning for this: the employees were

"fearful" of Dr. Gustilo and had expressed concerns about HHS "forcing" them to speak with someone with "whom they were afraid." (*Id*.) The other stated concern was the fear of "retaliation," despite no proffered example of retaliation by Dr. Gustilo in the past. (*Id*. at 196:14–197:16, 221:3–11.) In fact, there was no record of Dr. Gustilo ever retaliating against any member of her department. (*Id*. at 230:20–231:8.) Dr. Gustilo did not even have the power to retaliate against her team members in the way of a demotion or a pay cut. (*Id*.) When asked whether Dr. Gustilo could retaliate against the members of department through performance reviews, she clarified that they did not even allow her to conduct performance reviews on the premise that she could unjustly review people, despite that she had never done so at any point prior, making such fear irrationally based. (*Id*. at 231:9–232:8.)

The HSDI Report was commissioned for "an assessment of the environment in the department" (Hilden Dep. at 94:17-20.) The stated plan of action included:

- Share stories of our experience working in the department;

- Hear the experience and concerns of others;

- Come to shared understandings of our differences and what we share;

- Explore options for action;

- Commit to a plan of action to establish and maintain patterns of personal and shared health, wellbeing, and productivity.

(*Id.*, St. Amant Decl. Ex. R.)  The alleged plan was "to review the report and then see what ways [HHS] could help the department move forward[.]" Dr. Hilden claimed to have "no preconceived about what the report would show." (Hilden Dep. at 94:21-95:3.)

The current challenge was identified as:

Tensions are running high in the OB/GYN department. On top of the COVID-19 crisis, political institutional, racial and personal tensions create leadership challenges. The current culture and habits of interaction are not rising to meet these emerging challenges, so tensions continue to escalate for many in the team. . .you would like support in facilitating dialogue, surfacing and responding to racial and political differences, and providing leadership development for those involved.

(*Id.*, St. Amant Decl. Ex. R.)  After the "Study" concluded, in the Patterns of Performance findings, HSDI noted "external factors," "amplified and revealed patterns of relationship and behaviors that do not support the expectations for Hennepin Healthcare leaders, its mission, values, DEI intent, and to support a diverse community." (St. Amant Decl. Ex. D at 13.) Among these "factors" were COVID-19 and the death of George Floyd. (*Id.*) The interviews, which were conducted with members of the Department and recorded, included intensely personal criticisms of Dr. Gustilo. In her interview, Dr. Alabi admits to Eoyang, "I will be honest in that I haven't had the best relationship with her over the last few years." (St. Amant Decl. Ex. S at 9:21-25.) Dr. Alabi's interview also included inconsistencies mirroring the overall tone of the Department's grievances of Dr. Gustilo: Dr. Alabi simultaneously criticized Dr. Gustilo's failure to "follow up" and "check in" on members of the Department (*Id*. at 7:19-8:11.), but also asserted that speaking with Dr. Gustilo is "traumatizing and triggering" for her, indicating a desire not to have conversations with her. (*Id*. at 13:3-19.) Both her and Tracy Prosen's interviews indicate that Dr. Gustilo's post-May 2020 views changed how they treated her. (*See id*. at 14:5-15:17) (I don't invest too much time into Tara until more recently when this kind of social media post kind of came through. I was disgusted and could not sleep for days after reading

and going through her Facebook); (*see also* St. Amant Decl. Ex. T at 4:1-21) ("in the past year, there's been a shift, and my main concern is kind of an overall philosophy change.); (*see also id*. at 12:13-18) ("[Dr. Gustilo's] personality changed so much that people didn't feel like they could trust her anymore.")

The following "themes" pertaining to Dr. Gustilo were also reported at the conclusion of the "Study":

- Personal perspective about race, community needs, DEI seems uninformed; comes across as judgmental.

- Unaware that statements that institutional racism doesn't exist is offensive and traumatic for many people, especially BIPOC individuals

- Response to those who supported White Coats/Black Lives became a divisive experience for the department and those that work closely with the department's members.

- Questions shared and requests to shift the language in the community letters to disparage demonstrators, request to use the reference to "riot" verses "peace demonstrations" resulted in the politicization of a letter meant to provide comfort and support.

(St. Amant Decl. Ex. D at 16.) The Report further notes that "[i]n personal interactions, people expressed being afraid or traumatized or triggered by [Dr. Gustilo.]" (*Id*. at 17.) Included in these "interactions," were the following: "Personal beliefs at odds, so people don't feel safe with her as leader." (*Id*. at 18.)[12]

Despite HSDI's stated goal of commitment to an action plan, Eyoang wrote to Dr. Hilden, Dr. Hoody, Hauff, and Linda Archer (Hauff's supervisor) that the interviews

---

[12] HHS did not listen to the interviews before Dr. Gustilo's demotion but, upon listening to them after litigation started, testified that the interviews contained no information they had not already been aware of. (HHS Dep. at 97:11–20.)

contained the "same issues of racism," and "misalignment with the mission and values" of HHS. (St. Amant Decl. Ex. U.) On January 13, 2021, the lead investigator/interviewer of the "environmental study," Eoyang seemingly made up her mind, conveying to Hauff, "I do hope [Dr. Gustilo] understands the need for her to leave." (St. Amant Decl. Ex. V.) Despite Hauff's shared sentiment, she had only met with Gustilo *once* regarding the present issues in her Department at that point. (*Id.*, Ex. L [Hauff Dep.] at 68:20–24.)

Hauff further testified that despite a goal for such action plan, there was no plan in writing ever put into place. (*Id.* at 60:25–61:8; 62:8–19.) Only a few days later, as represented by the timeline produced by HHS itself, "Dr. Hoody and Jennifer Hauff me[t] with Dr. Gustilo to share with her the themes from the report. At this meeting, Dr. Gustilo was asked to consider voluntarily step down from her Chair responsibilities." (Hilden Dep. at 95:4-15.)

While there were several meetings leading up to Dr. Gustilo's demotion,[13] (*see* St. Amant Decl. Ex. W), with an insistence that demotion was only "one option," among those of mediation, coaching, or facilitated conversations, there is no evidence that any of those other avenues were ever meaningful considered or pursued. (Gustilo Dep. at 100:21-101:9.) Dr. Gustilo believed her political beliefs, paired with how she viewed race and equity issues, served as the basis for her demotion. (*Id.* at 228:16-21, 229:4–13.)

HHS does not contend that Dr. Gustilo's off-duty speech caused any disruption to the OB/GYN Department. (HHS Dep. at 87:24–88:2.) HHS has no policy dictating political

---

[13]     Dr. Gustilo recorded these conversations because she felt she was being treated unjustly wanted an accurate record. (Gustilo Dep. at 219:12–17.)

affiliation of its employees, according to HHS, "people may choose to . . have whatever political affiliation they choose." (*Id*. at 79:16–23.) In terms of Dr. Gustilo's on-duty speech, HHS claims that the members' "fear" of Dr. Gustilo "distracted and disrupted" from patient care, as well as their "discomfort," and "fear" of getting their earned income taken away if they did not agree with Dr. Gustilo's viewpoints. (*Id*. at 88:7–89:12.) HHS contends that Dr. Gustilo disrupted department operations by trying to persuade people into her viewpoint. (*Id*.) HHS contends that these factors caused a lack of support, which in turn disrupted Department operations. (*Id*. at 90:6–18.)

### *The Pretextual Reasons for Dr. Gustilo's Demotion*

Several pretextual reasons were cited throughout the MEC packet as well as in Defendant's Opposition to Plaintiff's EEOC charge, including Dr. Gustilo's failure to show up for meetings or show up on time, (St. Amant Decl. Ex. D at 16) (Dr. Gustilo is "chronically tardy," she "schedules meetings and does not attend"), a 2017 Incident involving a patient's refusal to be treated by African American providers, (St. Amant Decl. Ex. X) and an incident involving salary cuts for the midwives in the Department. (St. Amant Decl. Ex. D at 21.)

There has historically always been tension between the doctors and midwives in the OB/GYN Department. (*Id*., Ex. Y [Nezworski Dep.] at 22:22–23:8.) Dr. Nezworski, now permanent Chair of the OB/GYN Department, admitted to this ongoing tension even in present-day. (*Id*.) When Dr. Gustilo attempted to unify the department by showing support for the midwives—where tension constantly plagued the Department between the two groups—she was vilified for that effort. This materialized when Dr. Gustilo raised the issue

of midwife salary cuts in mid-2020 as part of the overall budget reductions in 2020. (*Id.*, Ex. D at 21.) Dr. Gustilo suggested the doctors, making significantly more, should take a minor pay cut to cover the loss in salary and show their support. (*Id.*) Dr. Gustilo also believed the issue should be brought to a vote. (*Id.*)

While the majority of the department initially voted against Dr. Gustilo's efforts to support the midwives, Dr. Gustilo realized that the members of the Department had not been provided all the critical information to be considered when voting, thus putting it to re-vote. (*Id.*) She clarified that she asked for a second vote "because after the first vote there was some discussion about how the midwives made so much more than the nurse practitioners . . . that wasn't true." (Gustilo Dep. at 172:10–24.) Due to this misinformation or misunderstanding regarding the midwives' situation, Dr. Gustilo decided it was appropriate to ask for a second vote. (*Id.* at 172:10–173:8.) Dr. Gustilo made clear that following this clarification, "[i]f the majority still do not want to do this, it will not happen and I will say no more." (*Id.*, St. Amant Decl. Ex. D at 21.)

Hauff also testified that there were concerns regarding Dr. Gustilo failing to show up for meetings. (St. Amant Decl. Ex. L [Hauff Dep.] at 29:20–30:18.) But Hauff could not point to any specific document memorializing the issue or steps for correction, much less any document recounting this issue before May of 2020. (*Id.* at 29:20–30:18.) But apart from the 2017 incident regarding a patient refusing to be seen by African American care providers, Hauff could not point to any concern—much less any material concern— regarding Dr. Gustilo's performance. (*Id.* at 32:1–6.) In a January 5, 2021 email, after the "environmental study" concluded, Hauff sent the 2019 employee engagement survey to

Dr. Hoody, Dr. Hilden, Archer, and Eoyang, stating "[p]lease see the comments, especially the department functions report. Similar themes as what we have heard regarding Tara' involvement in the department. These aren't as egregious as recent feedback, but would support that this has been building for some time." (St. Amant Decl. Ex. Z.) Despite Hauff's search for pretextual reasons, she could not recall whether any of these "similar themes" were ever addressed. (*Id*., Ex. L [Hauff Dep.] at 34:9–20.)

In 2017, around the same time that Dr. Gustilo received high reviews in her department feedback, there was an Incident where two African American physicians reported that a patient at the clinic refused to be treated by an African American healthcare provider. (*Id*., Ex. L [Hauff Dep.] at 15:19–17:1; Ex. AA.) Dr. Gustilo responded that there was no hospital policy at the time regarding a patient's refusal to be seen or treated by an African American healthcare provide. (*Id*.) While a memorandum was written with follow-up recommendations, none that directly related to Dr. Gustilo's conduct but rather suggested how to handle similar issues in the future; no follow-up was ever had directly with Dr. Gustilo regarding this Incident, especially since there was no HHS policy regarding this issue. (*Id*., Ex. L [Hauff Dep.] at 19:16–21:13.) There were no further concerns regarding Dr. Gustilo for three years. (*Id*. at 21:14–22:5.)

### *Dr. Gustilo's Demotion*

Under Section 9.5-6 of HHS procedure, "[a] Department Chair may be moved by action of the Governing Body or by a two-thirds vote of all members of the MEC that the Governing Body subsequently approves. Removal from office alone has no effect on Medical Staff appointment or Clinical Privileges" (St. Amant Decl. D at 12.) In the time

32

since Dr. Gustilo had been a member of the MEC, no one had ever been removed as chair through this procedure. (Gustilo Dep. at 227:6–11.)

Prior to the meeting, members of the Committee were provided with a 90-page packet with documents supporting the call to demote Dr. Gustilo. (Hilden Dep. at 137:8–16.) MEC members were expected to review this packet prior to the meeting. (*Id*. at 135:17–21.) Several members recalled reviewing the contents of the packet before voting. (St. Amant Decl. Ex. BB [Linzie Dep.] at 18:22-19:2; Ex. CC [Cutts Dep.] at 13:24-14:11, Ex. DD [Fey Dep.] at 17:21-19:7, Ex. EE [Engel Dep.] at 23:25-24:12.)

Dr. Gustilo also provided a packet ahead of the meeting, though some members testified that they could not recall receiving or reviewing this packet ahead of their vote to demote Dr. Gustilo. (Hilden Dep. at 137:8–16.) (St. Amant Decl. Ex. FF [Starchook Dep.] at 16:21-17:15; Ex. CC [Cutts Dep.] at 20:23-21:1.)

Dr. Hilden's presentation was approximately 10-15 minutes. (Hilden Dep. at 120:13–16.) Dr. Gustilo was given a chance to speak where she attempted to reiterate what she had been attempting to convey to the members of her Department and HHS leadership all along; that it was important to have discussions around dissenting views, especially when it came to racial inequities and the origins of COVID-19 and how individuals treat others with dissenting views. (*See id*., Gustilo Dep. at 260:5–23.) Dr. Gustilo additionally recalled stating that she felt like a canary in the coal mine, attempting to raise concerns with the issues boiling up at HHS, as someone whose father worked at Hennepin County and had cared deeply about the organization for a long time. (*Id*. at 260:24–261:19.) With this institutional knowledge, Dr. Gustilo reiterated that she slowly saw HHS closing open

debate and a lack of willingness to consider a diversity in opinion. (*Id*.) Confirming this fear, the MEC ultimately voted to demote Dr. Gustilo. (See *id*.)

The discussion before the Board of Directors' ratification lasted "less than ten minutes," "maybe five." (Hilden Dep. at 151:19–152:11.) After the MEC's vote, the HHS Board of Directors approved and ratified the MEC's decision in all respects through a roll call vote. (*Id*. Ex. [HHS Dep] at 75:25–76:16.)

In late January of 2021, after Dr. Gustilo was placed on paid administrative leave, Dr. Nezworski, a white woman, was placed as acting chair of the OB/GYN Department. (*Id*. at 92:10–93:13.) She was not considered "next" seniority-wise. (*Id*. at 93:14–16.) Dr. Nezworski now serves as permanent chair of the OB/GYN Department. (*Id*. at 95:9–10.)

## LEGAL STANDARD

Summary judgment is only appropriate if there is "no genuine dispute as to any material fact" therefore entitling the movant to "judgment as a matter of law." Fed. R. Civ. P. 56(a); *TCF Nat'l Bank v. Mkt. Intel., Inc.*, 812 F.3d 701, 707 (8th Cir. 2016) (defining material fact as one that may affect the action's outcome). The Court must view the evidence and any reasonable inferences drawn from it in the light most favorable to Plaintiff. *Windstream Corp. v. Da Gragnano*, 757 F.3d 798, 802–03 (8th Cir. 2014). Thus, summary judgment is only proper if the nonmoving party fails to "establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"Summary judgment should seldom be granted in the context of employment actions, as such actions are inherently fact based." *Walker v. Nw. Airlines, Inc.*, No. CIV.

00-2604 (MJD/JGL), 2004 WL 114977, at *7 (D. Minn. Jan. 14, 2004). If there exists conflicting evidence upon which reasonable people might differ, there is sufficient evidence to survive summary judgment. *Hocevar v. Purdue Frederick Co.,* 223 F.3d 721, 727 (8th Cir. 2000).

## ARGUMENT

### I.     HHS VIOLATED TITLE VII AND THE MINNESOTA HUMAN RIGHTS ACT

Eliminating racial discrimination means eliminating all of it. *Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*, 600 U.S. __ at 15 (2023); *Yick Wo v. Hopkins*, 118 U. S., 356, 369 (1886). The Supreme Court recently reiterated this concept in *Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*, reaffirming the result of *Brown v. Board of Education*, 349 U.S. 294, 300-301 (1955) specifically, that the time for making distinctions on the basis of race has passed and is fundamentally unconstitutional and discrimination on the basis of race is unconstitutional, even if well meaning. *Id*. While the Supreme Court treated the Title VI and equal protection analysis as identical, Justice Gorsuch's concurrence went into detail on why this is so, and due its uniformity, thereby extended such analysis to Title VII as well.

The premise of *Students for Fair Admissions, Inc.* is thus directly applicable here: racial discrimination is racial discrimination even if well-meaning or seemingly innocuous. Specifically, "it is becoming increasingly clear that discrimination on the basis of race— often packaged as 'affirmative action' or 'equity' programs—are based on the benighted notion 'that it is possible to tell when discrimination helps, rather than hurts, racial

minorities.'" 600 U.S. ____ at 32, (2023) (citing *Fisher v. University of Texas Austin*, 570 U.S., 297, 328 (2013) (THOMAS, J., concurring). "The Constitution abhors classifications based on race, not only because those classifications can harm favored races or are based on illegitimate motives, but also because every time the government places citizens on racial registers and makes race relevant to the provision of burdens or benefits, it demeans us all." *Id.* (citing *Grutter v. Bollinger*, 539 U.S. 306, 353 (2003) (opinion of THOMAS, J.)).

"Congress has passed numerous laws—such as the Civil Rights Act of 1875—under its authority to enforce the Fourteenth Amendment, each designed to counter discrimination and each relying on courts to bring a skeptical eye to alleged discriminators." *Id.* Under Title VII, Congress made it "unlawful . . . for an employer . . . to discriminate against any individual . . . because of such individual's race, color, religion, sex, or national origin." §2000e–2(a)(1). Title VII codifies a categorical rule of "individual equality, without regard to race." *Regents of Univ. of Cal. v. Bakke*, 438 U. S. 265, 416, n. 19 (1978) (opinion concurring in judgment in part and dissenting in part). As such, Title VII tolerates no racial discrimination, subtle or otherwise. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801 (1973).

The principles of Title VII squarely contradict those of critical race theory ideology. Critical race theory instead calls for *equity*, rather than equality. The difference of just a few less vowels, though seemingly innocuous, is entirely offensive to Title VII because CRT's implementation of equity demands race-based discrimination on the premise that systemic racism has produced disparities between the races, thereby requiring them to be

treated differently. (*See* Gustilo Decl.) It is these fundamental tenets which Dr. Gustilo believes to be inconsistent with her role as a healthcare provider and healer, and the very tenets to which she spoke out against at HHS—suffering both discrimination and retaliation as a result.(*See id.*)

## A. Retaliation Under Title VII and the Minnesota Human Rights Act

To establish a prima facie case of retaliation, a plaintiff must present evidence that (1) he engaged in a protected activity; (2) an adverse employment action was taken against him; and (3) a causal connection exists between the two. *Barker v. Missouri Dep't of Corr.*, 513 F.3d 831, 835 (8th Cir. 2008); *Thompson v. Bi–State Dev. Agency*, 463 F.3d 821, 826 (8th Cir. 2006). "To prove unlawful retaliation, [the employee] must show that she complained of discrimination, the [employer] took adverse action against her, and the adverse action was causally related to her complaint," citing *Marzec v. Marsh,* 990 F.2d 393, 396 (8th Cir.1993)); *Smith v. St. Louis Univ.,* 109 F.3d 1261, 1266 (8th Cir.1997) (describing these elements as establishing a *prima facie* case of retaliation). Once this *prima facie* showing is made, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. Under Minn. Stat. § 363A.15, reprisal includes, but is not limited to, any form of intimidation, retaliation, or harassment in connection with certain activities, such as the assigning the individual to a lesser position in terms of wages, hours, job classification, job security, or other employment status. Minnesota State Courts give "strong weight to federal court interpretations of Title VII claims because of the substantial similarities between the two statutes." *Wayne v.*

*MasterShield, Inc.,* 597 N.W.2d 917, 921 (Minn. Ct. App. 1999), *review denied* (Minn. Oct. 21, 1999).

"To defeat summary judgment on a retaliation claim, a plaintiff must produce either direct evidence of retaliation, or create an inference of retaliation under the *McDonnell Douglas* burden-shifting framework." *Young–Losee v. Graphic Packaging Int'l, Inc.,* 631 F.3d 909, 912 (8th Cir.2011). The plaintiff may present admissible evidence directly indicating unlawful discrimination, that is, evidence showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action. *Russell v. City of Kan. City, Mo.,* 414 F.3d 863, 866 (8th Cir. 2005). Alternatively, if the plaintiff lacks such evidence of discrimination, she may survive the defendant's motion for summary judgment by creating an inference of unlawful discrimination under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04 (1973). To make a claim for Title VII race discrimination, a party must show (1) that she is a member of a protected class; (2) who was meeting the legitimate expectations of her employer; (3) who suffered an adverse employment action; and (4) that similarly situated employees outside the protected class were treated differently. *Carpenter v. Con–Way Cent. Express, Inc.,* 481 F.3d 611, 616 (8th Cir. 2007).

A plaintiff is not required to disprove an employer's adverse employment action at the summary judgment stage. *See Riley v. Lance, Inc.,* 518 F.3d 996, 1000 (8th Cir.2008); *Davenport v. Riverview Gardens Sch. Dist.,* 30 F.3d 940, 944 (8th Cir. 1994).

If this were the case, *McDonnell Douglas* burden-shifting analysis would collapse into the second element of the prima facie case. *See Davenport,* 30 F.3d at 944 ("[B]y requiring plaintiff to disprove the alleged conduct violations in order to establish his prima facie case, the district court essentially required plaintiff, at the outset, to disprove defendant's alleged business reasons for its adverse employment action—in other words, to prove pretext and the ultimate issue of intentional discrimination."). "The prima facie burden is not so onerous." *Id., quoting Johnson v. Arkansas State Police,* 10 F.3d 547, 551 (8th Cir.1993).

i.    Direct Evidence of Retaliation

"Direct evidence of retaliation is evidence that demonstrates a specific link between a materially adverse action and the protected conduct, sufficient to support a finding by a reasonable fact finder that the harmful adverse action was in retaliation for the protected conduct." *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 57, 68 (2006). In demonstrating evidence of direct retaliation, Dr. Gustilo was told by Hauff in a March 10, 2021 meeting, in the presence of other HHS leadership, that her stated beliefs served as the "trigger" for her demotion. (Gustilo Dep. at 274:25–275:12; St. Amant Decl. Ex. P.) Those beliefs encompassed Dr. Gustilo's vocalized beliefs against CRT and in support of nondiscrimination under Title VII. There is no genuine dispute that this *isn't* direct evidence of retaliation, as HHS admits to Dr. Gustilo that her beliefs initiated the demotion process.

While HHS may attempt to walk back this admission, such refutation, if anything, only emphasizes the impropriety of granting summary judgment because it creates a genuine dispute of material fact as to *what* HHS leadership could have meant when making

39

that admission in a meeting that ultimately led to Dr. Gustilo's demotion. Dr. Gustilo's claim of retaliation under Title VII and MHRA accordingly survives based on such dispute.

ii.    Circumstantial Evidence of Retaliation

Dr. Gustilo also makes a sufficient circumstantial showing of retaliation under Title VII. As discussed above, the tenets of CRT are inconsistent with the demands of Title VII. Title VII demands non-discrimination on the basis of race while CRT requires discrimination on the basis of race, in order to yield equal racial group outcomes under the conception of "equity." But the Supreme Court has just recently made clear, "[r]acialism simply cannot be undone by different or more racialism." *Students for Fair Admissions*, 600 U. S. ____ at 48 (2023) (Thomas, J., concurring). Because these two concepts are incompatible with each other, the natural byproduct of Dr. Gustilo's vocalized dissent of CRT's instantiation at HHS creates an inference of retaliation under Title VII.

If a plaintiff presents *indirect evidence* of retaliation, then courts must proceed under the single-motive analysis articulated in *McDonnell Douglas. See id.* Once the plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a non-discriminatory reason for the employment action. *See id.* If the employer identifies such a reason, then the burden shifts back to the plaintiff to present sufficient evidence that the proffered reasons were actually a pretext for intentional discrimination. *See id.*

Dr. Gustilo's vocalized dissent and the timing of HHS's actions rise to an inference of retaliation. This is first highlighted in Dr. Gustilo's vocal opposition to the appearance of sponsorship at the White Coats for Black Lives rally, on the basis that any alleged

support of such organization not only violated HHS's policies regarding sponsorship, but importantly, violates principles of non-discrimination.

HHS's retaliation is next highlighted through a board retreat in July, where Dr. Gustilo attempted to convey her concerns with the conflicting and offensive ideology encompassed under CRT, specifically, issues of defunding the police, and the harm to communities HHS served by such action. CMO Dr. Hoody found Dr. Gustilo's comments in defense of nondiscriminatory principles comments to be "racist."

Dr. Gustilo's personal Facebook posts were also frequently brought up by HHS leadership and members of the OB/GYN Department. (*See* St. Amant Decl. Ex. MEC Packet.) Members specifically took issue with "[p]osts that imply or directly state that racism does not exist in our society," as well as "[p]osts that support others (sic) statements of blatantly racist comments." (*Id*. at 19.) These Facebook posts were instead directly in line with Title VII principles, with sentiments such as: "I agree that people should not be judged by the color of their skin but by the content of their character[;]" (St. Amant Decl. Ex. N, Gustilo0017,) "I encourage you to actually read the platform of BLM hosted at M4BL . . . BLM and M4BL lays out the path they seek to racial justice . . . [l]ooking at recent events and what has occurred recently in democratic run cities, is this the path forward for our country?" (St. Amant Decl. Ex. N, Gusitlo0018).

One of Dr. Gustilo's Facebook posts called out the roots of CRT ideology and the harmful connotations that looked all too familiar to Dr. Gustilo's workplace environment at HHS:

> The Marxist takeover is what is important, not the individual issues or what is Right. . .a man named Manning Johnson who in 1958 wrote a book called 'Color, Communism and Common Sense,'. . .had been in the Communist Party for ten years and then became a whistle blower. . .[because the party was]. . .[c]reating doubt, lack of confidence, suspicion; setting up situations that bring racial bitterness, violence and conflict; putting forth demands so unrealistic that race relations are worsened; attacking everybody in disagreement as reactionaries, fascists, Ku Kluxers among whites and Uncle Toms among Negroes[.]

(St. Amant Decl. Ex. M at Gustilo0024.)

Finally, Dr. Gustilo spoke out against the transformation of the Doula Program, a program that sought to embrace and incorporate various cultures into the treatment of care, to one that purported to be segregated care.

These instances of vocalized dissent constitute protected activity under Title VII because in each instance, Dr. Gustilo spoke out against what she believed to be HHS's encouragement of discrimination by race. Dr. Gustilo's Facebook posts are no exception, as they outline her concerns regarding the implementation of these ideologies in society and are referenced heavily in the MEC Packet upon which the MEC based their decision.

Only a few months following this dissent, Dr. Gustilo's competency as a leader was suddenly materially questioned when it had never been previously; Dr. Gustilo's reputation at HHS—that she had worked to build over twelve years—was quickly destroyed in less than twelve months. A plaintiff may establish a causal connection between protected activity and an adverse action either through (a) "an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action," *or* (b) "a pattern of antagonism coupled with timing to establish a casual link." *Budhun v. Reading*

*Hosp. & Med. Ctr.*, 765 F.3d 245, 257 (3d Cir. 2014) (quoting *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007)).

Dr. Gustilo's advocacy for compliance with what Title VII requires, specifically, her dissent to policies that encourage discrimination is a protected activity. In each of the above instances, Dr. Gustilo advocated for Title VII compliance through the articulation of nondiscriminatory principles.

### B. Racial Discrimination under Title VII and the Minnesota Human Rights Act

In racial discrimination cases, a plaintiff may survive a defendant's motion for summary judgment by similarly showing direct or circumstantial evidence of discrimination under the *McDonnell Douglas* burden-shifting analysis and framework. Under Minn. Stat. § 363A.08, subd. 2, it is an unfair employment practice for an employer to discriminate against an employee on the basis of race, color, creed, religion, and national origin, among other things.

First, Dr. Gustilo maintains the admission that her beliefs served as "the trigger" for her demotion is direct evidence of not only retaliation, but discrimination itself. As an Asian-American woman of color, Dr. Gustilo is a member of a protected class. Before May of 2020, Dr. Gustilo was meeting the legitimate expectations of HHS; only approximate two years prior, she underwent a vigorous review process and had been promoted to permanent chair of the OB/GYN Department. As Chair of the OB/GYN Department, Dr. Gustilo had high performance reviews and overall satisfaction among members of her Department and HHS leadership. Yet, after May of 2020, Dr. Gustilo began to oppose the

instantiation of the illiberal CRT ideology at HHS—which ultimately led to her demotion. Below are circumstances, all of which are referenced in the MEC packet, giving rise to an inference of discrimination:

- Dr. Gustilo's opposition to recognition of the OB/GYN Department as an official sponsor at the White Coats for Black Lives Rally given both the content of the Rally (the push to defund the police) and the lack of consensus of support from the entire department regarding the nature and content of the Rally itself.

- Dr. Gustilo's personal Facebook posts, many of which question the principles of CRT and the potential harmful effects it could have on achieving justice and equality.

- Dr. Gustilo's vocalized opposition to HHS equity initiatives.

Throughout each of these actions, Dr. Gustilo vocalized her dissent through the lens of opposition to the principles of CRT.

One of the bases for Dr. Gustilo's demotion was her alleged failure to listen to concerns or understand different perspectives. This is pretextual. Throughout her written correspondence, Dr. Gustilo emphasizes gratitude to the members of her department for their efforts, engagement in discussion, and a willingness to listen to other perspectives.

The Members of the OB/GYN Department also vocalized a fear of retaliation. Yet nowhere in any documentation or testimony could one single person point to provide any instance of retaliation by Dr. Gustilo. This, of course, is also a pretextual excuse for HHS's discrimination of Dr. Gustilo. It wasn't because issues of racism and inequality could not be talked about in the workplace at HHS—because they were in fact being discussed

frequently. It was not because Dr. Gustilo failed to listen or consider other viewpoints—because she did in fact repeatedly emphasize her understanding and willingness to listen. Instead, it was because Dr. Gustilo, an Asian-American woman who had long been touted for representing HHS' mission, did not fit the expected role of a person of color who should endorse the new illiberal anti-racism that advocates for racial discrimination in order to equalize outcomes. When she diverged from what was expected of her as a woman of color, she was vilified; her long-standing reputation and regard at HHS was ruined, and her long-standing tenure as a successful chair of the OB/GYN Department was destroyed and replaced with pretextual and vague reasons for her demotions, reasons that could never be remedied no matter how hard Dr. Gustilo tried. Thus, there is a genuine dispute of material fact as to whether Dr. Gustilo's beliefs and opposition, as a woman of color, served as the basis for the discriminatory treatment she faced after voicing such opposition—especially considering the stark contrast of how she was treated and uplifted as a role model in the HHS community prior to her vocalized opposition of CRT ideology.

Finally, regarding the fourth factor of the *McDonnell Douglas* test, Dr. Gustilo was treated differently than a similarly situated employee outside of the protected class. After Dr. Gustilo was placed on administrative leave, she was replaced by a white woman (Dr. Nezworski), who towed the line to the ideology HHS agreed with, despite that Dr. Nezworski was not the next most senior Department member. There exists a genuine dispute of material fact as to whether Dr. Gustilo, an Asian-American woman who was demoted for holding views HHS found incompatible with what it regards as the only true

viewpoint of a woman of color, was discriminated against when replaced by Dr. Nezworski, a white woman.

### C. There is a Genuine Dispute of Material Fact as to Whether HHS's Reasoning for Dr. Gustilo's Demotion is Pretextual

A plaintiff can avoid summary judgment when evidence considered in its entirety (1) creates a fact issue as to whether the employer's proffered reasons are pretextual and (2) creates a reasonable inference that race was a determinative factor in the adverse employment decision. *Rothmeier v. Investment Advisers, Inc.,* 85 F.3d 1328, 1336-37 (8th Cir. 1996). The second part of the test may sometimes be satisfied without additional evidence where the overall strength of the prima facie case and the evidence of pretext "suffice[s] to show intentional discrimination." *Id.*

"A plaintiff may show that the employer's explanation is unworthy of credence . . . because it has no basis in fact. Alternatively, a plaintiff may show pretext by persuading the court that a [prohibited] reason more likely motivated the employer." *Id.* (alterations in original) (citations omitted) (internal quotation marks omitted).

As discussed above, there were several pretextual reasons for Dr. Gustilo's demotion, several of which included vague accusations amounting to Dr. Gustilo's "inability to lead." However, HHS cites other pretextual reasons fail on an even more fundamentally direct level.

First, regarding the 2017 Incident, the issue itself did not involve any alleged racism on behalf of Dr. Gustilo. Instead, the 2017 Incident focused on a patient's refusal to undergo treatment by African American healthcare providers. While these providers were

upset by Dr. Gustilo's handling of the situation, Dr. Gustilo was bound by the lack of HHS policy addressing such issue. Even after the issue was briefed in a memorandum with certain action items, there was never any follow-up with Dr. Gustilo or further complaints regarding this issue. HHS cannot cite to an incident that occurred over three years prior to the allegedly offensive behavior, and then rely on this as a basis for Dr. Gustilo's demotion.

Second, regarding Dr. Gustilo's timeliness or appearance at meetings, there is no documentation prior to May of 2020 demonstrating issues relating to tardiness or absence. Further, there is no evidence demonstrating a plan was ever put in place (post May 2020) to address alleged concerns relating to her alleged tardiness or absence.

Finally, the midwife issue cannot be the grounds for termination that HHS wishes it to be. Dr. Nezworski testified of the long-standing tension between the differing care providers in the OB/GYN Department. Dr. Gustilo, seeking to alleviate that tension and show support for the midwifes, asked her Department to vote to support them, ensured they had the correct information to support such vote, and made clear that she would not prod the issue further after the Department made an informed decision. This, at minimum, creates a genuine dispute of material fact regarding the propriety of Dr. Gustilo's behavior as Chair in a long-divided department—a question most appropriate and suitable for the jury to consider.

HHS's reasons for demotion are entirely pretextual, based on a lack of documentation, pertain to years-old and isolated disputes, and as a whole fail on the basis of flimsy reasoning.

## II.  DR. GUSTILO'S FIRST AMENDMENT RETALIATION SURVIVES SUMMARY JUDGMENT BY HHS'S OWN ADMISSIONS UNDER OATH

### A. HHS's Board of Directors Ratified the MEC's Decision to Demote Dr. Gustilo

HHS maintained an unconstitutional policy by ratifying the MEC decision. "[M]unicipal liability under § 1983 attaches where—and only where— a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. Cincinnati*, 475 U.S. 469, 483-84 (1986). A subordinate who lacks policymaking authority may bind the final policymaker if the final policymaker either delegated power to the subordinate or ratified the subordinate's decision. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988). Notably, "[a] final policymaker ratifies the decision of a subordinate when he or she takes an affirmative act to approve *both the decision* and *the basis for the decision*." *Soltesz v. Rushmore Plaza Civic Center*, 847 F.3d 941, 947 (8th Cir. 2017) (citing *Praprotnik*, 485 U.S. at 127) (emphasis added). Ratification occurs where the final policymaker has "both knowledge of the alleged constitutional violation, and proof that the policymaker specifically approved of the subordinate's act." *Id.* (citing *Lytle v. Carl*, 382 F.3d 978, 988 n.2 (9th Cir. 2004)).

Although HHS is correct that "simply going along with discretionary decisions made by one's subordinates," is legally insufficient, the Board's action here amounted to much more than simply "going along" with MEC's conduct; it ratified and approved

MEC's decision. *Soltesz v. Rushmore Plaza Civic Center*, 847 F.3d 941, 947 (8th Cir. 2017). HHS's deposition testimony affirmed its ratification:

> Q:      And after the MEC's vote it's accurate to say that the HHS board . . . approved and ratified the MEC's decision in all respects; correct?
>
> ***
> A:      The board of directors approved it in a roll call vote.
>
> ***
> Q:      And that would include the basis for the decision?
>
> A.      Yes.

(HHS Dep. at 75:25-76:15.). In addition, Dr. Hilden himself identified that the governing body must ratify or approve the MEC's decision to give it effect. (Hilden Dep. at 115:16-20, 152:9-11).

Because MEC's decision was based on the unconstitutional violation of Dr. Gustilo's First Amendment rights, so was the HHS Board's action. MEC's decision was based in part on the MEC packet which included numerous discussions of her Facebook posts. (*See* MEC Packet at 13, 17, 19, 21, 34, 63, 67.) In addition, the MEC decision was based upon "anonymous feedback from employees," which, as discussed in the MEC packet, were based in part on the Facebook posts as well. (*Id.*) In Dr. Hilden's memorandum to the Board, which was presented and considered at the Board meeting, he highlighted that "during *robust discussion* the MEC noted the following critical points as a basis for their decision," which summarized the conclusions from its meeting, and the "six-month process," and "hundreds of pages of documents." (Hilden Dep. at 149:1-22) (emphasis added). That "six-month process" and "hundreds of pages of documents"

included robust discussion of Dr. Gustilo's Facebook posts, which cumulated into the MEC's findings. *Id.* This evidence, viewed in the light most favorable to Dr. Gustilo, supports that the Board did in fact have knowledge of the unconstitutional violation and it specifically approved of it by ratifying Dr. Gustilo's demotion. Nevertheless, the issue of whether a final policymaker ratified a subordinate's decision is a question of fact for the jury to decide and should not be decided at this stage. See *Christie v. Iopa*, 176 F.3d 1231, 1238–39 (9th Cir. 1999).

**B.  Because HHS Testified that Dr. Gustilo's Personal Facebook Posts Did Not Impact OB/GYN Department's Operations, There is a Genuine Dispute of Material Fact as to Whether HHS Retaliated Against Dr. Gustilo for her Personal Facebook Posts under the First Amendment**

Public employees do not surrender all their First Amendment rights solely due to their employment. *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). Rather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern. See, *e.g., Pickering v. Bd. Of Ed. Of Tp. High School Dist. 205, Will Cnty., Illinois*, 391 U.S. 563, 568 (1968); *Connick v. Myers*, 461 U.S. 138, 147 (1983); *Rankin v. McPherson,* 483 U.S. 378, 384 (1987); *United States v. Nat'l Treasury Emps. Union,* 513 U.S. 454, 466 (1995). "The typical *Pickering-Connick* case involves a government employee causing workplace disruption by speaking as a citizen on a matter of public concern, followed by government action adversely affecting the employee's job." *Thompson v. Shock*, 852 F.3d 786, 791 (8th Cir. 2017)*.* This "test provides flexible weighing of the case-specific facts to balance the interests of the government with those of the employee." *Id.*

The *Pickering* analysis includes two inquiries to guide interpretation of the constitutional protections afforded to public employee speech. First, the court must determine whether the employee spoke as a citizen on a matter of public concern. *Pickering*, 391 U.S. at 568. If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech. *See Connick*, 461 U.S. at 147. If the answer is yes, then the possibility of a First Amendment claim arises.

Second, the court must determine whether the employee's speech has undermined the effective function of the public employer's enterprise. *Richardson v. Sugg*, 448 F. 3d 1046, 1062 (8th Cir. 2006) (citing *Rankin v. McPherson,* 483 U.S. 378, 388 (1987)).

While government employers have a considerable amount of discretion to manage their operation, including the assurance that their employees' official communications are accurate, demonstrate sound judgment, and promote the employer's mission, the First Amendment limits the ability of a public employer to leverage the employment relationship to restrict, incidentally or intentionally, the liberties employees enjoy in their capacities as private citizens. *See Perry v. Sindermann,* 408 U.S. 593, 597 (1972). So long as employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are *necessary for their employers to operate efficiently and effectively. See*, *e.g., Connick*, 461 U.S. at 147. ("Our responsibility is to ensure that citizens are not deprived of fundamental rights by virtue of working for the government") (emphasis added). The court in *Garcetti v. Ceballos* found that "many citizens do much of their talking inside their respective workplaces, and it would not serve the goal of treating public employees like "any member of the general public" in holding that all speech within

the office is automatically exposed to restriction. 547 U.S. 410, 420-421 (2006) (citing *Pickering,* 391 U.S. at 573).

      i.      <u>HHS Concedes that Dr. Gustilo's Private Speech is not at Issue</u>

HHS testified that Dr. Gustilo's off-duty speech did not cause any disruption to the OB/GYN Department. (HHS Dep. at 87:24–88:2.) Despite this continued assertion that it was not Dr. Gustilo's off-duty speech that affected her ability to lead, HHS now alleges that these off-duty Facebook posts did, in fact, *significantly* disrupt the department. (Def.'s Brief at 42.) HHS' concession exposes its tell—specifically, the non-existent line that HHS has drawn between Dr. Gustilo's off-duty and on-duty speech, revealing that HHS *did actually* consider Dr. Gustilo's Facebook posts as a basis for her demotion. Indeed, HHS' own brief alleges Dr. Gustilo's Facebook posts were "disruptive" in nature because they discussed: "presidential candidates, socialism, fascism, racism, police killings, Black Lives Matter, 'defunding' the police, and COVID." (*Id.* at 46.) Accordingly, HHS' perception reveals its viewpoint discrimination as to Dr. Gustilo's private speech.

Dr. Gustilo's off-duty speech on her personal Facebook was made private and included a disclaimer that all views were her own, after HHS relayed its concern with her incidentally public posts. Despite her compliance with HHS' social media policy and believed resolution of the incident, HHS still cited Dr. Gustilo's off-duty speech numerous times in the MEC packet. (*See* St. Amant Decl. Ex. D.) HHS cannot have its cake and eat it too; if the October social media intervention was resolved, her posts should have remained private speech that did not further impact Dr. Gustilo's employment. If, however, HHS believes Dr. Gustilo's Facebook posts are public speech relating to a matter of public

concern, and that speech has adversely impacted the Department as it currently alleges, then cited concerns related to Dr. Gustilo's off-duty speech remained and are inextricably linked with HHS' reasons for demoting Dr. Gustilo.

     ii.    <u>Dr. Gustilo's Speech did not Impact the Operations of the OB/GYN Department</u>

Nonetheless, if this Court finds that Dr. Gustilo's speech regarded a matter of public concern, HHS has failed to proffer sufficient evidence that it was Dr. Gustilo's speech that created "significate disharmony" in the department. Largely, HHS fails to consider or own its own role and cultivation of a work environment of disharmony.

First, HHS cannot establish that Dr. Gustilo's speech had an adverse impact on the Department via the *Pickering* test. HHS itself spearheaded policy resolutions to pursue health equity and anti-discrimination initiatives, and then invited discussion on such issues. (HHS Dep. at 22:18-22/August 5, 2020 Resolution, Hilden Dep. at 124:16-19) ("The whole organization was talking about racial justice issues."). In response to the Department's policy initiatives, Dr. Gustilo actively voiced her on-duty speech in a respectful manner and treated her off-duty speech as her own views. (June 30, 2020 email chain; Facebook exhibits). Despite Dr. Gustilo's thoughtful engagement in these issues, which were widely discussed, she was ostracized because she did not hold the majority viewpoint. (HHS Dep. at 91:12-15) ("A leader needs to facilitate conversations, not impose her personal viewpoints. And to the degree that she had virtually no followers, that's disruptive.").

Moreover, HHS' handling of the discourse fueled the fire of disharmony within the Department. For example, the Department held a "listening session" where it reported the

results of the external consultant and allowed the department members to make comments regarding Dr. Gustilo. (HHS Dep. at 54:12-19.) Even Dr. Nezworski commented during her HSDI interview that she felt as though the conversations surrounding Dr. Gustilo were "going off the deep end[.]" (St. Amant Decl. Ex. GG [Nezworski Interview] at 19:12-20:7.) HHS did nothing to control or contain the conversation. Pinpointing Dr. Gustilo as the instigator of workplace disharmony misrepresents HHS's role in the boiling over of tensions within the Department. Even so, HHS does not attribute the OB/GYN department's financial performance to Dr. Gustilo, which shows that her actions did not impede the employees' abilities to perform their duties. (HHS Dep. at 66:19–67:23.)

At minimum, there exists a genuine dispute of material fact regarding the impact that Dr. Gustilo's protected speech had on the Department, and therefore summary judgment should be denied.

## CONCLUSION

For the reasons described herein, Plaintiff Dr. Gustilo respectfully requests this Court deny HHS's Motion for Summary Judgment.

ECKLAND & BLANDO LLP

Dated: September 6, 2023
/S/ DANIEL J. CRAGG
Daniel J. Cragg, Esq. (#389888)
Anne N. St. Amant, Esq. (#401923)
800 Lumber Exchange Building
10 South Fifth Street
Minneapolis, MN 55402
dcragg@ecklandblando.com
astamant@ecklandblando.com
(612) 236-0160

UPPER MIDWEST LAW CENTER

Douglas P. Seaton (#127759)
James V. Dickey (#393613)
8241 Wayzata Boulevard, Suite 300
Golden Valley, Minnesota 55426
Doug.Seaton@umlc.org
James.Dickey@umlc.org
(612) 428-7000

*Counsel for Plaintiff*