# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Tara Gustilo, M.D., | Case No.: 0:22-cv-00352-SRN-DJF |
| Plaintiff, | |
| v. | **MEMORANDUM, DECISION AND ORDER** |
| Hennepin Healthcare System, Inc., | |
| Defendant. | |

Anne St. Amant & Daniel J. Cragg, Eckland & Blando, 800 Lumber Exchange Building, 10 South Fifth Street Minneapolis, MN 55402, for Plaintiff

Douglas P. Seaton & James V. F. Dickey, Upper Midwest Law Center, 8421 Wayzata Boulevard, Suite 300, Golden Valley, MN 55426 for Plaintiff

Katlyn Lynch & Matthew S Frantzen, Hennepin County Attorney's Office Civil Division, A-2000 Government Center, 300 South 6th Street, Minneapolis, MN 55487, for Defendant.

SUSAN RICHARD NELSON, United States District Judge

Plaintiff Dr. Tara Gustilo ("Gustilo"), an experienced obstetrician-gynecologist ("OBGYN") and former Chair of the Hennepin County Medical Center's Department of Obstetrics and Gynecology (the "OBGYN Department"), claims that she was targeted for investigation and eventually demoted from her position as Chair by Defendant Hennepin Healthcare System, Inc. ("HHS") because she did not hold the political opinions allegedly expected of her as a woman of color, and raised her opposition to "critical race theory" in the workplace.

1

HHS contends that Gustilo's race and her political opinions themselves were irrelevant to her demotion. Rather, Gustilo was demoted because of her leadership failures—which included inappropriate and unwelcome injection of her personal political opinions into the workplace—leading to a widespread loss of confidence in her leadership among other physicians and staff within the OBGYN Department.

HHS now moves for summary judgment [Doc. No. 51] as to all five of the causes of action Gustilo brought against it in her Complaint ("Compl.") [Doc. No. 1], arguing that there are no genuine issues of material fact in dispute and judgment should be entered in its favor as a matter of law.

The Court agrees. Based on a review of the record, all five of Gustilo's claims fail as a matter of law. For the reasons stated below, the Court **GRANTS** HHS' Motion for Summary Judgment in its entirety.

## I.      BACKGROUND

### A.      Gustilo's Employment At HHS Prior To The COVID-19 Pandemic

Gustilo began working for HHS—then called Hennepin County Medical Center—as an OBGYN in January 2008. (Compl. at ¶¶ 10-11.) She held various positions at HHS until she was appointed Interim Chair of the OBGYN Department in May 2015. (*Id.* at ¶¶ 12-14.) She was then appointed permanent Chair of the OBGYN Department in 2019 for a five-year term. (*Id.*) Gustilo's personal medical practice focused on gynecology over obstetrics. (*Id.* at ¶ 15.)

HHS is a subsidiary of Hennepin County and operates medical facilities including the Hennepin County Medical Center hospital. (*Id.* at ¶ 10.) HHS's facilities function as

a "safety-net" hospital system, serving a disproportionate number of indigent patients and historically underserved neighborhoods.  (Compl. Ex. A at 3.)   At a meeting of the HHS Board of Directors ("HHS Board") on August 5, 2020, the HHS Board declared that health equity was a strategic priority for HHS.  (*See* Decl. of Anne N. St. Amant in Opp. to Mot. for S.J. [Doc. No. 62] ("St. Amant Decl."), Ex. F.)

While serving as Interim and then permanent Chair of the OBGYN Department, Gustilo's performance was broadly well-reviewed.  She received both high scores and strong qualitative performance reviews in 2018 and 2019.  (*See* Decl. of Matthew S. Frantzen in Support of Mot. for S.J. [Doc. No. 54] ("Frantzen Decl."), Exs. 10 and 11.) Her 2018 review scored her as consistently exceeding expectations, while her 2019 review stated that she "provided consistent exceptional leadership to her department and the organization." (*Id.*)  However, Gustilo also received some critical feedback.  For instance, in 2017, she was given guidance on how to provide feedback after two providers in the OBGYN Department reported experiences of racism from patients and felt unsupported by Gustilo.  (Frantzen Decl., Ex. 12.)  Staff surveys in 2019 stated that some providers wanted Gustilo to be more actively involved in parts of the OBGYN Department's practice. (Frantzen Decl., Ex. 11.)

Gustilo affirms that beginning in May 2020, she began to "educate [herself] on the Black Lives Matter movement, critical race theory ideology, police brutality, and the dissemination of information in the United States."  (Declaration of Tara Gustilo, M.D., [Doc. No. 58] ("Gustilo Decl.") at ¶ 3.)  This led to Gustilo's opposition to "critical race

theory" ("CRT"), which she began to "voice" her "opposition" to, both within the workplace and on her private Facebook account. (*Id*. at ¶ 5.)

### B.     Issues Within The OBGYN Department

During the spring and summer of 2020, a combination of stressors from the COVID-19 pandemic and the death of George Floyd (and subsequent local and national events) produced several incidences of conflict within the OBGYN Department. Together, these incidents caused a serious rupture between Gustilo and her colleagues that were eventually brought to the attention of HHS's management.

#### 1.     Tensions Directly Relating To COVID-19

The COVID-19 pandemic hit Minnesota in earnest in March 2020, upending regular practice within HHS's practice groups and requiring budget cuts for many HHS departments. HHS required the OBGYN Department to implement budget cuts, causing a reduction in salary for its employees. (*See* Frantzen Decl. Ex., 33 at 30.) In late April 2020, Gustilo proposed that the OBGYNs in the department take a further voluntary salary cut in order to protect the department's midwives from a salary cut. The OBGYNs voted and declined to approve this proposal. Gustilo then asked the OBGYNs to vote again. While the OBGYNs approved the proposal after a second vote, many members of the department later asserted that they felt pressured and manipulated to do so. (Frantzen Decl., Ex. 15 at 21-26; Ex. 75)

Staff within the OBGYN Department also perceived Gustilo as lacking a presence in the department during the heat of the pandemic. (*See* Frantzen Decl., Ex. 75.) Gustilo

and department staff agree that she was working almost exclusively from home from at least March through June of 2020.  (*See* Frantzen Decl., Ex. 8 at 78-80.)

### 2. Incident Involving Letter Of Community Support

On May 25, 2020, George Floyd was killed by Minneapolis police.  Demonstrations against racial injustice and police brutality subsequently erupted both in Minneapolis and worldwide and persisted for several weeks.  In Minneapolis, substantial property destruction occurred alongside the demonstrations.

On June 1, 2020, OBGYN Dr. Sally Zanotto proposed sending a letter to patients "that pledges our support for our patients" and "recognize[s] our privilege that we have to care for mothers of color."  (Frantzen Decl., Ex. 17.)  Other members of the OBGYN Department agreed with the idea, including Gustilo, and the letter was drafted.  (*Id*.)

On June 3, Gustilo returned the original draft with edits and comments, including proposing that the letter include a discussion of the "riots" which had occurred as part of the protests rather than use the word "unrest."  (*Id*.)  Gustilo received pushback from several members of the OBGYN Department, including the only Black OBGYN in the department, Dr. Elizabeth Alabi.  (*Id*.)  Gustilo refused to budge on the issue and stated that she would allow the letter to be sent using the original language, but only without her signature.  (*Id*.)  The other OBGYNs eventually agreed to remove the word "unrest" without including reference to "riots" in order to proceed with a unified letter.  (*Id*.)  Gustilo subsequently apologized to the group, explaining her perspective, but also recognizing that she "was too forceful in [her] assertions[.]"  (*Id*.)

### 3.     Incident Involving White Coats For Black Lives

Beginning on June 2, 2020, certain members of the OBGYN Department also began to discuss participation as a group in a June 6 rally held at the Minnesota state capital by White Coats for Black Lives ("WC4BL"), a medical student-led organization advocating for racial justice.  (Frantzen Decl., Ex. 21.)  Gustilo stated that the OBGYNs could not display official affiliation with HHS while engaging in political activity but was supportive of the OBGYN Department's staff's participation in the rally and sent an email to staff thanking the individuals who had helped organize the rally.  (Frantzen Decl., Exs. 21-22.)

At the WC4BL rally, the event's organizers thanked HHS for its participation and assistance with organizing the event.  (Frantzen Decl., Ex. 23.)  Moreover, at least one speaker allegedly advocated for "defunding the police."  (*Id.*)  On June 9, 2020, Gustilo sent an email to providers in the OBGYN Department congratulating the organizers of the rally but stating that she was personally opposed to the idea of defunding the police.  (*Id.*) Gustilo argued that, in the future, the department should research and discuss the stances held by any organization they planned to affiliate with and unanimously agree on any affiliation, particularly given the risk of others identifying HHS with controversial political stances.  (*Id.*)  Gustilo sent a follow-up email after receiving multiple replies to her initial missive, reiterating her position and sparking further discussion.  (Frantzen Decl., Ex. 24.)

### 4.     Gustilo's Letter Concerning Board Retreat Materials

On July 18, 2020, in advance of an HHS Board retreat, Gustilo circulated an email with an attached letter to members of the Board, responding to what Gustilo believed to be a "definite political bias" in background readings provided for a Board discussion of equity

issues.  (St. Amant Decl., Ex. I.)  The attached letter discussed Gustilo's perspective on alleged racial disparities in shootings by police and her reasons for her opposition to the idea of "defunding" the police.  (*Id.*)

### 5.  Gustilo's Social Media Presence

On March 20, 2020, Gustilo posted a fundraising link to her public Facebook account entitled, "OB/GYN Improvement Fund - Hennepin Healthcare Foundation." (Frantzen Decl., Ex. 25.)  In her post, Gustilo identified herself as "the Department Chair of Obstetrics and Gynecology" at HHS and sought to raise funds to purchase blood pressure cuffs and thermometers for HHS prenatal-care patients.  (*Id.*)  Gustilo's post, which was "public" per Facebook's privacy functions, successfully raised substantial funds and caught the attention of Mpls. St. Paul Magazine, which in an April 2, 2020, article noted she was "the chairwoman of obstetrics and gynecology at Hennepin Healthcare" and that she had "decided to take matters into her own hands and initiated a fundraising request, spreading the message across…her very own Facebook page."  (Frantzen Decl., Ex. 26 at 2-3.)

Over the next several months, Gustilo began to frequently use her Facebook account to post controversial political material, both on her personal page and through comments on other individuals' posts: these posts concerned "presidential candidates, fascism, racism, police killings, Black Lives Matter, and COVID."  (Frantzen Decl., Exs. 25, 28.) In one exchange, Gustilo commented on a post concerning the proposed boycott of an apple orchard whose owners had used the phrase "China virus" to refer to COVID-19, in a way

that allegedly suggested Gustilo approved of this phrase's use.[1]  (*See, e.g.*, Frantzen Decl., Ex. 54.)  Gustilo did not reference her place of employment in these posts but made them from the same account as her prior fundraising for HHS.  (Frantzen Decl., Ex. 25, 28.)

> ###### 6.     Gustilo's Workplace Conversations Concerning Political Topics

During the period following George Floyd's killing, other members of the OBGYN Department allege that Gustilo began to discuss politics in the workplace on a more regular basis.  Gustilo allegedly shared conspiracy theories about China's involvement in the spread of COVID-19 and advocated for her positions relating to issues of race and racism. At the board retreat discussed *supra*, Gustilo also allegedly made at least one comment concerning racism, allegedly stating in sum and substance that "systemic racism ended in the '60s, so why are we still talking about it now."  (Frantzen Decl. Ex. 33, at 33:21-34:2.)

According to her colleagues, Gustilo was persistent in pursuing these conversations despite their obvious and sometimes expressly stated discomfort.  Sylvia Lotz, Gustilo's longtime administrative assistant, stated that their relationship had become strained because of Gustilo's frequent discussions of political topics and failure to stop when asked. (Frantzen Decl., Ex. 30.)   Dr. Laura Nezworski, the OBGYN Department's then-medical director and presently its Chair, said that she went so far as to take a break from having regular meetings with Gustilo due to her persistent turn towards "ideological conversations."  (Frantzen Decl., Ex. 15 at 13-19.)   Dr. Tracey Prosen, another OBGYN in the department, recounted a similarly strained relationship due to Gustilo's frequent

---

[1]      Gustilo did not disclose a copy of this post in discovery.

turns towards political conversation.  (St. Amant Decl., Ex. X. at Ex. 6.)  Gustilo does not deny that she discussed politics in the workplace.

### C.     Response From HHS Management

In September 2020, HHS management was informed of the growing tensions within the OBGYN Department by a group of five department physicians.  (*See* Frantzen Decl., Ex. 2 at 29-33; Ex. 9 at 13; Ex. 31).  These OBGYNs expressed that they were disturbed by Gustilo's social media posts and felt that there was a risk that HHS would be identified with them and that patients of color could be alienated; that Gustilo was less involved and accessible to members of the department than she had been; and that the growing discontent could cause several physicians to leave the department.  (*Id.*)

Dr. David Hilden, HHS's then-Vice President of Medical Affairs, and Dr. Daniel Hoody, HHS's Chief Medical Officer, led the response, which began with conversations with Gustilo concerning her conduct, and concluded with Gustilo's involuntary demotion from her position as OBGYN Department Chief.

### 1.     Initial Response And HSDI Inquiry

As an initial matter, Hilden and Hoody met with Gustilo concerning her social media behavior on October 5, 2020; this was memorialized in an October 9 email. (Frantzen Decl. Ex. 34).  Hilden and Hoody relayed that several members of the OBGYN Department had raised concerns about how issues of racial justice were manifesting in the department, and that they did not feel comfortable speaking with Gustilo directly because they perceived her as non-receptive.  (*Id.*)  Hilden and Hoody also raised Gustilo's Facebook posts, and that because of her past fundraising, her positions could be wrongfully

attributed to HHS.  (*Id.*)  They also stated that while Gustilo was welcome to express her opinions on the "issues of the day," pursuant to HHS' social media policy, HHS leaders like Gustilo should use "exceptional judgment" when posting on a public forum and advised that she should label her posts as solely her opinion.  (*Id.*)

During this meeting, Gustilo allegedly raised political issues like critical race theory. Afterward, Gustilo sent a subsequent email memorializing her perspective.  (Frantzen Decl. Ex. 36).  Gustilo agreed that she had been "defensive" at the meeting, as she felt she was being unfairly tarred as a racist by her colleagues for holding a different perspective on issues of racial justice.  (*Id.*)  She stated that "critical race theory" provided a "flawed" approach in her view and that she would continue speaking out about its perceived application in HHS's work, and emphasized her history of work on racial and social justice. (*Id.*)  Gustilo also asked for advice on who could mediate a meeting between her and the other members of the department.  (*Id.*)

On October 7, 2020, Gustilo discussed these issues with Dr. Prosen, who subsequently sent an email memorializing the conversation.  (Frantzen Decl., Ex. 37). During this conversation, Prosen raised that Gustilo's posts had offended members of the department and risked offending others (such as donors and clients), and that members of the department had noticed changes in her personality that made it more difficult to have conversations with her.  (*Id.*)  Gustilo allegedly justified use of the phrase "China virus," and insisted that she was not having a "mental breakdown."  (*Id.*)

On November 2, 2020, Gustilo sent a letter to members of the OBGYN Department justifying her actions, arguing that she had been an open-minded leader, and outlining her

vision for the department. (Frantzen Decl., Exs. 39-40). She also apologized for the lack of a facilitated departmental meeting over the issue in the interim. (*Id.*)

### 2.    HSDI Inquiry and Report

Due to the ongoing tension within the OBGYN Department, HHS hired the Human Systems Dynamics Institute ("HSDI") to perform an interview survey of the department's staff and report back an analysis of trends and issues in the department. Between November 24 and December 24, 2020, HSDI staff interviewed Gustilo and 13 other department staff for approximately one hour each on the organizational dynamics of the OBGYN Department and how each staff member believed they could be improved. (Frantzen Decl., Exs. at 46-59.)

In late December 2020, three departmental physicians reached out to Hilden with concerns about whether Gustilo could fairly evaluate them in upcoming performance reviews and requested that she not perform their reviews. (Frantzen Decl., Ex. 62.) One of these physicians, Dr. Eric Heegaard, contended at least three of his colleagues (including the only two physicians of color in the OBGYN Department) would leave if Gustilo remained as Chair, and that the ensuing damage to the department could be "irreparable." (*Id.*) At around the same time, HSDI delivered an interim update, expressing that while many of the department's staff reported feelings of personal affection towards Gustilo, all interviewees described similar concerns about Gustilo's leadership. (Frantzen Decl., Ex. 60.)

HSDI provided a report to HHS on January 5, 2021, which found broad dissatisfaction with Gustilo's leadership. (Frantzen Decl., Ex. 64.) Her conduct around

specific incidents (discussed *supra*) and her day-to-day behavior concerning issues of racial and social justice faced universal disapproval.  (*Id*. at 4-7.)  The respondents were also dissatisfied with her lack of presence on the obstetrics side of the practice, which had faced particular pressures during COVID-19.  (*Id*.)  Multiple physicians stated that Gustilo's continued leadership would cause staff members to leave or was otherwise unsustainable. (*Id.* at 6.)

### 3. Placement of Gustilo On Administrative Leave, 360 Review, And Meetings With HHS Management

On January 8, 2021, Gustilo met with Hoody and Jennifer Hauff, an HHS human resources employee, to discuss the report. [2]  (Frantzen Decl., Ex. 67.)  Hoody and Hauff summarized the report to Gustilo, who requested an opportunity to "face [her] accusers," and generally seemed confused and defensive about the report's contents.  (*Id*.)  Hoody stated that while he had no specific action planned, he thought Gustilo should voluntarily step down as department chair.  (*Id*.)

On January 15, 2021, Gustilo met with Hoody and Hauff again.  (Frantzen Decl. Ex. 68.)  Hoody provided several options for HHS "moving forward in a non-voluntary fashion," specifically (1) a performance improvement plan; (2) involuntary removal from the chair position; or (3) termination from HHS.  (*Id*.)  That day, Gustilo provided a letter to Hoody stating that there were "no actual facts or incidents of bad performance,

---

[2] Gustilo surreptitiously recorded this meeting, as well as several other meetings concerning her position in the OBGYN Department.  (Deposition of Tara Gustilo, M.D. [Doc. No. 59] ("Gustilo Dep.") at 219:8-11, 225:20-24, 236:15-21, 238:21-239:6, and 242.)

'discrimination,' 'retaliation', or 'racism'" raised by the OBGYN Department's staff, that the investigation was an excuse to "cancel [her]," and that she viewed the request for her to step down as based on her political beliefs.  (Frantzen Decl., Ex. 73.)

Also on January 15, 2021, Hoody, Hauff, and human resources operations director Linda Archer met with staff (both physicians and nurses) of the OBGYN Department other than Gustilo to discuss the ongoing tension in the department.  (Frantzen Decl., Ex. 66.) Several staff raised concerns that multiple OBGYNs would leave the department, devastating the department's practice, and that they believed the staff's relationship with Gustilo was irreparable.  (*Id.*)

On January 22, 2021, Gustilo met with Hoody and Hauff again.  (Frantzen Decl. Ex. 69.)  Hoody relayed feedback from the physicians in the OBGYN Department, informed Gustilo that he did not see a path forward for her to continue in the Chair position while HHS investigated the state of the department, and asked if she would agree to take a voluntary administrative leave during which she would cease to perform her duties as Chair but would not be paid less.  (*Id.*)  Gustilo declined to take a voluntary leave, so Hoody informed Gustilo that she would be involuntarily suspended, with Nezworski becoming acting Chair.  (*Id.*)  Gustilo stated that this was a good choice.  (*Id.*)  Gustilo was formally notified of her suspension that day by letter.  (Frantzen Decl., Ex. 74.)

On February 3, 2021, Gustilo met with Hoody and Hauff again to discuss the results of the ongoing investigation and for Gustilo to answer questions.  (Frantzen Decl., Ex. 70.) Gustilo defended her leadership decisions, such as (1) her relatively hands-off approach to the obstetrics part of the OBGYN Department's practice; (2) her approach to seeking a

13

voluntary salary cut from the OBGYNs to help the department's midwives; (3) her approach to the letter of community support and White Coats for Black Lives incidents; (4) her engagement with the use of the phrase "China virus"; and (5) the general discontent in the department.  (*Id.*)  Hauff stated that the expressed concerns were not always based on specific policies or metrics, but on the "soft space" of the team's emotional wellbeing and feelings of support.  (*Id.* at 23-24.)

In February 2021, Gustilo received her "360 review," a periodic performance review for managers in HHS, with reviews coming from subordinates, superiors, and peer colleagues.  (Frantzen Decl., Ex. 65.)  According to Hilden, 360 reviews are usually performed approximately halfway through a department chair's five-year term. (Deposition of Dr. David Hilden [Doc. No. 60] ("Hilden Dep.") at 154:2-156:22.) Gustilo's numerical scores were unusually low, particularly compared to her previous years' reviews, while Gustilo's self-ratings were broadly high.  (Frantzen Decl., Ex. 65.) In qualitative comments, Gustilo defended her record, while her departmental colleagues were very critical.  (*Id.*)  These criticisms focused both on the ongoing specific tensions in the OBGYN Department and on Gustilo's approach to leadership more generally.  (*Id.*)

On March 1, 2021, Gustilo met with Hoody and Hauff again to discuss the results of her 360 review.  (Frantzen Decl., Ex. 71.)  Gustilo claimed that she felt the biggest challenge she faced was dealing with bias against her based on her perspective/political ideology and discussed her various successes as Chair.  (*Id.* at 2.)  Hoody highlighted that he still wanted to hear more from Gustilo concerning the OBGYN Department's staff's discomfort, which was a pervasive piece of feedback from the staff.  (*Id.* at 5.)  Hoody

asked Gustilo whether she thought she could get the department back to a position where they felt comfortable, to which Gustilo responded that she didn't know, and that she felt her staff had "silenced" her and implied she was mentally unwell because of her political views.  (*Id*. at 7-8.)

On March 1, 2021, Gustilo also met with Hoody, Hauff, Hilden, and Nezworksi. (Frantzen Decl., Ex. 72.)  Nezworski delivered a letter signed by 13 of the 14 physicians in the OBGYN Department stating their grievances and that the group did not feel that they could continue with Gustilo as their leader.  (*Id*. at 4-5; *see also* Frantzen Decl., Ex. 75.) Hoody stated that because of this loss of confidence in her leadership, Gustilo could step down voluntarily or be involuntarily removed from her position as Chair.  (Frantzen Decl., Ex. 72 at 6.)

### 4.    Demotion Of Gustilo

Gustilo did not voluntarily resign as Chair of the OBGYN Department.  As such, the HHS Medical Executive Committee ("MEC")[3] convened in a special meeting on April 13, 2021, to determine whether she should be demoted from her position.  (Frantzen Decl. Ex. 9.)  Both Hilden and Gustilo were given the opportunity to present, with Hilden advocating for HHS management's position that Gustilo be demoted and Gustilo advocating that she should remain in her position.  (*See* Frantzen Decl., Exs. 76, 78.)  25 members of the MEC voted to demote Gustilo, with Gustilo herself as the only vote against

_____

[3] The MEC is comprised of all departmental chairs, eight at-large members, the deputy Vice President for Medical Affairs, and the President for Medical Affairs.  27 members of the MEC attended the April 13 meeting.  (Frantzen Decl. Ex. 79.)

her demotion, and one abstention.  (Frantzen Decl., Ex. 79.)  Hilden provided a memorandum to the HHS Board on April 21, 2021, explaining the MEC's decision (the "Hilden Memo").  (Frantzen Decl., Ex. 80.)  On April 28, 2021, the HHS Board subsequently adopted the MEC's decision to remove Gustilo from her position as Chair of the OBGYN Department.  (Frantzen Decl., Ex. 81.)

### D.    Procedural History

On June 25, 2021, Gustilo filed a charge with the Equal Employment Opportunity Commission ("EEOC").  (Frantzen Decl., Ex. 82.)  Gustilo claimed that she was demoted because she advocated against the use of "Critical Race Theory" in the workplace.  (*Id*. at 2-4).  She also claimed that her colleagues "advocated for race essentialism" and that "as a minority [she] should possess this same view on race, and that without it [she] was incapable of leading or managing a department."  (*Id*. at 2-4.)  Gustilo alleged discrimination and retaliation under Title VII.

On December 29, 2021, 180 days after Dr. Gustilo filed her Charge with the EEOC, the EEOC gave Dr. Gustilo the Notice of Right to Sue.  On February 6, 2022, Gustilo filed suit in this Court alleging five counts: (I) racial discrimination under Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e-2); (II) retaliation for voicing dissent against segregated care under Title VII (42 U.S.C. § 2000e-3); (III) deprivation of her First Amendment rights under 42 U.S.C. § 1983; (IV) racial discrimination under the Minnesota Human Rights Act (Minn. Stat. § 363A.15(1).107 ("MHRA"); and (V) reprisal for opposing discrimination under the MHRA (Minn. Stat. § 363A.15(1)).  (*See* Compl. ¶¶ 74-111).  After discovery, HHS filed the motion now before this Court.

## II.   DISCUSSION

A court may grant a party summary judgment if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).  A party opposing summary judgment "'must set forth specific facts showing that there is a genuine issue for trial,' and 'must present affirmative evidence in order to defeat a properly supported motion for summary judgment.'"  *Ingrassia v. Schafer*, 825 F.3d 891, 896 (8th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).   However, in considering a summary judgment motion, the Court must "view[] the evidence in the light most favorable to the nonmoving party," *Grinnell Mut. Reinsurance Co. v. Schwieger*, 685 F.3d 697 (8th Cir. 2012), and must not "weigh the evidence and determine the truth of the matter itself," *Nunn v. Noodles & Co.*, 674 F.3d 910, 914 (8th Cir. 2012).  "In essence," the question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson*, 477 U.S. at 251-52.

In its motion for summary judgment, HHS makes the following arguments: (1) Gustilo's federal and state race-based claims (Counts I and IV) fail, as Gustilo has not established direct or circumstantial evidence of race discrimination; (2) Gustilo's federal and state retaliation/reprisal claims (Counts II and V) fail, as Gustilo did not engage in any activity protected by statute; and (3) Gustilo's First Amendment claim under § 1983 fails, as HHS did not maintain an unconstitutional policy sufficient for *Monell* liability, or

alternatively that Gustilo's Facebook posts had an adverse impact on the OBGYN Department and her posts themselves were not a basis for her demotion.

### A.  Race Discrimination Claims (Counts I and IV)

Title VII and the MHRA make it unlawful for covered employers to discriminate against any individual with respect to the terms and conditions of their employment because of such individual's race, color, religion, sex, or national origin.  *See* 42 U.S.C. § 2000e-2(a)(1); Minn. Stat. § 363A.15(1).  Discriminating against a member of a protected class for conforming to or failing to conform to stereotypes of that classification is prohibited by Title VII.  *See generally Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989); *Hussain v. Fed. Express Corp.*, 657 Fed. Appx. 591, 594 (7th Cir. 2016) ("Title VII forbids an employer to base a hiring decision on a candidate's ability to fit a stereotype of her national origin, or her inability to fit a stereotype of a different national group or gender.").

An employee may prove unlawful race discrimination in two ways.  First, they can provide direct evidence "showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action[.]" *EEOC v. Audrain Health Care, Inc.*, 756 F.3d 1083, 1086 (8th Cir. 2014) (cleaned up). Alternately, the employee can "creat[e] an inference of unlawful discrimination through the McDonnell-Douglas analysis." *Burton v. Martin*, 737 F.3d 1219, 1229 (8th Cir. 2013) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)). To do this, the employee "must show (1) he is a member of a protected class, (2) he met his employer's legitimate expectations, (3) he suffered an adverse employment

action, and (4) the circumstances give rise to an inference of discrimination." *Id.* Once the employee makes this "prima facie" case, the employer may rebut the employee's evidence by providing "a non-discriminatory, legitimate justification for [their] conduct." *Id.* "Once the [employer] provides this reason, the presumption of discrimination disappears, requiring [the employee] to prove that the proffered justification [was] merely a pretext for discrimination." *Id.* (cleaned up).

HHS argues that Gustilo has raised no direct evidence of race discrimination. Moreover, HHS argues that Gustilo's performance issues in leading her department provided a valid and non-discriminatory justification for her demotion, and that she has raised no evidence that this justification was pretextual. (Def.'s Mem. [Doc. No. 53] at 30-34.)

Gustilo first argues that HHS's alleged statement that her beliefs served as the "trigger" for her demotion constitutes direct evidence of race discrimination. (Pl's Mem. [Doc. No. 57] at 43.) Second, Gustilo argues that the disparate treatment she faced, up to and including her demotion, constitutes circumstantial evidence of discrimination. Gustilo argues that as a woman of color, she held beliefs different than those expected of her and she was treated differently once she began to publicly expound those beliefs. (*Id.* at 44-45.) Moreover, Gustilo argues that her replacement by Nezworski, a white woman, is further evidence of disparate treatment, and that the justification for her demotion based on performance issues raised by HHS is pretextual. (*Id.* at 43-45.)

Gustilo's claims fail at the first hurdle, as she does not make out a prima facie case of discrimination. Gustilo alleges that she is a member of a protected class as a Filipina

woman, and that she suffered an adverse employment action in the form of demotion, but she does not demonstrate or explain how her race is connected to the adverse employment action such that discrimination can be inferred.  While Gustilo alleges that she "did not fit the expected role of a person of color who should endorse the new illiberal anti-racism," (*Id.* at 45), there is no evidence in the record that HHS had any expectation or requirement that persons of color *in particular* hold any set of beliefs.  To the extent that Gustilo alleges that HHS treated individuals who ascribe to "CRT" differently from those who did not, this is an issue of discrimination based on political belief, which is not protected by Title VII. *See Nahal v. Allina Health Sys.*, Case No. 18-cv-631-DWF-KMM, 2019 WL 8370775 at *5 (D. Minn. November 10, 2019), *aff'd* 842 Fed. Appx. 9 (8th Cir. 2021) (holding that where the plaintiff alleged that his colleagues had "turned against him" after showing them a video about the political state of Iran, "this would not establish an inference of discrimination based on [Plaintiff's] Iranian nationality. Rather, at best, it would show an adverse reaction to [Plaintiff's] political beliefs, which are not protected by Title VII.").

Gustilo's invocation of her replacement by Nezworski is not persuasive evidence in favor of her claim.  Had Nezworski (a white woman) taken a similar attitude towards CRT as Gustilo, Gustilo's replacement by Nezworski would constitute a prima facie allegation of disparate treatment by HHS.  However, by her own argument, Nezworski "towed the line to the ideology HHS agreed with[.]"  (Def.'s Mem. at 45.)  As such, Nezworski is an inapposite comparator.  Nowhere in the record does Gustilo make any comparison between herself and other employees (white or not) who shared her beliefs, or provide any evidence that white employees who 'reject CRT' are treated differently than employees of color.

20

*Benner v. Saint Paul Public Schools*, also decided by this Court, dealt with a similar claim.   380 F.Supp.3d 869 (D. Minn. 2019) (granting in part and denying in part defendant's motion for summary judgment).   In *Benner*, the plaintiff African-American teacher opposed the defendant school district's "racial equity policy" for student discipline. Subsequently, Benner faced repeated discipline and was eventually constructively discharged.   *Id*. at 875-95.   In denying the motion for summary judgment as to the plaintiff's Title VII race discrimination claim, this Court held that Benner "adequately set forth a 'prima facie' case of racial discrimination, particularly with respect to identifying 'similarly situated' white teachers who were treated more favorably than him."   *Id*. at 903. Benner identified specific instances in which white teachers accused of the same workplace misconduct of which he was accused were treated less harshly.   *Id*. at n.11, n.12, and n.17. Such evidence is lacking from the record before the Court in the instant case.

For these reasons, the Court grants HHS summary judgment with respect to Gustilo's race discrimination claims under Title VII and the MHRA.

### B.     Race-Discrimination Retaliation and Reprisal Claims

In addition to prohibiting outright race discrimination in employment decisions, Title VII also prohibits discrimination against an employee who "has opposed any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e-3(a). To establish a prima facie case of retaliation, an employee must show (1) that they "engaged in protected conduct by opposing a practice that a reasonable person could have believed violated [Title VII]," (2) "that a materially adverse action was taken against [them]," and

(3) "that there was a causal connection between the protected conduct and the adverse action." *Helton v. Southland Racing Corp.*, 600 F.3d 954, 960 (8th Cir. 2010).

Similarly, under the MHRA, it is "an unfair discriminatory practice for any individual ... to intentionally engage in any reprisal against any person because that person ... [o]pposed a practice forbidden under [the MHRA]." Minn.Stat. § 363A.15.  A prima facie MHRA reprisal case is established by showing (1) an employee's statutorily protected activity; (2) an employer's adverse employment action; and (3) a causal connection between the two.  *See Sameh Mahmoud Mohamed Said v. Mayo Clinic*, 44 F.4th 1142, 1151 (8th Cir. 2022) (citing *Fletcher v. St. Paul Pioneer Press*, 589 N.W.2d 96, 101-02 (Minn. 1999)).  A reprisal claim under the MHRA is analyzed by applying the *McDonnell-Douglas* burden-shifting test.  *See Chivers v. Wal-Mart Stores, Inc.*, 641 F.3d 927, 932 (8th Cir. 2011); *see also Guimaraes v. SuperValu, Inc.*, 674 F.3d 962, 977 (8th Cir. 2012) ("Title VII retaliation claims and MHRA reprisal claims are governed by the same standards.").  The parties agree that the statutes are read in tandem.  (*See* Def.'s Mem. at 34-35; Pl.'s Mem. at 37-38.)

The parties do not dispute that Gustilo suffered an adverse employment action, but dispute (a) whether Gustilo engaged in protected activity; and (b) whether HHS's demotion of Gustilo was related to the allegedly protected activity.

HHS argues that Gustilo's claim must fail, as she did not oppose a discriminatory employment practice.  (Def.'s Mem. at 35.)  Rather, HHS argues, Gustilo at most alleges that she opposed "a voluntary 'culturally congruent care' program (a program she supported and touts in her resume but that never launched because of COVID) wherein

HHS sought to improve patient care for expectant African American mothers[;] and critical race theory, which she admits was never implemented by HHS." (*Id.* at 35-36.) HHS also argues that HHS was never made aware of "any alleged dissent, complaint, or concern Gustilo supposedly had about the [culturally congruent care] program[,]" and that actual or constructive knowledge of the plaintiff's dissent is necessary to establish retaliation. (*Id.* at 36.) As such, HHS argues, there is no link between the allegedly protected activity and Gustilo's demotion.

Gustilo argues that she "[spoke] out against CRT indoctrination at HHS" in three specific contexts: (1) raising objections to the "political bent" of reading materials distributed for discussion on July 18, 2020 in advance of an HHS Board meeting; (2) raising objections to what Gustilo perceived as a "segregated care model" for delivery of doula care; and (3) an October 9, 2020 email in which Gustilo, reflecting on her discussion with Hilden and Hoody concerning the tensions within her department and questions raised about her leadership, identified her opposition to CRT. (Pl.'s Mem. at 10-13.)

### 1.    Gustilo's Actions Were Not Protected Activity

Claims of retaliation under Title VII are limited to instances where the plaintiff opposes "an 'employment practice' that is illegal under Title VII itself, rather than just illegal as a general matter." *Benner*, 380 F. Supp. 3d at 905 (comparing Title VII to the Minnesota Whistleblower Act). Thus, employer retaliation for filing a charge with the EEOC, reporting race-based harassment to management, or refusing to implement a discriminatory employment policy are all prohibited. *Id.* (citing multiple cases).

Conversely, "opposing an employer's actions outside the ambit of an employment practice is unprotected by Title VII." *Artis v. Francis Howell North Band Booster Ass'n, Inc.*, 161 F.3d 1178, 1183 (8th Cir. 1998) (holding that where the plaintiff complained about a school employee's treatment of a black student, because discrimination against students is not unlawful under Title VII, the plaintiff's complaint was not protected). Even where alleged disparities could plausibly have motivated the plaintiff or had an impact on the terms and conditions of employment, if such an impact is not alleged by the plaintiff in the first instance, their conduct is unprotected. *See Warren v. Kemp*, 79 F.4th 967, 975 (8th Cir. 2023) (holding that even where a plaintiff testified that her "concern for employees being treated fairly motivated her to file the EEOC complaint," where the initial report that served as the alleged basis for her non-hiring concerned unequal treatment of students rather than school staff, filing said report was not protected by Title VII).

"A plaintiff need not establish the conduct which she opposed was in fact discriminatory but rather must demonstrate a good faith, reasonable belief that the underlying challenged conduct violated the law." *Buettner v. Eastern Arch Coal Sales Co.*, 216 F.3d 707, 714-15 (8th Cir. 2000), *cert. denied*, 531 U.S. 1077 (2001). Moreover, to the extent that the plaintiff complains to their employer, they must identify that the practice in question discriminates based on a protected characteristic or their opposition is unprotected. *See Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 450 F.3d 130, 135 (3rd Cir. 2006) ("A general complaint of unfair treatment is insufficient to establish protected activity under Title VII."); *see also Evans v. Tex. Dep't of Transp.*, 547 F. Supp. 2d 626, 654 (E.D. Tex. 2007) ("Plaintiff has not shown that she engaged in a statutorily

protected activity. Specifically, although [she] complained of a purportedly hostile work environment, at no time did she suggest that [the conduct at issue] was related to [Plaintiff's] race, sex, . . . or other characteristic protected by Title VII.")

Gustilo's July 18 email concerning the "political bent" of the HHS Board retreat is not clearly related to an employment practice. There is no allegation that Gustilo was required to read the materials or participate in the related discussion. (*See* St. Amant Decl. Ex. I.) At most, Gustilo raised questions about what the at-issue materials implied about HHS' broader orientation to issues of race and racism. While such orientation could theoretically affect HHS's employment practices, Gustilo's July 18 email includes no mention of such effects, but rather focuses on how a diversity of viewpoints could "strengthen" HHS's "decision making process." This is far too attenuated from HHS's employment practices to constitute protected activity under Title VII.

Gustilo's October 9 email is also unprotected. In the email, Gustilo mixes reflection on her meeting with Hoody and Hilden, discussion of the incidents involving the community letter of support; WC4BL rally, and her Facebook posts; her beliefs concerning issues of racial and social justice; and her feeling that her colleagues in the OBGYN Department (and perhaps HHS management) "portrayed [her] as a 'racist'" and began treating her differently for holding those beliefs. (*See* St. Amant Decl., Ex. K.) Gustilo's belief that her generalized opposition to CRT changed the way people treated her is good faith and objectively reasonable. Yet, in the October 9 email, Gustilo does not identify any *employment practice* relating to CRT other than the alleged change in her colleagues' treatment of her. To the extent that Gustilo only raised her perceptions of changed

treatment of her because of her opposition to CRT, she does not allege that these changes have anything to do with her race, gender, or another protected status, which is a necessary element of a protected communication.

### 2.   Connection Between Gustilo's Activity And HHS's Adverse Actions

In order to allege a prima facie case of retaliation, "[a] plaintiff must show the employer had actual or constructive knowledge of the protected activity." *Buettner*, 216 F.3d at 715. "[A] causal link does not exist if the employer is not aware of the employee's statutorily protected activity." *Wolff v. Berkley Inc.,* 938 F.2d 100, 103 (8th Cir. 1991). Where the agents of the employer who take an adverse employment action are not aware of the protected activity, there is no causal connection between the activity and the adverse action. *See Buytendorp v. Extendicare Health Servs., Inc.*, 498 F.3d 826, 836 (8th Cir. 2007) (finding no causal connection where employee had "presented no evidence suggesting" that the individual who threatened her termination was aware of her protected conduct); *see also Doering v. Wal-Mart Stores, Inc.*, Civil No. 12–2629 (JRT/LIB), 2014 WL 3395745 at *16 (D. Minn. July 11, 2014) (no retaliation where the manager threatening discipline was not aware of the plaintiff's charge of sexual harassment).

Gustilo alleges that, on a group call with the UCare team, she perceived that the UCare "culturally congruent care" program which she had worked on was transforming into a "segregated care model" due to the group's insistence that only a black community health worker be hired. (Gustilo Dep. at 289:24-294:6.) Gustilo stated in her deposition that she vocalized her disagreement to "people who were on the team that were working

on this care[,]" and identifies an unnamed group of meeting attendees and "Dominique," an HHS midwife, as people to whom she expressed this sentiment. (*Id.* at 272:24-25.) However, Gustilo provides no evidence that HHS management had actual or constructive knowledge that she had raised these objections. Gustilo admits that she did not put these objections into writing. (*Id.* at 273:9-11.) Moreover, nowhere does Gustilo identify any manager with whom she raised these concerns or any other way that said concerns could have been transmitted to the HHS managers who were responsible for her demotion. Conversely, HHS avers that no such concerns were brought to its attention. (HHS 30(b)(6) Deposition [Doc. No. 61] ("HHS Dep.") at 99:14-100:19.) Accordingly, there is no genuine dispute of material fact as to actual or constructive knowledge, and as such the Court need not reach the question of whether this communication was protected.

For these reasons, the Court grants HHS summary judgment with respect to Gustilo's retaliation claims under Title VII and the MHRA.

### C.    First Amendment Retaliation Claim Under § 1983

Gustilo's final claim—First Amendment retaliation in connection with her Facebook posts—arises under 42 U.S.C. § 1983, which allows victims of allegedly unconstitutional state or local government actions to sue the offending government official(s) for money damages. It is well established that a government employer is limited in when it can take adverse employment action against its employees for exercising their First Amendment rights, and that employees may sue under 42 U.S.C. § 1983 as a remedy. *See Connick v. Myers*, 461 U.S. 138, 142 (1983). Employees at public medical facilities like HHS are public employees for the purposes of § 1983. *See, e.g., Smith v. Cleburne*

27

*County Hospital*, 870 F.2d 1375 (8th Cir. 1989) (the plaintiff doctor worked at a county hospital and sued under § 1983 for First Amendment retaliation).

To establish government employer retaliation in violation of the First Amendment, "a public employee must prove: (1) he engaged in activity protected by the First Amendment; (2) the defendants took an adverse employment action against him; and (3) the protected conduct was a substantial or motivating factor in the defendants' decision to take the adverse employment action." *Lyons v. Vaught*, 875 F.3d 1168, 1172 (8th Cir. 2017).

HHS argues—following the standards set by *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978) and its progeny— that HHS has not maintained an unconstitutional "policy," as the HHS Board did not delegate final decision-making authority to the MEC and is thus the constitutionally relevant decision-maker.  (Def.'s Mem. at 37-39.)  HHS alleges that the Board did not consider Gustilo's Facebook posts when it chose to demote her, and therefore the claim fails.  (*Id.* at 39-40.)  In the alternative, HHS argues that Gustilo's Facebook posts had a sufficiently adverse impact on the OBGYN Department such that her termination was constitutionally acceptable, and regardless, the Facebook posts were not the basis for her demotion.

Gustilo argues that the HHS Board ratified the MEC's decision to demote her, and therefore municipal liability attaches to HHS.  (Pl. Mem. at 48-50.)  Given that, Gustilo argues that there is a genuine dispute of material fact as to whether her demotion was based on her private Facebook posts and whether her speech inside and outside the OBGYN

Department impacted the department's operations, particularly as discussion of issues of racial and social justice were widespread in the Department.  (*Id*. at 50-54.)

A municipal agency is only liable for violating a plaintiff's constitutional rights if the violation arose pursuant to an "unconstitutional official custom or policy," *Hess v. Ables*, 714 F.3d 1048, 1054 (8th Cir. 2013), or where the decisionmaker who took the allegedly illegal action "possess[ed] final authority to establish municipal policy with respect to the action ordered," *Soltesz v. Rushmore Plaza Civic Center*, 847 F.3d 941, 946 (8th Cir. 2017) (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986)).  Courts generally look to "state and local law," or "state and local custom or usage having the force of law," to "identify the final policymaker."  *Soltesz*, 847 F.3d at 946.

In addition to creating municipal liability for their own actions, final policymakers can also create this liability by either delegating policymaking authority to a subordinate or ratifying the actions of a subordinate.  *Id*. (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 124-27 (1988)).  However, "ratification requires both knowledge of the alleged constitutional violation, and proof that the [final] policymaker specifically approved of the subordinate's act."  *Soltesz*, 847 F.3d at 947 (citing *Lytle v. Carl*, 382 F.3d 978, 988 n.2 (9th Cir. 2004)).  Similarly, although a "final policymaker" can be held liable if they "delegat[e] policymaking authority to a subordinate," such delegation only occurs if the "[subordinate] official acts (1) free of review and (2) without any constraints imposed as a matter of policy by the original policymaker."  *Soltesz*, 847 F.3d at 947.  To demonstrate that the final policymaker ratified the decision of their subordinates, "a plaintiff must prove that the "authorized policymakers approve a subordinate's decision and the basis for it."

29

*Praprotnik*, 485 U.S. at 127.   "The issue of whether a final policymaker ratified a subordinate's decision is a question of fact for the jury to decide."   *Soltesz*, 847 F.3d at 947 (citing *Christie v. Iopa*, 176 F.3d 1231, 1238–39 (9th Cir. 1999)).   To withstand summary judgment, "a plaintiff must establish that there is a genuine issue of material fact regarding whether a ratification occurred."   *Christie*, 176 F.3d at 1239.

Even where there is evidence in the record that members of a board serving as the final decision-maker knew about the plaintiff's at-issue speech, this Court has found such knowledge alone insufficient to imply that the plaintiff's speech was the basis for the decision.   *See Benner*, 380 F.Supp.3d at 908-09 (holding that while the record showed the defendant school board's board president and superintendent discussing Plaintiff's speech negatively, "[n]o reasonable juror could infer from this evidence…that the entire school board 'ratified' the administrators' conduct, in that they 'knew' of the adverse employment actions [its employees] were taking against Benner, and then 'specifically approved' those actions.")   Where courts have found ratification by a board of a decision based on retaliation for protected speech, the board's knowledge and specific ratification of the basis of the decision was clear.   *See Beall v. London City Sch. Dist. Bd. of Educ.*, Case No. 2:04-cv-290, 2006 WL 1582447 at *6 (S.D. Oh. June 8, 2006) (holding that where the evidence showed the defendant school board "knew that Plaintiff was a lesbian and that she had given a controversial presentation…prior to rendering its decision to non-renew Plaintiff's teaching contract[,]" Plaintiff's principal reminded the board of this fact, and her sexual orientation and presentation were discussed at the board meeting where renewal of her contract was considered, Plaintiff's claim survived the motion for summary judgment).

HHS and Gustilo agree that the HHS Board is the final policymaker, but dispute whether the HHS Board ratified the MEC's decision.  HHS argues that the Board's decision was based on the Hilden Memo, which did not mention Gustilo's Facebook posts, and "there is no evidence that the Board discussed, considered, or even knew about Gustilo's Facebook posts during its April 28 meeting when it approved the demotion."  (*Id*. at 39-40; *see also* Frantzen Decl., Ex. 80.)   Gustilo argues that HHS confirmed that the HHS Board approved the MEC's decision including the basis for that decision, and therefore the HHS Board ratified said decision, which was based on her Facebook posts.  (Pl. Mem. 48-49.)

Regardless of whether the MEC considered Gustilo's Facebook posts, Gustilo fails to create a genuine issue of material fact regarding whether the HHS Board considered her Facebook posts in making its decision to demote her.  Gustilo provides no evidence that, at the April 28 board meeting, the HHS Board considered any bases for its decision other than those provided in the Hilden Memo.  The memo does not mention Gustilo's Facebook posts or even Gustilo's workplace political conversations.  (*See* Frantzen Decl., Ex. 80.) While Gustilo points to HHS and Hilden's admission that the HHS Board "approved and ratified the MEC's decision in all respects…includ[ing] the basis for the decision."  (HHS Dep. at 75:14-76:15), this statement is far too thin a reed to create a genuine dispute of material fact, as there is no evidence that "the basis" for the Board's decision refers to anything other than the Hilden Memo.

Moreover, there is no evidence that Gustilo's Facebook posts were discussed at the meeting.  According to Hilden, who attended the April 28 board meeting, while there was

31

a discussion of the merits of the MEC's case and the role of the HHS Board lasting between five and 10 minutes, there was no discussion of whether the Board would have made the same decision itself.  (Hilden Dep. at 150:3-52:11.)

There is no evidence in the record that the HHS Board considered or even knew about Gustilo's Facebook posts when voting on whether to demote Gustilo.  A jury could only find that the Board considered these Facebook posts through pure speculation.

As such, the Court finds that Gustilo has failed to raise a genuine issue of disputed material fact as to the HHS Board's reliance on her Facebook posts as to her demotion, and grants summary judgment under *Monell* and its progeny.[4]

---

[4] As HHS is not liable for First Amendment retaliation under *Monell*, the Court need not reach the parties' analysis of whether Gustilo's speech was protected.

### III.   CONCLUSION

Based on the submissions and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment [Doc. No. 51] is **GRANTED.**

**LET JUDGMENT BE ENTERED ACCORDINGLY**

Dated: October 24, 2023                      */s/ Susan Richard Nelson*
                                            SUSAN RICHARD NELSON
                                            United States District Judge