L UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Dr. Tara Gustilo, M.D., <br><br> Plaintiff, <br><br> v. <br><br> Hennepin Healthcare System, Inc., <br><br> Defendant. | Case No. 22-cv-352 (SRN/DJF) |

**PLAINTIFF'S TRIAL BRIEF**

## I.  TRIAL

Daniel J. Cragg, Bailey T. Stubbe, Aaron M. Bostrom, and James Dickey will try this case to a jury on behalf of Plaintiff Tara Gustilo. The estimated time for trial is five days. Their contact information is below:

Daniel J. Cragg (#389888)
Bailey T. Stubbe (#401097)
Aaron M. Bostrom (#401773)
800 Lumbar Exchange Building
10 South Fifth Street
Minneapolis, MN 55402
dcragg@ecklandblando.com
bstubbe@ecklandblando.com
abostrom@ecklandblando.com
612-236-0160

James v. Dickey (#393613)
Upper Midwest Law Center
8241 Wayzata Boulevard, Suite 300
Golden Valley, Minnesota 55426
James.Dickey@umlc.org
(612) 428-7000

## II.  JURISDICTION

The district court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 1983.

1

### III. FACTS

#### A. Background

After completing her prestigious academic and medical training, Plaintiff Dr. Tara Gustilo has devoted her entire career to underserved populations. Since starting at Hennepin Healthcare System, Inc. ("HHS") in 2008, Dr. Gustilo made a significantly positive impact on her patients, staff, and HHS as a whole. Dr. Gustilo embraced several leadership positions, serving as the clinic medical director, on several HHS committees, and on the Board of Directors from 2014 to 2020. Upon recommendation from the previous Chair, Dr. Gustilo became interim Chair of the OB/GYN department ("Department") in 2015, and became permanent Chair in 2020, with the full support of HHS. As Chair, Dr. Gustilo piloted a program to address the needs minority women, improved daily life for physicians, and receiving glowing reviews across the Board. HHS proudly represented HHS on podcasts and billboards. For years, Dr. Gustilo was universally loved at HHS.

#### B. Dr. Gustilo's Speech

During the COVID-19 pandemic and the months following the death of George Floyd, Dr. Gustilo began educating herself on the Black Lives Matter movement, critical race theory, police brutality, and the dissemination of information in the U.S. She also began to identify as a classical liberal advocating for civil liberties, economic and political freedom, and free speech. She then made a series of Facebook posts to her personal account in which she reflected on race, equality, and misinformation in the U.S. These posts usually included links with commentary, reflective questions, and invitations to engage her personal Facebook friends in a respectful discussion:

2

- "We all agree with the premise of innate equality of humans, black and otherwise. We all agree that this is an ideal that we as a country should seek to embody. The question is how best to achieve it . . . I am not seeking to tell you how to think about, just to think about it).

- "Powerful speech, in my opinion. Makes me think. Would love to hear the thoughts of others. What do you agree with, what don't you? Why?"

- At one point, Dr. Gustilo shares an article about the City of Seattle where she clarifies, "I had to look hard (which is weird in and of itself given the content below) but I was able to find a second independent article on this as well. . .[i]f you can provide this is untrue, please let me know. If not, this is truly scary!"

- In a July 24, 2020 post, Dr. Gustilo writes, "This is an article that challenges much of the current rhetoric, I would be interested in hearing people's thoughts. Do you agree? Disagree? Why?"

- In another post from the same day, Dr. Gustilo states, "I believe that the vast majority of the people in this country want justice and equality for all."

- In a July 26, 2020 post, Dr. Gustilo shares a perspective "regarding. . .why governments have failed to address many issues about racial disparities[.]" She then ends her post stating, "I would love to hear reactions/thoughts to what he says."

- Regarding the destruction of urban areas following the 2020 protests, Dr. Gustilo writes, "I just do not get it. Can someone explain to me why you support this? What do you really think is being accomplished at this point?"

- In a post featuring an African American man who addresses "[t]he five biggest issues facing black Americans[,] Dr. Gustilo writes, "I would like to hear people's thoughts on this talk. Please share if you are willing."

Although HR did not typically review leaders' social media posts, now former HR representative Jennifer Hauff took a particular interest in Dr. Gustilo's. She testified that Dr. Gustilo's personal Facebook posts were "not in keeping with Hennepin Healthcare values." When asked for specific examples of what this "alignment" meant, Hauff testified "generally speaking, alignment with Hennepin's values on respect, compassion, teamwork

3

. . . people feeling valued." HHS asked Dr. Gustilo to make her Facebook page private and to include a disclaimer that her posts were her own and did not reflect the views of HHS, which she did in October 2020.

### C. HHS Invited Speech Regarding the Topics on Which Dr. Gustilo Spoke

While HHS chastised Dr. Gustilo for posting on these topics on Facebook, it actively encouraged its employees to discuss these exact topics at the same time. On August 5, 2020, HHS declared racism a national, public health crisis. HHS resolved to support local, state, regional, and federal initiatives advancing efforts to dismantle individual, institutional, and systemic racism and to promote community efforts to amplify issues of racism and its impact on health. HHS also created and distributed videos and pamphlets calling for racial justice and the application of critical race theory. At an HHS-sanctioned retreat, materials on "equity" were provided ahead of the retreat for attendees to read and discuss. COVID-19 was also discussed frequently at HHS in 2020. HHS believed it was important to discuss these issues in the workplace and to foster an environment where a diversity of viewpoints could flourish—except for Dr. Gustilo's.

The same conversations took place within the OB/GYN Department itself. For example, the Department had discussions on race when members wrote a Department-wide letter addressing George Floyd and related political and social responses. Likewise, members of the Department created and held a related event called "White Coats for Black Lives." HHS clearly encouraged individual discussions on these topics, as long as they conformed to the accepted, majority view, which Dr. Gustilo's did not.

### D. HHS Continued to Successfully Perform Its Public Functions

After Dr. Gustilo made these Facebook posts, she continued to satisfy patient and Department needs. During Dr. Gustilo's tenure as chair, guidelines, protocols, and the development of exams for over 28 tests were developed. The Department successfully collaborated with various other departments. Dr. Gustilo worked on ongoing template revisions, level-loading clinics, obtaining a post-call day off for the physicians, a "doctor of the day" initiative, and a surgery schedule to help manage the physicians' workloads. She also hired additional members, piloted numerous equity programs, and successfully navigated the Department through the pandemic. Collectively, the Department, unsurprisingly, continued to function efficiently and meet patient needs. In fact, patients gave a 90% approval rating. Accordingly, in its 30(b)(6) testimony, HHS testified that Dr. Gustilo's off-duty speech did not disrupt the Department's operations at all.

### E. Dr. Gustilo's Demotion

On February 7, 2025, HHS demoted Dr. Gustilo from her position as Chair of the Department. Despite the fact that they did not disrupt the Department, these Facebook posts were a substantial and motivating factor for Dr. Gustilo's demotion. HHS even admitted that there was no performance-based reason for demoting her. Some members of HHS simply disagreed with and disliked Dr. Gustilo's posts. Realizing that the decision to demote Dr. Gustilo could invite litigation, HHS felt it important to dissuade Dr. Gustilo from initiating suit by warning her that there could have been greater discipline. Due to the way HHS treated her, Dr. Gustilo obtained new employment in 2022 at a reduced salary.

## IV. LEGAL ISSUES

Dr. Gustilo has asserted a § 1983 claim against HHS for retaliating against her by demoting her for exercising her First Amendment free speech rights by posting to Facebook. It has since been established that 1) Gustilo engaged in activity protected by the First Amendment (she spoke on matter of public concern), 2) HHS took adverse action against Gustilo (demoted her), but remains to be determined in a second bifurcated trial whether 3) that this speech was a substantial motivating factor in the decision to demote her. The only legal issue for this trial is the balancing of Dr. Gustilo's interest as a citizen in commenting upon matters of public concern with the interests of the state in promoting the efficiency of the public services it performs through its employees. *Lewis v. Harrison Sch. Dist. No. 1*, 805 F.2d 310, 313 (8th Cir. 1986). To determine this, the Court must apply a fact-specific, two part test.

The first question is whether the employee's speech disrupted the workplace or was reasonably likely to do so. *Disruption* is understood to mean interference with the efficient functioning of the public services being performed by the state. *Rankin v. McPherson*, 483 U.S. 378, 388 (1987). "Speech that [merely] outrages or upsets co-workers without evidence of 'any actual injury' to … operations does not constitute a disruption." *Dodge v. Evergreen Sch. Dist. #114*, 56 F.4th 767, 782 (9th Cir. 2022). If the speech does not cause disruption, it is generally protected without further analysis. *Sexton v. Martin*, 210 F.3d 905, 913 (8th Cir. 2000). Requiring meaningful disruption is consistent with the bedrock principle that public employees do not surrender all their First Amendment rights due to their employment. *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006).

6

Dr. Gustilo's off-duty personal Facebook posts did not disrupt the Department. Dr. Gustilo continued to operate effectively and satisfactorily, both as a practitioner and as Chair. Led by Dr. Gustilo, the Department performed at a high level. There is no evidence that any patients saw her Facebook posts or that they drove existing patients away.

HHS's claims of disruption are speculative, pretextual, and exaggerated. At their core, they only amount to the fact that certain co-workers were upset with the viewpoints Dr. Gustilo expressed on social media. This does not come close to satisfying the standard for disruption. Even if it did, this "disruption" was caused by HHS, not Dr. Gustilo, as HHS encouraged political speech and action on these very topics during this inflammatory time. Either way, no disruption contemplated by *Pickering* occurred—meaning Dr. Gustilo's speech cannot form a basis for adverse employment action.

In the event the Court disagrees and finds that Dr. Gustilo's Facebook posts disrupted the Department, the Court moves to step two and engages in the *Pickering* balancing test, in which the employee's interests in expressing her protected speech are weighed against the employer's interests in operating efficiently and effectively. This test is flexible and hinges on the specific facts. *Thompson v. Shock*, 852 F.3d 786, 791 (8th Cir. 2017). Courts often look to a number of factors, including but not limited to the following:

1. the need for harmony in the office or work place;
2. whether the government's responsibilities require a close working relationship to exist between the plaintiff and co-workers when the speech in question has caused or would cause the relationship to deteriorate;
3. the time, manner, and place of the speech;
4. the context in which the dispute arose;
5. the degree of public interest in the speech; and

> 6. whether the speech impeded the employee's ability to perform their duties.

*Belk v. City of Eldon*, 228 F.3d 872, 880-81 (8th Cir. 2000). "When balancing an employee's interest against an employer's interest, the constitutional standard takes proportionality into account." *Sexton*, 210 F.3d at 913. "The closer the employee's speech reflects on matters of public concern, the greater must be the employer's showing that the speech is likely to be disruptive before it can be punished." *Id.* The primary question in applying the *Pickering* balancing is whether the employee's speech has **undermined the effective functioning of the public employer's enterprise**. *Richardson v. Sugg*, 448 F.3d 1046, 1062 (8th Cir. 2006) (emphasis added).

Because Dr. Gustilo spoke on the two most significant and hotly debated matters of public concern during that time—the COVID-19 pandemic and the George Floyd aftermath—her speech requires a maximum level of protection. But as explained above, no disruption existed to justify demoting Dr. Gustilo based on her Facebook posts. All that HHS can cite to is the fact that coworkers disagreed and became upset with the viewpoints she expressed in her off-duty personal Facebook posts. While HHS calls this an "implosion," the concrete evidence rebuts this exaggerated and emotionally-charged narrative. The Department continued to meet patient needs and perform highly across the board. Certainly, the personal Facebook posts did not undermine the effective functioning of the Department's enterprise. On balance, Dr. Gustilo's interests in exercising her free speech rights protected by the First Amendment vastly outweigh any arguable "disruption."

Therefore, even if the Court finds that Dr. Gustilo caused disruption to the Department, she will still succeed on her claim.

## V. PROPOSED SPECIAL INTERROGATORIES TO THE JURY

Please see Plaintiff's Proposed Special Interrogatories to the Jury attached as **Exhibit A** and Plaintiff's Proposed Jury Instructions for answering the Special Interrogatories attached as **Exhibit B**.

## VI. CONCLUSION

For the foregoing reasons, Plaintiff Tara Gustilo respectfully requests that the Court conclude that her Facebook posts did not disrupt the efficient operations of the Hennepin Healthcare System, Inc.'s OB/GYN Department or, at minimum, that her free speech rights outweighed any disruption to the same, and for the Court to schedule a subsequent jury trial to determine causation and damages on Dr. Gustilo's § 1983 claim.

ECKLAND & BLANDO LLP

Dated: May 13, 2025

/S/ DANIEL J. CRAGG
Daniel J. Cragg, Esq. (#389888)
Anne N. St. Amant, Esq. (#401923)
Bailey T. Stubbe, Esq. (#401097)
Aaron M. Bostrom, Esq. (#401773)
800 Lumber Exchange Building
10 South Fifth Street
Minneapolis, MN 55402
dcragg@ecklandblando.com
astamant@ecklandblando.com
bstubbe@ecklandblando.com
abostrom@ecklandblando.com
(612) 236-0160

UPPER MIDWEST LAW CENTER

Douglas P. Seaton (#127759)
James V. Dickey (#393613)
8241 Wayzata Boulevard, Suite 300
Golden Valley, Minnesota 55426
Doug.Seaton@umlc.org
James.Dickey@umlc.org
(612) 428-7000

*Counsel for Plaintiff*
