## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Tara Gustilo, M.D., | Case No.: 0:22-cv-00352-SRN-DJF |
| Plaintiff, | |
| | **ORDER** |
| v. | |
| Hennepin Healthcare System, Inc., | |
| Defendant. | |

Anne St. Amant & Daniel J. Cragg, Eckland & Blando, 800 Lumber Exchange Building, 10 South Fifth Street, Minneapolis, MN 55402; and Douglas P. Seaton & James V. F. Dickey, Upper Midwest Law Center, 8421 Wayzata Boulevard, Suite 300, Golden Valley, MN 55426, for Plaintiff.

Katlyn Lynch & Matthew S. Frantzen, Hennepin County Attorney's Office Civil Division, A-2000 Government Center, 300 South Sixth Street, Minneapolis, MN 55487, for Defendant.

SUSAN RICHARD NELSON, United States District Judge

Plaintiff Tara Gustilo, M.D., sued Defendant Hennepin Healthcare System (HHS), alleging that its Board of Directors ratified its Medical Executive Committee's (MEC) decision to demote her in retaliation for posts made on her personal Facebook page which, she contends, are protected by the First Amendment. (Doc. 1 ¶¶ 89–97.) In addition, Dr. Gustilo asserted claims of unlawful race discrimination and retaliation/reprisal under Title VII and the Minnesota Human Rights Act (MHRA). (*Id.* ¶¶ 74–88, 98–111.) The Court previously granted summary judgment in HHS's favor on all claims. *Gustilo v. Hennepin Healthcare Sys., Inc.*, No. 22-cv-352, 2023 WL 7001735 (D. Minn. Oct. 24,

1

2023) (Doc. 65) ("Summary Judgment Order").   However, the United States Court of Appeals for the Eighth Circuit reversed and remanded as to Dr. Gustilo's First Amendment claim, finding a genuine issue of material fact in dispute over whether the Board considered Dr. Gustilo's Facebook posts when ratifying the MEC's decision to demote her.  *Gustilo v. Hennepin Healthcare Sys., Inc.*, 122 F.4th 1012, 1018–19 (8th Cir. 2024) (Doc. 81 at 7–10).   The Eighth Circuit instructed that the Court should "further consider[ ] ratification and other legal issues, beginning with whether Dr. Gustilo's Facebook posts are protected speech, and perhaps the development of a full record if the ratification and other issues require a trial."  *Id.* at 1019 (Doc. 81 at 9).

As to Dr. Gustilo's appeal of her other claims, the Eighth Circuit's ruling on the First Amendment claim rendered its review of her Title VII and MHRA claims interlocutory.  *Id.* at 1020–21 (Doc. 81 at 11–12).  The Eighth Circuit therefore exercised its appellate discretion to not review Dr. Gustilo's Title VII and MHRA claims at that time. *Id.* at 1021 (Doc. 81 at 12).  However, the Eighth Circuit advised that on remand the district court would "have the discretion to revisit the grants of summary judgment [on Plaintiff's Title VII and MHRA claims] on this record based, for example, on a changed or expanded pretrial record."  *Id.*

Now on remand, HHS moves for summary judgment on the ground that Dr. Gustilo's posts were not protected by the First Amendment.  (Doc. 97; Doc. 99 at 1.) Because there are genuine disputes of material fact underlying this question of law, the Court denies HHS's Supplemental Motion for Summary Judgment [Doc. 97].

In addition, Dr. Gustilo moves for reconsideration of summary judgment on her Title VII and MHRA claims for race discrimination and retaliation and reprisal. (Doc. 103; Doc. 104 at 1.) Having considered the newly expanded record, the Court again finds no genuine disputes of material fact as to these claims and denies Dr. Gustilo's Motion for Reconsideration of Summary Judgment [Doc. 103].

## I.     BACKGROUND

The parties are familiar with the facts, and both the Eighth Circuit and this Court have laid them out in prior orders. *See Gustilo*, 122 F.4th at 1015–17 (Doc. 81 at 2–7); *Gustilo*, 2023 WL 7001735, at *1–7 (Doc. 65 at 2–16). So the Court incorporates them by reference but will not repeat them here.

That said, some supplementary facts warrant discussion in light of the parties' arguments in this new round of motions. The Court will also summarize new evidence that was discovered after the appeal.

### A.     Newly Relevant Evidence

Recall that "[o]n March 20, 2020, Dr. Gustilo posted a fundraising link to her public Facebook account, titled, 'OB/GYN Improvement Fund - Hennepin Healthcare Foundation.'" (Doc. 65 at 7 (quoting Doc. 54-2 at 29–30).) "In her post, she identified herself as 'the Department Chair of Obstetrics and Gynecology' at HHS and sought to raise funds to purchase blood pressure cuffs and thermometers for HHS prenatal-care patients." (*Id.*) The post, "which was 'public' per Facebook's privacy functions, successfully raised substantial funds and caught the attention of Mpls. St. Paul Magazine, which in an April 2, 2020, article noted she was 'the chairwoman of obstetrics and gynecology at Hennepin

3

Healthcare' and that she had 'decided to take matters into her own hands and initiated a fundraising request, spreading the message across . . . her very own Facebook page.'" (*Id.* (quoting Doc. 54-2 at 39–40).)

"In the following months, Dr. Gustilo made a series of posts on that Facebook account concerning controversial political issues including presidential candidates, fascism, racism, police killings, Black Lives Matter, socialism, and COVID." *Gustilo*, 122 F.4th at 1015 (Doc. 81 at 3). (*See also* Doc. 54-2 at 17–36, 47–102.) For example, she made a variety of posts supporting President Trump and criticizing Democrats as anti-capitalist, socialist, Marxist, fascist, racist, and anti-American (Doc. 54-2 at 18–21, 24, 50, 66, 68, 82–85), claiming that systemic racism is a myth (*id.* at 31), suggesting that criminals accept the risk of being killed during an arrest (*id.* at 32), and criticizing supporters of the Black Lives Matter movement as Marxists and "domestic terrorists" (*id.* at 33, 60, 70). In a particularly controversial post, Dr. Gustilo "used the phrase 'China virus' to refer to COVID-19," "which some colleagues considered racist." *Gustilo*, 122 F.4th at 1015 (Doc. 81 at 3). (*See also* Doc. 54-1 at 22, 342–43; Doc. 54-2 at 113.) In lengthy emails and meetings, Dr. Gustilo's colleagues told her about their concerns with the content of these posts; they also admonished her to cease her persistent efforts to debate these issues in the workplace. (*E.g.*, Doc. 54-1 at 166–67; Doc. 54-3 at 73, 79–80, 83, 114, 126, 133–34, 162, 209.) But their concerns were met with—in the words of one doctor— "an attitude of belligerence and defiance." (Doc. 54-2 at 111; *see also* Doc. 54-3 at 101–03.)

Members of the department were also concerned that Dr. Gustilo's posts would reflect negatively on the department. (*E.g.*, Doc. 54-1 at 350.) Though most of her posts prompted few reactions or comments (*e.g.*, Doc. 54-2 at 47–51, 54–59, 63–69), a few prompted ten or more (*e.g.*, Doc. 54-2 at 53, 59, 60). They "did not reference her place of employment," but she "made them from the same account as her prior fundraising for HHS." (Doc. 65 at 8.) So many doctors believed "that because of her past fundraising, her positions could be wrongfully attributed to HHS." (*Id.* (citing Doc. 54-2 at 167).) When Dr. Daniel Hoody and Dr. David Hilden talked to Dr. Gustilo about this concern, she set her Facebook to private and added a disclaimer to the top of her page, stating, "My posts do not necessarily represent those with whom I am affiliated. Obvious, right?" (Doc. 54-1 at 162–64; Doc. 54-2 at 38–41, 89.)

Around the same time, "the HHS Board of Directors adopted a Declaration of Health Equity as a strategic priority" which "resolved 'that HHS will support local, state, regional, and federal initiatives that will advance efforts to dismantle individual to institutional to systemic racism and will promote community efforts to amplify issues of racism and its impact on health.'" *Gustilo*, 122 F.4th at 1016 (Doc. 81 at 4 (quoting Doc. 62-1 at 118–19)). The mismatch between these priorities and Dr. Gustilo's beliefs led to "growing tensions within the OBGYN Department." (Doc. 65 at 9.) And eventually—in the words of Dr. Laura Nezworski, a friend of Dr. Gustilo's "whom [she] described as a 'good choice'" to be her successor as department chair, *Gustilo*, 122 F.4th at 1017 (Doc. 81 at 5 (quoting Doc. 54-3 at 225))—there was a "fracturing." (Doc. 54-3 at 101.)

"In September 2020, four Department physicians approached Dr. David Hilden, then Vice President of Medical Affairs at HHS, to discuss concerns they had about Dr. Gustilo." *Gustilo*, 122 F.4th at 116 (Doc. 81 at 4). (*See also* Doc. 54-1 at 15–16.) The physicians told Dr. Hilden that their department "was 'imploding' under Dr. Gustilo's leadership." *Gustilo*, 122 F.4th at 116 (Doc. 81 at 4 (quoting Doc. 54-1 at 15)). "[S]he would not listen to their concerns, was intimidating, and frequently lectured them about their personal views on issues that had nothing to do with the provision of care in a clinical setting, primarily the murder of George Floyd and COVID-19." *Id.* "They felt bullied by their boss and said they would leave HHS if Dr. Gustilo remained chair." *Id.*

In December, three department doctors told Dr. Hilden that they were not comfortable having Dr. Gustilo conduct their performance reviews. (Doc. 54-3 at 164.) One of the doctors named three physicians whom he believed would leave HHS because of Dr. Gustilo's leadership. (*Id.* at 164–65.) In other words, "a quarter to a third of the physicians in the department [were] considering leaving the organization." (Doc. 54-1 at 75.) The reporting doctor predicted that the damage would be "irreparable." (Doc. 54-3 at 165.) Dr. Hilden believed that such a loss "would have disrupted [HHS's] operations to the point where [it] could no longer adequately provide child birth care to [its] communities." (Doc. 54-1 at 75.)

In a series of meetings in early 2021, department members continued to raise the alarm, warning that the department would lose "3 or 4 or more" physicians. (Doc. 54-3 at 200; *see also* Doc. 65 at 13.) At the final meeting, "Dr. Nezworski presented a letter signed by thirteen of the OBGYN department's fourteen physicians stating they could not 'return

6

to a place . . . where [Dr. Gustilo] could regain [their] trust.'" *Gustilo*, 122 F.4th at 1017 (Doc. 81 at 5 (quoting Doc. 54-3 at 295).)  The letter cited a long list of concerns with Dr. Gustilo's on-duty leadership inside the department.  (Doc. 54-3 at 294–95.)  It also cited Dr. Gustilo's "Social Media Postings," which it described as "imply[ing] or directly stat[ing] that racism does not exist in our society" and "support[ing] others['] statements of blatantly racist comments."  (*Id.* at 294.)  The physicians' "concerns about these posts" were that "[t]hey may cause our current or future patients to mistrust our department and the medical care we provide," "[t]hey create division among our medical staff, midwifery staff, and nursing staff," and "[t]hey reflect negatively on us as a department when viewed by others, including other employees within Hennepin Healthcare."  (*Id.*)

"Despite this mounting pressure, Dr. Gustilo declined to step down."  *Gustilo*, 122 F.4th at 1017 (Doc. 81 at 5).  However, the MEC "voted to remove Dr. Gustilo by a vote of twenty-five to one, with Dr. Gustilo casting the only contrary vote."  *Id.*  And on April 28, 2021, the Board "unanimously approved Dr. Gustilo's removal as Chair."  *Id.*

**B.    Newly Discovered Evidence**

After the Eighth Circuit remanded the case back to this Court, some additional evidence came to light.  As it turns out, there is video of the April 28, 2021, Board meeting that was the focus of the appeal.

To start, Dr. David Hilden summarized his memorandum, emphasizing that multiple staff members voiced their concerns about Dr. Gustilo's leadership and "the atmosphere in the Department of OB-GYN" not being "one of psychological safety for people of color."

(Doc. 101-3 at 62–64.)[1]  Dr. Hilden also mentioned that some were concerned "that people of color would maybe not be so likely to want to receive their care [at HHS] due to the environment in that department."  (*Id.* at 66–67.)  He then explained the process that the MEC undertook before making its decision.  (*Id.* at 68–105.)  And he clarified that the MEC had not voted to fire Dr. Gustilo—just to remove her as chair.  (*Id.* at 85–104.)  "It was her leadership that was . . . challenging," he said.  "It was not her clinical cares." (*Id.* at 88–89.)  Finally, he recounted that every member of the MEC voted to remove Dr. Gustilo, except for one abstaining member and Dr. Gustilo herself.  (*Id.* at 100–02.)

Board members then asked a series of questions.  One member asked whether the Human Systems Dynamic Institute (HSDI) consultants who prepared a report on Dr. Gustilo's leadership also interviewed Dr. Gustilo to get her perspective. (*Id.* at 107–08.)   Dr. Hilden responded that her perspective was "solicited" and "documented" "in a number of different venues," including by HSDI.  (*Id.* at 110–17.) Another member asked when Dr. Gustilo became department chair, and Dr. Hilden reminded them that she started as interim chair and was now entering her third year of a five-year term.  (*Id.* at 119–25.)  The first member then asked whether the concerning issues existed when Dr. Gustilo was interim chair.  (*Id.* at 129.)  Dr. Hilden first said that most issues did not come up until about a year prior, when Dr. Gustilo "reexamined her positions

---

[1]  HHS filed a copy of the video (Doc. 101-2), along with an accompanying unofficial transcript (Doc. 101-3), in support of its Supplemental Motion for Summary Judgment.  The Court finds that the unofficial transcript fairly represents what is said in the video and therefore cites to the transcript, which contains occasional timestamps.

on the world." (*Id.* at 132–40.)  Then he added that Dr. Gustilo's "positions and her viewpoints on world events," and her ability to express them, "are none of our business," and "we told her that many times." (*Id.* at 140–43.)  The problem was that "she was bringing her viewpoints into the workplace a great deal.  And the atmosphere in the workplace was one in which people were declining to even have their performance reviews done by her because they did not feel safe in so doing." (*Id.* at 143–46.)

After a question about the Board's bylaws, some members asked why the MEC did not pursue disciplinary action or termination. (*Id.* at 166–79, 196–201, 228–29.) Dr. Hilden explained that there was no "specific incidence of something that is a violation . . . of an HR thing." (*Id.* at 235–37.)  Her opinions were "hers to have," but Dr. Gustilo kept bringing her opinions about "the matters of the day"—like "racial equity issues," "the George Floyd . . . murder," and COVID-19—"into the workplace." (*Id.* at 237–42.)  He also noted that Dr. Gustilo had "five pages of accomplishments as the Chair," "many of them around clinical . . . quality improvement projects" and "productivity measures" (*id.* at 185–86); that many department members continued to speak "in . . . caring terms of her" and "wanted her to . . . continue to practice" as a clinician (*id.* at 190–91); and that "the risk to this organization," and "the consequences to her [particular] practice[,] would be grave on termination" (*id.* at 192–93).  Another doctor then added that Dr. Gustilo continued to have favorable reviews as to her patient care. (*Id.* at 249–52.)  It was just her "clear failures . . . at a leadership level" and "[in]ability to create a fellowship amongst the OB-GYN department." (*Id.* at 254–58.)

Next, a member asked if Dr. Gustilo was offered leadership training. (*Id.* at 259–60.) Dr. Hilden responded that Dr. Gustilo had a leadership coach and "was offered . . . a number of other things as well." (*Id.* at 265–66.) He also explained that remediation "didn't seem possible." (*Id.* at 272.) The "department did not feel safe in . . . having . . . a lengthy process of mediation." (*Id.* at 268–69.) Members were "done with that." (*Id.* at 271.) And in any event, Dr. Gustilo "sort of declined," saying "you're not gonna change my mind." (*Id.* at 274–75.) Asked to clarify further, Dr. Hilden recalled that he and Dr. Daniel Hoody "made this about her leadership and . . . the environment[ ] in the workplace," but Dr. Gustilo "almost every time brought it back to political issues of the day." (*Id.* at 284–86, 290.) She "labeled [Dr. Hoody] and [Dr. Hilden] with some names of . . . a political nature," and "she talked about" the presidential candidate "she voted for" and "her . . . ideas about . . . policing in our community." (*Id.* at 291–94.) She "had a lot of opinions," and they "just kept trying to not discuss that because those are her personal opinions." (*Id.* at 205–96.) "And she said, . . . [']you're trying to cancel me, and I'm not about to have that done.[']" (*Id.* at 299–300.)

Later, a member asked if Dr. Gustilo's peers felt that her "perspectives" were "putting patients in jeopardy who may be diverse patients" and if they felt that "the patients are safe." (*Id.* at 359–64.) Dr. Hilden answered, "no patient . . . safety concerns were ever raised." (*Id.* at 368.) Another member asked if Dr. Gustilo was offered a performance plan, and Dr. Hilden responded, "no. . . . We felt that . . . the department was at risk of . . . implosion. . . . [W]e felt we would lose two to three or four physicians. . . . [S]he was

offered coaching and plenty of chances to remedy the situation," but "she was not given a performance plan specifically on this issue." (*Id.* at 387–401.)

A member then commented that "if [Dr. Gustilo] doesn't see a problem, it's really hard to get to a constructive performance improvement if we've got such polar different positions." (*Id.* at 403–05.) Another commented, "[a]s an outside observer, it just looks like it got way too far down this path before we jumped in and . . . did anything. And I don't know if that's true or not," but "it looks like there was maybe a lack of leadership to some point, and then all of a sudden it hit." (*Id.* at 408–11.) And yet another member observed that Dr. Gustilo has gone "seemingly way off the rail in a pretty short period of time." (*Id.* at 439.) In response, Dr. Hilden explained that "it was the presidential politics and the murder of George Floyd that led her to her positions. And so . . . we had no inkling before. . . . several people came to me in confidence" in September 2020. (*Id.* at 442–45.)

Finally, the Board voted. All members agreed that the MEC's decision should be ratified and Dr. Gustilo should be removed as chair. (*Id.* at 451–506.) Before moving on to another topic, a member observed "that there's a reasonable risk of litigation from" Dr. Gustilo and suggested that the decision "be presented in a way to . . . perhaps allow her resignation . . . from her employment . . . if you would come together with a package . . . including a non-disparagement . . . statement." (*Id.* at 512–24.) And another member said he regretted that he did not "call [Dr. Gustilo] out" when she sent an email in the aftermath of George Floyd's death to "a number of people," including him "as a board member," with an article "disputing the fact that blacks [are] shot more by police than whites." (*Id.* at 544–551.) He explained, "I think we want our leaders to speak the truth and not

dispense false information." (*Id.* at 552–53.)  A few members expressed agreement, and the Board then moved on to a new agenda item.  (*Id.* at 555–67.)

With this additional evidence in mind, the Court turns to the parties' supplemental motions.

## II.    ANALYSIS

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In considering a summary judgment motion, a court "view[s] the evidence in the light most favorable to the nonmoving party," *Sexton v. Martin*, 210 F.3d 905, 909 (8th Cir. 2000), and does not "weigh the evidence and determine the truth of the matter itself," *Nunn v. Noodles & Co.*, 674 F.3d 910, 914 (8th Cir. 2012).  To defeat the motion, the party opposing it "must set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256–57 (1986).  "In essence," the question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

### A.    HHS's Supplemental Motion for Summary Judgment:  First Amendment Retaliation Claim (Count III)

To succeed in her First Amendment retaliation claim, Dr. Gustilo must prove that (1) she "engaged in protected activity," (2) the Board[2] "took an adverse employment action

---

[2] As the Eighth Circuit explained, the Board is the relevant decisionmaker because Dr. Gustilo's claim is one for municipal liability under 42 U.S.C. § 1983. *See Gustilo*, 122 F.4th at 1018.

against" her, and (3) her "protected speech was a 'substantial or motivating factor' in that decision to take the adverse employment action." *Noon v. City of Platte Woods*, 94 F.4th 759, 764 (8th Cir. 2024). On the second element, the parties do not dispute that Dr. Gustilo's demotion was an adverse employment action. And on the third element, the Eighth Circuit has found that there exists a genuine issue of material fact in dispute over "whether the Board also approved the basis of the MEC's decision, which included consideration of her Facebook posts, the allegedly protected speech." *Gustilo*, 122 F.4th at 1018 (Doc. 81 at 8). So HHS focuses on the first element, arguing that Dr. Gustilo's speech was unprotected as a matter of law.

### 1.    Protected Speech

At the outset, the Court notes that the only speech at issue here is Dr. Gustilo's Facebook posts. Though there is evidence that the Board was also concerned about Dr. Gustilo's on-duty speech to her co-workers, that evidence is relevant to whether HHS can prove "by a preponderance of the evidence that [the Board] would have reached the same decision . . . even in the absence of the" Facebook posts—a showing that would defeat the third element of a First Amendment retaliation claim, not the first. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *see also, e.g.*, *Lewis v. Harrison Sch. Dist. No. 1*, 805 F.2d 310, 313, 316–17 (1986). Dr. Gustilo does not argue that her on-duty speech is protected speech. *See Gustilo*, 122 F.4th at 1018 (Doc. 81 at 7) (noting that "Count III of the Complaint alleges that Dr. Gustilo 'engaged in a constitutionally protected activity when she expressed her opinions on her personal Facebook page;'" that this protected activity "was a substantial motivating factor" in her

demotion; and that the demotion "was done upon recommendation from the [MEC] and was formally adopted and approved by the HHS Board of Directors," making it an "official action of the final policy making authority of HHS" (quoting (Doc. 1 ¶¶ 89–97))). So, for these purposes, the Court considers only whether her Facebook posts were protected speech.

"Whether a public employee's speech is protected by the First Amendment requires a two-step judicial inquiry." *Gustilo*, 122 F.4th at 1019 (quoting *Shands v. City of Kennett*, 993 F.2d 1337, 1342 (8th Cir. 1993)) (Doc. 81 at 10).[3] First, the Court asks if "the employee's speech can be 'fairly characterized as constituting speech on a matter of public concern." *Shands*, 993 F.2d at 1342 (quoting *Connick v. Myers*, 461 U.S. 138, 146 (1983)). "If the answer is yes, then the possibility of a First Amendment claim arises." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). Second, the Court asks whether the employer has produced evidence that the speech created an actual or reasonably foreseeable disruption to the employer's operations. *Anzaldua v. Ne. Ambulance & Fire Prot. Dist.*, 793 F.3d 822, 832–34 (8th Cir. 2015). HHS "bear[s] the burden of . . . submitting evidence of disruption." *Mayfield v. Missouri House of Reps.*, 122 F.4th 1046, 1055 (8th Cir. 2024). And if it does so, the Court conducts an analysis called *Pickering* balancing, in which the court weighs the "interests of the [employee], as a citizen, in commenting upon matters of public concern" against "the interests of the State, as an employer, in promoting the

---

[3] The Eighth Circuit has, at other times, described this inquiry as a three-step analysis. *E.g.*, *Henry v. Johnson*, 950 F.3d 1005, 1011 (8th Cir. 2024). The analysis is the same either way.

efficiency of the public services it performs through its employees." *Shands*, 993 F.3d at 1342 (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)).

The Eighth Circuit has already put the first question to rest, finding that "Dr. Gustilo's media posts were matters of public concern." *Gustilo*, 122 F.4th at 1020 (Doc. 81 at 10). So the Court proceeds to the second step and asks whether HHS has "put[ ] the *Pickering* balancing test into play," by "submitting evidence of disruption." *Mayfield*, 122 F.4th at 1055; *see also Henry v. Johnson*, 950 F.3d 1005, 1011 (8th Cir. 2020) (explaining that "[w]here there is no evidence of disruption, resort to the *Pickering* factors is unnecessary because there are no government interests in efficiency to weigh against First Amendment interests" (citation omitted)).

Consistent with the Eighth Circuit's instruction that this Court "will need to apply the flexible *Pickering* balancing test," *see Gustilo*, 122 F.4th at 1020 (Doc. 81 at 10), the Court finds that HHS has submitted evidence that the Facebook posts caused a disruption. "An employer need not 'allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action,'" and courts will give "substantial weight to government employers' reasonable predictions of substantial disruption." *Henry*, 950 F.3d at 1012 (quoting *Connick*, 461 U.S. at 152); *see also Waters v. Churchill*, 511 U.S. 611, 673 (1994). But HHS need not rely on mere predictions here. It has made a strong showing that disruptions had already occurred by the time the Board got involved. As one Board member observed, "it just looks like it got way too far down this path before we jumped in and . . . did anything." (Doc. 101-3 at 408–11.)

By the time the Board intervened, there had already been a "fracturing" in the department, as noted by Dr. Nezworski. (Doc. 54-3 at 101–02.) According to Dr. Hilden, about "a quarter to a third of the physicians in the department [were] considering leaving the organization." (Doc. 54-1 at 75.) Some had reported that they were not comfortable having their performance reviews done by Dr. Gustilo. (*Id.* at 76; Doc. 54-3 at 164.) And 13 of the 14 department physicians were frustrated enough to sign a letter to Dr. Gustilo stating, "we[,] as a group, feel that recent changes in judgment, leadership, and relationship with your team . . . cannot possibly return to a place where they are in line with the institutional mission and a place where you could regain our trust." (Doc. 54-3 at 294–96; *see also id.* at 282–83.)

Given this evidence of fracturing, which a reasonable jury could find was caused at least in part by Dr. Gustilo's Facebook posts, the Court finds that *Pickering* is "in[ ] play." *Mayfield*, 122 F.4th at 1055.[4]

### a.    Pickering *Analysis*

*Pickering* balancing is a "complex task." *Gustilo*, 122 F.4th at 1020. It "requires full consideration of the government's interest in effective and efficient fulfillment of its responsibilities." *Shands*, 993 F.2d at 1344 (quoting *Connick*, 461 U.S. at 150). "The

---

[4] Dr. Gustilo argues that "[t]he Court should apply *Kennedy v. Bremerton School District* and apply strict scrutiny" rather than *Pickering* and that *Pickering* "should be abolished" to the extent that it "does not protect speech from being restricted due to the subjective reactions of coworkers." (Doc. 116 at 38–39.) The Court does not address these arguments because, as Dr. Gustilo "recognizes and acknowledges," the Court is "unable to overrule *Pickering* or apply strict scrutiny." (*Id.* at 39 n.5.)

government has a legitimate purpose in 'promot[ing] efficiency and integrity in the discharge of official duties, and in mainta[ining] proper discipline in the public service.'" *Id.* (quoting *Connick*, 461 U.S. at 150–51). "To this end, the Government, as an employer, must have wide discretion and control over the management of its personnel and internal affairs." *Connick*, 461 U.S. at 151 (quoting *Arnett v. Kennedy*, 416 U.S. 135, 168 (1974) (Powell, J. concurring)). "This includes the prerogative to remove employees whose conduct hinders efficient operation and to do so with dispatch. Prolonged retention of a disruptive or otherwise unsatisfactory employee can adversely affect discipline and morale in the work place, foster disharmony, and ultimately impair the efficiency of an office or agency." *Id.*

"In balancing an employee's and an employer's competing interests," courts "weigh six interrelated factors." *Shands*, 993 F.2d at 1344 (citing *Bowman v. Pulaski Cnty. Special Sch. Dist.*, 723 F.2d 640, 644 (8th Cir. 1983)). They are "(1) the need for harmony in the work place; (2) whether the government's responsibilities require a close working relationship; (3) the time, manner, and place of the speech; (4) the context in which the dispute arose; (5) the degree of public interest in the speech; and (6) whether the speech impeded the employee's ability to perform his or her duties." *Noon*, 94 F.4th 759 (quoting *Anzaldua*, 793 F.3d at 835). While the ultimate balance is a "question[ ] of law for the court," *Gustilo*, 122 F.4th at 1019 (citing *Connick*, 461 U.S. at 148 n.7), any "underlying factual disputes concerning whether the plaintiff's speech is protected . . . should be submitted to the jury through special interrogatories or special verdict forms," *id.* (quoting *Shands*, 993 F.2d at 1342).

17

The Court finds that there are underlying factual disputes as to many of the *Pickering* factors, so summary judgment is not warranted.

### i.    Need for Harmony and Close Working Relationships

Starting with the first two factors, HHS asserts that, "[l]ike most any public organization, especially an organization dedicated to providing safety-net health care to expectant mothers and delivering babies, 'the need for harmony' in the department 'was obviously high.'" (Doc. 99 at 33 (quoting *Palmer v. Cnty. of Anoka*, 200 F. Supp. 3d 842, 849 (D. Minn. 2016) and citing *Shands*, 993 F.2d at 1344–45).) Dr. Gustilo, for her part, does not challenge this assertion in her briefing. (Doc. 116 at 26–27.) But at oral argument, her counsel argued that doctors—unlike the prototypical example of a team of firefighters—work individually.

When it comes to police and fire departments, courts often find that the need for harmony and close working relationships weighs heavily in favor of the employer. *E.g.*, *Shands*, 993 F.2d 1344–45 ("When lives may be at stake in a fire, an *esprit de corps* is essential to the success of the joint endeavor." (quoting *Janusaitis v. Middlebury Volunteer Fire Dept.*, 607 F.2d 17, 26 (2d Cir. 1979)). And at least one court has found the same for a hospital emergency department. *Glandon v. Keokuk Cnty. Health Ctr.*, 408 F. Supp. 2d 759, 769 (S.D. Iowa) ("Where lives are at stake those providing medical care, particularly emergency care, have to be able to work together harmoniously for the sake of the patient."). It is somewhat less clear how this factor applies to a county hospital OB-GYN department, though the Court finds it implausible that doctors in a department

that delivers babies do not need a close and harmonious relationship. Nonetheless, the Court believes that jury findings on this issue would be helpful.

### ii.    Time, Place, and Manner of the Posts

Turning to the third factor, the parties seem to agree on the time and place of the speech, but not its manner. They do not dispute that the posts were on Dr. Gustilo's personal Facebook page outside of work hours. But they disagree about whether they could affect the department—for example, by tarnishing its public reputation or offending employees. (*Compare* Doc. 99 at 34 ("The department not only expressed grave concerns about the content of [Dr.] Gustilo's Facebook posts. The department was also concerned that [Dr.] Gustilo, a visible leader at HHS who was featured on HHS billboards and in Mpls St. Paul magazine, had used her public Facebook account to identify herself as a leader at HHS and fundraise on behalf of HHS around the same time she was posting her personal opinions to the same Facebook account." (citing Doc. 54-2 at 29–30)), *with* Doc. 116 at 35 ("Concerning time, manner, and place, posting to one's personal Facebook page is the least invasive form of speech. Not only is it silent in the physical workplace, but it is completely avoidable, simply by virtue of not searching for and viewing a particular Facebook profile.").)

Speech by an employee on her own time and outside the workplace is often entitled to more protection. *See, e.g.*, *Connick*, 461 U.S. at 152–53 & n.13. "[A] purely private statement on a matter of public concern will rarely, if ever, justify discharge of a public employee." *Rankin v. McPherson*, 483 U.S. 378, 388 n.13 (1987). This is, in part, because "the risk that a single private comment . . . will disrupt the work place and lower morale is

low." *Shands*, 993 F.2d at 1346.  Public comments, by contrast, tend to carry a greater risk of disruption.  *See, e.g.*, *id.* (distinguishing *Rankin* on the ground that in *Rankin*, there was "no suggestion that the employee's speech or ideas were going to reach the general public").  So when comments are public or are likely to have publicly-visible effects, this fact often weighs in favor of the employer.  *See id.* (plaintiffs "had to expect that" their private request for a city councilman to take the "public action" of "tabl[ing] the hiring of [a firefighter] would raise questions and could potentially disrupt the fire department").

On the one hand, the posts at issue were made while Dr. Gustilo's Facebook page was public, shortly after she had garnered media attention by using the same account to fundraise for the department.  (*E.g.*, Doc. 54-1 at 162–64; Doc. 54-2 at 38–41.)  As HHS points out, "[t]here was, therefore, a justifiable concern by the department that the viewpoints and opinions Gustilo expressed in her public Facebook posts (which were thought to be, at least in part, 'blatantly racist'), at a time of deep political and cultural division during the Covid-19 pandemic and in the wake of the murder of George Floyd, could 'be construed to incorrectly represent [HHS], our department, and us as individuals.'"  (Doc. 99 at 34–35 (quoting Doc. 54-3 at 294).)  Plus, the posts were widely known among Dr. Gustilo's colleagues and had garnered strong reactions within the workplace, prompting lengthy email exchanges and meetings during work hours.  (*See, e.g.*, Doc. 54-3 at 101–03.)  Considering these facts, a reasonable jury could find that the manner of the posts was quite public and disruptive.

But on the other hand, Dr. Gustilo set her Facebook to private after Dr. Hilden and Dr. Hoody talked to her about her posts.  (*E.g.*, Doc. 54-1 at 162–64; Doc. 54-2 at 38–41.)

She even added a disclaimer to the top of her page, stating, "My posts do not necessarily represent those with whom I am affiliated. Obvious, right?" (*Id.*; Doc. 54-2 at 89.) And while a few of her posts prompted more than ten reactions or comments (*e.g.*, Doc. 54-2 at 53, 59, 60), most received less than five (*e.g.*, Doc. 54-2 at 47–51, 54–59, 63–69). Based on these facts, a reasonable jury could, perhaps, find that the manner of the posts was less public and disruptive than HHS makes them out to be.

The Court therefore finds that there are genuine issues of material fact in dispute underlying the third *Pickering* factor.

### iii.    Context of the Dispute

The parties do not discuss the context of the dispute separately from the time, place, and manner of the posts. (*See* Doc. 99 at 34–36; Doc. 116 at 35.) Nonetheless, the Court distinguishes between the two factors.

In contrast to the third *Pickering* factor—which refers to the time, place, and manner of the *speech*—the fourth factor refers to the broader context of the dispute within which the speech arises. It has to do with whether the dispute was over an employee's personal grievance or something of broader relevance outside the employer-employee relationship. *See, e.g.*, *Connick*, 461 U.S. at 148; *Bowman*, 723 F.2d at 645. "The same speech may be protected in one context but not in another; an employee's speech that arises from a purely academic interest is entitled to more protection than speech that arises from a personal dispute with a government employer." *Shands*, 993 F.3d at 1346 (citing *Connick*, 461 U.S. at 153). "When employee speech arises from a dispute with a supervisor, 'additional weight must be given to the supervisor's view that the employee has threatened the

authority of the employer to run' the department." *Id.* (quoting *Connick*, 461 U.S. at 153); *see also Porter v. Dawson Educ. Svc. Co-Op.*, 150 F.3d 887, 894 (8th Cir. 1998) ("Personal motives may be factored into the Pickering balance test. '[I]nsofar as self interest is found to have motivated public-employee speech, the employee's expression is entitled to less weight . . . .'" (citation omitted)).

From one perspective, Dr. Gustilo's posts can be seen as purely academic. Indeed, Dr. Gustilo's political posts did not critique HHS directly. They discussed a range of social issues that were being debated across the nation. As Dr. Gustilo describes them, her posts broadly "reflect[ed] her thoughts and impressions on current issues and conversations on race, equality, and misinformation in the U.S." (Doc. 116 at 3.)

But from another perspective, the posts were intertwined with Dr. Gustilo's personal grievances with HHS's priorities—grievances that she aired in the workplace. HHS is "an urban safety-net healthcare system" (Doc. 99 at 15 n.6), created to provide medical care "for the indigent." Minn. Stat. §§ 383B.901 & .928. So, predictably, the Board engaged in—as Dr. Gustilo puts it—"much discussion surrounding both the issues of COVID-19 [and] issues of race, given the current events of May 2020." (Doc. 116 at 8.) The Board "resolved in August 5, 2020, to declare 'racism a public health crisis that affects the entire Country'" and to "support 'local, state, regional, and federal initiatives that advance efforts to dismantle individual to institutional to systemic racism and . . . promote community efforts to amplify issues of racism and its impact on health.'" (*Id.* at 8–9 (quoting Doc. 62-1 at 118–19).) And Dr. Gustilo resisted both at work and online. For just one example, Dr. Gustilo sparred with colleagues at work over her insistence on using the term "China

virus" to refer to COVID-19, which many considered to be racist and culturally insensitive. (*See, e.g.*, Doc. 54-2 at 111–13.) And at the same time, she posted about the "China virus" on Facebook. (Doc. 54-1 at 166–67.)

The Court therefore finds that there are genuine issues of material fact in dispute underlying the fourth *Pickering* factor.

### iv.    Degree of Public Interest in the Posts

The fifth factor does not simply duplicate the first step of the protected speech analysis—whether the plaintiff spoke on a matter of public concern. Rather, it deals with the *degree* of public interest in the speech. It looks at whether the speech should receive heightened protection because it has some quality or perspective that gives it special value. For example, "an employee's first amendment interest is entitled to more weight where he is acting as a whistleblower exposing government corruption." *Noon*, 94 F.4th at 765–66 (citation omitted).

HHS compares this case to *Palmer*, where Judge Patrick J. Schiltz found that there was minimal public interest in the personal Facebook posts of a county attorney's spokesperson criticizing police brutality. 200 F. Supp. 3d at 848. (Doc. 99 at 36.) Judge Schiltz reasoned that the employee "d[id] not have any particular expertise on the issues on which she was commenting, nor was she acting as a whistleblower or contributing previously unknown facts or insights to the public debate. She was simply adding her views to the views of countless others." *Palmer*, 200 F. Supp. 3d at 848. Dr. Gustilo's sole response is that her Facebook posts "were made during a time when everyone was

discussing these important topics of public concern in-person and online."  (Doc. 116 at 35.)

Here, as in *Palmer*, there was arguably minimal public interest in Dr. Gustilo's speech.  A reasonable jury could find that she had no special knowledge and merely parroted the views of others, contributing little to the public discourse.  Indeed, most of her posts simply shared others' articles and videos with approving commentary.  And the posts in controversy, unlike the fundraising post, received little to no attention from the media or general public.  *Cf. Bowman,* 723 F.2d at 644 (observing that "the media coverage and [reactions of students' parents] are a good indication of the public's interest in" speech by teachers about corporal punishment at a school).  That said, a reasonable jury could also plausibly find that there was a special public interest in her posts because, for example, they were timely.  The parties do not dispute that they related to issues being hotly debated across the nation in 2020.

Given the subjective nature of this question, the Court finds that jury findings on this issue would be helpful.

###### v.    Interference with Duties

Finally, the Court addresses the sixth *Pickering* factor—whether Dr. Gustilo's Facebook posts interfered with her ability to perform her duties.  The parties do not dispute that Dr. Gustilo was demoted from her position as chair of the OB-GYN department, not fired.  So the duties at issue are those of the department chair, not Dr. Gustilo's clinical duties as a doctor within the department.

HHS argues that Dr. Gustilo lost "the complete support of the department. Indeed, she was no longer supported by 'anybody in the department.'" (Doc. 99 at 36.) Dr. Gustilo, on the other hand, points to evidence that the OB-GYN department was high performing and that Dr. Gustilo had made several improvements as chair. (Doc. 116 at 26–27, 32–33.) She also emphasizes that "[i]n its corporate deposition, HHS testified that Dr. Gustilo's off-duty speech, i.e., Facebook posts, did not cause any disruption to the OB-GYN Department." (Doc. 116 at 28 (citing Doc. 61 at 87:24–88:2).)

As already discussed, the Court agrees with HHS that there is strong evidence of disruption. A jury could find that Dr. Gustilo was no longer in a position to lead after having lost the support of all her colleagues. The department's performance and accomplishments *before* the escalation of tension with her colleagues do not change this fact.

That said, there remains a genuine issue of material fact in dispute over the *cause* of the disruption. There is, of course, plenty of evidence that draws a direct connection between Dr. Gustilo's Facebook posts and her losing the support of her colleagues—including, for example, her colleagues' letter citing her posts among their reasons. (Doc. 54-3 at 294; *see also, e.g.*, Doc. 54-3 at 101–02 ("[W]hen that fracturing happened with the Facebook posts and with the sort of lack of support for people that were . . . feeling the call to stand for change . . . . I felt like she was . . . not [supportive], and . . . maybe public[ly] chastised the folks that were involved in some of the more public demonstrations, and . . . I felt that was wrong, and I think it created a lot of division in the group, and then the Facebook posts just threw it over the edge.").) But there is also

25

evidence from which a reasonable jury could find that Dr. Gustilo's behavior *at work* was the primary reason her colleagues could no longer tolerate her leadership. As Dr. Gustilo points out, HHS's corporate representative testified to that effect. At a Federal Rule of Civil Procedure 30(b)(6) deposition, the representative testified:

> Q. Okay. Did Dr. Gustilo's off-duty speech cause any disruption in the OB-GYN department?
>
> A. Her off-duty speech isn't our concern.
>
> Q. But did it cause any disruption?
>
> A. Only her off-duty speech when she -- the short answer is no. It is the speech she did in her capacity as the department chair.
>
> Q. Okay. So with respect to that on-duty speech then, could you describe the nature of the disruption?
>
> A. People come to work to be physicians and to care for patients, not to have to defend themselves to their boss. When they are distracted and disrupted from patient care and from the academics, if they're in an academic position of teaching and the like because their boss is intimidating them and making them feel uncomfortable coming to work. If you are not comfortable coming to work, if you fear getting a performance review from your boss, which many did, if you fear that she is going to take away your earned income if you don't vote along with her view points. She did all those things. She manipulated people in to voting not anonymously to give up their income. That distracts from your ability to provide quality patient care in the workplace. When you fear having to speak to your own supervisor because she is going to interrupt you, she is going to, by her own admission, try to persuade you of her viewpoints, that she is going to not accept what you have told her as your viewpoint but instead try to change your viewpoint, those are disruptive to the practice of medicine and people can't -- they can't feel comfortable in the workplace.
>
> Q. Anything else?
>
> A. It's a failure of leadership.
>
> Q. My question was about the disruptions to the department.

A.  She disrupted the operations of the department.

(Doc. 61 at 87:24–89:18.)  A jury could accept this testimony, among other evidence, and find that Dr. Gustilo's speech on Facebook is not what strained her relationships—or was only a minor factor among many other contributing causes.[5]

All told, there are genuine issues of material fact in dispute underlying a proper *Pickering* analysis.  Therefore, the Court will need a jury's input "through special interrogatories or special verdict forms" before it can determine the proper balance, as a matter of law, between HHS's interests "in promoting the efficiency of the public services it performs through its employees" and Dr. Gustilo's interests "in commenting upon matters of public concern."  *Shands*, 993 F.2d at 1342 (citation omitted).  Accordingly, the Court denies HHS's Supplemental Motion for Summary Judgment.

## B.    Dr. Gustilo's Motion for Reconsideration of Summary Judgment

As noted, Dr. Gustilo seeks reconsideration of the Court's ruling that granted summary judgment to HHS on Dr. Gustilo's federal and state race discrimination claims (Counts I and IV) and her federal and state retaliation/reprisal claims (Counts II and V). (Doc. 65 at 18–27.)  On remand, and upon learning of the video, the Court permitted the

---

[5] Of course, if the jury accepts this testimony, it may also be inclined to find that the Board would have demoted Dr. Gustilo regardless of her Facebook posts.  But as already discussed, that finding would go to the third element of a First Amendment retaliation claim, not the first element. *See Mt. Healthy*, 429 U.S. at 287 (creating a burden-shifting framework for the third element in which the plaintiff first shows that his conduct was a "motivating factor" in the defendant's decision to take the adverse employment action and then the defendant may avoid liability by showing "by a preponderance of the evidence that it would have reached the same decision . . . even in the absence of the protected conduct").

parties to submit supplemental briefing on the limited question of whether the newly discovered evidence changes the Court's summary judgment decision on Dr. Gustilo's race discrimination and retaliation claims. (Doc. 107 at 11.)

### 1.    Title VII and MHRA Race Discrimination Claims (Counts I and IV)

Under Title VII and the MHRA, it is unlawful for a covered employer to discriminate against any individual with respect to the terms and conditions of their employment because of the individual's race, color, religion, sex, or national origin. *See* 42 U.S.C. § 2000e-2(a)(1); Minn. Stat. § 363A.15(1).

An employee may prove unlawful race discrimination in two ways. First, the employee can provide direct evidence "showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action." *EEOC v. Audrain Health Care, Inc.*, 756 F.3d 1083, 1086 (8th Cir. 2014) (cleaned up). Second, and more commonly, the employee may "creat[e] an inference of unlawful discrimination through the *McDonnell-Douglas* analysis." *Burton v. Martin*, 737 F.3d 1219, 1229 (8th Cir. 2013) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). In the first part of the *McDonnell-Douglas* burden-shifting analysis, the employee "must show (1) he is a member of a protected class, (2) he met his employer's legitimate expectations, (3) he suffered an adverse employment action, and (4) the circumstances give rise to an inference of discrimination." *Id.* After the employee makes this "prima facie" case, the employer may rebut the employee's evidence by providing "a

28

non-discriminatory, legitimate justification for [their] conduct." *Id.* (citation omitted). "Once the [employer] provide[s] this reason, the presumption of discrimination disappears, requiring [the employee] to prove that the proffered justification [was] merely a pretext for discrimination." *Id.* (citation omitted). "Proof of pretext, coupled with a strong prima facie case, may suffice to create a triable question of fact." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1046 (8th Cir. 2011) (en banc).

In the Summary Judgment Order, the Court found that while Dr. Gustilo is a member of a protected class who suffered an adverse employment action, she failed to demonstrate or explain how her race was connected to her demotion such that discrimination can be inferred. (Doc. 65 at 19–20.) Specifically, the Court observed there was "no evidence in the record that HHS had any expectation or requirement that persons of color *in particular* hold any set of beliefs." (*Id.*) In addition, to the extent Dr. Gustilo alleged that HHS treated individuals who ascribe to "critical race theory" ("CRT") differently from those who did not, the Court found that this constitutes discrimination based on political belief, which is not protected by Title VII. *See Nahal v. Allina Health Sys.*, Case No. 18-cv-631-DWF-KMM, 2019 WL 8370775 at *5 (D. Minn. November 10, 2019), *aff'd* 842 Fed. Appx. 9 (8th Cir. 2021) (holding that where the plaintiff alleged that his colleagues had "turned against him" after showing them a video about the political state of Iran, "this would not establish an inference of discrimination based on [Plaintiff's] Iranian nationality. Rather, at best, it would show an adverse reaction to [Plaintiff's] political beliefs, which are not protected by Title VII").

In her Title VII and MHRA racial discrimination claims, Dr. Gustilo alleges that HHS "punished [her] for her 'internalized whiteness'" when "she refused to subscribe to the ideology expected of her as a person of color." (Doc. 1 ¶¶ 78(d), 105.) In her Motion for Reconsideration, Dr. Gustilo acknowledges that, "at first glance," her race discrimination claims "may seem novel," but she maintains that the video of the Board meeting demonstrates that "[she] was discriminated against for the stereotype she failed to uphold *after* May of 2020." (Doc. 104 at 9–12 (emphasis in original).) Dr. Gustilo argues that the timing of her "leadership issues" coincided with her reexamination of her "positions on the world." (*Id.* (citing Doc. 101-3 at 138–40).) She points to Dr. Hilden's statement at the Board meeting that HHS was concerned about Dr. Gustilo's beliefs threatening the "psychological safety for people of color." (*Id.* (citing Doc. 101-3 at 2:52- 3:105).) His concern, she argues, highlights that HHS "*does* indeed expect people of color to conform to a certain set of beliefs." (*Id.*) She contends that "the fact that HHS felt that Dr. Gustilo's beliefs would be offensive to people of color, thereby assuming that people of color hold certain political beliefs opposite to those of Dr. Gustilo's, further supports the notion that HHS does in fact subscribe to stereotyping." (*Id.* at 12.)

At oral argument, Dr. Gustilo's counsel elaborated on this theory. Counsel speculates that Dr. Gustilo experienced more retaliation for her views than a white person with the same views because when a white person holds them, it is seen as par for the course, whereas when a person of color holds them, it is seen as particularly offensive. (*See* Doc. 134-1 at 31:23–33:25.) Even assuming that this theory forms a legally cognizable race discrimination claim, there is no record evidence to support it. Dr. Gustilo

does not identify a single instance where a white person shared disfavored views and HHS shrugged its shoulders. Nor does she identify a single instance where anyone expressed that her views were particularly offensive because she is a person of color.

It remains the case that there is no evidence of race discrimination. The addition of the video to the record evidence does not change this reality. Again, there is no dispute that Dr. Gustilo is a member of a protected class and that she suffered an adverse employment action when she was demoted. Setting aside the question of whether she met her employer's legitimate expectations, the video fails to give rise to an inference of race discrimination.

### a.    Lack of Race-Related Comments in the Video

Title VII prohibits discrimination against a member of a protected class for conforming to, or failing to conform to, stereotypes of a protected class member. *See generally Price Waterhouse v. Hopkins*, 490 U.S. 228, 235 (1989) (remanding sex discrimination claim where reasons for denying female plaintiff partnership promotion included that she was aggressive, "macho," "overcompensated for being a woman," needed to "take a course at charm school," and used profanity, which was objectionable "because it's a lady using foul language."); *Hussain v. Fed. Express Corp*., 657 F. App'x 591, 594 (7th Cir. 2016) (finding issues of disputed fact on national-origin discrimination claim where plaintiff, a woman of Indian descent, was denied promotion for being overly aggressive, too emotional, and too facially expressive, and manager advised her to become "more Indian" or "more stoic like an American Indian" to increase her chances at promotion). Unlike the evidence in *Price Waterhouse* and *Hussain* in which the employer

referenced gender, race, or national origin in connection with an adverse employment action, the video here completely fails to connect the Board's demotion of Dr. Gustilo to her race, or to the fact that she identifies as a woman of Filipino descent.

While the video reflects that Dr. Hilden relayed concerns about Dr. Gustilo's leadership from staff members of color—including that employees declined to have Dr. Gustilo conduct their performance reviews "because they did not feel safe in so doing" (Doc. 101-3 at 63–64, 143–46)—and he expressed concern that patients of color might be less likely to receive care at HHS "due to the environment in that department" (*id.* at 66–67), these comments are similar to evidence that was previously available in the summary judgment record, including the Hilden Memo. In the Hilden Memo, Dr. Hilden recounted that the OB-GYN department had "questioned [Dr. Gustilo's] capacity to provide empathic leadership, particularly around racial justice issues, cultural sensitivity and creating a psychologically safe work environment for all but in particular for patients and staff who are people of color." (Doc. 54-7 at 13–15; *see also* Doc. 54-1 at 16, 38 (testifying that a key point in Dr. Hilden's MEC presentation concerned a "[l]ack of safety for people of color" because Dr. Hilden "had been told at those initial conversations that people of color would not feel comfortable working here nor receiving care here" because "of [Dr. Gustilo's] behaviors in the workplace"; staff "felt intimidated and bullied by their boss").)

Again, the video of the Board meeting contains no reference to Dr. Gustilo's race or background as a person of Filipino descent. The Board discussed Dr. Gustilo's conduct in bringing her opinions into the workplace, and the effect of her conduct on the workplace

environment and her ability to lead the OB-GYN department.  (*See, e.g.*, Doc. 101-3 at 394–95.)  Consistent with the earlier record evidence, the video confirms that the focus of the Board's comments was on Dr. Gustilo's conduct, and it does not raise a genuine issue of material fact about whether racial bias against Dr. Gustilo motivated her demotion. *See DeCarolis v. Presbyterian Med. Ctr. of Univ. of Pa. Health Sys.*, 554 F. App'x 100, 104 (3d Cir. 2014) (affirming dismissal of Title VII race discrimination claim where decisionmakers and other employees were offended by the content of an email that plaintiff circulated about President Obama, the discord prompted her termination, and there was no evidence suggesting "that the focus of their comments or actions was related to [plaintiff's] race as opposed to her conduct."); *Hanners v. Trent*, 674 F.3d 683, 694 (7th Cir. 2012) ("[T]here is no evidence to suggest that . . . defendants' comments or actions were related to [plaintiff's] race as opposed to the inappropriate nature of his conduct.").  The video— and all the record evidence, for that matter—does not raise any inference that the Board was concerned about Dr. Gustilo's alleged shortcomings as a leader on account of her identity as a member of a protected class.  The only reasonable inference from the record is that HHS would have made the same decision for an employee who behaved the same way but was not a member of a protected class.

### b.    Timing

The Court is also unpersuaded that the timing of Dr. Gustilo's leadership issues supports an inference of race discrimination or demonstrates pretext.  She emphasizes that prior to her change in views, HHS prominently featured her on billboards, she appeared on podcasts, and she was "touted as an effective and respected leader who fostered a culture

that valued diversity and compassion." (Doc. 104 at 10.) But it was only after events in 2020 and her change in viewpoints, she argues, that HHS discriminated against her for failing to conform to her prior beliefs and the beliefs expected of her as a woman of color. (*Id.* at 9–10.) This timing does not support an inference of race discrimination. The changed variable was her views, not her race.

### c.    Job Performance

As to Dr. Gustilo's argument that the video supports a finding of pretext because the Board found no deficiencies in her performance as a practicing physician, found no "specific incidence" of an HR policy or rule violation, and one Board member found the information initially presented at the Board meeting "a little cryptic" (Doc. 104 at 12–14), the video adds nothing new to the existing record. Dr. Gustilo was merely demoted from her position as department chair; she was not fired from clinical practice at HHS. As the earlier record evidence showed, her "accomplishments clinically" were not in question; HHS sought to "preserve her position on [its] medical staff" but remove her as chair "due to [her] failure to do the expectations of that chair." (Doc. 54-1 at 40.) The video is consistent with the earlier record evidence. Dr. Hilden stated at the Board meeting that Dr. Gustilo's work as a treating physician was not in question, only her performance as department chair. (Doc. 101-3 at 2:88–90.)

### d.    Comparator Employee

Finally, Dr. Gustilo renews her argument that race discrimination can be inferred from the fact that she was treated differently than her successor, Dr. Nezworski, who is white. (Doc. 104 at 13–14; Doc. 121 at 11.) She points to portions of the meeting where

the Board discussed that Dr. Gustilo brought her views on policing, COVID-19, racial equity issues, and the murder of George Floyd into the workplace. (Doc. 121 at 12 (citing Doc. 101-3 at 123–46, 235–42, 290–95).) And she notes that Dr. Nezworski, in contrast, was allowed to discuss her views in the workplace—"views that appeared to conform with the majority of HHS leadership." (Doc. 104 at 13–14; Doc. 121 at 11.)

The Court continues to believe that Dr. Nezworski is an inapposite comparator in the race-discrimination context. (Doc. 65 at 20.) As Dr. Gustilo acknowledges, Dr. Nezworski had different views from her. Had Dr. Nezworski held similar views and made them known in a similar manner, a reasonable jury might be able to infer that race made the difference. But there is no record evidence showing that Dr. Nezworski engaged in conduct similar to Dr. Gustilo and was treated differently.[6]

The newly disclosed video does not alter the Court's determination. Even Dr. Gustilo's own argument about the video evidence focuses on the two doctors' differences in viewpoint, not race. "[I]nstances of disparate treatment can support a claim of pretext." *Torgerson*, 643 F.3d at 1051. But as the Court has already observed, an allegation "that HHS treated individuals who ascribe to 'CRT' differently from those who

---

[6] Dr. Gustilo points to nothing in the record showing that Dr. Nezworski's personal viewpoints, of any stripe—whether aligned with HHS or aligned with Dr. Gustilo—caused leadership difficulties. Nor does she identify evidence showing that Dr. Nezworski invoked her personal viewpoints in the workplace in a manner similar to Dr. Gustilo. To the contrary, the only record evidence that Dr. Gustilo cites in support of her contention that Dr. Nezworski was permitted to "freely voice her opinions on the same issues" (Doc. 121 at 12; *see also* Doc. 104 at 13) is a June 5, 2020 letter of support that the OB-GYN department sent to its patients—a letter that all members of the department, *including Dr. Gustilo*, agreed upon. (*See* Doc. 53 at 6–8.)

did not" is "an issue of discrimination based on *political belief*," not race. (Doc. 65 at 20.)
While the Eighth Circuit has ruled that the record creates a triable issue of fact as to First
Amendment retaliation, discussed *supra*, the record fails to create a disputed question of
material fact as to race discrimination claims.

For all of these reasons, the Court finds no evidence from the video—or the rest of
the record—that creates a reasonable inference of a racially discriminatory attitude among
the Board members sufficient to allow a reasonable jury to infer that Dr. Gustilo's
race was a motivating factor in her demotion. Accordingly, Dr. Gustilo's Motion for
Reconsideration is denied as to her race discrimination claims under Title VII and the
MHRA, and the Court reaffirms its grant of summary judgment in favor of HHS.

### 2.    Race-Discrimination Retaliation and Reprisal Claims (Counts II & VI)

Dr. Gustilo also argues that the newly disclosed video warrants reconsideration of
summary judgment in HHS's favor on Dr. Gustilo's claims for retaliation under Title VII
and reprisal under the MHRA. (Doc. 104 at 14–18.) In the Summary Judgment Order,
the Court found that Dr. Gustilo's actions in support of these claims, expressed in two
emails, failed to constitute protected activity under Title VII. (Doc. 65 at 23–25.) In
addition, the Court found no connection between Dr. Gustilo's statements on a group call
in which she expressed disagreement with a "culturally congruent care" program and
HHS's adverse actions. (*Id.* at 26–27.) Specifically, she presented no evidence showing
that HHS had actual or constructive notice of her objections to "culturally congruent care."
(*Id.*)

As the Court previously noted, Title VII prohibits discrimination against an employee who "has opposed any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e-3(a). To establish a prima facie case of retaliation, an employee must show (1) that they "engaged in protected conduct by opposing a practice that a reasonable person could have believed violated [Title VII]," (2) "that a materially adverse action was taken against [them]," and (3) "that there was a causal connection between the protected conduct and the adverse action." *Helton v. Southland Racing Corp.*, 600 F.3d 954, 960 (8th Cir. 2010). "Protected activity" includes "opposition to employment practices prohibited under Title VII." *Bakhtiari v. Lutz*, 507 F.3d 1132, 1137 (8th Cir. 2007)). Such activity might include, for example, filing a charge with the EEOC, reporting race-based harassment to management, or refusing to implement a discriminatory employment policy. *Benner v. St. Paul Pub. Sch.*, 380 F. Supp. 3d 869, 905 (D. Minn. 2019) (collecting cases).

Similarly, under the MHRA, it is "an unfair discriminatory practice for any individual . . . to intentionally engage in any reprisal against any person because that person . . . [o]pposed a practice forbidden under [the MHRA]." Minn. Stat. § 363A.15. A prima facie MHRA reprisal case is established by showing (1) an employee's statutorily protected activity; (2) an employer's adverse employment action; and (3) a causal connection between the two. *See Sameh Mahmoud Mohamed Said v. Mayo Clinic*, 44 F.4th 1142, 1151 (8th Cir. 2022) (citing *Fletcher v. St. Paul Pioneer Press*, 589 N.W.2d 96, 101-02 (Minn. 1999)). A reprisal claim under the MHRA is analyzed by applying the *McDonnell-Douglas* burden-shifting test. *See Chivers v. Wal-Mart Stores, Inc.*, 641 F.3d 927, 932 (8th

Cir. 2011); *see also Guimaraes v. SuperValu, Inc.*, 674 F.3d 962, 977 (8th Cir. 2012) ("Title

VII retaliation claims and MHRA reprisal claims are governed by the same standards.").

There is no dispute that Dr. Gustilo suffered an adverse employment action, but the

parties again dispute (a) whether Dr. Gustilo engaged in protected activity; and (b) whether

HHS's demotion of Dr. Gustilo was related to the allegedly protected activity.

As for engaging in protected activity, Dr. Gustilo contends that her protected

activity included her opposition to the broader implementation of CRT "on the good faith

belief that it does impact care for both patients and employees," as well as "her dissent to

the discrimination she experienced, as a woman of color, for her personal beliefs and

advocacy of equality and compliance with Title VII."  (Doc. 121 at 14.)  She argues that

her "opposition to the infiltration of this [CRT] ideology" was noted during the Board

meeting, and "identified as a problem." (Doc. 104 at 17.)  For evidentiary support, she cites

Dr. Hilden's comments at the Board meeting about Dr. Gustilo expressing her opposition

in the workplace to racial equity issues and her views about George Floyd.  (*Id.*)

Once again, the Court finds that Dr. Gustilo did not engage in an activity protected

by Title VII or the MHRA.  (*See* Doc. 65 at 23–27.)  The record does not support an

inference that Dr. Gustilo opposed an employment practice that she reasonably believed

violated Title VII or the MHRA.  She does not identify a single *employment* practice that

she opposed.  She identifies broad priorities within HHS, but she does not identify any

particular policy regarding employment.  Moreover, Dr. Gustilo does not identify a single

instance where she expressed a belief that any of these priorities violated Title VII or the

MHRA. She shares examples of her concerns that they were morally and philosophically wrong, but she does not share any instance where she asserted that they were unlawful.

Even assuming for the sake of argument that she engaged in protected activity, there is no causal connection between an activity and the adverse employment action if the agents of the employer taking the adverse action lack knowledge of the protected activity. *See Buytendorp v. Extendicare Health Servs., Inc.*, 498 F.3d 826, 836 (8th Cir. 2007) (finding no causal connection where employee had "presented no evidence suggesting" that the individual who threatened her termination was aware of her protected conduct); *Doering v. Wal-Mart Stores, Inc.*, Civil No. 12–2629 (JRT/LIB), 2014 WL 3395745, at *16 (D. Minn. July 11, 2014) (no retaliation where the manager threatening discipline was not aware of the plaintiff's charge of sexual harassment). Dr. Hilden's generalized comments to the Board about Dr. Gustilo bringing her "specific opinions about racial equity issues, and very particularly about . . . the George Floyd murder," into the workplace (Doc. 101-3 at 239–41) are not evidence from which a reasonable jury could find that HHS knew that Dr. Gustilo opposed any particular employment practice. They are only evidence that the Board knew Dr. Gustilo had certain general political beliefs and priorities having nothing to do with her employment.

For all of these reasons, the Court denies Dr. Gustilo's Motion for Reconsideration on her reprisal and retaliation claims.

### III.   CONCLUSION

Based on the submissions and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendants' Supplemental Motion for Summary Judgment [Doc. 97] is **DENIED**; and

2. Plaintiff's Motion to Reconsider Summary Judgment [Doc. 103] is **DENIED**.


Dated:  May 15, 2025                              /s/  Susan Richard Nelson
                                                  SUSAN RICHARD NELSON
                                                  United States District Judge