# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| Tara Gustilo, M.D., | Case No.: 0:22-cv-00352-SRN-DJF |
| Plaintiff, | |
| v. | **ORDER** |
| Hennepin Healthcare System, Inc., | |
| Defendant. | |

Aaron Mark Bostrom, Anne St. Amant, Bailey Stubbe, and Daniel J. Cragg, Eckland & Blando, 800 Lumber Exchange Building, 10 South Fifth Street, Minneapolis, MN 55402; and Douglas P. Seaton, Upper Midwest Law Center, 8421 Wayzata Boulevard, Suite 300, Golden Valley, MN 55426, for Plaintiff.

Katlyn Lynch, Kelly K. Pierce, and Matthew S. Frantzen, Hennepin County Attorney's Office Civil Division, A-2000 Government Center, 300 South Sixth Street, Minneapolis, MN 55487, for Defendant.

SUSAN RICHARD NELSON, United States District Judge

Tara Gustilo, M.D., sued her former employer, Hennepin Healthcare System, Inc. (HHS), alleging, *inter alia*,[1] that HHS violated the First Amendment by removing her from her position as chair of its obstetrics and gynecology (OB-GYN) department in retaliation for public posts she made on Facebook in 2020. The parties agreed to a trial solely on disputed factual issues that would inform this Court's legal analysis under the *Pickering*

---

[1] The Court previously dismissed Dr. Gustilo's claims for race discrimination, retaliation, and reprisal. (Doc. 65 at 17–27; *see also* Doc. 143 at 27–39 (denying motion to reconsider dismissal of those claims).)

framework for deciding whether an employee's speech was protected by the First Amendment. *See Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968); *Shands v. City of Kennett*, 993 F.2d 1337, 1342 (8th Cir. 1993). (Doc. 130 at 1.) This matter is now before the Court for a ruling under *Pickering* after a five-day jury trial resolving those factual disputes by way of six special interrogatories.

## I.    THE LAW

To appreciate the relevance of the evidence at trial, it helps to first understand the *Pickering* framework.

The First Amendment prohibits Congress from, among other things, "mak[ing any] law . . . abridging the freedom of speech." U.S. Const. amend. I. As such, a public employer may not demote or discharge an employee in retaliation for constitutionally protected speech. *Rankin v. McPherson*, 483 U.S. 378, 383 (1987).

That said, a public employee's free speech right is "not absolute." *Bartlett v. Fisher*, 972 F.2d 911, 916 (8th Cir. 1992). Public employees "often occupy trusted positions in society," and "[w]hen they speak out, they can express views that contravene governmental policies or impair the proper performance of governmental functions," so when a "citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom." *Garcetti v. Ceballos*, 547 U.S. 410, 418–19 (2006). Without a "significant degree of control over their employees' words and actions," government employers would have "little chance" of providing efficient public services. *Id.* at 418. And "government offices could not function if every employment decision became a constitutional matter." *Connick v. Myers*, 461 U.S. 138, 143 (1983).

- 2 -

So courts give a "wide degree of deference" to public employers' management of their personnel and internal affairs. *Id.* at 152. This deference extends not only to speech that has caused actual disruption but also to "employers' reasonable predictions of disruption." *Waters v. Churchill*, 511 U.S. 661, 673 (1994) (plurality opinion). "An employer need not 'allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action.'" *Henry v. Johnson*, 950 F.3d 1005, 1012 (8th Cir. 2020) (quoting *Connick*, 461 U.S. at 152).

Importantly, this does not mean that a public employee "relinquish[es] First Amendment rights to comment on matters of public interest by virtue of government employment." *Connick*, 461 U.S. at 140. It just means that courts must strike a "balance" between the employee's interests, "as a citizen, in commenting upon matters of public concern" and the government's competing interest, "as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568. To that end, courts have developed a "framework for analyzing claims by public employees that they have been improperly discharged for exercising their right to free speech." *Shands*, 993 F.2d at 1342.

First, a court must ask whether the employee spoke "as a citizen addressing matters of public concern." *Garcetti*, 547 U.S. at 417. "If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech. If the answer is yes, then the possibility of a First Amendment claim arises." *Id.* at 418 (citation omitted).

Second, the court asks whether the public employer has "put[ ] the *Pickering* balancing test into play by submitting evidence of disruption." *Mayfield v. Mo. House of Representatives*, 122 F.4th 1046, 1055 (8th Cir. 2024); *see also Henry*, 950 F.3d at 1011 (explaining that "resort to the *Pickering* factors is unnecessary" when "there is no evidence of" either actual or reasonably predicted disruption because "there are no government interests in efficiency to weigh against First Amendment interests"). To "trigger" the *Pickering* balancing test, the employer must make a "threshold showing" that the speech had, or was reasonably predicted to have, an "adverse impact on the efficiency of the [public employer's] operations." *Lindsey v. City of Orrick*, 491 F.3d 892, 900 (8th Cir. 2007). Speech has an adverse impact if it "create[s] workplace disharmony, impede[s] the plaintiff's performance or impair[s] working relationships." *Noon v. City of Platte Woods*, 94 F.4th 759, 765 (8th Cir. 2024); *see also Henry*, 950 F.3d at 1012 ("When . . . a government employer relies substantially on the working relationships among its members, trust and morale are of prime importance.").

If *Pickering* is in play, the court then "must balance the 'interests of the [employee], as a citizen, in commenting upon matters of public concern and the interests of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Shands*, 993 F.2d at 1342 (quoting *Pickering*, 391 U.S. at 568). "This is a complex task." *Gustilo v. Hennepin Healthcare Sys., Inc.*, 122 F.4th 1012, 1020 (8th Cir. 2024); *see also Connick*, 461 U.S. at 150 ("balancing is difficult"). It requires more than just asking whether the employer has made a threshold showing, such as "'clearly demonstrat[ing]' that the speech involved 'substantially interfered' with official

responsibilities." *Connick*, 461 U.S. at 150. Rather, "the state's burden in justifying a particular discharge varies depending upon the nature of the employee's expression," so a proper analysis is "particularized," *id.*, and "flexible," *Shands*, 993 F.2d at 1344. "[T]he weight to be given to any one factor depends upon the specific circumstances of each case." *Id.*; *see also Garcetti*, 547 U.S. at 418 (noting that the "difficult" nature of *Pickering* balancing "is the necessary product of 'the enormous variety of fact situations in which critical statements by teachers and other public employees may be thought by their superiors . . . to furnish grounds for dismissal.'" (quoting *Pickering*, 391 U.S. at 569)).

To help guide the analysis, courts in the Eighth Circuit refer to six factors:

> (1) the need for harmony in the office or work place;
>
> (2) whether the government's responsibilities require a close working relationship to exist between the plaintiff and co-workers when the speech in question has caused or could cause the relationship to deteriorate;
>
> (3) the time, manner, and place of the speech;
>
> (4) the context in which the dispute arose;
>
> (5) the degree of public interest in the speech; and
>
> (6) whether the speech impeded the employee's ability to perform his or her duties.

*Shands*, 993 F.2d at 1344 (quoting *Bowman v. Pulaski Cnty. Special Sch. Dist.,* 723 F.2d 640, 644 (8th Cir.1983)). These factors are "non-exclusive," *Nagel v. City of Jamestown*, 952 F.3d 923, 930 (8th Cir. 2020), and other circuits refer to slightly different sets of factors, *see, e.g.*, *Grutzmacher v. Howard County*, 851 F.3d 332, 345 (4th Cir. 2017) (nine factors); *Bennett v. Metro. Gov't of Nashville & Davidson Cnty.*, 977 F.3d 530, 540–41

(6th Cir. 2020) (four factors); *Hicks v. Ill. Dep't of Corr.*, 109 F.4th 895, 901 (7th Cir. 2024) (seven factors); *Labriola v. Miami-Dade County*, 142 F.4th 1305, 1309 (11th Cir. 2025) (three factors). But they all target the same ultimate question—whether the public employer's interest in efficient provision of services outweighed the employee's speech interests.

This intricate balancing of interests is a question of law, but it depends on many underlying questions of fact for the jury, like "whether the speech created disharmony in the work place." *Shands*, 993 F.2d at 1342; *see also Porter v. Dawson Educ. Serv. Co-op.*, 150 F.3d 887, 893 (8th Cir. 1998) ("The jury found that appellant's speech (1) caused or could have caused disharmony and disruption in the work place, (2) impaired appellant's working relationship with other employees, and (3) impeded her ability to perform her duties."); *Lewis v. Harrison Sch. Dist. No. 1*, 805 F.2d 310, 312–13 (8th Cir. 1986) (noting that the jury found, through its "answers to [ten] interrogatories," a need for "close working relationships" but not actual or potential disharmony or disruption); *Bailey v. Dep't of Elementary & Secondary Educ.*, 451 F.3d 514, 517 (8th Cir. 2006) ("The jury also found, in response to the *Pickering* special interrogatories, [Plaintiff's] statements . . . 'cause[d], or could . . . have caused, disharmony or disruption in the working relationship between those working for [Defendant],' and [Plaintiff's] letter 'impair[ed] his ability to perform his duties.'"). The Court "must defer" to the jury's factual findings "unless they are totally unsupported by the record." *Lewis*, 805 F.2d at 315.

## II.    THE EVIDENCE

### A.    The Defendant, HHS, and its OB-GYN Department

HHS is a public healthcare organization that operates an inner-city county hospital—commonly known as Hennepin County Medical Center (HCMC)—and several clinics in and around Minneapolis. (Tr. 56:23–57:7.)[2]  It is the county's only "safety net" hospital, meaning it "take[s] care of everyone." (Tr. 57:7–14.)  It serves a "very diverse population, a low income patient population, a population that experiences a lot of barriers to care" and negative "social determinants of health" like poverty, food insecurity, housing insecurity, and crime. (Tr. 57:15–21; *see also* Tr. 58:24–60:8, 338:10–18, 342:1–11.)  Only about 15 to 20 percent of patients have private insurance, while about 70 and 80 percent of patients have insurance through Medicare or Medicaid, and 5 to 10 percent have none. (Tr. 58:13–23.)

HHS's obstetrics and gynecology (OB-GYN) department has an even more diverse patient population than the rest of HHS. (Tr. 57:22–24.)  About 70 percent of its patients are women of color, and at least half need translation services because they are not fluent in English. (Tr. 62:4–11, 216:11–14.)  Most of the department's patients have "complex medical situations or complex social situations." (Tr. 58:24–59:5.)  And because the department "care[s] for the reproductive system," the care they provide is deeply

---

[2] The trial transcripts are divided into five volumes—one for each day of trial. Volume I (Doc. 184) covers pages 1 to 124.  Volume II (Doc. 190) covers pages 125 to 399.  Volume III (Doc. 186) covers pages 400 to 681.  Volume IV (Doc. 191) covers pages 683 to 776.  And finally, Volume V (Doc. 188) covers pages 777 to 995.  For brevity, the Court cites only page numbers.

"personal." (Tr. 57:25–58:7.)  Though department employees are part of "really wonderful moments in patients' lives"—"you know, having a child, going through their first pregnancy, . . . welcoming a new family member into [the world]"—they also need to support patients who "have experienced trauma," especially sexual assault.  (Tr. 58:3–12.)

In that environment, trust is critical both among staff and between staff and patients. "[W]hen you're seeing people who are dealing with really difficult things every day," it is "critically important to have strong teams and support from each other."  (Tr. 63:12–17.) To "provide good patient care," medical providers need "to trust each other, to feel confident with each other, and to feel safe with each other."  (Tr. 63:18–64:5.)  Mistrust of the healthcare system is also "[e]xtremely common" among HHS's patients.  (Tr. 59:24–60:1.)  Many patients, "generally people of color," have been "mistreated by the healthcare system" and "dismissed by healthcare providers in the past," so it is "really important" to HHS that employees "approach . . . patients in a really respectful way."  (Tr. 59:24–60:8.)

To that end, HHS has emphasized "health equity"—which means making sure that "everybody has fair access to healthcare"—as part of its mission "[f]or decades." (Tr. 723:5–724:1; *see also id.* (testifying that HHS's vision statement is "exceptional care without exception"); Def. Ex. 1 at 1 (Doc. 54-1 at 2) (HHS 2393) (HHS's mission statement).)  And in August 2020, HHS officially "declare[d] health equity a strategic priority."  (Def. Ex. 1 at 1 (Doc. 54-1 at 2) (HHS 2393).)  The declaration came in the wake of George Floyd's murder near HCMC.  (Tr. 215:20–217:2.)

These values are held close by OB-GYN department staff, who testified that they work at HHS not for money—indeed, they take a pay cut to work at HHS—but because of

- 8 -

their "passion for the patient population that [HHS] serves" and their commitment to "taking care of everyone no matter . . . what their health insurance is, no matter who they are, no matter what their socioeconomic status or race status is." (Tr. 60:9–16, 510:5–7; *see also* Tr. 66:14–67:19, 109:25–110:6, 405:13–406:25, 477:12–25, 479:11–25, 573:10–19, 715:12–717:7.) Because of these shared values, and the shared struggle of working in a "chronically understaffed" department with limited resources, the department is "very, very tight knit." (Tr. 407:14–24, 511:19–23; *see also* Tr. 66:5–13, 391:11–16, 490:2–6.) Though doctors "oftentimes" care for patients "on their own," they call and text each other outside of work to ask questions about patients and regularly seek help with emergencies in both operating and delivery rooms. (Tr. 575:11–20; *see also* Tr. 65:4–66:4, 214:5–15, 574:4–22, 575:21–576:4.) In short, the department has an "esprit de corps"; team members rely on each other to "be there" and "ha[ve] [their] back" when they "need to hit the panic button." (Tr. 215:25–216:10, 409:15–24.)

### B.    The Plaintiff, Dr. Tara Gustilo

Dr. Gustilo joined the team in 2008 and quickly became a visible leader. (Tr. 643:9–19.) By 2015, she had been named the interim chair of the department. (Tr. 615:5–7.) In 2018, she started what was meant to be a five-year term as department chair. (Tr. 615:8–10.) And in 2019, she applied to be HHS's chief executive officer. (Tr. 69:7–14, 619:4–15.) During her time at HHS, Dr. Gustilo also served on several committees, including the Medical Executive Committee, the Leadership Development Committee, and the Board of Directors. (Tr. 614:7–23, 643:13–19.) And she even appeared on a billboard for HHS and

a radio show hosted by Dr. David Hilden, HHS's then-Vice President of Medical Affairs. (Tr. 615:11–14, 617:6–16; *see also* Def. Ex. 36 at 3, 5–6 (Doc. 58 ¶ 11; Doc. 58-1 at 1–2).)

As department chair, Dr. Gustilo had many responsibilities. (*See* Tr. 48:13–56:22, 621:8–624:24.) On top of her clinical duties, she was "responsible for ensuring the recruitment and retention and development of" staff. (Def. Ex. 42 at 7 (Doc. 62-1 at 25) (HHS 2039).) She "manage[d] the department budget," "set[ ] medical staff compensation" and schedules, and conducted "annual performance evaluation[s]." (*Id.* at 7–8 (Doc. 62-1 at 25–26) (HHS 2039–40).) She was expected to "[e]mbrace[ ] Hennepin Healthcare's mission," "[m]odel[ ] and promote[ ] behavior consistent with the organization's values," "foster[ ] a positive workplace culture," and "build[ ] inclusive workplace teams." (*Id.* at 9 (Doc. 62-1 at 27) (HHS 2041).) In exchange for taking on these additional responsibilities, HHS paid Dr. Gustilo an additional $153,000. (Tr. 619:16–620:20.)

Before 2020, Dr. Gustilo received positive reviews from both patients and colleagues. Dr. Laura Nezworski "really liked her" and "saw her as a friend" and "mentor"—"somebody who [she] could confide in and who would support [her] if [she] had questions." (Tr. 68:1–5.) Dr. Samantha Pace had a "collegial" and "friendly" relationship with her. (Tr. 440:10–12.) Dr. Eric Heegaard "thought she was a very good leader" and was "nothing but supportive." (Tr. 480:12–481:20.) And Dr. Tracy Prosen found her to be "very passionate about the mission of [HHS]" and "felt [they] had a really good relationship." (Tr. 510:3–4, 510:19–511:3.) No one ever complained about her to

- 10 -

Dr. Hilden, the "second in command in the physician hierarchy under the chief medical officer." (Tr. 82:24–83:4, 858:21–25.)

Then came the COVID-19 pandemic and the murder of George Floyd. These events hit very close to home for HHS and its patients. (*E.g.*, Tr. 408:1–409:5.) Indeed, George Floyd was murdered "in [their] neighborhood," and he was declared dead in HCMC's emergency department. (Tr. 408 at 15–21, 513:14–22.) HCMC "had a lot of security concerns," and had to put up "wooden planks around the first floor." (Tr. 408 at 22–25.) And HHS staff "knew all of [their] patients," who saw "their husbands, brothers, fathers, sons in George Floyd," "were significantly impacted by his murder." (Tr. 409 at 1–5; *see also* Tr. 513:23–514:4.) These events "amplified" the "mistrust" of the healthcare system that was already common in the community, and patients were voicing concerns that "they didn't get the right care because of their race" and were "feeling like they're not heard; dismissed." (Tr. 215:20–24, 216:19–217:2; *see also* Tr. 513:23–514:4, 576:21–577:12.)

## C.    HHS's Social Media Policy

Dr. Gustilo was obligated to comply with HHS's social media policy, which requires employees to be "incredibly careful when they identify themselves as being associated with the organization on public-facing webpages and social media." (Tr. 56:1–5.) Specifically, the policy states that "management level employees," by virtue of their "unique role in the organization," have a "heightened responsibility" to "use exceptional judgment" when expressing their views online and should "consider whether personal thoughts they publish may be misunderstood as expressing HHS's position." (Def. Ex. 7 at 3 (Doc. 54-2 at 172).)

- 11 -

### D.    The Facebook Posts at Issue

On March 20, 2020, Dr. Gustilo made a series of posts to her public Facebook account to raise funds for supplies for pregnant women.  (Tr. 625:8–11.)  In the primary post, Dr. Gustilo identified herself as the chair of HHS's OB-GYN department.



(Def. Ex. 3H (Doc. 54-2 at 30) (HHS 2201); *see also* Def. Ex. 3G (Doc. 54-2 at 29) (HHS 2200).)  She also identified herself as the chair of HHS's OB-GYN department in her Facebook biography.  (Tr. 222:5–14, 352:11–20.)

The fundraising posts garnered significant positive attention.  They reached Julia Di Caprio, a former HHS employee now working for a different healthcare network, who offered to contribute money to the fundraiser.  (Tr. 626:12–627:9.)  And a local magazine published an article about Dr. Gustilo's efforts titled "Hennepin Healthcare Reimagines Virtual Care Visits" and taglined "A fundraising appeal helmed by its OB-GYN chairwoman clinches thousands of dollars' worth of medical supplies for pregnant patients."  (Def. Ex. 2 at 1 (Doc. 54-2 at 38).)  The article mentioned that when

Dr. Gustilo's idea was slow to take off, she "decided to take matters into her own hands . . . spreading the message across local PR and her very own Facebook page." (*Id.* at 3 (Doc. 54-2 at 40).)

In the following months, however, Dr. Gustilo's posts turned highly political. In January 2020, Dr. Gustilo "decided that [she] was going to watch the impeachment trial" of President Trump and "read a variety of both left- and right-wing media" to "see how things got reported." (Tr. 665:4–17.) And by June, she had started sharing posts expressing her support for President Trump and opposition to Democrats, who she criticized as anti-capitalist, socialist, Marxist, fascist, racist, and anti-American. (*See generally* Def. Exs. 3B–F, 3I–M, 4A–Z, 4AA–OO (Doc. 54-2 at 18–28, 31–102) (HHS 2189–99, 2202–07; Gustilo 11–66).) She also shared her opinions on a variety of controversial topics like COVID-19, race, policing, and the Black Lives Matter movement. (*Ibid.*) Though the posts are too numerous to list here, a few examples are illustrative.

In one post, Dr. Gustilo stated that a video arguing systemic racism is a myth "explains some of [her] thought processes." (Def. Ex. 3I (Doc. 54-2 at 31) (HHS 2202).) In another post, Dr. Gustilo endorsed the argument that criminals who are killed during arrests "knew the risk when they did the crime" as "more than fair." (Def. Ex. 3J (Doc. 54-2 at 32) (HHS 2203).)

 

In a third post, Dr. Gustilo linked to another person's post asking, "Do you think Causasian America would Tolerate the killing of unarmed Caucasian men by Black Officers?" (Def. Ex. 4LL (Doc. 54-2 at 87) (Gustilo 51).)    And in response, Dr. Gustilo wrote, "Caucasians do.  Fact:  blacks are more likely to be killed by a black officer than a white. Black officers do kill white people.  The media just doesn't show it."  (*Id.*)



Finally, in a fourth post, Dr. Gustilo complained about "welfare queens" and "implied that black women are using . . . public assistance programs to enrich themselves." (Tr. 72:24–73:14; *see also* Tr. 223:1–224:1, 299:7–22.) Witnesses discussed this post at trial, but a copy of it was not produced because Dr. Gustilo deleted many of her posts. (Tr. 633:16–636:2.)

Dr. Gustilo also shared her views in the comments section of others' posts. (*E.g.*, Def. Exs. 3F & 3M (Doc. 54-2 at 21–28, 35–36) (HHS 2192–99, 2206–07).) In one instance, a former HHS nurse practitioner criticized an apple orchard's post defending its decision to call COVID-19 the "China Virus." (Tr. 220:2–221:22, 272:8–20; Pl. Ex. 22 (HHS 4277–78).) The former colleague remarked, "[i]f you enjoy the taste of racist apples, this sounds like the apple orchard for you." (Pl. Ex. 22 at 1 (HHS 4277).) Dr. Gustilo responded, "Looks like it's time to make apple pie!" (*Id.* at 2 (HHS 4278).)





### E.    The Onset of Disruption in the OB-GYN Department

According to the testimony, "leadership concerns" were "smoldering" in the OB-GYN department around the same time. (Tr. 206:9–16.) When COVID-19 hit, Dr. Gustilo created cohorts of staff who would work at the same time so that "if there was a sick person, . . . the whole team wouldn't get sick." (Tr. 159:16–160:6.) Though people "understood [Dr. Gustilo's] rationale" for the system, it also "really complicated making schedules," and staff found it "really hard" to "adjust." (*Id.*; *see also* Tr. 442:1–13.) Meanwhile, Dr. Gustilo had stopped "taking call" a couple years before the pandemic, she "stopped doing clinical care completely" at the start of it, and she was the only person exempted from the cohort system—she just worked from home and "didn't come on the unit," "didn't check in at the department at all." (Tr. 152:13–154:6, 160:7–15, 250:18–251:2, 372:10–23, 649:5–23.) Needless to say, staff were generally frustrated by her lack of visibility in the department and were "concerned that she was no longer grounded in [its] work." (Tr. 152:22–153:2.) As one nurse put it, "[w]e just never saw her. There were a lot of nurses that didn't know that she was the head of the department until [people started talking about] the Facebook posts." (Tr. 250:25–251:2.)

Dr. Gustilo also started having tense interactions with staff and taking "an argument[at]ive approach toward conflict." (Tr. 154:23–155:1.) For example, when there was a pandemic-induced "supply chain issue" with "Cook Catheters," Dr. Gustilo "thr[e]w [a nurse] under the bus," despite that the nurse "[was]n't necessarily responsible." (Tr. 155:2–156:17.) That incident "left [the nurse] in tears." (Tr. 155:6–7.)

In late April 2020, Dr. Gustilo proposed that money designated for physician compensation, which was usually distributed as bonuses, be reallocated to the department's midwives and nurse practitioners to alleviate financial strain on them from furloughs. (Tr. 156:18–157:23, 656:24–659:17.)  In an anonymous vote, the physicians agreed to cover the nurse practitioners' salaries but not the midwives' wages.  (Tr. 157:21–23, 658:3–7.)  Because Dr. Gustilo apparently got the impression that the physicians mistakenly believed the midwives made more than the nurse practitioners, she shared more information on how midwives were paid and asked for a revote.  (Tr. 157:24–159:12, 658:12–23.)  This time, the proposal passed, but some physicians were "upset" with Dr. Gustilo for making them revote.  (Tr. 158:19–20, 658:22–23, 659:7–9.)

In early June 2020, shortly after George Floyd was murdered, Dr. Sally Zanotto, following the lead of "another clinic in town," proposed sending a letter to patients that would "pledge[ ]" the department's "support for [its] patients" and "commit to keeping pregnancy and birth a safe place for all people."  (Pl. Ex. 7 at 4 (HHS 3213); *see also* Tr. 166:1–14, 662:2–14.)  Dr. Gustilo supported the idea, and three physicians drafted the letter.  (Pl. Ex. 7 at 2, 14–15 (HHS 3180–81, 3211); Tr. 662:2–14.)  But Dr. Gustilo took issue with the draft's use of the word "unrest" to describe what was happening in Minneapolis and instead proposed emphasizing "the effect of the *riots*" and "the adversity that they have and will cause."  (Pl. Ex. 7 at 14–16 (HHS 3180–81, 3285) (emphasis added).)  Several employees pushed back, arguing that the second paragraph already "referred to the strain that the events have caused" and that the word "riot" might "take[ ] away from the peaceful protesting that is largely occurring in our community."  (*Id.* at 14

- 17 -

(HHS 3180); *see also id.* at 7–16 (HHS 3173–3181, 3285).)  As a compromise, Dr. Gustilo proposed either removing the word "unrest" or omitting her signature.  (*Id.* at 11 (HHS 3177).)  Ultimately, her colleagues agreed to delete the word "unrest."  Dr. Gustilo said that although she was "deeply saddened" to "have been the nidus" of "acrimony and hard feelings" over the letter, she was "deeply grateful" that her colleagues were "willing to" accommodate her views.  (*Id.* at 7 (HHS 3173); *see also* Tr. 166:19–167:9, 169:22– 176:2, 662:2–664:5.)

Also in early June, several members of the OB-GYN department planned to participate in a rally at the Minnesota State Capitol led by a student group called White Coats for Black Lives.  (Tr. 176:3–10, 387:8–22, 410:18–411:10, 442:14–443:11, 660:7–10.)  Dr. Gustilo was supportive at first.  She lauded her colleagues' participation as an "incredible idea," stated that she was "proud to be a part of this team," and even attended the rally—though she sat on the sidelines and read a book.  (Tr. 396:15–21, 443:12–18, 660:11–14; Pl. Ex. 12 at 6 (HHS 3421).)  But she "was taken aback when one of the tenets stated of 'White Coats for Black Lives' was the defunding of police."  (Pl. Ex. 12 at 7 (HHS 3468).)  This made her feel "incredibly uncomfortable . . . to the point that [she] almost felt compelled to leave."  (*Id.*)  She was also "shock[ed]" that a speaker at the event "formally thanked" the OB-GYN department for the help that some of its doctors had provided in organizing the event.  (Tr. 660:15–661:12.)

Dr. Gustilo sent out an email after the event taking "blame for the fact that [she] hadn't vetted the White Coats for Black Lives group better" and stating that the department needs "to be vigilant about who [it] affiliate[s] with" going forward and not make any

public statement without unanimous consent.  (Tr. 661:7–12; *see also* Pl. Ex. 12 at 7 (HHS 3468).)  This email prompted a brief discussion about whether unanimous consent was realistic, and an apology from the doctor who asked White Coats for Black Lives to thank the department.  (Pl. Ex. 11 (HHS 3483–86).)  In the end, Dr. Gustilo clarified that her "point in opening this discussion was not to lay blame or make any[one] feel bad[ ]" and requested a Zoom meeting to discuss how to handle similar situations "going forward." (*Id.* at 1 (HHS 3483).)

None of these smaller conflicts boiled over, however, until Dr. Gustilo's colleagues discovered her Facebook posts.  (*See, e.g.*, Tr. 209:8–210:14, 318:19–21, 355:1–3, 590:14–16.)  In the words of Dr. Nezworski, the posts "were . . . an incendiary that . . . lit all of these smoldering concerns on fire."  (Tr. 84:21–23; *see also* Tr. 48:13–17, 68:2–15, 98:9–99:25, 206:9–16.)

## F.    The Disruption Continues

When Dr. Gustilo's colleagues first discovered the posts, they did not believe they were real.  (Tr. 310:1–23, 428:6–13.)  They figured that a "bot" or hacker had gotten into her account and "put th[at] garbage on [t]here."  (*Id.*)  The posts were just "so very different from . . . who [they] thought [they] knew in Tara Gustilo"—the person "who hired" many of them and "inspired" them to come to HHS.  (*Id.*)

Once it was clear that Dr. Gustilo was the one who made the posts, staff then became concerned about her "mental health."  (Tr. 428:6–24.)  They figured she was "under a lot of stress with George Floyd, with COVID," and not "seeing each other regularly," and they "wondered if the stress of the pandemic was just overwhelming." (Tr. 79:7–14, 428:6–24.)

Finally, when the "initial disbelief" wore off and staff realized the posts were "truly reflective" of Dr. Gustilo's beliefs, their concern gave way to "disappoint[ment], outrage[ ]," and a loss of "faith in her judgment [and] ability to lead [them]." (Tr. 429:2–5.) People "no longer felt they could trust her[,] [t]hat she was showing good judgment, or that it was safe to talk to her." (Tr. 79:17–25.) They were "devastated." (Tr. 82:10.)

For several months, Dr. Gustilo's posts were a frequent topic of conversation at work; they were "kind of underfoot all the time and distracting on a daily basis." (Tr. 80:4–14; *see also* Tr. 316:24–318:2, 350:4–14.) Her colleagues found the posts "deeply troubling" and worried "that if patients saw this they wouldn't feel safe coming to get their care" at HHS. (Tr. 222:18–25, 239:20–240:10; *see also* Tr. at 314:9–315:10.) "[A] good number of [HHS's] patients" receive public assistance, and about 40 to 45 percent of the OB-GYN department's patients are African American women. (Tr. 73:18–20, 299:19–22; *see also* Tr. 223:23–224:1.) So in their view, a post about "welfare queens" implying that black women are using public assistance programs to enrich themselves would be "hurtful to" their patients and destroy the trust they had worked to build in the community. (Tr. 72:24–74:18; *see also* Tr. 299:13–22.)

They also believed the term "China virus" would make patients feel unsafe. (*E.g.*, Tr. at 314:9–315:10.) Though they acknowledged that other diseases have been named for their geographic origin in the past (Tr. 178:19–180:5, 430:11–431:2, 453:13–454:10, 580:3–12, 888:17–890:2), they testified that they, and every other "self-respecting scientist," do not use the term because it "places blame for the virus on a specific demographic of people" and is therefore "inappropriate and disrespectful to patients and

other staff members." (Tr. 221:13–22, 432:22–25; *see also* Tr. 178:8–18, 180:6–10, 416:9–25, 430:4–431:2.) Department staff were well aware that "hate crimes against Asian[ ]Americans" were on the rise at the time—as reflected by a clinical psychologist's email containing two reports on the topic, which was forwarded to the department after a "shooting in Georgia that left eight people dead." (Tr. 299:23–300:6, 420:24–422:17; Def. Ex. 41 at 1–2 (HHS 3614–15); *see also id.* at 3–19 (HHS 3616–32).) They also explained that the China virus post was "very discordant" with "the value system, the mission, the vision of" HHS. (Tr. 311:6–24, 424:22–425:17.) To them, "extend[ing] a welcoming message to everybody" is "crucial for the execution of [HHS's] mission," and Dr. Gustilo's message "was not healing in any way . . . . It was not welcoming to people who might see it." (Tr. 499:18–500:11.)

Dr. Gustilo, for her part, testified that she was aware that "the term 'China virus' was politicized" and that "there was an uptick in violence against southeast Asians" when she commented on the China virus post. (Tr. 707:4–20.) She also testified that she did not use the term herself "[b]ecause the name was COVID-19." (*Id.*)

The concern that patients would see the posts was well founded. Indeed, Dr. William Madland testified that two "very upset" patients "spontaneously" mentioned Dr. Gustilo's posts during office visits. (Tr. 315:16–22.) Dr. Pace testified that two patients asked her about Dr. Gustilo's posts, and one "said she didn't want to see [Dr. Gustilo] anymore." (Tr. 423:13–24.)[3] And Dr. Elizabeth Alabi predicted that her

---

[3] Dr. Pace recalled that the two patients who complained to her were also HHS employees. (Tr. 461:3–12.) But Dr. Madland never shared any such details about his two

patients would see the posts because patients contact her through Facebook "[a]ll the time." (Tr. 350:22–351:14.)

On top of that, department staff worried about the department's relationships with other medical providers. (*E.g.*, Tr. 74:19–75:5, 240:4–242:3, 439:6–15.) Providers in other HHS departments "were very upset" about the posts and had "reached out to providers in [the OB-GYN] department" to ask "what's going on with Tara." (Tr. 74:21–75:5.) A midwife at a different hospital had also "reached out" to OB-GYN nurse Gina Braun "asking about what was going on with the Facebook posts," so Nurse Braun feared that a few "community birth centers that do transfers to [HHS]" would see the posts and stop sending their patients to HHS. (Tr. 240:4–22.) As one doctor explained, "[t]he birth community is fairly small and information travels fast, and once the department chair has been known to say or do something, it feels very reflective of the institution and it feels like it could have been easily interpreted as such." (Tr. 439:11–15; *see also* Tr. 241:3–242:3.)

### G.    Unsuccessful Efforts to Heal the Disruption

Feeling "like the department was fractured and falling apart," a group of physicians decided that they needed to do something. (Tr. 82:10–11.) Around September, they held two Zoom meetings where they discussed their concerns and how to bring them to

---

patients. (*See* Tr. 315:16–21.) The Court therefore takes exception with Dr. Gustilo's repeated factual assertion that "[t]here was no evidence that any patients (who did not work at HHS) ever saw a single Facebook post." (Doc. 199 at 3; *see also id.* at 18; Doc. 195 at 10.)

Dr. Gustilo and upper management. (Tr. 76:2–8, 80:15–81:18, 208:21–209:10, 352:24–353:6.) The organizers sent out the invites by personal email "because nobody felt comfortable using their work email to discuss th[e] topic," and they did not invite Dr. Gustilo because "people were afraid of her" and "afraid of retaliation." (Tr. 81:20–25, 82:1–6; *see also* Tr. 319:15–322:10, 353:7–16.) The meetings were "emotionally charged"; one doctor "remember[ed] people crying." (Tr. 590:4–13.) Ultimately, the group decided to have Drs. Nezworski and Prosen "try to meet with Dr. Gustilo individually to see if they could come to [a] consensus or explain [their] concern." (Tr. 354:5–25.) They also began drafting a letter to Dr. Gustilo, and they had four department leaders—Drs. Nezworski, Prosen, Madland, and Alabi—reach out to Dr. Hilden to "express [their] concerns." (*Id.*; *see also* Tr. 82:14–83:23, 318:22–319:10.)

After hearing from those leaders, Dr. Hilden scheduled a meeting with both Dr. Gustilo and Dr. Daniel Hoody, HHS's Chief Medical Officer, for October 5. (Tr. 84:24–85:4, 743:1–25; *see also* Def. Ex. 5 (Doc. 54-2 at 127) (HHS 785).) In the meantime, three more health care providers contacted Dr. Hilden with concerns. (Tr. 744:1–747:19.) First, Dr. Helen Kim—a psychiatrist who "ha[s] an overlap with childbirth because she deals with mothers and families who are struggling in [HHS's] Mother-Baby Center" and "is also the director of a program that [HHS] raises money for called the Red Leaf Center for Families"—emailed with screenshots of Dr. Gustilo's Facebook posts. (Tr. 744:8–745:4, 746:1–14; Def. Ex. 3A (Doc. 54-2 at 45) (HHS 3118).) She "worried that the birth community, which is not that large, . . . would hear of the divisive conversations . . . and choose to send their babies elsewhere." (Tr. 744:16–24.)

She "also was concerned that . . . wealthy donors would perhaps choose to donate their money elsewhere," jeopardizing a $30 million fundraising campaign. (*Id.*) Second, Jessica Holm, the lead of the nurse midwives, told Dr. Hilden "that the team dynamics with Dr. Gustilo w[ere] not good," despite being "quite good with all the other obstetricians." (Tr. 746:15–747:5.) And third, Dr. Madland reached out to tell Dr. Hilden that Drs. Alabi and Pace were considering leaving and that he, too, "couldn't see [himself] working for somebody that was so divisive in public." (Tr. 747:6–19.)

At the October 5 meeting, Dr. Hilden told Dr. Gustilo "that several physicians had come forward in her department with concerns about her Facebook posts and . . . the future of their department . . . . [a]nd that a few of them were questioning whether they would want to continue" at HHS. (Tr. 747:21–748:24.) He also emphasized "that [Dr. Gustilo is] entitled to [her] own opinions on all matters and ha[s] the right to express those opinions," and that her "personal opinions on issues of the day are not [HHS's] concern." (Def. Ex. 6 at 2 (Doc. 54-2 at 167) (HHS 4028).) But he noted that "one mechanism to minimize the risk" of her posts being interpreted as the views of the department due to her leadership role "is to clearly label [her] posts as not representing HHS and . . . exclusively [her] own." (*Id.*; *see also* Tr. 748:25–751:6.)

Dr. Gustilo, by her own admission, was "defensive" at the meeting. (Def. Ex. 8 at 2 (Doc. 54-2 at 176) (HHS 4018).) But in a follow-up email, she agreed to engage in mediation with her department. (Def. Ex. 6 at 1 (Doc. 54-2 at 166) (HHS 4027); *see also* Def. Ex. 8 (Doc. 54-2 at 175–77) (HHS 4017–19).) She also "took down the [Facebook] post that identifie[d her] with HHS," deleted about 20 or 30 other posts, made "some" other

posts private, and added a disclaimer to her profile saying, "My posts do not necessarily represent those with whom I am affiliated.  Obvious, right?"  (Def. Ex. 6 at 1 (Doc. 54-2 at 166) (HHS 4027); Tr. 630:9–636:2; Def. Ex. 39 (Doc. 101-1 at 2–3) (HHS 4025–26); Def. Ex. 4NN (Doc. 54-2 at 89) (Gustilo 53).)

### H.    Disruption Was Entrenched

For many in the OB-GYN department, this was not enough.  To start, Dr. Gustilo's colleagues had "other leadership concerns," and her "posture towards the department . . . could not be rectified."  (Tr. 105:22–106:5.)  Moreover, Dr. Gustilo's decision to delete the posts "months later" did not alleviate her colleagues' concerns about them.  (Tr. 585:4– 12.)  In their view, "[t]he damage had already been done, the posts had already been seen." (*Id.*; *see also* Tr. 468:3–25.)  Even if Dr. Gustilo deleted many of the posts or made them private, "people make screenshots, people share information"—"social media is forever." (Tr. 245:23–246:6, 551:1–2.)  And at least some of the controversial posts were apparently not among those that Dr. Gustilo immediately deleted or made private.  (*See* Tr. 85:13– 87:10 (recalling a November 2020 meeting in which doctors urged Dr. Gustilo "to take the Facebook posts down that were controversial" and specifically discussed the welfare queens and China virus posts).)  Her colleagues also found her disclaimer "snarky" and "sarcastic."  (Tr.244:7–18, 584:20–585:18, 782:11–18.)  They did not agree that it was "obvious" Dr. Gustilo's views did not represent those of the department because "an immediate post prior . . . called out the OB/GYN department at HHS and her being [its] chair," and "if you are listing yourself as the head of a department, . . . in some ways you are speaking for the department."  (Tr. 245:17–22, 584:22–585:3.)

In the next few weeks, it became "apparent that [Dr. Gustilo] wasn't really responding how [Dr. Hilden] would have hoped somebody might respond when [she is] a leader of people and those people are telling [her] that [she is] hurting them." (Tr. 785:22–786:7.) Just a few days after Drs. Hilden and Hoody met with Dr. Gustilo, Dr. Hoody emailed to check in with department leaders and float the possibility of "facilitated discussions." (Def. Ex. 10 at 2 (Doc. 54-2 at 184) (HHS 1325).) Dr. Prosen responded by telling Dr. Hilden about an "encounter" she had with Dr. Gustilo that day. (Tr. 784:22–785:17; Def. Ex. 10 at 1 (Doc. 54-2 at 183) (HHS 1324); *see also* Tr. 529:2–540:3; Def. Ex. 9 (Doc. 54-2 at 179–181) (HHS 4149–51).)

Dr. Prosen recounted that Dr. Gustilo "asked to speak with [her] . . . to find out what . . . the group was unhappy about." (Def. Ex. 10 at 1 (Doc. 54-2 at 183) (HHS 1324).) Dr. Prosen asked if she "was okay," and Dr. Gustilo "assured [Dr. Prosen] that she [was] 'not having a mental breakdown'" but admitted she had "changed in the past several months" as "she watched the impeachment trial and started to 'do her own research.'" (*Id.*) Dr. Prosen explained that "many people had seen her posts on Facebook" and found them "offensive and hurtful," and Dr. Gustilo responded with "absolutely no insight to how her words may be" received. (*Id.* (capitalization removed).) Dr. Gustilo "was clearly angry." (Tr. 531:19–25.) Instead of acknowledging that "the perception of the post [was] what mattered," she gave Dr. Prosen a "10 minute mantra about China's deceit with regard to the current pandemic," and Dr. Prosen "left even more discouraged." (*Id.*; Def. Ex. 10 at 1 (Doc. 54-2 at 183) (HHS 1324).) Ultimately, Dr. Prosen was "not sure how much good" a

meeting with a mediator would do because Dr. Gustilo did not "seem to want to admit that" her colleagues were "hurt."  (Def. Ex. 10 at 1 (Doc. 54-2 at 183) (HHS 1324).)

In November, Dr. Nezworski and Dr. Elizabeth Doty met with Dr. Gustilo outside of work.  (Tr. 85:13–23.)  As Dr. Nezworski recalled, "things had really gotten heated by that point and people were feeling really unsafe in talking to [Dr. Gustilo] about these things and people were saying that we didn't think that she could continue to lead the department."  (Tr. 85:25–86:3.)  But Dr. Nezworski was close with Dr. Gustilo, so she "didn't feel comfortable asking [Dr. Gustilo] to not lead the department potentially without talking to [Dr. Gustilo] [her]self.  And [Dr. Doty] felt the same."  (Tr. 86:4–11.)

That conversation "went fine."  (Tr. 86:13.)  The three of them "had a fairly reasonable conversation," and "everyone was able to share how they felt about . . . how difficult it was to be part of the department at that time."  (Tr. 86:14–17.)  Dr. Nezworski explained why she thought the welfare queens and China virus post would hurt their patients and destroy trust.  (Tr. 86:23–87:6.)  And, although she did not seem apologetic and "spent a fair amount of time trying to convince [her colleagues] of some of her beliefs," Dr. Gustilo "ultimately . . . said she would think about it."  (Tr. 87:2–17.)  In the end, Dr. Nezworski recommended that Dr. Gustilo take down the welfare queens and China virus posts to "deescalate the situation" and "maybe throw[ ] water on [the] fire." (Tr. 86:17–21, 87:23–88:3.)

Also in November,[4] Dr. Gustilo emailed a letter to the department addressing the posts.  (Tr. 88:16–90:20; Def. Ex. 11 (Doc. 54-2 at 187–89) (HHS 1308–1310).)  In the first paragraph, Dr. Gustilo acknowledged "that there was worry that [her] posts may reflect upon" the department and that "this made some uncomfortable."  (Def. Ex. 11 at 2 (Doc. 54-2 at 188) (HHS 1309).)  She also stated that although she "believe[s] every private citizen has a right to express themselves freely," she had "taken down [her] public posts in deference to [her colleagues'] sentiment."  (*Id.*)  She then spent three paragraphs explaining her Facebook activity as a personal effort to "challenge [her own] thinking" and "expose[ ] [herself] to a broad diversity of opinions," "test[ing] the different perspectives."  (*Id.*)  And finally, she spent six paragraphs defending her record as chair.  (*Id.* at 2–3 (Doc. 54-2 at 188–89) (HHS 1309–10).)  She stated that she believed she had "a record of being a supportive and collaborative leader" who "actively sought input," sought "to understand the concerns of others," and "tried to ensure that final decisions were crafted in a way that allowed freedom for each to behave according to their conscience."  (*Id.* at 2 (Doc. 54-2 at 188) (HHS 1309).)  She also highlighted the "areas that [she was still] working on for [the] department."  (*Id.* at 3 (Doc. 54-2 at 189) (HHS 1310).)

To Dr. Gustilo's colleagues, this email "was inadequate."  (Tr. 90:21–23.)  They found it "[v]ery defensive."  (Tr. 543:3–4.)  They observed that Dr. Gustilo did not apologize for the posts, acknowledge "the concerns and worries that people had," or even

---

[4] It is not clear from the record whether Dr. Gustilo sent this email before or after her meeting with Drs. Nezworski and Doty.  (*See generally* Tr. 85:13–89:15.)

say that she would do things differently in the future.  (Tr. 90:24–91:10; *see also*
Tr. 543:5–7, 593:10–23.)  To them, it felt like "more of the same, . . . more of defending
her position and not really listening to or understanding how she was impacting other
people."  (Tr. 91:13–16.)  Instead of responding with "basic humility" and taking
"accountability or responsibility," Dr. Gustilo was "preachy, like [her colleagues] were
wrong for not having an open mind about different things."  (Tr. 488:12–489:1, 593:10–
595:24.)

This was a "really, really low moment."  (Tr. 91:17–22.)  The letter "just made
things even more divided."  (Tr. 595:16–21.)  People had "[d]efeated looks" in their eyes.
(Tr. 92:20.)  They were "feeling afraid to have . . . normal conversations" and were
"whispering to people that they felt like they could trust but not knowing who they could
trust."  (Tr. 92:17–24.)  "People wanted to leave because they didn't feel like they could
work under [Dr. Gustilo's] leadership."  (Tr. 91:21–22.)

## I.    Management Seeks Outside Assistance

By late November, "the people were telling [Dr. Hilden] they did not feel safe
having a meeting with their boss," so he decided that a mediator would be no help.
(Tr. 787:5–16.)  Instead, he hired "an outside firm with expertise in workplace dynamics,"
Human Systems Dynamics Institute (HSDI), "to do an environmental assessment" and
"report back" about "what's going on in [the] department from a neutral perspective."
(Tr. 787:17–23.)  Dr. Hilden had never hired an outside company to investigate issues
within a department before.  (Tr. 788:3–11.)  From November 24 to December 24, HSDI

interviewed 14 people, including nearly all the doctors in the department.  (Tr. 93:6–94:3, 787:24–788:2.)[5]

During the HSDI assessment process, "people continued to feel very frustrated and lost." (Tr. 96:13–14.)  In the early morning of December 24, Dr. Hilden wrote to colleagues that he had "received three unsolicited concerns from Ob-Gyn" in the past two days. (Def. Ex. 25 at 1 (Doc. 54-3 at 161) (HHS 3934); *see also* Tr. 788:22–793:11.) Dr. Madland had emailed Dr. Hilden to say that he and "the majority (if not all) of [his] colleagues" did not believe Dr. Gustilo could conduct "a fair and productive performance review" of them.  (Def. Ex. 25 at 2 (Doc. 54-3 at 162) (HHS 3934–35); *see also* Tr. 321:18– 324:11.)  He also mentioned that "it may not be clear to [Dr. Gustilo] what exactly [Dr. Hilden] recommend[s]," and that "[s]ome [were] wondering if" Dr. Hilden would do their evaluations instead.  (*Id.*)  And he requested a reply "before the holiday," if possible. (*Id.*)  Dr. Alabi emailed separately to say that she needed to "'protect herself' from the [performance evaluation] process with Dr. Gustilo."  (Def. Ex. 25 at 1 (Doc. 54-3 at 151) (HHS 3934); *see also* Tr. 355:22–356:24.)  And Dr. Eric Heegaard, who was contacting Dr. Hilden for the first time, "voiced by phone concerns of a[n] 'implosion' of the department which he characterized as potentially catastrophic and from which it could be hard to recover."  (Def. Ex. 25 at 1 (Doc. 54-3 at 161) (HHS 3934).)

---

[5] Though neither party introduced the final report at trial, and Dr. Nezworski's recollection of these dates and numbers was slightly different from those listed on the report, the Court takes them as undisputed facts from the summary judgment record. *See* Doc. 54-3 at 170–77 (HHS 39–46) (the report); *Gustilo*, 122 F.4th at 1016 (Doc. 81 at 5) (summarizing the report).

In response to these reports, Dr. Hoody emailed Dr. Gustilo to "postpone indefinitely the performance evaluations of [her] direct reports" until HSDI completed its assessment.  (Def. Ex. 27 at 2 (Doc. 54-3 at 168) (HHS 3911); *see also* Tr. 794:15–796:6.)  Dr. Gustilo responded that she would "accede to [Dr. Hoody's] desires and . . . stop the performance evaluations."  (*Id.* at 1 (Doc. 54-3 at 167) (HHS 3910).)  She went on to say, "I am most interested to learn what tangible issues people on my team may have.  Clearly, I do not want to be (and do not believe there is anything in my past actions to suggest that I am) the retribution tyrant that some on my team seem to feel I am.  It will be interesting to hear what people have to say in the group meeting."  (*Id.*)

### J.     The Risk of Future Disruption

In the new year, Dr. Hilden, Dr. Hoody, and human resources staff met with 38 members of the OB-GYN department, including nurse practitioners, nurse midwives, and physicians, to share the results of the HDSI study.  (Pl. Ex. 17 (HHS 1676–1679); Tr. 796:21–798:2.)

By Dr. Hilden's account, it "was an emotionally distressed meeting.  There were lots of emotions being raised.  People were crying.  People were struggling with their words." (Tr. 797:14–16.)  To him, it "looked like a department falling apart." (Tr. 797:24.)

As Dr. Nezworski recalled, "people were extremely frustrated that no action had come despite them bringing concerns, despite them going through this process with the consultant." (Tr. 97:19–21.)  They "wanted resolution because they were worried that two of the people that they cared about the most and respected the most"—Drs. Alabi and Pace—"were thinking about leaving." (Tr. 97:21–98:4.)  It was well-known by then that

- 31 -

not only Drs. Pace and Alabi, but also Drs. Heegaard, Madland, Zanotto, and Fiest, planned to leave the department if Dr. Gustilo remained chair. (*E.g.*, Tr. 98:2–4, 254:9–255:10, 326:24–327:13, 435:9–436:11, 527:6–12, 592:10–24, 738:1–4; *see also* Tr. 358:5–17, 548:19–23, 597:15–25.)   In their view, Dr. Gustilo's posts showed "poor judgment." (Tr. 334:10–19, 424:22–425:17, 459:12–25.)   And keeping Dr. Gustilo as chair would mean that HHS "did not have the power or didn't care enough . . . to continue their stated mission . . . , value statement and vision." (Tr. 325:24–326:4.)   They "could not work for someone who[se] values did not align with not only [theirs], but [HHS's] own mission statement." (Tr. 358:5–10.)   And they did not want "to work for a place [that] could post [its] mission statement one place and then completely ignore [it] . . . when push came to shove." (Tr. 548:10–18; *see also* Tr. 109:21–111:5, 597:15–25.)

The department was a "small but mighty group" of only about 14 doctors, so it would have "implode[d]" if it lost a number of doctors at once. (Tr. 343:9–10, 436:20–22, 592:10–17; *see also* Tr. 93:25–94:3, 327:16–22, 528:12–529:1.)   Colleagues saw Drs. Alabi and Pace, in particular, as "the heart of the department." (Tr. 592:18–24.)   They have "a huge following of patients" who "ask to see them by name all the time." (Tr. 91:24–92:16, 115:2–14.)   Plus, they are "providers of color," and it is "very important to [HHS's] patients that they can come to the office or the hospital and see people that look like them." (*Id.*)

Any physician would be difficult to replace. (Tr. 358:24–359:10.)   And in the interim, "[a]ppointments would be out [months].   Referrals would be out months.   Staffing would have been really hard.   [And t]he remaining physicians would have been burned

out." (Tr. 436:23–437:7.) Witnesses predicted that there would have been a "snowball[ ]" or "domino effect" from being "underresourced and understaffed," making it "hard [for others] to continue working there" as well. (Tr. 255:5–10, 592:10–17, 597:10–14.) So many witnesses testified that they, too, would have "strongly" or "seriously considered" leaving the department if it got to that point. (Tr. 110:22–24, 256:1–4, 436:7–11.) In short, there would have been an "exodus" of an "enormous number of people" from "women's healthcare" at HHS. (Tr. 327:20–22.) And in the doctors' estimation, patient care could have suffered. (Tr. 308:6–16, 343:19–344:2, 358:24–360:21, 437:4–8; *see also* Tr. 528:15–529:1.)

After the January 2021 meeting, Dr. Hoody asked Dr. Nezworski if she "would step into the role of acting chair urgently." (Tr. 98:9–16.) Dr. Nezworski considered Dr. Gustilo a "friend" and did not know if she could successfully manage "this very fractured, very contentious mood," so she "felt really conflicted." (Tr. 98:18–99:8.) But she reflected on it overnight and decided she "would be the best person to step in [at that] moment." (Tr. 99:9–16.) She could provide "stability" as "someone who had a relationship with [Dr. Gustilo] and respected [Dr. Gustilo], as well as someone who understood the concerns of the rest of the team." (*Id.*) When Dr. Nezworski became acting chair, Dr. Gustilo temporarily ceased her leadership responsibilities in the department, but she continued her clinical responsibilities. (Tr. 100:1–8.)

## K.    The Final Confrontation

On March 8, 2021, Dr. Gustilo's colleagues finally presented her with the letter they had started drafting back in October. (Tr. 101:3–103:5.) All but one of the department's

fourteen doctors signed it.  (Tr. 107:13–15.)  Only Dr. Laura Coultrip abstained because

"she doesn't use Facebook" and "didn't feel comfortable signing anything about social

media posting."  (Tr. 107:16–108:2.)  The letter read:

> Dear Dr. Gustilo,
>
> As you know, representatives from our department, speaking
> on behalf of the MDs and NPs within our department, have met
> with leadership and their consultants to express concerns that
> we have about your leadership.
>
> Because of the power differential at play, the group is not
> comfortable discussing these issues with you as individuals.
>
> Our concerns involve two separate issues with considerable
> overlap:
> 1. Social media postings
> 2. Lack of confidence in leadership
>
> **<u>Social Media Postings</u>**
>
> It has come to our attention, directly and indirectly, that you
> have expressed views on Facebook that are not representative
> of our institutional mission, or of our department or of us as
> individuals.  However, as a visible leader in our institution,
> your posted beliefs may be construed to incorrectly represent
> Hennepin Healthcare, our department, and us as individuals.
> In the past, your use of Facebook as a platform to solicit funds
> for our department directly linked you to your position as the
> Chair of the OB GYN department at Hennepin Healthcare.  As
> your Facebook page until recently was public, anyone with a
> Facebook account could view these posts.
>
> We want to specifically state that this does not have to do
> directly with respect to your politics.  You, like anyone else,
> have the right to politically support individuals and groups of
> your choosing.  However, your content with which we have
> issue includes the following:
>
> - Posts that imply or directly state that racism does not
>   exist in our society

- 34 -

- Posts that support others['] statements of blatantly racist comments

We share the following concerns about these posts:

- They may cause our current or future patients to mistrust our department and the medical care we provide

- They create division among our medical staff, midwifery staff, and nursing staff

- They reflect negatively on us as a department when viewed by others, including other employees within Hennepin Healthcare

As an institution and as individuals, we are committed to identifying and eradiating racism and inequity in healthcare and society at large, and we desire leadership that also shares these same goals.

**<u>Confidence in leadership</u>**

Our concerns regarding your leadership include the following:

- Difficulty hearing concerns of staff members and responding in a way that gives confidence they are being understood and valued
    - When you asked us to vote on the proposal of absorbing the burden of the midwife salary cuts, you did not accept the first response, and instead, asked for a re-vote.  We felt like we had a chance to voice our opinions and were not heard

- Difficulty understanding the value that the perspectives of your colleagues can bring to the table
    - When we had a conference call regarding the letter we sent to our patients after the murder of George Floyd, we felt like our voices were not acknowledged
    - When we had a conference call regarding our department's role in the White Coats for Black Lives rally, the conversation felt very one-sided

- Having low visibility within the department and inpatient care areas

- 35 -

- o Some nurses do not know you are the department chair due to your absence on the inpatient side
- o Providers need you to understand the issues they are facing on nights and weekends

- Using a reactive approach to address conflict with medical and nursing staff which creates a fearful and mistrustful environment
    - o Bringing a nurse manager to tears regarding a pandemic related supply chain issue

- The mission and vision for our department is currently unclear
    - o Our group is committed to the eradication of injustice and inequity experienced by patients and staff in our department, we are not certain you share that goal
    - o You requested providers improve quality metrics by performing clerical tasks which would typically be performed by another team member (i.e. medical assistant)
    - o We have not given significant attention as a department to our declining OB volumes

- Several members of the department have also felt uncomfortable when you have described COVID-19 as "no worse than the flu" and suggested that schools should be opened in a business-as-usual state. As medical providers and scientists, we find this attitude concerning as it brings into question your judgment and your ability to take into adequate consideration the safety of our patients, our community, and us as individuals.
    - o Providers have witnessed you openly providing recommendations in contrast to CDC guidelines with regard to the pandemic and vaccination
    - o Providers have experienced criticism from you when taking additional precautions during the pandemic (specifically keeping children home from school)

We mentioned that there is overlap of the issues. As an institution caring for marginalized communities disproportionately affected by COVID, it is difficult for us to

separate your views from our department and institution, and by default ourselves.

While we recognize and appreciate the positive changes that you have brought to our group (ie, adjusting our schedules to accommodate the day off post-call, protecting our salaries from possible future salary readjustments, building bridges with the midwife service, hiring staff that are committed to the mission and vision of the institution, and leading our department though the peak of Covid), we as a group, feel that recent changes in judgment, leadership, and relationship with your team as expressed above cannot possibly return to a place where they are in line with the institutional mission and a place where you could regain our trust.

(Def. Ex. 31 (Doc. 54-3 at 294–96) (HHS 1500–02).)

Dr. Nezworski presented this letter to Dr. Gustilo at a meeting with Dr. Hilden, Dr. Hoody, and a human resources representative present. (Tr. 108:7–17.) She was "really sad" to "let [Dr. Gustilo] know that there [was] no longer support in the department for her to continue as [its] leader." (Tr. 108:12–19.) To be clear, Dr. Gustilo's colleagues were not asking her to resign from the department altogether; they "were comfortable having her . . . remain in the department as long as she was not the leader that they reported to directly." (Tr. 106:6–19.) But Dr. Nezworski was still "sorry to have to deliver this news." (Tr. 108:18–109:3.)

### L.   Dr. Gustilo is Demoted as Chair of the OB-GYN Department

Still, Dr. Gustilo did not agree to voluntarily step down. (Tr. 109:4–12, 640:8–20.) Therefore, she was formally demoted from her role as chair in April 2021, after a 25-to-1

vote of the Medical Executive Committee, in which Dr. Gustilo was the sole nay, and a unanimous vote of the HHS Board of Directors ratifying the MEC's decision.  (*Id.*)[6]

After the demotion, "people were extremely relieved."  (Tr. 109:13–15.)  Dr. Alabi felt like she could "move on and . . . get back to just patient care."  (Tr. 357:21–24.)  Nurse Braun was encouraged that HHS had taken the issue seriously "and was moving in a direction to fix things."  (Tr. 255:11–18.)  And Dr. Nezworski was happy that after going "for months feeling that they couldn't trust their leader," department members finally "didn't have to feel afraid anymore."  (Tr. 109:17–20.)

Though she was not fired from her clinical position, Dr. Gustilo chose to leave HHS. She now works at "a small community hospital" in "Appalachia in Newport, Tennessee." (Tr. 642:14–16.)  She also serves as "a CEO" of a hospital founded by her father "in a small town in the Philippines called Manapla," "working probably five hours, six hours [a week] remotely, and then going every quarter to the Philippines to help keep that hospital going." (Tr. 642:23–643:6.)

## M.    The Jury's Findings

At the end of a five-day trial presenting this evidence, the jury returned unanimous answers to six special interrogatories designed to guide the Court's analysis of the *Pickering* factors.  The jury found:

---

[6] Evidence of these votes was not introduced at trial, but the Court takes them as undisputed based on the record in prior proceedings.  *See, e.g.*, *Gustilo*, 122 F.4th at 1017.

**Question No. 1:**   Did HHS's OB-GYN Department have a need for harmony and close working relationships in the workplace?

☒ Yes        ☐ No                                    (Check one.)

**Question No. 2:**   Did Dr. Gustilo's 2020 Facebook posts cause, or could they reasonably have caused, disharmony or disruption in the workplace?

☒ Yes        ☐ No                                    (Check One.)

**Question No. 3:**   Were the time, place, and manner of Dr. Gustilo's 2020 Facebook posts such that they could have been attributed to HHS or its OB-GYN Department?

☒ Yes        ☐ No                                    (Check one.)

**Question No. 4:**   Did Dr. Gustilo's 2020 Facebook posts arise from a personal dispute between her and her employer, her academic interest in matters of public concern outside of work, both, or neither? (Check one.)

☐ Personal dispute with employer

☒ Academic interest in matters of public concern outside of work

☐ Both

☐ Neither

**Question No. 5:**   Did Dr. Gustilo's 2020 Facebook posts contain unique perspectives on the issues on which she was commenting or contribute previously unknown facts to the public debate?

☐ Yes        ☒ No                                    (Check one.)

**Question No. 6:**   Did Dr. Gustilo's 2020 Facebook posts impair her ability to perform her duties as Chair of the OB-GYN Department?

☒ Yes        ☐ No                                    (Check one.)

- 39 -

(Doc. 180.)

III.    ANALYSIS

With the jury's findings informing the Court's analysis, the Court finds as a matter of law that HHS's interest, as an employer, in promoting the efficiency of the critical public services it performs as a safety net hospital outweighed Dr. Gustilo's interests, as a citizen, in commenting upon matters of public concern.

A.    Dr. Gustilo spoke as a citizen on matters of public concern.

The Court begins by asking whether Dr. Gustilo spoke "as a citizen addressing matters of public concern." *Garcetti*, 547 U.S. at 417.  The answer is yes.  As the Eighth Circuit has already held in this case, "there can be little doubt that the subjects addressed in Dr. Gustilo's media posts were matters of public concern." *Gustilo*, 122 F.4th at 1020. The Court also sees no reason to doubt that Dr. Gustilo spoke "as a citizen." *See Lindsey*, 491 F.3d at 897 (explaining that the "as a citizen" question is a "separate inquir[y]" from the "matter of public concern" question).

B.    HHS has put *Pickering* into play.

The Court next asks whether the public employer has "put[ ] the *Pickering* balancing test into play by submitting evidence of disruption." *Mayfield*, 122 F.4th at 1055.  Again, the answer is yes, so the Court will conduct a *Pickering* balancing test. *See Gustilo*, 122 F.4th at 1020 (finding that "the district court will need to apply the flexible *Pickering* balancing test").  As the jury found, "Dr. Gustilo's 2020 Facebook posts cause[d], or could . . . reasonably have caused, disruption or disharmony in the workplace." (Doc. 180 at 1.) This finding is supported by a mountain of evidence that Dr. Gustilo's Facebook posts, and

- 40 -

her related behavior, were deeply disruptive to the functions of the department. Persuasive evidence that the department was fractured included the letter in which all but one of the department's physicians named the Facebook posts among the reasons that they "[could not] possibly return to a place where . . . [Dr. Gustilo] could regain [their] trust." (Def. Ex. 31 (Doc. 54-3 at 294–96) (HHS 1500–02); *see also* Tr. 107:9–108:2.) In further support was the extensive credible testimony of numerous doctors that they would have quit if Dr. Gustilo had remained as chair. (Tr. 91:24–92:16, 98:2–4, 254:9–255:10, 325:21–327:22, 358:5–359:10, 435:9–437:8, 527:6–12, 548:10–23, 592:10–24, 597:15–598:2, 738:1–24.)

In response, Dr. Gustilo argues that the Court should not even reach the *Pickering* balancing test for two reasons: (1) HHS is bound by deposition testimony that Dr. Hilden gave as one of its corporate representatives under Federal Rule of Procedure 30(b)(6), in which he stated that Dr. Gustilo's off-duty speech was not HHS's concern, and (2) there was insufficient evidence to support a finding of disruption. (Doc. 199 at 8; Doc. 195 at 1.)[7]

---

[7] Dr. Gustilo's position is arguably barred by the law of the case. The Eighth Circuit has stated that this Court "will need to apply the flexible *Pickering* balancing test," *Gustilo*, 122 F.4th at 1020, so the Court is bound to do just that, *see, e.g.*, *Marshall v. Anderson Excavating & Wrecking Co.*, 8 F.4th 700, 711 (8th Cir. 2021) (summarizing the law-of-the-case doctrine).

The overwhelming evidence at trial and the jury's findings of fact make clear that the Facebook posts did cause the very kind of disruption addressed in the case law, placing the department's operations at great risk.

### 1. Dr. Gustilo's incomplete excerpt of Dr. Hilden's 30(b)(6) deposition is not dispositive.

Dr. Gustilo argues that a few lines of Dr. Hilden's deposition testimony as a corporate representative of HHS under Federal Rule of Civil Procedure 30(b)(6) are "dispositive of the disruption issue." (Doc. 199 at 8.) HHS, through Dr. Hilden, testified:

> "Question: Did Dr. Gustilo's off-duty speech cause any disruption in the OB/GYN department?
>
> "Answer: Her off-duty speech isn't our concern.
>
> "Question: Okay. But did it cause any disruption?
>
> "Answer: Only her off-duty speech when she – the short answer is no. It is the speech she did in her capacity as the department chair.

(Tr. 877:12–19.) Dr. Gustilo argues that HHS is therefore estopped from arguing that the Facebook posts caused disruption. (Doc. 199 at 42–44.)

The Court disagrees. In rejecting the argument that a corporation is "estopped from denying the truth of" a corporate representative's deposition testimony, the Eighth Circuit has explained that although a corporation is bound by its 30(b)(6) representative's testimony, "it is no more bound than any witness is by his or her prior deposition testimony." *R&B Appliance Parts, Inc. v. Amana Co.,* 258 F.3d 783, 786–87 (8th Cir. 2001). As with any other witness, a corporation "is free to testify differently from the way

he or she testified in a deposition, albeit at the risk of having his or her credibility impeached by introduction of the deposition." *Id.*

Dr. Gustilo's cherry-picked excerpt was among many pages of 30(b)(6) testimony presented to the jury by video. (*See* Tr. 869:15–906:15.) That testimony included Dr. Hilden's express statement only a few questions later that Dr. Gustilo "disrupted the operations of the department." (Tr. 878:23–879:1.) It also included discussions of "speech topics that were causing disruption in the OB/GYN department," and "concerns raised about Dr. Gustilo putting on . . . forums like Facebook[ ] positions that could be reasonably interpreted as those of the organization" and having "absolutely no insight to how her words may be offensive or hurtful" to her colleagues when they tried to talk to her about them. (Tr. 883:4–885:21; *see also* Tr. 893:13–894:1.) At trial, Dr. Hilden explained that he found the question about "off-duty" speech confusing, that he was never asked about Dr. Gustilo's Facebook posts at the 30(b)(6) deposition, and that he viewed Dr. Gustilo's public posts as having been made in her capacity as chair. (Tr. 801:19–804:4.) Moreover, there was extensive live testimony at trial that the Facebook posts disrupted the department.

Dr. Gustilo was free to argue in closing that the 30(b)(6) testimony was more credible than the live testimony, and she did so. (Tr. 933:18–934:9.) The jury, for its part, was free to either accept Dr. Gustilo's argument or reject her argument and find that it was inconsistent with other evidence at trial. The jury apparently chose the latter option, finding that her "2020 Facebook posts cause[d], or could . . . reasonably have caused, disharmony or disruption in the workplace." (Doc. 180 at 1.) The Court will not second-guess this well-supported finding. *See Chicago, R.I. & P. Ry. Co. v. Sharp*, 63 F. 532, 533

(8th Cir. 1894) ("[T]o weigh conflicting evidence, pass upon the veracity of the witnesses, and determine the case according to what [the court] think[s] is the weight of evidence appearing in the record" would be "a flagrant invasion of the functions of the jury.").

### 2.    The evidence of disruption is sufficient to trigger *Pickering*.

Dr. Gustilo also argues that HHS presented "no evidence of actual disruption to the OB-GYN department's functions," only "unreasonable speculation" about future disruption. (Doc. 199 at 16 (emphasis and capitalization removed).) In her view of the evidence, her colleagues "br[ought] disharmony upon the department themselves" by responding to her posts "unreasonabl[y] and willful[ly]." (Doc. 195 at 1, 8–9; Doc. 199 at 3–4, 13, 33–34; *see also* Doc. 202 at 2 ("[M]any of the items of disruption identified by HHS were caused, not by Dr. Gustilo, but by HHS and members of the Department.").) In particular, she focuses on Nurse Braun—who saw the China virus post and shared it with her colleagues—as the disrupter. (Doc. 199 at 9–12, 29–30.)[8]

The jury disagreed. They found that Dr. Gustilo's *posts* are what "cause[d], or could . . . reasonably have caused, disruption or disharmony in the workplace," and thereby necessarily rejected Dr. Gustilo's argument—advanced extensively at trial—that her colleagues were the cause of the disruption. (Doc. 180 at 1.) The Court may not "usurp

---

[8] In making these arguments, Dr. Gustilo launches unfortunate ad hominem attacks on HHS medical professionals, calling them a "squad" or "mob" of "gossips and busy bodies" with a "Hive Mind" that "staged a coup" and "conspir[ed]" to "cancel" her. (Doc. 195 at 3–4; Doc. 199 at 3–12, 21–22, 34–35.) The Court finds these sensationalistic characterizations unnecessary.

the functions of [the] jury" and find otherwise. *McGee v. S. Pemiscot Sch. Dist. R-V*, 712 F.2d 339, 344 (8th Cir. 1983).

Dr. Gustilo also appears to theorize that disruption does not count if it involves colleagues' reactions to an employee's speech. (Doc. 195 at 5–8; Doc. 199 at 38–41.) In support, she cites snippets from *Rankin*, 483 U.S. at 384; *Lindsey*, 491 F.3d at 900–01; *Dodge v. Evergreen School District #114*, 56 F.4th 767, 782 (9th Cir. 2022); *Moser v. Las Vegas Metropolitan Police Department*, 984 F.3d 900, 909 (9th Cir. 2021); and Justice Thomas's statement respecting the denial of certiorari in *MacRae v. Mattos*, 106 F.4th 122 (1st Cir. 2024), *cert. denied*, 145 S. Ct. 2617 (2025).

The Court disagrees. Courts routinely reference such reactions in support of a finding that employee speech created disharmony and impaired working relationships. *E.g.*, *Anzaldua v. Ne. Ambulance & Fire Prot. Dist.*, 793 F.3d 822, 834 (8th Cir. 2015) (finding sufficient evidence of disruption where employee's email "shocked," "angered," and "irritated" coworkers and "fostered division between" them and plaintiff); *Noon*, 94 F.4th at 765 (finding sufficient evidence of disruption where plaintiff "testified that after the Complaint Packet's submission, he noticed relationships deteriorating among officers"); *accord Labriola*, 142 F.4th at 1309–10 (finding no genuine dispute that plaintiff's speech "impede[d] the government's ability to perform its duties efficiently" where colleagues testified they were "offended" and "shocked" by the speech, "kind of lost confidence in" the plaintiff, and "couldn't really speak to him freely about things anymore"); *Noble v. Cincinnati & Hamilton Cnty. Pub. Libr.*, 112 F.4th 373, 386 (6th Cir. 2024) (Sutton, J., dissenting) (finding sufficient evidence of disruption where library

security guard's non-public post "spread beyond his narrow group of Facebook friends, causing considerable dismay among his colleagues" who "worried that [he] would treat library patrons unfairly" and "expressed hesitation in calling him to respond to public safety concerns, which was precisely [his] main job"). Indeed, the Court is hard-pressed to imagine how a court could ever find that an employee's speech "created workplace disharmony" or "impaired working relationships" without considering the reactions of the employee's colleagues. *Noon*, 94 F.4th at 765.

Dr. Gustilo's citations are not supportive of her position. She correctly quotes the Supreme Court's statement in *Rankin* that "[v]igilance is necessary to ensure that public employers do not use authority over employees to silence discourse, not because it hampers public functions but simply because superiors disagree with the content of employees' speech." 483 U.S. at 384. (Doc. 195 at 6; Doc. 199 at 4 n.2, 39.) But then, relying on this language, she argues that "*Rankin* stands for the premise that the heckler's veto cannot govern employee speech." (Doc. 105 at 10; Doc. 199 at 44.) Clearly, however, the *Rankin* quote does not refer to actions by hecklers. It does not even refer to actions by peers or colleagues. It refers only to action by "superiors" who "use [their] authority" to punish employee speech "*simply because* [they] disagree with [its] content." *Rankin*, 483 U.S. at 384 (emphasis added). This is not a case where a superior punished an employee for her speech simply because he disagreed with it. Dr. Hilden did not, for example, see Dr. Gustilo's Facebook posts, take personal offense to them, and then demote her. To the contrary, he took great pains *not* to focus on the content of her speech and was clear that she was entitled to her political views. (*E.g.*, Def. Ex. 6 at 2 (Doc. 54-2 at 167)

(HHS 4028).) And despite the increasingly dire state of the department, he cautiously investigated its issues until it became clear that working relationships could not recover and it would be necessary to remove Dr. Gustilo as chair. (*E.g.*, Tr. 785:22–799:7.)

Consider the *Rankin* decision as a whole. There, Ardith McPherson—a county constable's office employee with "purely clerical" duties—heard on the radio that there had been an unsuccessful attempt to assassinate the President of the United States. *Id.* at 380–81. In a "brief conversation" with a co-worker, "who was apparently her boyfriend," she responded by expressing her disagreement with the President's choice to cut public safety-net programs and stating, "If they go for him again, I hope they get him." *Id.* A third co-worker overheard the comment and told the constable, who fired McPherson. *Id.* at 381–82. The Supreme Court held that the constable's interest in firing her did not outweigh her interest in speaking on a matter of public concern. *Id.* at 389–92. Important to the Court was that "[t]he Constable was evidently not afraid that McPherson had disturbed or interrupted other employees," there was no "danger that McPherson had discredited the office by making her statement in public," and there was no "assessment by the Constable that the remark demonstrated a character trait that made [McPherson] unfit to perform her work." *Id.* at 389. Moreover, because McPherson "serve[d] no confidential, policymaking, or public contact role, the danger to the agency's successful functioning from [her] private speech [was] minimal." *Id.* at 390–91.

Dr. Gustilo's case stands in stark contrast. Dr. Hilden, Dr. Hoody, and the MEC were certainly afraid that Dr. Gustilo had disturbed other employees. (*E.g.*, Tr. 879:18– 880:18, 902:9–14.) There was a significant danger that Dr. Gustilo had discredited the

office by making her statements in public—indeed, the jury found that her posts "could have been attributed to HHS or its OB-GYN Department." (Doc. 180 at 1.) Many witnesses testified that her speech exhibited character traits that made her unfit to lead the department. (*E.g.*, Tr. 79:21–25, 326:13–23, 362:5–15, 425:6–12, 485:11–486:7, 586:20–587:4, 601:1–19.) And as the head of a department of physicians, she served a prominent policymaking and public contact role. (*E.g.*, Def. Ex. 42 at 7 (Doc. 62-1 at 25–29) (HHS 2039–43).) In sum, all the factors that made the discharge improper in *Rankin* point in the opposite direction here.

Also consider the First Circuit's decision in *MacRae*. There, the court found that a school district's interests outweighed those of a teacher who posted six "allegedly controversial memes to her personal TikTok account" because, although there was a "lack of evidence of actual disruption," the district's prediction of future disruption was reasonable. *MacRae*, 106 F.4th at 126, 138–39. The Supreme Court declined to take up the case, but Justice Thomas, speaking only for himself, stated that the First Circuit's analysis was "questionable." *MacRae*, 145 S. Ct. at 2620. He explained that "[a]lthough [the Supreme Court] has 'consistently . . . given substantial weight to government employers' reasonable predictions of disruption,' the key word here is 'reasonable.' The First Circuit accordingly should have discarded factors whose disruptive potential was purely speculative, such as the fact that 'some students and staff . . . were aware of [plaintiff's] posts' or that 'students [were overheard] discussing her social media.'" *Id.* (citations omitted). Justice Thomas also criticized the First Circuit for "cit[ing] an arguable conflict between MacRae's posts and institutional expressions of viewpoint such as [the

employer's] 'Core Value of [r]espect[ing] . . . human differences' as evidence of potential disruption." *Id.* In his view, "[i]t undermines core First Amendment values to allow a government employer to adopt an institutional viewpoint on the issues of the day and then, when faced with a dissenting employee, portray this disagreement as evidence of disruption." *Id.*

Justice Thomas's point is similar to the Supreme Court's point in *Rankin*—courts should not allow employers to use baseless predictions of future disruption as pretext to punish speech solely because they disagree with it. *Cf. Melton v. City of Forrest City*, --- F.4th ----, No. 23-3398, 2025 WL 2329190, at *3 (8th Cir. Aug. 13, 2025) (reversing grant of summary judgment where a "reasonable jury [could] conclude" that employer's prediction of disruption "masked the true reason for [employee's] firing, which was a disagreement with the viewpoint expressed in the [Facebook post]"). To avoid this problem, courts must require employers to produce either evidence of actual disruption or evidence showing that the employer's prediction of future disruption was reasonable. *See Lindsey*, 491 F.3d at 901 ("To trigger the *Pickering* balancing test, a public employer must, with specificity, demonstrate the speech at issue created workplace disharmony, impeded the plaintiff's performance or impaired working relationships. Mere allegations the speech disrupted the workplace or affected morale, without evidentiary support, are insufficient." (citations omitted)); *accord Moser*, 984 F.3d at 909 ("'[B]are assertions of future conflict are insufficient to carry the day at the summary judgment stage.' . . . [A]n employer must provide some evidence for the court to evaluate whether the government's claims of disruption appear reasonable." (citations omitted)); *Craig v. Rich Twp. High Sch. Dist. 227*,

736 F.3d 1110, 1119 (7th Cir. 2013) ("[A]n employer's assessment of the possible interference caused by the speech must be reasonable—'the predictions must be supported with an evidentiary foundation and be more than mere speculation.'" (citation omitted)).

HHS has done just that. It produced evidence of actual disruption through days of testimony by Dr. Gustilo's *inferiors* that there was extreme disharmony in the department, and a letter signed by all but one of them stating that they did not believe Dr. Gustilo could ever "regain [their] trust." (Def. Ex. 31 (Doc. 54-3 at 295) (HHS 1501).) Moreover, HHS produced concrete evidence showing that HHS's prediction of future disruption was reasonable. The witnesses uniformly testified that a number of department physicians would have quit if Dr. Gustilo remained their supervisor and that patient care could have suffered. (Tr. 98:2–4, 254:9–255:10, 308:6–16, 326:24–327:13, 343:19–344:2, 358:5–17, 358:24–360:21, 435:9–436:11, 437:4–8, 527:6–12, 528:20–529:1, 548:19–23, 592:10–24, 597:15–25, 738:1–4.) This is not a case where the employer merely speculated that there would be disruption because people were *aware* of the posts. HHS presented overwhelming evidence that the posts had a concrete negative impact on the department.

This ruling is fully consistent with the Eighth Circuit's opinion in *Lindsey*, 491 F.3d at 900–01. Dr. Gustilo reads that case as holding that "allegations of disharmony or the impairing of working relationships must implicate evidence of 'disruption of the City's *functions*' to trigger *Pickering* balancing." (Doc. 195 at 5–6.) She therefore argues that HHS needed to present evidence that the posts resulted in "substandard patient care." (Doc. 199 at 17; *see also* Doc. 195 at 6.)

The Court reads *Lindsey* differently.  There, Charles Daniel Lindsey, a public works director for the City of Orrick, was fired for speaking up at city council meetings about his belief that the council was violating an open meetings law.  *Lindsey*, 491 F.3d at 895–96.  The Eighth Circuit affirmed the denial of summary judgment for Lindsey's supervisor because she did not "allege[ ] sufficient disruption to trigger *Pickering*."  *Id.* at 901.  The Eighth Circuit explained:

> To trigger the *Pickering* balancing test, a public employer must, with specificity, demonstrate the speech at issue created workplace disharmony, impeded the plaintiff's performance or impaired working relationships.  Mere allegations the speech disrupted the workplace or affected morale, without evidentiary support, are insufficient. . . .
>
> Here, [Supervisor] points to scant evidence of any disruption of the City's functions as a result of Lindsey's speech . . . . She states simply "when an employee attacks elected officials it has a direct and adverse effect on that relationship" and "strains in that relationship are apparent."  . . . She calls his speech "confrontational and disruptive" but does not explain how or if his speech actually disrupted the City's functions. . . . [S]uch "vague and conclusory statements do not demonstrate with any specificity that the speech created disharmony in the workplace, impeded [Lindsey's] ability to perform [his] duties, or impaired working relationships with other employees."

*Id.* at 900–01 (citations omitted) (quoting *Sexton v. Martin*, 210 F.3d 905, 912–13 (8th Cir. 2000)).  The court did not imply that Lindsey's supervisor needed to show that the public works department had begun providing substandard services.  Rather, it was clear that harm to morale, workplace harmony, performance of duties, or working relationships would be sufficient if shown by concrete evidence rather than bare assertions.

Dr. Gustilo's case is quite different from *Lindsey*.  "[T]his is not a case where [the employer] had no supporting evidence of disruption or relied on its own '[m]ere allegations of disruption.'"  *Anzaldua*, 793 F.3d at 835 (quoting *Sexton*, 210 F.3d at 912).  Rather, a jury found that "Dr. Gustilo's 2020 Facebook posts cause[d], or could . . . reasonably have caused, disruption or disharmony in the workplace."  (Doc. 180 at 1.)  And its finding was well-grounded in extensive testimony, among other evidence, that working relationships were so impaired and morale was so low that several doctors planned to quit if Dr. Gustilo was not demoted.  (*E.g.*, Tr. 98:2–4, 254:9–255:10, 326:24–327:13, 435:9–436:11, 527:6–12, 592:10–24, 738:1–4.)  In such circumstances, courts have found sufficient evidence of disruption to trigger *Pickering*.  *Compare Washington v. Normandy Fire Prot. Dist.*, 328 F.3d 400, 402–04 (8th Cir. 2003) (finding after a jury trial that the testimony of "several firefighters . . . that [plaintiff's] radio comments created disruption in the workplace, impeded [his] ability to perform his duties, and impaired his working relationship with other employees" was "sufficient to trigger the *Pickering* balancing test"); *Bailey*, 451 F.3d at 521 (same where the meeting at which the employee spoke "became quite heated" and the employee's speech "eventually led to another confrontation with [his supervisor] at a conference"); *Anzaldua*, 793 F.3d at 834–35 (finding sufficient evidence of disruption to grant summary judgment to employer where colleagues "reacted negatively to [the] exposure" created by employee's email to a journalist, submitted declarations that they were "shocked," "angered," and "irritated" by the email, and stated that it "fostered division between [employee] and his co-workers"); *Henry*, 950 F.3d at 1012–13 (same where employer "demonstrated a deterioration in trust within" the workplace); *Nagel*, 952

F.3d at 931 (same where "[s]ome officers shunned" the plaintiff for his speech, and "[o]thers were distressed by the rift it created"), *with Mayfield*, 122 F.4th at 1055 (finding after a jury trial that *Pickering* was not in play because "Defendants failed to submit jury instructions on the *Pickering* issue"); *Sexton*, 210 F.3d at 912 (finding at summary judgment that *Pickering* was not in play because "while [plaintiffs'] anger may have impaired working relationships between" them and defendant, defendant did "not say that in his deposition"); *Kincade v. City of Blue Springs*, 64 F.3d 389, 398–99 (8th Cir. 1995) (same where defendants "failed to provide even a scintilla of evidence that [employee's] August 5 statements caused disharmony in the workplace, impaired his ability to perform his duties, or impaired his working relationships with other employees"); *Melton*, 2025 WL 2329190, at *3 (finding that disruption question should go to a jury where police officers, city council members, and citizens complained about firefighter's post but "[n]o current *firefighter* complained or confronted him about it.  Nor did any co-worker or supervisor refuse to work with him").

Morgan v. Robinson* is a better comparator.  920 F.3d 521 (8th Cir. 2019) (en banc). There, the en banc Eighth Circuit reversed the denial of summary judgment to a sheriff who fired a deputy based on statements the deputy made while campaigning (ultimately unsuccessfully) for the top job.  *Id.* at 522.  In doing so, the court held that there was sufficient "evidence of 'actual disruption'" to justify the firing.  *Id.* at 526.  The court's list of "actual disruption" evidence included the sheriff's testimony that "he believed Morgan's statements were detrimental to the office, harmful to morale, and adversely impacted the public's trust of the office"; the testimony of the plaintiff's peers that his "statements bred

'uneasiness,' made some employees feel uncomfortable, contributed to lack of morale, and created turmoil"; the fact that five of his colleagues "recommended his termination"; and a termination letter by the sheriff stating that the plaintiff "had 'violated the trust' of the administration and his fellow officers and created 'disharmony in the office.'"  *Id.* at 525. The court focused on the harm to internal relationships and morale.  There was no evidence that the department had failed to respond to calls or let the law go unenforced.

Turning to Dr. Gustilo's out-of-circuit citations, she quotes the Ninth Circuit's statement in *Dodge* that "[s]peech that outrages or upsets co-workers without evidence of 'any actual injury' to school operations does not constitute a disruption."  56 F.4th at 782 (quoting *Settlegoode v. Portland Pub. Schs.*, 371 F.3d 503, 514 (9th Cir. 2004)).  (Doc. 195 at 7.)  There, the court reversed the grant of summary judgment to a principal who berated a teacher for wearing a Make America Great Again hat to teacher-only trainings.  *Dodge*, 56 F.4th at 772–73.  The principal argued that the hat was disruptive because it made staff feel "'intimidated,' 'shock[ed],' 'upset,' 'angry,' 'scared,' 'frustrated,' and '[un]safe.'"  *Id.* at 782–83.  But the court found that there was "no evidence that Dodge or his hat interfered with the teacher training sessions."  *Id.*  The court explained:

> Dodge sat in the back of the room quietly during both trainings with the hat either on his table or on his backpack beside him. From the approximately 60 attendees present, fewer than five people complained . . . .  And regardless, both trainings were completed without incident.  Nor did Dodge's expression cause any disruption *to school*.  He had his hat at teachers-only trainings where students and parents were not present, and he told [the principal] that he would not wear it "in class, around parents, or in front of kids."  No students or parents ever complained about Dodge's MAGA hat.

> In sum, while some of the training attendees may have been
> outraged or offended by Dodge's political expression, no
> evidence of actual or tangible disruption to school operations
> has been presented.

*Id.* at 783.

*Dodge* is quite distinguishable.  HHS presented plenty of evidence of tangible

disruptions.  Witnesses testified that both patients and providers outside the department

complained about the posts.  (Tr. 74:21–75:5, 240:4–14, 315:16–21, 439:11–15.)  They

also testified that relationships within the department deteriorated so much that several

doctors planned to quit, and that very significant future disruptions to medical services

would have come if multiple doctors left.  (*E.g.*, Tr. 98:2–4, 110:22–24, 254:9–255:10,

256:1–4, 326:24–327:22, 358:5–360:21, 435:9–437:8, 527:6–12, 528:8–529:1, 548:19–23,

592:10–593:2, 597:8–25, 738:1–24.)  And finally, they explained that doctors spent an

inordinate amount of time dealing with the fallout from the posts—time that could have

been spent on patient care.  (*E.g.*, Tr. 115:15–24, 256:5–15, 327:23–328:18, 360:22–

361:10, 437:15–438:4, 602:1–23.)

Dr. Gustilo also argues that "the Ninth Circuit in [*Moser*, 984 F.3d at 909], held,

'[t]hreatened disruption by others reacting to public employee speech simply may not be

allowed to serve as justification for public employer disciplinary action directed at that

speech.'" (Doc. 195 at 9; Doc. 199 at 41.)  Setting aside that this was not a holding but a

parenthetical quote in a "see also" cite to another case, *Berger v. Battaglia*, 779 F.2d 992,

1001 (4th Cir. 1985), this quote still does not apply the way Dr. Gustilo argues it does—

*i.e.*, to the reactions of *colleagues*.

In *Berger*, a police commissioner ordered an officer who moonlighted as a musician to stop performing in blackface. *Id.* at 993–96. By that point, the department had received numerous complaints from outside the department, several community members had picketed at a show, and rumors had spread that community members intended to storm the stage, forcing two dozen "Tactical Squad" officers to "remain on standby" nearby. *Id.* Despite these arguably disruptive events, the court found that the *Pickering* balance tipped in favor of the officer. *Id.* at 1000. The court observed that "*Pickering*, its antecedents, and its progeny" focused on "avoiding direct disruption, by the speech itself, of the public employer's *internal* operations and employment relationships" and that the defendants conceded there had been no disruption of operations or relationships within the department. *Id.* (emphasis added). The court then "assum[ed] that under some circumstances disruption by employee speech of a public employer's *external* operations and important *external* relationships might justify disciplinary action." *Id.* at 1000–01 (emphasis added). But the court found that no such circumstances existed because the perceived threat of external disruption "was caused not by the speech itself but by threatened reaction to it by offended segments of the public." *Id.* The court explained, "Short of direct incitements to violence by the very content of public employee speech (in which case the speech presumably would not be within general first amendment protection), we think this sort of threatened disruption by others reacting to public employee speech simply may not be allowed to serve as justification for public employer disciplinary action directed at that speech." *Id.* In this context, it is clear that when the *Berger* court referred to "threatened disruption by others," it was speaking of threatened disruption by members of the public outside the department,

not the reactions of the employee's colleagues and strained relationships within the department.

*Moser* itself is also distinguishable. There, the Ninth Circuit reversed the district court, finding genuine disputes of material fact precluded an entry of summary judgment for the police department. *Moser*, 984 F.3d at 911. The police department transferred Charles Moser out of its SWAT team after he posted a single comment on Facebook in response to an article reporting that police had apprehended a suspect who shot an officer. *Id.* at 903. Moser wrote, "It's a shame [the suspect] didn't have a few holes in him." *Id.* The court found a genuine dispute of material fact about the meaning of this comment, noting that it could be read either as advocating violence or as a "provocative political statement against police officers being shot in the line of duty." *Id.* at 907–08. The court also found that the police department "provided no evidence of actual or potential disruption in the workplace or to the department's mission." *Id.* at 911. Moser deleted the post, and there was "no evidence that anyone other than [a single] anonymous tipster even saw Moser's Facebook comment. Nor would most people have even known that Moser served as a SWAT sniper because nothing in his Facebook profile confirmed his employment." *Id.* at 910.

Here, by contrast, Dr. Gustilo's Facebook posts were numerous, and the jury heard and saw plenty of evidence that colleagues and even patients were deeply disturbed by them. (*E.g.*, Tr. 74:21–75:5, 240:4–22, 315:16–318:2, 423:13–24, 744:8–746:14; Def. Ex. 3A (Doc. 54-2 at 45) (HHS 3118).) These colleagues and patients knew that Dr. Gustilo was an HHS leader; indeed, she identified herself as such both in a publicized post

- 57 -

and in her Facebook biography. (Tr. 222:5–14, 352:11–20; Def. Ex. 3H (Doc. 54-2 at 30) (HHS 2201).) Importantly, Dr. Gustilo was the chair of the department, not an ordinary member of the team. (*See* Tr. 48:13–56:22, 621:8–624:24; Def. Ex. 42 at 7–8 (Doc. 62-1 at 25–26) (HHS 2039–40).) And there was unanimous testimony that the posts caused a fracturing in the morale and functioning of the department. (*E.g.*, Tr. 98:2–4, 254:9–255:10, 326:24–327:13, 358:5–17, 435:9–436:11, 527:6–12, 548:19–23, 592:10–24, 597:15–25, 738:1–4.)

Dr. Gustilo's case is much closer to *Grutzmacher*, 851 F.3d at 346—a case that the *Moser* court addressed, 984 F.3d at 911. In *Grutzmacher*, the Fourth Circuit affirmed the district court's grant of summary judgment to the employer, relying on the fact that "multiple coworkers told plaintiff's supervisors that they did not want to work with plaintiff after seeing his racially charged posts" and "[t]hose conversations led to concerns about the plaintiff's ability to act as a supervisor and role model." *Moser*, 984 F.3d at 911 (citing *Grutzmacher*, 851 F.3d at 346). The evidence is similar here. Dr. Gustilo's racially charged posts led her colleagues to conclude that she was unfit to lead them. (*E.g.*, Def. Ex. 31 (Doc. 54-3 at 294–96) (HHS 1500–02).) And Dr. Gustilo's supervisors knew that a number of doctors planned to quit if they had to continue working for her. (*E.g.*, Tr. 747:6–19.)

Finally, the Court addresses Dr. Gustilo's overarching argument that the Court should apply the "heckler's veto" principle here. (*E.g.*, Doc. 199 at 44.) That principle holds that speech cannot be punished or banned "simply because it might offend a hostile mob." *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 134–35 (1992); *see also*

*Roe v. Crawford*, 514 F.3d 789, 796 n.3 (8th Cir. 2008) ("[T]he mere possibility of a violent reaction to [protected] speech is simply not a constitutional basis on which to restrict [the] right to speak." (citation omitted)).

Though many courts have declined to apply the heckler's veto principle in employment cases, *see, e.g., Bennett*, 977 F.3d at 544; *Melzer v. Bd. of Educ.*, 336 F.3d 185, 199 (2d Cir. 2003); *Locurto v. Giuliani*, 447 F.3d 159, 178–79 (2d Cir. 2006); *Dible v. City of Chandler*, 515 F.3d 918, 928–29 (9th Cir. 2008), the Eighth Circuit recently addressed it in a case where a mayor fired a firefighter after receiving numerous complaints about a controversial Facebook post, *Melton*, 2025 WL 2329190, at *3. In *Melton*, the Eighth Circuit reversed the grant of summary judgment to the defendants, finding that the record was "a tossup" on actual or potential disruption and needed to go to a jury. *Id.* "The problem" was the defendants' lack of any "showing that [the firefighter's] post had an impact on the fire department itself." *Id.* "'[S]everal' police officers and city-council members were upset and 'phone lines [were] jammed' with calls from concerned citizens," but "[n]o current *firefighter* complained or confronted him about it. Nor did any co-worker or supervisor refuse to work with him." *Id.* Under those facts, the Eighth Circuit found that "[g]ranting summary judgment based on such 'vague and conclusory' concerns, without more, r[an] the risk of constitutionalizing a heckler's veto." *Id.* (citing *Sexton*, 210 F.3d at 912; *Kincade*, 64 F.3d at 398). The court explained, "Enough outsider complaints could prevent government employees from speaking on any controversial subject, even on their own personal time. And all without a showing of how it *actually* affected the

government's ability to deliver 'public services.'"  *Id.* (citing *Bennett*, 977 F.3d at 544 (Murphy, J., concurring), and quoting *Henry*, 950 F.3d at 1011–12).

The key word is "outsider."  Unlike in *Melton*, HHS received numerous complaints from doctors and nurses *inside* the OB-GYN department, and many of those insiders testified under oath that they would have quit if Dr. Gustilo had remained their leader. *Cf. Hedgepeth v. Britton*, --- F.4th ----, No. 24-1427, 2025 WL 2447077, at *5 (7th Cir. 2025) ("distinguish[ing]" *Melton* where there was "evidence of internal disruption" in the form of "students and parents expressing concern about [plaintiff's] fitness as a teacher").

Confirming this distinction between external and internal disruption are the two other circuit cases that have applied the heckler's veto principle in the employment context. *See Berger*, 779 F.2d at 1000–01; *Flanagan v. Munger*, 890 F.2d 1557, 1566 (10th Cir. 1989).  In both cases, the court took great pains to emphasize that the record reflected only "potential disruption" to "the department's *external* relationships and operations" and was "devoid of evidence of actual, or potential, disruption of the department's internal operations—no discipline problems, no disharmony, no impact on close working relationships, and no performance problems by plaintiffs."  *Flanagan*, 890 F.2d at 1566; *see also Berger*, 779 F.2d at 1000–01 ("[T]he perceived threat of disruption [was] only to external operations and relationships"; "the district court expressly found, and the defendants concede, that no [internal] disruption was caused by [plaintiff's] speech.").  The Eighth Circuit has explained that "the primary concern addressed by the [employers] in those cases was not internal disruption in the force, but repercussions in the community." *Tindle v. Caudell*, 56 F.3d 966, 972 (8th Cir. 1995).  And it has found them inapposite

where "the main problem" the employer perceives is "the potential for disruption within the [workforce]." *Id.* (finding that police department's "interests in maintaining discipline and harmonious working relationships within the" department outweighed plaintiff's interests in wearing costume where "it [was] undisputed that some African–American officers of the [department] were offended by [plaintiff's] costume"); *accord Worrell v. Henry*, 219 F.3d 1197, 1208 (10th Cir. 2000) (distinguishing *Flanagan* where "[t]here were many law enforcement officers who greatly resented [plaintiff] for what he did, and who would have refused to work for him"); *see also Dible*, 515 F.3d at 929 n.7 (declining to follow *Flanagan* and *Berger* "to the extent that they minimize the potential for an actual effect on the efficiency and efficacy of police department functions arising from public perceptions of the inappropriate activities of police officers" (citing *City of San Diego v. Roe*, 543 U.S. 77, 84 (2004) (per curiam))); *Melzer*, 336 F.3d at 199 (declining to follow *Flanagan* in school context because parents "are not outsiders seeking to heckle [teacher] into silence" but "are participants in public education" and so "[a]ny disruption created by parents can be fairly characterized as internal disruption to the operation of the school"); *Locurto*, 447 F.3d at 179 (holding that "[w]here a Government employee's job quintessentially involves public contact, the Government may take into account the public's perception of that employee's expressive acts in determining whether those acts are disruptive to the Government's operations").

　　　The Court's research has not unearthed any case applying the heckler's veto principle where, as here, the employee's speech harmed internal relationships. This comes as no surprise because it is well established that an employer may take adverse action when

speech "impairs . . . harmony among co-workers," "has a detrimental impact on close working relationships," or "impedes the performance of the speaker's duties." *Rankin*, 483 U.S. at 388. An employee's "colleagues with whom she must work collaboratively can hardly be said to be 'a hostile mob.'" *Bennett*, 977 F.3d at 544.

Moreover, the *Melton* court made clear that "it will usually be up to the jury" to decide whether the employer's prediction of disruption "was reasonable enough to be entitled to 'substantial weight.'" 2025 WL 2329190, at *3 (quoting *Waters*, 511 U.S. at 673). Here, a jury did just that. After five days of testimony, the jury found that "Dr. Gustilo's 2020 Facebook posts cause[d], or could . . . *reasonably* have caused, disharmony or disruption in the workplace." (Doc. 180 at 1 (emphasis added).)[9]

The Court therefore finds that the evidence of disruption is sufficient to put *Pickering* into play.

## C.    The *Pickering* balance tips in HHS's favor.

Lastly, the Court turns to "the flexible *Pickering* balancing test." *Gustilo*, 122 F.4th at 1020. Again, this inquiry requires the Court to balance Dr. Gustilo's interests, "as a citizen, in commenting upon matters of public concern" with HHS's interests, "as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568. To help guide its analysis, the Court will refer to six non-exclusive factors widely accepted in the case law:

---

[9] Fundamentally, Dr. Gustilo disagrees with current Supreme Court and Eighth Circuit precedent regarding the *Pickering* balancing test. (Doc. 199 at 44–46.) But as she acknowledges, this Court is bound by that precedent. (*Id.* at 45.)

(1) the need for harmony in the office or work place;

(2) whether the government's responsibilities require a close working relationship to exist between the plaintiff and co-workers when the speech in question has caused or could cause the relationship to deteriorate;

(3) the time, manner, and place of the speech;

(4) the context in which the dispute arose;

(5) the degree of public interest in the speech; and

(6) whether the speech impeded the employee's ability to perform his or her duties.

*Shands*, 993 F.2d at 1344 (quoting *Bowman*, 723 F.2d at 644); *see also Nagel*, 952 F.3d at 930. The ultimate balance is a question of law, but it depends on the jury's findings of fact, to which the Court "must defer . . . unless they are totally unsupported by the record." *Lewis*, 805 F.2d at 315.

Applying the six factors identified by the Eighth Circuit, the Court finds that the balance tips in favor of HHS. On HHS's side of the scale are the first, second, third, and sixth factors. The fifth factor is neutral. And on Dr. Gustilo's side, the fourth factor stands alone.

### 1.    Need for Harmony and Close Working Relationships

The first factor weighs heavily in HHS's favor. The jury found that there was a need for harmony and close working relationships in the OB-GYN Department at HHS. (Doc. 180 at 1.) And this finding was supported by the record.

"'[W]hen close working relationships are essential to fulfilling public responsibilities,' an employer's judgment may be given a 'wide degree of deference.'"

*Tindle*, 56 F.3d at 971 (quoting *Connick*, 461 U.S. at 151–152). The degree of deference is especially wide for "public safety organization[s]" like fire departments and police departments, which "'ha[ve] a more significant interest than the typical government employer in regulating the speech activities of [their] employees in order 'to promote efficiency, foster loyalty and obedience to superior officers, maintain morale, and instill public confidence' in [their] ability.'" *Anzaldua*, 793 F.3d at 834 (quoting *Shands*, 992 F.2d at 1344). "When lives may be at stake in a fire," for example, "an [*esprit*] *de corps* is essential to the success of the joint endeavor," so a court will give "considerable judicial deference" to a department's determination that "speech ha[s] caused or would cause dissension and disruption." *Shands*, 793 F.2d at 1344–45 (citations omitted).

HHS persuaded the jury that the OB-GYN department in a busy, crowded urban county hospital has the same need for close working relationships and public confidence. *See Glandon v. Keokuk Cnty. Health Ctr.*, 408 F. Supp. 2d 759, 769 (S.D. Iowa 2005) ("Where lives are at stake those providing medical care, particularly emergency care, have to be able to work together harmoniously for the sake of the patient."); *cf. Bennett*, 977 F.3d at 543–44 (finding that an emergency-dispatch agency needs a "level of teamwork" that is "analogous to a police department" and noting "[t]he diverse constituents of Metro Government need to believe that those meant to help them in their most dire moments are fair-minded, unbiased, and worthy of their trust"). Many witnesses testified that close working relationships among staff are "critically important." (Tr. 63:12–17; *see also* Tr. 215:25–216:10, 307:19–308:5, 342:12–343:11, 409:6–410:4, 511:19–512:4, 514:5–515:7.) Having a cohesive group has a big impact on morale, which is always fragile

because HHS can be an "extremely challenging" place to work. (Tr. 574:25–576:4; *see also, e.g.*, Tr. 214:24–215:9, 341:23–342:11, 407:3–13.) The OB-GYN department is underresourced, and it serves patients who are often in "difficult places in their lives," so staff deal with "a lot of grief, a lot of suffering." (Tr. 61:17–25, 307:10–308:5.)

Witnesses also testified about the importance of trust, as providers encounter emergencies like postpartum hemorrhages, cervical and other lacerations, and emergency cesarian sections "at least once per shift." (Tr. 574:4–24; *see also* Tr. 214:12–23, 343:12–344:2.) Indeed, Dr. Prosen had just finished a 24-hour shift with two overnight emergencies when she took the stand and testified. (Tr. 574:19–24, 605:21–606:2.) She explained that it could be "dangerous" for her to be distracted by distrust of her colleagues and could lead to poor patient outcomes, including death. (Tr. 575:21–576:20.) And her colleagues confirmed that when a staff member is "in a room with a patient that [needs] immediate emergency care," she needs "to hit the panic button and know that people are going to come and respond." (Tr. 216:5–10.) Patients are "entrusting [department staff] with their lives, so it's very important that [staff] can rely on [their] colleagues." (Tr. 343:23–344:2.)

## 2. Deteriorating Relationships

The second factor also weighs heavily in HHS's favor. The jury found that Dr. Gustilo's Facebook posts caused, or could reasonably have caused, disharmony and disruption in the workplace. (Doc. 180 at 1.) And this finding is well supported.

HHS showed actual disruption in the form of lost time. Numerous witnesses testified that they spent significant time and energy discussing the posts with colleagues,

patients, and outside providers and attending meetings with department colleagues, meetings with Dr. Hilden, and interviews with HSDI about the posts. (*E.g.*, Tr. 115:15–24, 256:5–15, 327:23–328:18, 360:22–361:10, 437:15–438:4, 602:1–23.) They also explained that the time they lost was time they could have spent on patient care. (*Id.*) *Cf. Bennett*, 977 F.3d at 540 (finding employer's interests outweighed employee's interest in Facebook posts where they "prompted a 'nonstop conversation' in the office that lasted for days").

HHS also showed actual disruption in the form of destroyed trust and morale. *See Grantham v. Trickey*, 21 F.3d 289, 295 (8th Cir. 1994) ("A public employee's exercise of free speech rights affects the efficiency of the operation of the public service when it affects the morale of the work force and damages the program's reputation."); *Morgan*, 920 F.3d at 525–26 (finding "evidence of actual disruption" where speech "'violated the trust' of the administration and [employee's] fellow officers," was "harmful to morale," and "adversely impacted the public's trust of the office"); *Porter*, 150 F.3d at 894 (finding disharmony and disruption where plaintiff "admitted that her relationship with [colleagues] was strained"). Word had already gotten around to providers outside the department, harming the trust the department had built with them. (Tr. 74:21–75:5, 240:8–14, 439:11–15.) And staff described morale as "really, really low." (Tr. 91:17–22.) They felt like the department was in "turmoil" and "falling apart." (Tr. 324:16–22, 357:9–20, 435:9–18.) The mood was "tense, nerve-racking, nauseating," "extremely uncomfortable," "ang[ry]," "extremely tense," "really stressful," and "distracted." (Tr. 324:16–22, 357:9–20, 435:9–18, 547:4–9, 592:10–17.) Everybody was "on pins and needles"; they "felt like they were walking on egg shells." (Tr. 357:9–20, 547:4–9.) And all but one of the doctors in the department felt

so strongly that they could not trust Dr. Gustilo that they signed their name to a letter stating as much.  (Tr. 107:13–108:2; Def. Ex. 31 at 2–3 (Doc. 54-3 at 295–96) (HHS 1501–02).)

Moreover, HHS established a reasonable basis for predicting future disruption through sworn witness testimony by several doctors that they planned to quit if Dr. Gustilo was not demoted and that patient care could have suffered.  (Tr. 98:2–4, 254:9–255:10, 308:6–16, 326:24–327:13, 343:19–344:2, 358:5–17, 358:24–360:21, 435:9–436:11, 437:4–8, 527:6–12, 528:20–529:1, 548:19–23, 592:10–24, 597:15–25, 738:1–4.)  This testimony alone was sufficient to justify the jury's disruption finding.  *See, e.g.*, *Henry*, 950 F.3d at 1012 ("An employer need not 'allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action.'" (quoting *Connick*, 461 U.S. at 152)).  And this finding is a heavy weight on HHS's side of the scale.  *Cf. Waters*, 511 U.S. at 680–81 (plurality opinion) (stating that "[d]iscouraging people from coming to work for a department certainly qualifies as disruption" and finding "[a]s a matter of law" that "the potential disruptiveness" of a nurse's speech, which "substantially dampened [a colleague's] interest in working in obstetrics," was "enough to outweigh whatever First Amendment value the speech might have had").

Dr. Gustilo urges the Court to disregard the jury's answer to the second special interrogatory[10] because "[t]he use of two disjunctives" in the question "lumps four inquiries

---

[10] This special interrogatory was taken directly from Eighth Circuit Model Civil Jury Instruction § 13.91 (2023).  The only substantive modification was adding the word

into one." (Doc. 199 at 35.) She does not ask for a new trial with different interrogatories, but she complains that "the jury was not given the opportunity to explain" whether it was finding actual disharmony, actual disruption, reasonably predicted disharmony, reasonably predicted disruption, or some combination of the four. (*Id.*) In her view, "there is a large chasm between disharmony—in the sense that people are upset because of another employee's viewpoint—versus disruption—in the sense that the Department's actual functions are not functioning." (*Id.* at 37.) Tellingly, she cites only an inapposite 1964 insurance case from the Fifth Circuit where a special interrogatory was found to be erroneously given because it melded two separate questions into one. *Prudential Ins. v. Morrow*, 339 F.2d 411, 412 (5th Cir. 1964) (per curiam). (Doc. 199 at 36–38.)

None of the seminal cases discussed in this Order distinguishes between evidence of disharmony and evidence of disruption, let alone weighs these categories differently. To the contrary, courts routinely use the terms "disharmony" and "disruption" interchangeably, or use "disruption" as an umbrella term for workplace disharmony, impediments to the plaintiff's performance, and impairments of working relationships. *See, e.g.*, *Bailey*, 451 F.3d at 521–22 (affirming the use of an interrogatory asking "whether Bailey's speech 'cause[d], or could . . . have caused, disharmony or disruption in the working relationship between those working for [defendant]'"); *Porter*, 150 F.3d at 893 (finding "[t]he district court permissibly submitted underlying factual disputes to the jury

---

"reasonably" to accommodate Dr. Gustilo's argument that an employer's prediction of disharmony or disruption must be reasonable. (*See* Doc. 158 at 34:14–35:1.)

through special interrogatory verdicts" where the jury found her speech "(1) caused or could have caused disharmony and disruption in the work place, (2) impaired [her] working relationship with other employees, and (3) impeded her ability to perform her duties"); *Noon*, 94 F.4th at 765 ("If there is evidence of disruption, an analysis under the so-called *Pickering* balancing test is necessary. . . . 'To trigger the *Pickering* balancing test, a public employer must, with specificity, demonstrate the speech at issue created workplace disharmony, impeded the plaintiff's performance or impaired working relationships.'" (quoting *Lindsey*, 491 F.3d at 900)). As discussed above, courts have found a lack of disruption when the record contained only speculation that there might be disharmony or impaired working relationships in the future. *E.g.*, *Lindsey*, 491 F.3d at 900–01; *Sexton*, 210 F.3d at 912; *Kincade*, 64 F.3d at 398–99. They have not found a lack of disruption where, as here, the evidence established that working relationships were damaged beyond repair.

Accordingly, the Court will not disregard the jury's finding on the second special interrogatory. *Cf. Lewis*, 805 F.2d at 315 (trial court erred by "disregard[ing] the jury's findings in balancing the factors under *Pickering*").

### 3.    Time, Place, and Manner

Turning to the third factor, the Court finds that it weighs in HHS's favor overall. As to time and place, HHS presented no evidence that Dr. Gustilo posted on Facebook while at the hospital. Rather, the evidence indicates that she likely "was off-duty and away from work" when she posted on Facebook—"a time and place at which [her] speech enjoys greater constitutional protection." *Labriola*, 142 F.4th at 1310–11; *see also Connick*, 461

U.S. at 152–53 & n.13. On the other hand, "manner weighs heavily against [her]." *Labriola*, 142 F.4th at 1311.

"[A] purely private statement on a matter of public concern will rarely, if ever, justify discharge of a public employee" because it carries little "danger that [the employee] ha[s] discredited the office," *Rankin*, 483 U.S. at 388–89 & n.13, and "the risk that [it] will disrupt the work place and lower morale is low," *Shands*, 993 F.2d at 1346. Public comments, in contrast, tend to favor the employer because they carry a greater risk of disruption and disrepute. *Cf. id.* (finding in favor of public employer where firefighters "had to expect" their request for a city councilman "to take public action" of "tabl[ing] the hiring of [a firefighter] would raise questions and could potentially disrupt the fire department"). Public comments on social media, which often "amplifies the distribution of the speaker's message" and thereby "increases the potential, in some cases exponentially, for departmental disruption," usually favor the employer. *Grutzmacher*, 851 F.3d at 345.

At the time that Dr. Gustilo made her posts—and for a long time thereafter—her Facebook page was public. (*E.g.*, Tr. 626:1–11.) In other words, "anyone could view [her] posts, and any member of the public or Department could have come across them." *Hicks*, 109 F.4th at 903. Of critical importance to this case, Dr. Gustilo identified herself on her Facebook page as the chair of HHS's OB-GYN department both in a fundraising post and in her biography. (Def. Ex. 3H (Doc. 54-2 at 30) (HHS 2201); Tr. 222:5–14, 352:11–20.) A local magazine wrote an article about her Facebook fundraising efforts which likewise identified her as department chair. (Def. Ex. 2 (Doc. 54-2 at 38–43).) And several

witnesses testified that both patients and providers from outside the department had seen the posts and were concerned about them. (Tr. 74:21–75:5, 240:8–14, 315:16–21, 439:11–15.) It is not surprising, then, that her colleagues were concerned the posts would destroy the trust they had built with patients and hurt their reputation with donors and other providers. Nor is it surprising that the jury found that "the time, place, and manner of Dr. Gustilo's 2020 Facebook posts [were] such that they could have been attributed to HHS or its OB-GYN Department." (Doc. 180 at 1.)

Considering these facts and the jury's finding, the Court finds that the manner of the posts created a serious risk of attribution and disrepute, which undermined HHS's "compelling and legitimate government interest" in maintaining public confidence. *Anderson v. Burke County*, 239 F.3d 1216, 1221–22 (11th Cir. 2001); *see also Bennett*, 977 F.3d at 541–42 ("This court and several others 'have recognized the interest of a governmental entity in preserving the appearance of impartiality.'" (citation omitted)); *Schneiter v. Carr*, --- F.4th ----, No. 22-2137, 2025 WL 2170320, at *8 (7th Cir. July 31, 2025) ("A public employer's reputational interests are a valid part of the balancing inquiry."); *Grutzmacher*, 851 F.3d at 347 ("The potential for Plaintiff's statements to diminish the Department's standing with the public further weighs in favor of the Department.").

Unfortunately, it appears that Dr. Gustilo's late concession to make her Facebook private after meeting with Dr. Hilden and Dr. Hoody did not make any material difference. (*See* Doc. 199 at 23–25.) HHS persuasively argues that once a social media post is out there, it is out there for good. (*See* Tr. 245:23–246:6 ("people make screenshots, people

share information"), 551:1–2 ("social media is forever").)  *Cf. Grutzmacher*, 851 F.3d
at 339 (employer received complaint that included screenshot of deleted post); *Bennett*,
977 F.3d at 534–35 (similar).  By the time Dr. Gustilo set her Facebook to private, her posts
had already spread extensively among HHS staff and outside providers.  Her choice to post
her opinions publicly, when she always had the option to do so privately, made clear to her
colleagues that she lacked the judgment necessary to lead the department.

### 4.    Context

The context in which the dispute arose favors Dr. Gustilo.  As the jury found, her
"2020 Facebook posts ar[o]se from . . . her academic interest in matters of public concern
outside of work," not "a personal dispute between her and her employer."  (Doc. 180 at 2.)

In contrast to the third factor, which refers to the time, place, and manner of the
*speech*, the fourth factor refers to the broader context of the *dispute*, if any, that motivated
the speech.  "[I]nsofar as self-interest is found to have motivated public-employee speech,
the employee's expression is entitled to less weight in the *Pickering* balance than speech
. . . intended to serve the public interest."  *Porter*, 150 F.3d at 894 (quoting *Barnard v.
Jackson County*, 43 F.3d 1218, 1226 (8th Cir. 1995)); *see also Connick*, 461 U.S. at 154
("[I]t would indeed be a Pyrrhic victory for the great principles of free expression if the
Amendment's safeguarding of a public employee's right, as a citizen, to participate in
discussions concerning public affairs were confused with the attempt to constitutionalize
the employee grievance that we see presented here.").  If the speech arose from "a personal
dispute with [the] government employer," it is entitled to less protection than if it arose
from the employee's "purely academic interest" outside of work.  *Shands*, 993 F.2d

at 1346; *see also Connick*, 461 U.S. at 153 ("When employee speech . . . arises from an employment dispute . . . additional weight must be given to the supervisor's view that the employee has threatened the authority of the employer to run the office."); *Bowman*, 723 F.2d at 645 (noting that the employee's speech "arose in the context of a public debate," not "an internal office grievance").

This is not a case where the employee's speech was about a dispute she had with her employer. *Cf. Connick*, 461 U.S. at 153 (finding employer's interests outweighed employee's interests in questionnaire challenging office policies related to the decision to transfer her because it "ar[ose] from an employment dispute," not employee's "purely academic interest"). Dr. Gustilo did not criticize HHS in any of her posts, let alone personally attack her colleagues. *Cf. Anzaldua*, 793 F.3d at 834 (noting that plaintiff's "email also attacked Chief Farwell personally"); *LeFande v. District of Columbia*, 841 F.3d 485, 496 (D.C. Cir. 2016) (finding police department's interest outweighed police officer's interest in emails that "read more as personal attacks on [commander] than as proposals for improving departmental policy"); *Graziosi v. City of Greenville*, 775 F.3d 731, 740 (5th Cir. 2015) (finding police department's interests outweighed police officer's interests in posts on local mayor's public Facebook page criticizing department leadership).

### 5.    Degree of Public Interest

The fifth factor favors neither party. The jury found that Dr. Gustilo's posts did not "contain unique perspectives on the issues on which she was commenting or contribute previously unknown facts to the public debate." (Doc. 180 at 2.) In accord with the jury's finding, the Court finds that there was no special public interest in Dr. Gustilo's speech,

- 73 -

and it was therefore not entitled to a heightened level of protection.  *See Bennett*, 977 F.3d at 539 (finding no "high[er] level of protection" for speech that "was couched in terms of political debate" but "had no special insight").

The fifth *Pickering* factor does not simply duplicate the first step of the protected speech analysis—whether the plaintiff spoke as a citizen on a matter of public concern. Rather, it deals with the *degree* of public interest in the speech.  It looks at whether the speech should receive heightened protection because it has some quality or perspective that gives it "special value" to the public.  *Lane v. Franks*, 573 U.S. 228, 240 (2014); *see also Sexton*, 210 F.3d at 913 (explaining that "the constitutional standard takes proportionality" between public value of speech and amount of disruption "into account").  For example, "speech by public employees on subject matter related to their employment" is entitled to heightened protection "because those employees gain knowledge of matters of public concern through their employment."  *Lane*, 573 U.S. at 240; *see also Waters*, 511 U.S. at 674 (plurality opinion) ("Government employees are often in the best position to know what ails the agencies for which they work; public debate may gain much from their informed opinions.").  Similarly, "an employee's first amendment interest is entitled to more weight where he is acting as a whistle-blower exposing government corruption." *Noon*, 94 F.4th at 765–66 (citation omitted); *see also Sexton*, 210 F.3d at 913 ("[S]peech alleging potentially illegal misconduct of public officials occupies the 'highest rung of First Amendment hierarchy.'" (citation omitted)).

While Dr. Gustilo's posts were certainly timely—they "touched on [matters] of intense public concern" in 2020—they did not contribute anything new or original to the

public debate. *Cf. Darlingh v. Maddaleni*, 142 F.4th 558, 566 (7th Cir. 2025). For example, they did not comment on obstetric or gynecological matters on which Dr. Gustilo had special knowledge. *Cf. id.* ("[B]ecause Darlingh is a trained educational professional who works with children daily in her role as a school guidance counselor, her perspective on gender-identity issues and their impact on children carries special weight."). Nor did they expose corruption within HHS. *Cf. Noon*, 94 F.4th at 766 (finding that *Pickering* balance favors police officers who alleged "financial mismanagement, workplace misconduct, and serious investigative failures"). Dr. Gustilo simply "add[ed] her views to the views of countless others." *Palmer v. County of Anoka*, 200 F. Supp. 3d 842, 848 (D. Minn. 2016). That is not the kind of speech that is entitled to special protection. *See id.* (finding Facebook posts by county attorney's spokesperson unentitled to heightened protection because she "d[id] not have any particular expertise on the issues on which she was commenting, nor was she acting as a whistleblower or contributing previously unknown facts or insights to the public debate").

To be clear, the Court finds that this factor is neutral, meaning the Court "hold[s] [HHS] to [its] full burden" and does not "discount" Dr. Gustilo's First Amendment interest or view it "as 'weigh[ing] less than it normally would.'" *Cf. MacRae*, 145 S. Ct. at 2620 (statement of Thomas, J., respecting the denial of certiorari) (citation omitted). The Court simply finds that Dr. Gustilo's speech is not entitled to proportionally higher protection under the case law.

### 6.    Impairment of Ability to Perform Duties

The sixth and final factor weighs decisively in HHS's favor.  As the jury found, Dr. Gustilo's posts "impair[ed] her ability to perform her duties as Chair of the OB-GYN Department."  (Doc. 180 at 2.)

As one example, Dr. Gustilo was responsible for an annual performance evaluation of department providers, yet she was unable to conduct performance reviews at the end of 2020 because of her colleagues' lack of confidence in her ability to be fair and impartial. (*Compare* (Def. Ex. 42 at 7–8 (Doc. 62-1 at 25–26) (HHS 2039–40), *with* Def. Ex. 25 at 2 (Doc. 54-3 at 162) (HHS 3934–35); Def. Ex. 27 (Doc. 54-3 at 167–168) (HHS 3910–11); Tr. 321:18–324:11, 622:2–14.)  For another, she was responsible for promoting provider satisfaction and ensuring the recruitment, retention, and development of staff, yet several doctors testified that they were simply unable to work for her and would have left HHS if she was not removed as chair.  (*Compare* Def. Ex. 42 at 7 (Doc. 62-1 at 25) (HHS 2039); Tr. 48:13–56:22, *with* Tr. 98:2–4, 326:24–327:13, 358:5–17, 435:9–436:11, 527:6–12, 548:19–23, 592:10–24, 597:15–25.)  More broadly, Dr. Gustilo was responsible for leading the department, and by the time the Board intervened, all but one of her colleagues had signed their name to a letter stating that they had no trust in her leadership.  (Def. Ex. 31 at 1–2 (Doc. 54-3 at 294–95) (HHS 1500–01).)

In short, Dr. Gustilo became a leader without any followers.  HHS therefore had a strong interest in removing her from her leadership position.  *See Rankin*, 483 U.S. at 388 ("Interference with work, personnel relationships, or the speaker's job performance can detract from the public employer's function; avoiding such interference can be a strong

state interest."); *cf. Pickering*, 391 U.S. at 572–73 (teacher's letter to local newspaper criticizing school board was protected speech where school district did not show teacher's statements "in any way either impeded [his] proper performance of his daily duties in the classroom or . . . interfered with the regular operation of the schools generally").

All told, the Court finds that the *Pickering* balance weighs heavily in favor of HHS. Considering HHS's need for harmony and close working relationships, the significant disruption and disharmony caused by the posts, and their interference with Dr. Gustilo's ability to perform her duties as chair, HHS had a strong interest in protecting its operations by removing her from leadership.

### D.  Additional factors favor HHS.

Two additional factors reinforce the Court's holding.  First, Dr. Gustilo's speech undermined HHS's mission.  *See, e.g.*, *Bennett*, 977 F.3d at 540 (listing whether the employee's speech "undermines the mission of the employer" among the four factors the Sixth Circuit considers); *Grutzmacher*, 851 F.3d at 345 (listing "whether a public employee's speech . . . undermined the mission of the institution" among the nine factors the Fourth Circuit considers); *Darlingh*, 142 F.4th at 567 (observing that school counselor's speech "conflicted with the school district's mission and policies").  By publicly espousing views incongruent with HHS's mission, Dr. Gustilo created "concerns regarding [her] fitness as a supervisor and role model."  *Grutzmacher*, 851 F.3d at 346; *see also Schneiter*, 2025 WL 2170320, at *8 (noting that department of corrections was "quite reasonably concerned that [plaintiff's] posts called into question [his] ability to treat staff fairly and impartially").  Numerous colleagues testified that the posts showed "poor

judgment."  (Tr. 71:13–14, 73:25–74:4, 253:13–14, 296:17–23, 236:12–23, 334:16–19, 425:6–12, 485:11–486:11.)  They also made clear that Dr. Gustilo "violated the trust [they had] in [her] to be in [her] administrative role."  *Grutzmacher*, 851 F.3d at 346.  Again, all but one of her colleagues were clear that they did not believe Dr. Gustilo could ever "regain [their] trust."  (Def. Ex. 31 (Doc. 54-3 at 295) (HHS 1501).)

Dr. Gustilo argues that "[u]sing the 'mission' and 'vision' of the organization to characterize employee speech as problematic is just a clever form of viewpoint discrimination."  (Doc. 199 at 31.)  But she forgets that a government "has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general."  *Pickering*, 391 U.S. at 568; *see also Connick*, 461 U.S. at 151 ("[T]he Government, as an employer, must have wide discretion and control over the management of its personnel and internal affairs.  This includes the prerogative to remove employees whose conduct hinders efficient operation and to do so with dispatch." (citation omitted)); *Waters*, 511 U.S. at 674–75 (plurality opinion) ("[T]he extra power the government has [when acting as an employer] comes from the nature of the government's mission.").  For example, a county attorney who works with police offers every day is not required to retain a liaison who posts on Facebook accusing the police of "sanctioning homicide."  *See Palmer*, 200 F. Supp. 3d at 844, 846–49 (emphasizing that it was "critical" to the county attorney's operations "that all law–enforcement officers working in and with [the county] have the utmost confidence in" him).  To hold otherwise would be to kneecap public employers who

provide critical services.  *See Connick*, 461 U.S. at 143 ("[G]overnment offices could not function if every employment decision became a constitutional matter.").

Second, Dr. Gustilo was in a public-facing leadership position.  "The burden of caution employees bear with respect to the words they speak will vary with the extent of authority and public accountability the employee's role entails."  *Rankin*, 483 U.S. at 390. If an employee "serves no confidential, policymaking, or public contact role, the danger to the agency's successful functioning from [her] private speech is minimal."  *Id.* at 390–91. But if she is a "highly placed supervisory" employee with "authority and discretion," or serves in a role that requires "public contact," her "expressive activities . . . will be more disruptive."  *E.g.*, *Grutzmacher*, 851 F.3d at 346 (quoting *McEvoy v. Spencer*, 124 F.3d 92, 103 (2d Cir. 1997) (citing authorities)).

Dr. Gustilo was a highly placed supervisory employee with significant authority and discretion.  (Tr. 48:13–56:22; Def. Ex. 42 at 7–9 (Doc. 62-1 at 25–27) (HHS 2039–41).) The duties of her role as chair of the department were a far cry from the "purely clerical" responsibilities of the employee in *Rankin* whom the Supreme Court held was improperly discharged.  461 U.S. at 392.  In fact, she was the public face of the department, as demonstrated by her fundraising post on Facebook and appearances in a magazine article, in a podcast, and on a billboard.  (Tr. 222:5–14, 352:11–20, 615:11–14, 617:6–16; Def. Ex. 3H (Doc. 54-2 at 30) (HHS 2201); Def. Ex. 2 (Doc. 54-2 at 38); Def. Ex. 36 at 3, 5–6 (Doc. 58 ¶ 11; Doc. 58-1 at 1–2).)  This increased both the actual and potential disruption from her Facebook posts.  *Cf. Palmer*, 200 F. Supp. 3d at 848–89 (emphasizing that employee was not "a clerk or custodian; she was employed as [the county attorney's]

spokesperson"); *Schneiter*, 2025 WL 2170320, at *8 (emphasizing that employee "was not just a rank-and-file correctional officer" but "held a high-level office as a deputy warden— a leadership role of significant trust and confidence"); *Bennett*, 977 F.3d at 542 (emphasizing that employee "was in a public-facing role and [spoke] in a public forum from a [Facebook] profile that implicated" her employer).

Perhaps most importantly, Dr. Gustilo's department served high-risk and vulnerable patients in a uniquely sensitive and personal area of medicine. (Tr. 57:22–59:5, 62:4–11, 216:11–14.) As such, her role "entail[ed] 'an inordinate amount of trust and authority'" when compared even to other highly placed government employees. *Darlingh*, 142 F.4th at 567 (citation omitted) (finding that school counselor's role serving vulnerable students requires "a degree of public trust not found in many other positions of public employment" (quoting *Melzer*¸ 336 F.3d at 198)); *see also Schneiter*, 2025 WL 2170320, at *8 (noting that deputy warden's posts "[t]argeting Muslims, black, and gay people . . . denigrated populations he was required to supervise, manage, and lead" and "risked exacerbating already high tensions among the inmates").

HHS's social media policy was therefore correct to warn that Dr. Gustilo, by virtue of her "unique role in the organization," had a "heightened responsibility" to "use exceptional judgment" when expressing her views online. (Def. Ex. 7 at 3 (Doc. 54-2 at 172).) She had a responsibility to cultivate trust and "safeguard the public's opinion of" the department. *Grutzmacher*, 851 F.3d at 346. But instead, she engaged in behavior that, in the words of one of her colleagues, was "not befitting of [her] role as the chair[wo]man of the department." (Tr. 486:9–11.) Because Dr. Gustilo revealed beliefs demonstrating a

lack of fitness to advance the mission of the organization in which she was a public-facing leader, HHS had a strong interest in demoting her.

In light of the jury's findings and the evidence of record, the Court finds that HHS's interests in protecting the efficiency of its operations outweigh Dr. Gustilo's First Amendment interests in her Facebook posts. In doing so, the Court does not take Dr. Gustilo's First Amendment interests lightly. First Amendment principles encourage robust debate and plurality of opinion. The Court wholeheartedly agrees that "[i]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). That said, the Court must also fulfill its duty to give government agencies, when acting as employers, "sufficient discretion to manage their operations." *Garcetti*, 547 U.S. at 422. Like a fire department or police department, this OB-GYN department in a busy, inner-city hospital serves vulnerable citizens often in high-risk situations. The community depends on it, so it cannot allow itself to fall apart from internal disharmony and low morale. HHS's interests in removing Dr. Gustilo from her leadership position were therefore exceptionally weighty, and its decision to remove her from her leadership role was justified. Her Facebook posts were therefore not constitutionally protected speech in this context and thus her First Amendment retaliation claim fails.

## IV.    REMAINING MOTIONS

Before concluding, the Court addresses two motions that remain pending.

First, the Court denies Dr. Gustilo's Renewed Motion for Judgment as a Matter of Law [Doc. 194]. For all the reasons stated above, the Court does not find that the evidence presented at trial was insufficient to sustain the jury's answers to the special interrogatories.

Second, the Court denies Dr. Gustilo's Motion for Sanctions [Doc. 108]. Dr. Gustilo seeks sanctions "in the form of attorney fees and costs incurred in her Eighth Circuit appeal" of the Court's prior order granting summary judgment to HHS. (Doc. 108; *see also* Doc. 109.) She argues that the Court would have denied summary judgment if it had access to a late-disclosed video[11] of the HHS board meeting in which the Board voted to demote her. (Doc. 109 at 1–2.) She asserts that the video contains "numerous references to [her] changed world views, internet activities (referred to as blog posts), and specifically-noted views on race and COVID-19." (*Id.* at 17.)

The Court disagrees. While the video does contain references to the fact that Dr. Gustilo had "some political opinions" about race and COVID-19 "that she was bringing into the workplace," it contains no reference to her Facebook posts outside of work. (Doc. 101-3 at 140–44, 237–42.) The focus of the conversation is her speech *within the workplace*, not online. (*Id.*) The sole mention of a digital communication is a Board member's comment that Dr. Gustilo "sent out an email" to him "as a board member" with an article "disputing the fact that blacks were . . . shot more by police than whites." (*Id.*

---

[11] The Court has described the video in detail in a prior order. (*See* Doc. 143 at 7–12.) A transcript of the video is also available. (*See* Doc. 101-3.)

at 544–54.)  Dr. Gustilo's Complaint does not cover this email; it alleges only that the speech "on her personal Facebook page" was constitutionally protected.  (Doc. 1 ¶ 90.)

The Court therefore finds that the video would not have changed its prior decision to grant summary judgment to HHS after finding "no evidence in the record that the HHS Board considered or even knew about Gustilo's Facebook posts when voting on whether to demote [her]."  (Doc. 65 at 32.)  As such, HHS's late disclosure did not cause Dr. Gustilo to incur unnecessary appellate fees and costs, and the sanction Dr. Gustilo seeks would be inappropriate.  *See* Fed. R. Civ. P. 26(g)(3) ("[T]he court . . . must impose an *appropriate* sanction . . . .  The sanction *may* include an order to pay the reasonable expenses, including attorney's fees, *caused by* the violation." (emphasis added)); *Johnson Int'l Co. v. Jackson Nat'l Life Ins.*, 19 F.3d 431, 439 (8th Cir. 1994) (describing courts' discretion to impose an appropriate sanction); *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 108 (2017) (holding that a sanction of attorney fees "must be compensatory rather than punitive in nature").

## V.    ORDER

Based on the submissions and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that:

1.  Judgment as a matter of law is **GRANTED** in favor of Defendant;

2.  Plaintiff's Renewed Motion for Judgment as a Matter of Law [Doc. 194] is **DENIED**; and

3.  Plaintiff's Motion for Sanctions [Doc. 108] is **DENIED**.

LET THE JUDGMENT BE ENTERED ACCORDINGLY.


Dated:  September 4, 2025                                  /s/ Susan Richard Nelson
                                                          SUSAN RICHARD NELSON
                                                          United States District Judge